## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

BRANDON RAUB,          )
)
        Plaintiff,     )
)
v.                      )     Civil Action No. 3:13CV328–HEH
)
DANIEL LEE BOWEN, *et al.*,  )
)
        Defendants.   )

### MEMORANDUM OPINION
### (Motion to Dismiss)

Brandon Raub ("Raub") was detained for a mental health evaluation after he was

arrested by Chesterfield County, Virginia, police officers, acting in concert with federal

authorities and mental health professionals.  Both a state-court magistrate and a special

justice found probable cause for his detention, but a state court judge ultimately reversed

the detention orders and ordered Raub's release.  This lawsuit ensued and several

Defendants now move to dismiss the claims against them.

Based on the events surrounding his detention, Raub asserts constitutional and

common law claims against two Chesterfield County police officers, two mental health

professionals,[1] and ten unidentified federal agents.  The police officers and mental health

professionals move to dismiss based on qualified immunity and for failure to state a

claim. (ECF Nos. 8, 15.)  Those motions have been thoroughly briefed and the Court

---

[1] A third mental health professional, Lloyd C. Chaser, was also initially named as a
defendant.  Raub has since dismissed Defendant Chaser from this lawsuit, without
prejudice, on the representation that he was not involved in the judicial proceedings that
are the subject of this lawsuit.

heard oral argument on July 26, 2013. For the reasons that follow, the motions will be granted in part and denied in part.

## I. BACKGROUND

As required by Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court assumes Raub's well-pleaded allegations to be true, and views all facts in the light most favorable to him. *T.G. Slater & Son v. Donald P. & Patricia A. Brennan, LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (citing *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). The Court's analysis at this stage is informed and constrained by the four corners of the Complaint.[2] Viewed according to these standards, the facts are construed as follows for purposes of resolving the Motions to Dismiss.

_____

[2] In addition to the allegations, Defendants ask the Court to consider a "Prescreening Report" and emails attached thereto, which were filed under seal. While the Prescreening Report was referenced and quoted several times in Raub's Complaint, and relied upon extensively during oral argument, the Court cannot consider it at this stage because Raub has disputed the authenticity of the document as filed. (Comp. at ¶¶ 32, 34-35.) Contrary to Defendants' attempt to portray the authenticity issue as a mere procedural technicality, Raub asserts that he has never been provided with the attached emails, so he cannot agree that these documents are authentic. While the Prescreening Report may ultimately be dispositive of the case, the Court will not consider it on a motion to dismiss where its authenticity is fairly challenged. *Dittmer Props., L.P. v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013) (citation and internal quotation marks omitted) (Court may consider documents "whose authenticity is *unquestioned*") (emphasis added); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citation omitted) ("[A court] may consider documents . . . attached to the motion to dismiss, so long as they are integral to the complaint and authentic"); *Gasner v. County of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995) ("[T]he document must be one of *unquestioned* authenticity.") (emphasis added).

Even if the Court were to consider the Prescreening Report and incorporated emails, the document would not be dispositive at this stage of the proceedings. There is no indication that any Defendant was aware of the specific contents of those emails before Raub's arrest. *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) ("Probable cause is determined from the totality of the circumstances known to the officer at the time

Raub served his country as a United States Marine, seeing active duty in both Iraq and Afghanistan. (Compl. at ¶ 7.) At some point after returning home, Raub started to express political views highly critical of the government. (*Id.* at ¶¶ 15, 19.) Allegedly concerned about Raub's political beliefs, on August 16, 2012, federal agents and Chesterfield County police officers Daniel Bowen ("Bowen") and Russell Granderson ("Granderson") went to question Raub at his home. (Compl. at ¶ 15.) Bowen and Granderson were in uniform with their badges on display. (*Id.* at ¶ 15.) Raub was introduced to several unidentified agents of the Secret Service and Federal Bureau of Investigation, who had allegedly instructed Bowen and Granderson to confront Raub about his political views. (*Id.* at ¶¶16-19.) Raub agreed to speak with the officers on the curtilage of his home, freely discussing his beliefs with all officers and agents present. (*Id.* at ¶ 19.)

After conversing with Raub for a few minutes, one of the federal agents telephoned Michael Campbell ("Campbell" or collectively with Bowen and Granderson, the "County Defendants"), a licensed psychotherapist employed by Chesterfield County, to discuss the situation. (*Id.* at ¶¶ 11, 22-23.) Although Campbell had never met, observed, or evaluated Raub, he allegedly concluded that Raub should be taken into

---

of the arrest."). The only allegation of *prior* knowledge concerns Raub's "political views, including views he had expressed on various Facebook posts that were critical of the government." (Compl. at ¶ 15.) Construing the facts in the light most favorable to Raub, as the Court must do at this stage, neither the Prescreening Report nor the emails establish that these particular Defendants had probable cause to believe that Raub might engage in acts of violence at the time of his arrest. (*Id.*) In fact, during oral argument, counsel for Defendants repeatedly discussed a series of "necessary inferences" that the Court must draw from the Prescreening Report, suggesting that the evidentiary import of the document may be in dispute.

custody as potentially dangerous. (*Id.* at ¶¶ 22-23.) Beyond that, the Complaint does not

elucidate the contents of the phone conversation between Campbell and the John Doe

Defendant. On Campbell's recommendation, Bowen and Granderson handcuffed Raub

and arrested him without a warrant, relying on Virginia laws involving mental health

evaluations. (*Id.* at ¶¶ 21-22.)[3]

Later that day, Campbell evaluated Raub. (*Id.* at ¶ 29.) Around midnight that

night, Campbell filed a sworn "Petition for Involuntary Admission for Treatment" (the

"First Petition") pursuant to Va. Code §§ 37.2-800 through 37.2-847. (*Id.* at ¶ 30.) In the

First Petition, he alleged that Raub had a mental illness and that there was a substantial

likelihood that he would cause serious physical harm to others in the near future. (*Id.* at ¶

31.) Campbell attached a "Prescreening Report" in support of his request, in which he

opined that Raub was "psychotic" based on a "clinical finding" that he "had long pauses

before answering questions" and was "very labile w[ith] the Secret Service." (*Id.* at ¶

32.)

Soon thereafter, a magistrate reviewed the First Petition and issued a Temporary

Detention Order ("TDO"). The Magistrate found probable cause pursuant to Va. Code §

37.2-809 that Raub

---

[3] The Court must emphasize the limited information that it has at this stage with respect to the sequence of events. The Complaint says nothing about the extent of Campbell's knowledge about Raub at the time of arrest and the extent to which the officers relied on Campbell's professional opinion when deciding to arrest. Ultimately, evidence may show that the officers acted in reasonable reliance on Campbell's professional opinion. Evidence may also show that the County Defendants received additional information from the John Doe agents. But the Court is limited in its analysis to the particular facts as alleged in the Complaint, and so this issue must be resolved at a later date.

(i) has a mental illness, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future, (a) cause serious physical harm to him/herself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information or (b) suffer serious harm due to his/her lack of capacity to protect him/herself from harm or to provide for his/her basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

(*Id.* Ex. B.) On these findings, the magistrate ordered that Raub be taken into custody and transported to John Randolph Hospital for emergency evaluation or treatment. (*Id.*) He was held pursuant to this TDO until August 20, 2012. (*Id.* at ¶ 37.)[4]

Allegedly at the behest of the federal agents involved, on August 20, 2012, LaTarsha Mason ("Mason") filed a "Petition for Involuntary Admission for Treatment" (the "Second Petition") in her capacity as a social worker working in conjunction with Chesterfield County.[5] (*Id.* at ¶¶ 12-13, 37-40, Ex. C.) A Special Justice held a hearing

---

[4]Raub alleges that Campbell sought the First Petition at the behest of unidentified federal agents motivated to silence Raub's political speech. (*Id.* at ¶ 34.) Thus, he asserts that the mental health allegations were a "pretext." (*Id.*) Raub specifically points to a Department of Homeland Security program called "Operation Vigilant Eagle," which purportedly conducts surveillance of military veterans. (*Id.* at ¶ 49.) According to his Complaint, this program monitors "Rightwing Extremism," including "anti-government" groups critical of government authority. (*Id.* at ¶ 50.) There are, however, no allegations specifically tying "Operation Vigilant Eagle" to Raub's involuntary detention, so the allegations of this program have no bearing on the analysis.

[5] It is somewhat unclear from the allegations whether Mason is employed by Chesterfield County or a private entity. Mason submits her own affidavit disputing several facts, including the identity of her employer and at whose direction she filed the Second Petition. In its discretion, the Court excludes this document from consideration, rather than convert the motion into a motion for summary judgment, as it is permitted to do under Fed. R. Civ. P. 12(d). *Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007) (discussing district courts' discretion in deciding whether to convert motion or disregard extraneous material). For similar reasons, the Court does not consider the "Independent Evaluation" filed under seal in support of Mason's Motion. In the alternative, Mason seeks summary judgment to allow the Court to consider the

on the Second Petition and found "by clear and convincing evidence that [Raub] meets the criteria for involuntary admission and treatment specified in Virginia Code § 37.2-817(C)." (*Id.* at ¶ 41, Ex. D.) Specifically, he found that Raub had a mental illness, that there was a substantial likelihood that he would cause serious physical harm to others in the near future, and that less restrictive means of treatment were inappropriate. (*Id.* Ex. D.) At the conclusion of the hearing, the Special Justice entered an order requiring Raub to be civilly committed for treatment for thirty days. (*Id.*)

On August 22, 2012, Raub's attorneys appealed the August 20 order and moved to suspend his detention pending appeal. (*Id.* at ¶ 43.) A judge of the Circuit Court for the City of Hopewell, Virginia, held a hearing the next day and found that the Second Petition was "so devoid of any factual allegations that it could not be reasonably expected to give rise to a case or controversy." (*Id.* at ¶ 45, Ex. E.) Raub was then released.

As a result of these events, Raub initiated the immediate action against Bowen, Granderson, Campbell, Mason, and ten "John Doe" agents of the Federal Bureau of Investigation and/or Secret Service.[6] Invoking 42 U.S.C. § 1983, he alleges violations of

---

extraneous evidence, but conversion is unnecessary to afford Mason dispositive relief at this juncture. For purposes of resolving the motion under Fed. R. Civ. P. 12(b)(6), the Court credits Raub's allegations concerning Mason's role in these events. Regardless of whether she is a county employee, there are insufficient allegations to suggest that she violated Raub's constitutional rights or that her actions amounted to "state action" for purposes of Section 1983 liability. *See S.P. v. City of Takoma Park*, 134 F.3d 260, 269 (4th Cir. 1998) (recognizing that private person's actions may constitute state action where jointly conducted with state actors or where state exercises coercive power over private actor). Thus, the claims against Mason will be dismissed without prejudice. *See infra* at Section III(C).

[6] Unfortunately, the allegations in the Complaint raise more questions than they answer, particularly with respect to the John Doe defendants. At oral argument,

his Fourth Amendment (Count I) and First Amendment (Count III) rights against Defendants Bowen, Granderson, Campbell, and Mason. He also asserts a state law claim for false imprisonment (Count IV) against Bowen and Granderson specifically, but also against other "Defendants" indiscriminately. Each of these Defendants moves to dismiss principally on qualified immunity grounds, but also arguing that Raub fails to state a claim generally. In large part, both arguments rely heavily on extraneous evidence that goes beyond the pleadings, which the Court will not consider. *See supra* at n.2. Instead, the Court analyzes the arguments within the generally-applicable confines of the Rule 12(b)(6) standard.

## II. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v.*

Plaintiff's counsel stressed that he is not yet sure that the email recipient was present at Raub's arrest. But to be fair to the County Defendants, especially Bowen and Granderson, the Court urges Raub and his counsel to bring all known parties into the case with haste. Based on the context of the allegations, Bowen and Granderson appear to have relied heavily on the information provided by the John Does, as did Campbell, who was telephoned by one of these unidentified agents. Ultimately, the County Defendants' reasonable reliance on the John Does' representations may bear on the qualified immunity analysis. To that end, Raub has requested expedited discovery to learn the John Does' identities, and this Court will grant that request. *See infra* at Section III(A).

*Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *T.G. Slater*, 385 F.3d at 841 (citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7]

### III. DISCUSSION

Before addressing the merits of Defendants' Motions, the Court must carefully frame the impact of the applicable standard of review. At oral argument, counsel for the County Defendants repeatedly directed the Court to the Prescreening Report, parsing the sequence of events and asking the Court to draw a number of "necessary inferences" in favor of Defendants. Specifically, they ask the Court to infer that the County Defendants had knowledge of the violent nature of Raub's Facebook posts, or at least that one of the John Doe Defendants possessed such information at the time of Raub's arrest. To draw such an inference in favor of the movant would run afoul of the Rule 12(b)(6) standard.

---

[7] Raub relies on a number of conclusory allegations that Defendants lacked probable cause. (Compl. at ¶¶ 28, 33, 39.) Consistent with the Supreme Court's decision in *Iqbal*, 556 U.S. at 678, the Court disregards these statements as mere legal conclusions. Instead, the analysis focuses solely on Raub's allegations of the facts surrounding his arrest and detention to determine whether he sufficiently alleges a lack of probable cause.

Indeed, there is no authority allowing this Court to draw inferences in favor of a defendant when addressing a motion made under Rule 12(b)(6), and the Supreme Court has specifically rejected attempts to alter the standard of review when the defense of qualified immunity may apply. *Crawford-El v. Britton*, 523 U.S. 574, 594-95 (1998) (rejecting heightened pleading and proof standards where qualified immunity is defense). At the same time, the Court remains cognizant of the Supreme Court's admonition that qualified immunity should be addressed at the earliest possible stage. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations and internal quotation marks omitted). Such competing interests—expediency and liberal pleading standards—weigh heavily in favor of expediting this case towards early summary judgment—particularly with respect to qualified immunity. But the Court must first address the task at hand, the Motions to Dismiss.

Bearing in mind the limitations imposed upon the Court at this stage, the County Defendants have raised the qualified immunity defense in a Rule 12(b)(6) motion, as they are permitted to do.[8] Stated succinctly, the County Defendants argue that they had probable cause to detain Raub for a mental health evaluation; or, at the very least, they argue that it was not clearly established that a reasonable officer would know probable

---

[8] "[A] defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage." *Tobey v. Jones*, 706 F.3d 379, 393-94 (4th Cir. 2013) (citing *Behrens v. Pelletier*, 516 U.S. 299 (1996)). So long as qualified immunity does not turn on *disputed facts*, "whether the officer's actions were reasonable is a question of pure law." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*en banc*). As is the case here, however, qualified immunity is peculiarly well-suited for resolution at the summary judgment stage. *See Willingham v. Crooke*, 412 F.3d 553, 558-59 (4th Cir. 2005).

cause was lacking under those circumstances. Mason, on the other hand, admits that she cannot invoke qualified immunity because she takes the factual position that she is not a government actor. In this way, Mason argues that she cannot be liable for constitutional claims brought under Section 1983. Collectively, all Defendants move to dismiss the state law false imprisonment claim, and Raub offers no specific counterargument in defense of that claim. However, it appears to rise or fall on the same analysis applicable to the Section 1983 claim, and so it will be evaluated accordingly.

## A.    Qualified Immunity

"Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Takoma Park*, 134 F.3d at 266 (citation and internal quotation marks omitted). The Fourth Circuit has lamented that there exists a "lack of clarity in the law governing seizures for psychological evaluations"—or at least that such clarity was lacking when *Takoma Park* was decided in 1998. *Id.* at 266 (citation and internal quotation marks omitted). Nevertheless, there are some clearly established standards to guide a reasonable police officer who detains a person for mental evaluation. At a minimum, police traverse a "bright-line" when executing a mental health seizure without "'probable cause to believe that the individual pose[s] a danger to [him]self or others.'" *Bailey v. Kennedy*, 349 F.3d 731, 741 (4th Cir. 2003) (quoting *Takoma Park*, 134 F.3d at 266).

On the limited facts presented in his Complaint, Raub has minimally, but sufficiently, alleged that the County Defendants crossed a bright-line when they arrested him. With such a sparse record, the Court cannot ascertain whether the County

10

Defendants had probable cause or, at the very least, whether the vagaries of existing precedent left the officers without "clearly established" precedent to guide them in the particular circumstances that they faced. Because the Court is bound to construe the allegations in Raub's favor, it must deny qualified immunity, at least at this stage.

"[T]he basic purpose of qualified immunity [] is to spare individual officials the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1992) (*en banc*) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). When a defendant claims qualified immunity, the Court engages in a two-step analysis. First, the Court "'must decide whether a constitutional right would have been violated on the facts alleged.'" *Cloaninger v. McDevitt*, 555 F.3d 324, 330 (4th Cir. 2011) (quoting *Bailey*, 349 F.3d at 739). If a constitutional violation is sufficiently alleged, the Court must then "consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Id.* at 330-31 (citation and internal quotation marks omitted).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citations and internal quotation marks omitted). Thus, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Id.* (emphasis added) (citations and internal

quotation marks omitted). This guidance from *Saucier* is particularly applicable here, where the minimal record now before the Court fails to adequately explain the situation that the County Defendants confronted leading up to Raub's arrest. Without further information, the Court cannot determine "whether it would be clear to [the County Defendants] that [their] conduct was unlawful in the situation [they] confronted." *Id.* (citations and internal quotation marks omitted).

Relying heavily on the Fourth Circuit decisions in *Gooden* and *Takoma Park*, the County Defendants argue that the arrest and detention of Raub was "objectively reasonable" under the circumstances, thereby shielding them with qualified immunity. Because the issue of qualified immunity turns heavily on existing binding precedent, the Court will discuss these and other authorities at some length. *See Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000) ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [Fourth Circuit] decision on point . . .").

In *Gooden*, police were called to an apartment complex on reports of loud screaming and yelling. 954 F.2d at 962. The officers checked with the occupant of the subject apartment, Theresa Gooden, who denied that she was the source of any commotion. The officers left, but about one week later they were again called to the same location on reports of a "long, loud blood-chilling scream" coming from Gooden's apartment. *Id.* As they approached her door, the officers themselves heard a scream from within her apartment. When they confronted Gooden about the noises coming from her apartment, she initially denied any knowledge, but then admitted that she had "yelped" after she accidentally burned herself on an iron. *Id.* Denying any danger

existed, Gooden insisted that the officers leave her alone. They departed to interview the complaining neighbor, who lived immediately below. *Id.* at 963. While there, the officers heard a loud "thud" and additional screaming from Gooden's apartment, including multiple different voices that they believed might be the product of multiple personalities exhibited by Gooden herself. *Id.* This time, upon confronting Gooden again, she appeared to have been crying and acting "strangely." *Id.*

Based on Gooden's bizarre behavior, the officers concluded that she might be a danger to herself and detained her for a mental examination. *Id.* Upon examination, a doctor found no sign of mental illness and released her. *Id.* at 964. Gooden filed suit and the officers invoked qualified immunity as a defense. The district court denied qualified immunity, as did a divided panel of the Fourth Circuit. *Id.* Rehearing the matter *en banc*, the Fourth Circuit reversed, holding that "[i]n cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place." *Id.* at 965. Thus, it did not matter whether the officers were correct in their perceptions—what mattered was whether their perceptions were reasonable. *Id.* The Court emphasized that the officers did not just act upon the citizen complaint, but had personally encountered Gooden on two occasions, multiple times hearing screams for themselves. *Id.* at 966. "Under these circumstances," the Fourth Circuit concluded that "the officers can hardly be faulted for taking action against what they reasonably perceived to be a genuine danger to the residents . . . or to Ms. Gooden herself." *Id.*

13

Five years later, in *Takoma Park*, the Fourth Circuit relied on *Gooden* to conclude

that officers' conduct was shielded by qualified immunity on slightly different facts. In

that case, a husband and wife had an argument that led to the husband leaving the house

and calling the police. 134 F.3d at 264. After extensive discussions with the husband,

the dispatcher sent officers to the home to check on a possibly suicidal person. Upon

their arrival, the officers found the wife "visibly agitated and crying" about a "painful

argument" she had with her husband. *Id.* She also told the officers that "if it was not for

her kids she would end her life." *Id.* On their supervisor's instructions, the officers

detained the wife against her protestations, taking her to a hospital for a mental health

evaluation. Initially, mental health professionals concluded that the wife was clinically

depressed and suicidal, but within a day, a psychiatrist conducted a complete psychiatric

examination and concluded otherwise. *Id.* at 264-65. She was released and subsequently

sued the police.

Relying on its analysis in *Gooden*, the Fourth Circuit found the officers' conduct

in *Takoma Park* to be "objectively reasonable" and, therefore, within the protection of

qualified immunity. The Court specifically emphasized that "[t]he police officers did not

decide to detain [the wife] in haste. Rather, they had ample opportunity to observe and

interview [the wife] before making a deliberate decision" to detain her. *Id.* at 267.

"Reasonable officers, relying upon our decision in *Gooden* and the other circuit court

decisions addressing similar situations, would have concluded that involuntarily detaining

[the wife] was not only reasonable, but prudent." *Id.* at 267-68 (citing *Gooden*, 954 F.2d

at 969). As in *Gooden*, the Court found that qualified immunity shielded the officers from liability.[9]

In the years since *Takoma Park* and *Gooden*, the Fourth Circuit has authored additional decisions expanding upon the standards governing mental health detentions. In *Bailey*, the Fourth Circuit rejected a qualified immunity claim where the officers acted on nothing but a neighbor's telephone call, in which she indicated that Bailey was drunk and suicidal. 349 F.3d at 734, 742. A police officer was dispatched to Bailey's home, where he found Bailey intoxicated but otherwise cooperative and nonviolent. *Id.* at 740. Once a second officer arrived, however, the two officers discussed the situation and decided to detain Bailey for a mental health evaluation. The Fourth Circuit rejected the officers' argument that the neighbor's 911 call supplied probable cause, explaining:

> Of course, citizen complaints are entitled to some credence, and officers need not wait "until they [see] blood, bruises and splintered furniture." *Gooden*, 954 F.2d at 967 (citation and quotation marks omitted). Nonetheless, accepting the facts as the district court viewed them, the 911 report, viewed together with the events after the police officers arrived, was insufficient to establish probable cause to detain [Bailey] for an emergency mental evaluation.

*Id.* at 740-41. In reaching this conclusion, the Court emphasized that the officers observed no sign of any danger to Bailey or anyone else during the encounter. *Id.*

---

[9] The County Defendants emphasize that the individual officers in *Takoma Park* were granted qualified immunity at the 12(b)(6) stage. While this is true, the Fourth Circuit carefully emphasized that all necessary facts were pulled from the plaintiff's pleadings. *Takoma Park*, 134 F.3d at 264, 267. Unlike *Takoma Park*, the County Defendants rely on extraneous evidence from which they ask for a favorable inference. Here, the Court lacks the details that were alleged in the pleadings filed in *Takoma Park*.

Several years later the Fourth Circuit upheld the grant of qualified immunity in *Cloaninger*, 555 F.3d 324. In that case, police also responded to reports of a possibly suicidal individual—Cloaninger. One of the police officers arriving on the scene informed the others that he had previous experience with Cloaninger, including previous threats of suicide and the possible presence of firearms in his home. Cloaninger rebuffed the officers' attempts to help him, so they contacted a supervisor. Upon his arrival, the supervisor asked Cloaninger if he was alright, but his inquiries were met with nonresponsive behavior. An officer on the scene then contacted a nurse familiar with Cloaninger's history of suicidal threats. *Id.* at 328-29. She agreed with the officer's suggestion that they seek an emergency commitment order. *Id.* "[A]fter collecting all this information and professional advice," this "additional information . . . established probable cause." *Id.* at 333.

Considering *Gooden*, *Takoma Park*, *Bailey*, and *Cloaninger* together, a single common feature emerges to distinguish *Bailey*—where qualified immunity was lacking— from those cases where qualified immunity applied. Generally, where police officers' observations or independent knowledge confirm the potentially dangerous nature of the situation, qualified immunity applies. More specifically, it is the officers' own observations during an encounter with an arrestee that rendered their conduct objectively reasonable in *Gooden*, *Takoma Park*, and *Cloaninger*. In *Bailey*, the lack of such observations rendered the officers' actions not objectively reasonable. Also in *Bailey*, the officers had nothing but a 911 telephone call from a neighbor, and their observations failed to confirm any suicidal intent.

By contrast, the officers in both *Gooden* and *Takoma Park* observed for themselves signs of possible danger. In *Cloaninger*, a somewhat different situation, the officers' observations neither confirmed nor discounted violent designs, but the officers had a history of dealing with Cloaninger's suicide threats and they confirmed that history with medical personnel familiar with him. The Fourth Circuit summarized the distinction, explaining:

> [W]e believe officers have probable cause to seize a person for a psychological evaluation when "the facts and circumstances *within their knowledge* and of which they had *reasonably trustworthy information* were sufficient to warrant a prudent man" to believe that the person poses a danger to himself or others. *Cf. Beck v. Ohio*, 379 U.S. 89, 91 (1964). This dual concern was evident in *Gooden*, where we stated that "the reasonableness of [the officers'] response must be gauged against the reasonableness of their perceptions"—in that case, a "genuine danger" not only to the residents of the apartment complex but to the plaintiff herself. 954 F.2d at 965-66.

*Cloaninger*, 555 F.3d at 334 (emphasis added).

Applying these cases here, the Court is simply without enough information to determine what the County Defendants knew at the time of Raub's arrest. Under the Rule 12(b)(6) standard, which is decidedly deferential to plaintiffs like Raub, the Court must construe the allegations in his favor, giving him the benefit of all reasonable inferences. *T.G. Slater*, 385 F.3d at 841 (citation omitted). Assuming the truth of Raub's allegations for the sake of analysis, the County Defendants had never met Raub before their encounter with him, Campbell had never evaluated him, and they knew nothing about him except for his "political views . . . critical of the government." (Compl. at ¶

15.) Unlike the situation in *Cloaninger*, it is not yet established that anyone on the scene possessed any knowledge of Raub's alleged history of violent threats. 555 F.3d at 334.

Taken at face value, Raub's allegations paint a picture more akin to the situation presented in *Bailey*, where the officers acted solely on information received from a third party. Here, Raub alleges that the officers acted on almost *no information*, and especially none concerning violence. The County Defendants dispute this allegation. There may eventually be evidence that the County Defendants personally observed signs of danger or otherwise learned more information about Raub's allegedly foreboding comments, thereby placing this case within the rubric of *Gooden*, *Takoma Park*, and *Cloaninger*. But until such facts properly emerge in the record, the case appears to fit more squarely within the analysis of *Bailey*.

Moreover, in each of the Fourth Circuit cases addressing qualified immunity in the context of a mental health detention, the police were "hurriedly called to the scene of a disturbance" or perceived emergency situation. *Gooden*, 954 F.2d at 965. Arguably, such an immediate emergency was present in *Bailey*, where police officers believed a suicide might be imminent, though that belief was later determined to be mistaken and unreasonable. 349 F.3d at 740-41. In Raub's Complaint, there is no allegation of any emergency situation at Raub's home when he was arrested. If the facts later suggest otherwise, the scale could further tip in favor of granting qualified immunity.[10]

---

[10] The facts alleged by Raub raise another concern that the Fourth Circuit addressed in *Cloaninger*. There, the Court considered the rule that "the unique qualities of the home prohibit seizures there without a warrant or exigent circumstances." 555 F.3d at 334. While that rule is generally applicable in the criminal arrest context, the

The touchstone of the qualified immunity analysis is whether the police violated a right that was "'sufficiently clear' so that a reasonable officer would have understood, under the circumstances at hand, that his behavior violated the right." *Bailey*, 349 F.3d at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal citations omitted)). In other words, did the police transgress a "bright-line," or were they simply acting within a "gray area." *Id.* (quoting *Takoma Park*, 134 F.3d at 266). Factually, it may be the case that the County Defendants possessed sufficient information to reasonably believe that Raub posed an immediate danger. Or, officers Bowen and Granderson may have reasonably relied on Campbell's professional judgment to reach that conclusion. The record is not developed on these points. But where the Complaint alleges an arrest without any knowledge of a risk of harm, Raub has sufficiently—albeit minimally— alleged that the County Defendants transgressed such a "bright-line." The evidence may yield a different result at the summary judgment stage, but for the time being, the Court must deny the County Defendants' Motion to Dismiss on qualified immunity grounds.

Although the Court presently denies the motion, it is sensitive to the unique posture resulting when a defendant raises the qualified immunity defense. Given the knowledge gaps affecting the qualified immunity analysis, the most appropriate course is

Fourth Circuit tacitly recognized its application to mental health detentions. "'[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" *Id.* (quoting *Payton v. New York*, 445 U.S. 573, 590 (1980)). At this time, the record does not yet provide the circumstances of any exigency. Aside from passing reference in *Cloaninger*, the Court has not found any well-developed authority addressing this rule in the context of a mental health seizure. For this reason, the "home arrest without a warrant" issue may be especially appropriate for a qualified immunity defense at the summary judgment stage.

to permit limited, focused discovery addressing what the County Defendants knew at the time of Raub's arrest. Such a procedure would balance the competing goals of expediency, *see Pearson*, 555 U.S. at 232 (citations and internal quotation marks omitted), and protecting government actors from broad discovery and trial, *see Gooden*, 954 F.2d at 965. Rapidly moving the qualified immunity issue towards summary judgment is also consistent with the recognized suitability of summary judgment as a vehicle to resolve qualified immunity. *See Willingham*, 412 F.3d at 558-59. Raub will not be permitted to go beyond the limited scope of discovery that this Court establishes, at least not until after the qualified immunity issue is addressed on summary judgment.[11] In this way, the Court reaches a balance between the immunities afforded to the County Defendants and the liberal pleading standard favoring Raub.

## B.     First Amendment Claim

The Court reaches essentially the same result with respect to Raub's First Amendment Claim. Based on their argument that the officers had probable cause to arrest Raub, the County Defendants also seek dismissal of the First Amendment claim against them. This argument flows from the Supreme Court's recent statement that there is no recognized First Amendment right to be free from a seizure "that is otherwise supported by probable cause." *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012). Having found the record insufficient at this stage to conclude that probable cause supported Raub's arrest—at least on these allegations—this statement from *Reichle* has

_____

[11] Discovery and argument on this limited motion for summary judgment would place no limitation on a subsequent merits-based motion for summary judgment.

limited application.  Nevertheless, it is necessary for the Court to briefly and separately explain why Raub's First Amendment claim must also proceed.

In *Tobey v. Napolitano*, this Court denied a motion to dismiss a First Amendment claim on qualified immunity grounds.  808 F. Supp. 2d 830 (E.D. Va. 2011).  In that case, Tobey was arrested at an airport after his bizarre act of removing his shirt to display the Fourth Amendment written on his chest in protest of airport security procedures.  *Id.* at 834.  Among other claims, Tobey asserted that he was arrested in retaliation for his display of the Fourth Amendment.  Essentially, the dispute centered on what motivated the arrest—political speech or probable cause to believe that the bizarre behavior was calculated to disrupt the processing of passengers.  *Id.* at 851.  At the motion to dismiss stage, this Court concluded that the qualified immunity analysis "is based upon factual conclusions not reasonably inferred from the face of Plaintiff's Complaint, and which the Court cannot entertain at this procedural stage."  *Id.*  Thus, "'the qualified immunity question [could not] be resolved without discovery.'"  *Id.* (quoting *DiMeglio v. Haines*, 45 F.3d 790, 795 (4th Cir. 1995)).  The Fourth Circuit affirmed.  *Tobey v. Jones*, 706 F.3d 379, 392 (4th Cir. 2013).

The situation here is similar to that in *Tobey*, because the factual record is similarly sparse.  Thus, for purposes of alleging a First Amendment retaliation claim, Raub's Complaint meets the minimum pleading requirements.  The three elements of such a claim are: (1) expression of protected speech; (2) retaliatory action that adversely affects constitutionally protected speech; and, (3) a causal relationship between the speech and retaliatory action.  *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th

Cir. 2000) (citations omitted). Here, there is no dispute over whether political speech is protected or whether an arrest for political speech would adversely affect one's ability to further engage in political expression. And the third element—causation—may be inferred from Raub's allegation that the only knowledge that the County Defendants had at the time of arrest concerned his political views. Accordingly, Raub's First Amendment claim survives Defendants' Motions to Dismiss.

## C.    Section 1983 Claims against Mason

Mason's defense takes a different tact than that of the County Defendants. While she asserts that the qualified immunity defense would shield her conduct *if* she was a government actor, she denies that she is employed by Chesterfield County. Instead, she claims that she is employed by a private hospital. Thus, she argues, the Section 1983 claims against her should be dismissed *because* she is employed by a private entity. Mason is correct, as the allegations here are insufficient to state a claim against her regardless of the identity of her employer. Accordingly, her motion to dismiss will be granted.[12]

The only substantive allegation against Mason is found at Paragraph 40 of Raub's Complaint. It states:

> On information and belief, Chaser and Mason filed the [Second Petition] at the request and/or instigation of one or more John Does, who also lacked probable cause to file that petition against Raub. Indeed, the John Does sought to label Raub as mentally ill and continue his incarceration and commitment because of their desire to suppress and chill Raub's political

---

[12] Because the case otherwise proceeds against the County Defendants and the John Doe Defendants, Raub is free to seek leave to amend his Complaint to join Mason should he learn additional facts concerning her involvement in these events.

views critical of the government, and the [Second Petition] constituted retaliation against Raub for his constitutionally-protected speech.

(Compl. at ¶ 40.) Three aspects of this allegation give the Court pause. First, the preamble "on information and belief" is a device frequently used by lawyers to signal that they rely on second-hand information to make a good-faith allegation of fact. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (quoting *Black's Law Dictionary* 783 (7th ed. 1999)); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182 (10th Cir. 2003) (quoting *Black's Law Dictionary* 779 (6th ed. 1990)). This practice is permissible when pleading is governed by Fed. R. Civ. P. 8(a), as is the situation here. *Pirelli Armstrong*, 631 F.3d at 442. It does, however, signal that the allegations against Mason are tenuous at best.

Second, and more striking, is the conclusory nature of all substantive allegations contained in Paragraph 40. Raub alleges that Mason filed the Second Petition at the instruction of the John Doe federal agents. Only in conclusory fashion does Raub then allege that Mason "lacked probable cause." With respect to Mason, there are no facts whatsoever to raise a plausible inference to support the legal conclusion that she "lacked probable cause." Thus, the legal conclusion must be disregarded. *Iqbal*, 556 U.S. at 678. Her situation is otherwise markedly different from that of the County Defendants, because she filed the Second Petition *after* Raub had been examined for some time and within the context of a continuing medical examination, not an initial arrest. Without more, it is not plausible that Mason violated Raub's constitutional rights. Accordingly, the claims against her will be dismissed.

Lastly, the allegations do not suggest that Mason was acting jointly with any state actor. The mere statement that she filed the Second Petition at the request of federal agents, alone, does not rise to the level of "joint action" for Section 1983 purposes. *Mentavlos v. Anderson*, 249 F.3d 301, 313 (4th Cir. 2001) (citation omitted); *see also Takoma Park*, 134 F.3d at 269 (citations omitted). This allegation does not raise any inference that Mason was working with state actors in a "deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill," as Raub argues. *See Jensen v. Lane Cnty.*, 222 F.3d 570, 575 (9th Cir. 2000) (citation omitted). But even if Raub's allegation was sufficient, his failure to sufficiently allege that she violated his constitutional rights in the first place would render his claim deficient. Accordingly, the constitutional claims against Mason will be dismissed.[13]

**D.    State Law False Imprisonment Claim**

All Defendants move to dismiss the state law false imprisonment claim that Raub asserts in Count IV. Mason is correct that Count IV appears to be asserted primarily against Bowen and Granderson, though the Complaint is ambiguous on this point. Raub identifies the targets of Count IV as *"one or more* Defendants—including but not limited

---

[13]As an alternative argument, Raub argues that Virginia's statutory scheme *required* Mason to file the petition seeking further detention for evaluation, rendering her actions "state actions" by virtue of Virginia's coercive power over her. *Mentavlos*, 249 F.3d at 313. This argument would require this Court to interpret a Virginia statute on a matter of first impression that would distinguish it from the Maryland statute at issue in *Takoma Park*, 134 F.3d at 269. Because the Court finds the allegations insufficient to allege a constitutional claim against Mason in the first place, it need not render a novel interpretation of Virginia law at this juncture. *See Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1002-03 (4th Cir. 1998) (explaining the extensive deference federal courts must give to state courts when interpreting state law).

to Bowen and Granderson." (Compl. at ¶ 72 (emphasis added).)  Given such vagaries, the false imprisonment claim will be dismissed as alleged against Mason and Campbell, without prejudice, because it has not "put [them] on notice of the claim." *James v. Pratt & Whitney, United Techs. Corp.*, 126 Fed. App'x 607, 613 (4th Cir. 2005); *see also Cataldo v. United States Steel Corp.*, 676 F.3d 542, 551-52 (6th Cir. 2012) ("[Complaint] fails to allege the speaker of the alleged statements, instead referring vaguely only to 'defendants,' of which there are many in this case.").  Bowen and Granderson are clearly identified in Count IV, but no other Defendant can be expected to know whether that claim includes him or her.

Raub's false imprisonment claim against Bowen and Granderson will proceed, however, because the claim against them turns largely on the same analysis addressed with respect to qualified immunity, *supra* at Section III(A).  Under Virginia law, "[f]alse imprisonment is the restraint of one's liberty without any sufficient legal excuse.  If the plaintiff's arrest was lawful, the plaintiff cannot prevail on a claim of false imprisonment." *Lewis v. Kei*, 708 S.E.2d 884, 890 (Va. 2011) (citations omitted). Arguing for dismissal of the state law claim, the County Defendants candidly tie the outcome to the analysis of the qualified immunity issue.  (Mem. Supp. Mot. Dismiss at 17.)  Based on the Court's findings on that issue, the Motion to Dismiss will be denied with respect to Count IV.  The County Defendants may renew this issue when they file a motion for summary judgment on qualified immunity.

## IV. CONCLUSION

In sum, the Court finds that the allegations in Raub's Complaint meet the bare minimum requirements to survive dismissal. Simply put, the record at this stage is insufficient to address the qualified immunity defense. For similar reasons, the motion to dismiss his state law false imprisonment claim will be denied with respect to Bowen and Granderson, but granted with respect to Campbell and Mason. Moreover, Raub's constitutional claims against Mason are dismissed, because the few allegations against her are entirely conclusory and do not otherwise give rise to a plausible inference that she violated Raub's constitutional rights through joint action with the government.

An appropriate Order will accompany this Memorandum Opinion.

                                            /s/
                                     Henry E. Hudson
                                     United States District Judge

Date: August 2, 2013
Richmond, Virginia