# In The Matter Of:

*Brandon Raub v.*
*Daniel Lee Bowen, et al.*

---

*Michael Paris*
*October 17, 2013*

---

*Chandler & Halasz, Inc.*
*PO Box 9349*
*Richmond, Virginia 23227*
*(804)730-1222 Fax (866)882-5809*
*TracyJStroh@gmail.com*

Original File 17OCT13.txt
Min-U-Script® with Word Index

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 2 of 95 PageID# 1187

Brandon Raub v.                                                          Michael Paris
Daniel Lee Bowen, et al.                                               October 17, 2013

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    RICHMOND DIVISION

 3

 4

 5   BRANDON RAUB,

 6            Plaintiff,

 7       v.                      Case No.
                                 3:13cv328 HEH
 8   DANIEL LEE BOWEN, et al.,

 9            Defendants.

10

11   * * * * * * * * * * * * * * * * * * * * * * *

12           DEPOSITION OF MICHAEL PARIS

13   * * * * * * * * * * * * * * * * * * * * * * *

14

15              October 17, 2013

16

17              Richmond, Virginia

18

19

20

21

22           CHANDLER and HALASZ, INC.
              Stenographic Court Reporters
23                  P.O. Box 9349
              Richmond, Virginia 23227
24                 (804)730-1222
         Reported by:  Tracy J. Stroh, RPR, CCR, CLR
25
```

Page 2

```
 1           Deposition of MICHAEL PARIS, taken by and

 2   before Tracy J. Stroh, RPR, CCR, CLR and Notary

 3   Public, in and for the Commonwealth of Virginia at

 4   large, pursuant to Rule 30 of the Federal Rules of

 5   Civil Procedure, and by notice to take deposition;

 6   commencing at 2:07 p.m., October 17, 2013, at the U.S.

 7   Attorney's Office, 600 East Main Street, Suite 1800,

 8   Richmond, Virginia.

 9

10   Appearances:

11           TROUTMAN SANDERS
              1001 Haxall Point
12            Richmond, Virginia 23219
              By:  STEPHEN C. PIEPGRASS, ESQ.
13                      and
              ECKERT SEAMANS CHERIN & MELLOTT, LLC
14            707 East Main Street, Suite 1450
              Richmond, Virginia 23219
15            By:  ANTHONY F. TROY, ESQ.

16            attorneys, of counsel for Plaintiff

17

18            CHESTERFIELD COUNTY ATTORNEY'S OFFICE
              PO Box 40
19            Chesterfield, Virginia 23832
              By:  JEFFREY L. MINCKS, ESQ.
20                 STYLIAN P. PARTHEMOS, ESQ.
              County Attorney, Deputy County Attorney,
21            respectively, of counsel for Defendants

22

23

24

25
```

Page 3

```
 1   U.S. ATTORNEY'S OFFICE
     600 East Main Street, Suite 1800
 2   Richmond, Virginia 23219
     By:  JONATHAN H. (JAY) HAMBRICK, ESQ.
 3   Assistant United States Attorney, of
     counsel for Michael Paris
 4

 5   FBI - RICHMOND
     1970 East Parham Road
 6   Richmond, VA 23228
     By:  LAWRENCE J. BARRY, ESQ.
 7   Chief Division Counsel

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1              I N D E X

 2              DEPONENT

 3            MICHAEL PARIS

 4   Examination By:                          Page
     Direct    - MR. TROY                        5
 5

 6              EXHIBITS

 7   Exhibit    Description                    Page
```

```
 8   No. 1      8/29/12 Incident Full Report      5
     No. 2      Corporal Detective Michael Paris, 5
 9              unit 885
     No. 3      Answers of Michael Campbell to    5
10              Limited Interrogatories Approved
                by the Court
11   No. 4      Petition for Involuntary          5
                Admission for Treatment
12   No. 5      Mental Health Crisis Form         5
     No. 6      Aug. 15, 2012, email              5
13   No. 7      Aug. 16, 2012 email               5
     No. 8      Aug. 16, 2012 email               5
14   No. 9      Richmond Liberty Movement         5
                Facebook
15   No. 10     Handwritten notes                 5
```

```
16

17

18

19

20

21

22

23

24

25
```

Page 5

1  (Exhibit Number 1 was marked.)
2  (Exhibit Number 2 was marked.)
3  (Exhibit Number 3 was marked.)
4  (Exhibit Number 4 was marked.)
5  (Exhibit Number 5 was marked.)
6  (Exhibit Number 6 was marked.)
7  (Exhibit Number 7 was marked.)
8  (Exhibit Number 8 was marked.)
9  (Exhibit Number 9 was marked.)
10  (Exhibit Number 10 was marked.)
11
12      MICHAEL PARIS,
13  was sworn and testified as follows:
14      DIRECT EXAMINATION
15  BY MR. TROY:
16  Q    How do you like to be addressed?  Is it
17  Detective Paris or --
18  A    That's fine.
19  Q    -- Agent Paris?
20  A    You can call me Mike or Michael, if you'd
21  like.
22  Q    Okay.  Is it Michael or Mike?
23  A    Michael is fine.
24  Q    Michael.  Are you sure that's okay?
25  A    I'm okay with that.

Page 6

1  Q    All right.  All right, Michael.  Then go
2  ahead, if you would, and state your full name and
3  address, place of employment.
4      MR. HAMBRICK: Can we keep the address to
5  place of work?  He's law enforcement.  I don't want a
6  home address on the record.
7      MR. TROY: That would be fine, yeah.  Not
8  a problem.
9  A    It's Michael Anthony Paris, and I'm
10  currently working out of the Richmond FBI field
11  office.  It's 1970 East Parham Road, Richmond.
12  BY MR. TROY:
13  Q    Way out there, the new facility --
14  A    Yes, sir.
15  Q    -- on Parham?
16  A    Yes, sir.
17  Q    All right.  Do you work out of
18  Chesterfield as well?
19  A    I'm assigned full-time to the FBI Joint
20  Terrorism Task Force.
21  Q    So you work out of the Parham Road --
22  A    Yes, sir.
23  Q    -- headquarters?
24      How long has that been?
25  A    Since April of 2009.

Page 7

1  Q    And are you a resident of Virginia?
2  A    Yes, sir.
3  Q    How long have you been a resident of
4  Virginia?
5  A    August of '89.  Since then.
6  Q    Give me a -- just a quick background of
7  where you were born, raised and education.
8  A    Born in Sharon, Pennsylvania, grew up in
9  western Pennsylvania.  I went to college in a school
10  in Erie, Pennsylvania.  I got my bachelor's in
11  criminal justice security.
12  Q    What school?
13  A    Mercyhurst.  Mercyhurst, one word.
14  Q    Go ahead.
15  A    I got my master's in administration of
16  justice at the same university.
17  Q    And then what was your first employment --
18  give me your employment history up-to-date.
19  A    I was a loss prevention manager for JC
20  Penney's for roughly half a year.  Went to Kaufmann's
21  department store as a loss prevention associate for
22  about a year and a half.  And then I was a loss
23  prevention manager at JC Penney's for about two years.
24      Moved to Virginia, Richmond, Virginia,
25  Chesterfield, in August of 1989.  Was working as an

Page 8

1  electrician, laborer, for a couple months, and I got
2  hired by Chesterfield County Police Department
3  October 10th, 1989.
4      Left the department in 2004.  Went and
5  worked for the National White Collar Crime for about
6  13 months from July 2004.  Came back in September of
7  2005 to the department.
8  Q    What did you do in that period of '04,
9  '05?
10  A    '04, '05. I was the investigative support
11  manager for the National White Collar Crime Center.
12  And we had an office up here at Boulders Office Park.
13  Q    What is that center?
14  A    It's a federally funded nonprofit, and we
15  assist state and local law enforcement in interstate
16  white collar crime type offenses.
17  Q    All right.  And when did you get your
18  bachelor's degree, what year?
19  A    '82 to '86 was my four years of bachelor
20  degree.
21  Q    And your master's?
22  A    '86 to '89.
23  Q    So you were working -- were you working
24  the whole time that you were both in college --
25  undergraduate as well as master's or --

Page 9

1     A    I was working full-time as -- when I was
2   getting my master's.
3     Q    Okay.  But not when you were -- did you
4   have any employment during your --
5     A    Yes.
6     Q    -- undergrad-- --
7     A    I had like three part-time jobs.
8     Q    Okay.
9           MR. HAMBRICK: Wait until he finishes his
10  question --
11          THE DEPONENT: I'm sorry.
12          MR. HAMBRICK: -- before you start your
13  answer.  It makes it easier for the court reporter to
14  take it.
15          THE DEPONENT: Sorry.
16  BY MR. TROY:
17    Q    That wasn't such an important question.  I
18  don't mind being interrupted.  But yeah, he's right
19  when we get down to the little more -- so you worked
20  part-time during college?
21    A    Yes, sir.
22    Q    And then full-time while earning your
23  master's?
24    A    That's correct.
25    Q    And after '05?

Page 10

1     A    I came back to the department, police
2   department.
3     Q    Chesterfield --
4     A    Yes, sir.
5     Q    -- Police Department?
6     A    Yes, sir.
7     Q    Ever been employed by the Chesterfield
8   County Sheriff's Office?
9     A    No, sir.
10    Q    And so you were -- if I understand you
11  correctly, you were with the Chesterfield Police
12  Department.  You still are with the Chesterfield
13  Police Department?
14    A    Yes.  Yes.
15    Q    And you were with the police department --
16  what did you do from -- when you came back in
17  approximately '05 to April of '09?
18    A    From -- from September of '05 till April
19  of 2006, I was assigned to uniform operations.  I
20  worked patrol.  And then from, I'd say -- probably
21  more like May of 2006.  Excuse me.  I was transferred
22  to an investigative unit.  And there really wasn't a
23  name for it.  I could tell you what the name for it is
24  now, but at the time it was kind of a new -- it was a
25  new section.

Page 11

1     Q    And what were your duties in that -- were
2   you in uniform?
3     A    No, sir.  We wore plain clothes.
4     Q    And what were your duties?
5     A    We investigated particularly organized
6   crime.  We would do surveillance, conduct -- my job
7   was to do a lot of financial investigations, find out,
8   you know, where they were hiding the money, that type
9   of thing.
10    Q    What training did you have for that?
11    A    When I was with the National White Collar
12  Crime Center, I obtained my certification as a
13  certified fraud examiner.  Just had a little bit of
14  background in it.  I worked white collar crime for the
15  department before I left in 2004.
16    Q    Investigating any of my clients or --
17    A    I don't think so.
18          MR. HAMBRICK: Tony, I know you're just
19  doing background, but we're --
20          MR. TROY: Yeah.
21          MR. HAMBRICK: -- pretty far afield of the
22  allowed subject areas.
23          MR. TROY: Well, I'm just trying to get --
24          MR. HAMBRICK: I know, and that's why I've
25  allowed it.

Page 12

1          MR. TROY: -- a little background on it.
2   BY MR. TROY:
3     Q    All right.  So then what was next, just
4   briefly, from the time you were in patrol, next in
5   your investigative --
6     A    Yes, sir.
7     Q    -- in May of '06?
8     A    I was -- I was put on a -- at the time, it
9   wasn't a task force, but it evolved into one with
10  other jurisdictions.  But it was a state and local --
11  it wasn't a federal task force.  It was called, and it
12  still is called, the Metropolitan Special Operations
13  Group.  It's -- we call it MSOG.
14    Q    All right.  And what was the -- how long
15  were you there?
16    A    I was there until April of 2009.  And then
17  I was then assigned to --
18    Q    All right.
19    A    -- the FBI Joint Terrorism Task Force.
20    Q    All right.  Did you apply for that
21  position?
22    A    No, sir.
23    Q    How were you chosen, if you know?
24    A    I -- I really -- I guess because I had --
25  I had some clearance and I've had some interaction

Page 13

1 with the FBI.  I guess the department felt I was the
2 best candidate to go there and work at that capacity.
3        MR. HAMBRICK: If you know, say the
4 answer.  If you don't know, say I don't know.
5 BY MR. TROY:
6    Q    The department suggested that you -- you
7 were assigned to that joint task force by your
8 department?
9    A    Yes, sir.  Yeah.
10    Q    And that would be the Chesterfield Police
11 Department?
12    A    Yes, sir.
13    Q    All right.  During all this period of time
14 that you have been employed in various -- either in
15 private or public law enforcement type activity, have
16 you had any training with regard to any mental health
17 issues, individuals with suspected mental health
18 problems?
19    A    We had some training on autism, I know for
20 sure, one year in in-service.  We received training on
21 autistic subjects.
22    Q    Any other training?
23    A    Just exposure to experience.  No, sir.
24    Q    So the training has been with regard to
25 autism and --

Page 14

1    A    Yeah.  And none other that I can recall.
2    Q    All right.  Let's go ahead and get started
3 on these exhibits that you have in front of you.  I
4 have put nine(sic) exhibits in.  We're going to, you
5 know, go through them, if I may.
6        The Exhibit Number 1 is entitled
7 "Chesterfield County Police Department Incident Full
8 Report" with an incident number, "Case status:
9 Inactive."  On the top, "Page 8 of 13."
10        The first paragraph on the top -- well,
11 who prepared these notes or this report?  Do you know?
12        MR. MINCKS: Tony, I'm going to object.
13 The --
14 BY MR. TROY:
15    Q    Are these yours?
16        MR. MINCKS: -- document, on its face,
17 indicates it's not complete.
18        MR. TROY: Pardon?
19        MR. MINCKS: The document, on its face,
20 indicates that it's incomplete.  It's not a complete
21 document.  So just an objection --
22        MR. TROY: Oh, okay.
23        MR. MINCKS: -- that we're dealing with a
24 document that is incomplete.
25        MR. TROY: Do you mean page 8 of 13?

Page 15

1        MR. MINCKS: Right.
2        MR. TROY: Compared to, quote, Incident
3 Full Report?
4        MR. MINCKS: Correct.
5        MR. TROY: All right.
6 BY MR. TROY:
7    Q    Are these your notes?
8        MR. HAMBRICK: Can you be more specific as
9 to which of the notes?  Because it looks like they're
10 written by multiple people.
11        MR. TROY: That's what I'm trying to get
12 to.
13 BY MR. TROY:
14    Q    Let me ask it, is this first paragraph on
15 the top later in the shift, is that you or is that
16 Lieutenant Carpenter?
17    A    I know that it's not me, sir.  It's not --
18 that's not my report.  And I -- I can't say who wrote
19 that, based on this page here.
20    Q    All right.  We'll get to it.
21        In this paragraph, there's commentary
22 about -- I'll paraphrase it, and you tell me if I'm
23 wrong.  Brandon Raub's family making comments and
24 cursing with regard to comments about the
25 Constitution.

Page 16

1        Were you there when that --
2    A    No, sir.
3    Q    -- happened?
4    A    No, sir.
5    Q    All right.  And then it says, "At the
6 request of Unit 99."  Who is Unit 99?  Is that --
7 well, who is Unit 99?
8    A    I don't know.
9    Q    And who is Unit 310?
10    A    Well, if I look at the -- the paragraph
11 below that, Officer Bowen Unit 310.  I'm -- I'm -- I'm
12 assuming that's --
13        MR. HAMBRICK: Don't assume.  If you know,
14 answer the name.  If you don't know, say I don't know.
15    A    I can't say for sure.
16 BY MR. TROY:
17    Q    Well, when I read this like you were,
18 "Officer Bowen Unit 310," is that his unit
19 designation?
20    A    I don't know for sure.
21    Q    So if I read, "Officer Bowen Unit 310
22 presented probable cause to Magistrate Znotens," am I
23 incorrect in indicating that on the next day after
24 Mr. Raub was detained, that Officer Bowen approached a
25 magistrate in the -- early in the morning, trying to

Page 17

1  get an arrest warrant for resisting arrest?
2      Is that a correct reading of that second
3  paragraph?
4      MR. HAMBRICK: Objection. The document
5  speaks for itself. If --
6  BY MR. TROY:
7  Q  In your opinion, is that a correct reading
8  of that paragraph?
9      MR. HAMBRICK: Objection.
10 BY MR. TROY:
11 Q  You can answer.
12     MR. MINCKS: Same objection, if you can.
13 A  I can't speak for Officer Bowen, if he did
14 that or not, sir.
15 BY MR. TROY:
16 Q  Did you have any discussions with any of
17 the officers about trying to obtain a warrant against
18 Mr. Raub for resisting arrest?
19 A  I did not.
20 Q  You did not?
21 A  I did not.
22 Q  Did you have -- make any recommendations
23 on that?
24 A  No, sir.
25 Q  All right. Do you work with these people

Page 18

1  or did you work with these people when you were with
2  the Chesterfield Police Department?
3      MR. HAMBRICK: Objection. Vague. Who do
4  you mean by "these people"?
5      MR. TROY: Unit 310, Unit 99, Unit 30.
6  A  I may have. I --
7  BY MR. TROY:
8  Q  Lieutenant Carpenter, do you know him?
9  A  Yes, sir.
10 Q  You worked with him previously?
11 A  A little.
12 Q  All right. Officer Bowen, you know him?
13 A  I don't know him personally. I know he's
14 a police officer.
15 Q  Had you worked with him previously?
16 A  I don't recall.
17 Q  Officer Granderson, Unit 99, did you work
18 with him -- do you know him?
19 A  I know him, sir. I may have worked with
20 him some.
21 Q  All right. Let's go on to the -- near the
22 bottom of the page for Exhibit 1 it says -- there's a
23 number "10. Supplement on 8/18/2012 at 2232."
24     MR. MINCKS: Tony, you said on page 4?
25     MR. TROY: Page 1 of Exhibit 1.

Page 19

1      MR. MINCKS: I thought you said page 4 of
2  Exhibit 1. Okay. Which is page 8?
3      MR. TROY: Pardon?
4      MR. MINCKS: Which is page 8?
5      MR. PARTHEMOS: Of the document.
6      MR. TROY: Well, I called it the first
7  page of Exhibit --
8      MR. MINCKS: First page of Exhibit 1.
9      MR. TROY: -- of Exhibit 1. I'll be happy
10 to describe it however you want. We have not switched
11 the page yet.
12 BY MR. TROY:
13 Q  Is this your supplemental note?
14 A  Yes, this is, sir.
15 Q  All right. And this was made a couple
16 days after the arrest or detention of Brandon Raub?
17 A  Yes.
18 Q  All right. Why did it take -- why did you
19 come up with this note approximately two days later?
20     MR. MINCKS: Objection. Form of the
21 question.
22     MR. HAMBRICK: Tony, these are very
23 strict --
24     MR. TROY: Uh-huh.
25     MR. HAMBRICK: -- limitations. What does

Page 20

1  what he did or why he did something two days after the
2  detention, how is that relevant to any of these four
3  topics?
4      MR. TROY: I'm trying to figure out, you
5  know, what -- what he knew, what he was thinking
6  during the time of the seizure.
7      MR. HAMBRICK: Okay. Well, then I would
8  encourage you to ask him what he knew or what he did
9  at the time of the seizure instead of what he did two
10 days later.
11 BY MR. TROY:
12 Q  Well, do these notes reflect what happened
13 at the time of the seizure and before the time of the
14 seizure?
15     MR. HAMBRICK: Objection. Vague. But you
16 can answer.
17 A  It doesn't reflect the totality of
18 everything that happened. It's a summary of -- a
19 brief summary, brief paragraph.
20 BY MR. TROY:
21 Q  Including what was transpiring prior to
22 your visitation with Mr. Raub at his residence,
23 correct?
24 A  I -- can you rephrase that question,
25 please?

Page 21

1  Q    These are your notes.  They reflect
2  certain actions and thoughts that were transpiring
3  prior to the detention of Mr. Raub and subsequent to
4  the detention of Mr. Raub, correct?
5       MR. MINCKS: I'm going to object.  What is
6  here speaks for itself.  It says what it says.  But go
7  ahead.
8  A    I don't know if I understand the question,
9  and I want to make sure I understand the question.
10 BY MR. TROY:
11 Q    That's fair.
12 A    I'm --
13 Q    Let me try to rephrase it and let's --
14 this reflects certain actions and information you were
15 receiving regarding Mr. Raub both prior to -- let me
16 just make it one question, prior -- some of which was
17 prior to his detention, correct?
18 A    Yes, sir.
19 Q    Okay.  And it was -- you were notified
20 here, it said, by the FBI Joint Task -- Terrorism Task
21 Force field office on Wednesday, the 15th of August,
22 2012, by John Wyman.
23      Who is Mr. Wyman?
24 A    John Wyman is the special agent -- he's a
25 supervisory special agent and he's our supervisor for

Page 22

1  our squad.
2  Q    All right.  And this was with regard to a
3  situation involving a resident of Chesterfield?
4  A    Yes, sir.
5  Q    Had you had any other conversations prior
6  to that involving -- as part of the Joint Terrorism
7  Task Force involving Mr. Raub?
8  A    From Mr. Wyman?
9  Q    From anybody.
10 A    I know on the 15th I received an email
11 from Special Agent Terry Granger asking me and
12 Detective Wade, who is Richmond, to check our
13 databases for police contact, in our records
14 management system, to see if there was any police
15 contact with Mr. Raub.
16 Q    And when you say "our records management,"
17 that would be the Chesterfield Police Department's
18 record management?
19 A    Yes, sir.
20 Q    Not the Joint Terrorism Task Force?
21 A    No, sir.
22 Q    And you checked the -- at the request of
23 Agent Granger, you did make a check?
24 A    Yes.
25 Q    All right.  Was Mr. Raub's name discussed

Page 23

1  at all among members of the Joint Terrorism Task Force
2  prior to the 15th of August?
3  A    If it --
4       MR. HAMBRICK: Objection.  If you know the
5  answer, you can answer.
6  A    I don't know that answer.  I -- it wasn't
7  discussed with me before the 15th.
8  BY MR. TROY:
9  Q    Do you have any knowledge of it being
10 discussed among the Joint Terrorism Task Force?
11 A    I don't.  Not that I can recall, no, sir.
12 Q    Any knowledge of Joint Terrorism Task
13 Force discussions about returning veterans and what is
14 on their Facebook?
15      MR. HAMBRICK: Objection.  He's already
16 said he doesn't know anything about that, and it --
17 and that has nothing to do with this.
18      MR. TROY: Well --
19      MR. HAMBRICK: You're supposed to ask
20 about what he knew, not what other people knew.
21 BY MR. TROY:
22 Q    I'm trying to get to what led to the
23 detention of Mr. Raub, and this is a fair question.
24 And it's not what you know.  It's what you may have
25 heard or understood.  You don't have to speak directly

Page 24

1  from your own knowledge.  This is a discovery
2  deposition.
3       Have you ever given a deposition before?
4  A    No, sir.
5  Q    Okay.  Are you on any medications or -- of
6  any sort that would impair your ability to respond?
7  A    No.
8  Q    So my question is discussions that you may
9  be aware of by the Joint Terrorism Task Force
10 regarding returning veterans and Facebook postings.
11 Any discussion of that subject, to your knowledge?
12      MR. HAMBRICK: Objection.  If it relates
13 to Brandon Raub, you can answer the question.  If it
14 relates to anybody else, the answer is do not answer.
15      MR. TROY: I'm -- that's not a fair
16 objection.
17      MR. HAMBRICK: What part of this talks
18 about anybody other than Brandon Raub?  Here's a big
19 one.
20      MR. TROY: Thank you.  Appreciate the big
21 one.
22      All right.  It indicates whether the
23 plaintiff's beliefs posed a danger, and I'm trying to
24 find out -- the plaintiff is a returning veteran.
25 Were there discussions about returning veterans, and

Page 25

1  then we can move on to plaintiff Brandon Raub.
2  　　　MR. HAMBRICK: No.  We're going to stick
3  with Brandon Raub because nowhere does it say about
4  plaintiff's belief.  If you want to ask him a question
5  about whether he knew about any discussions involving
6  Brandon Raub, you're more than welcome to ask that.
7  　　　MR. TROY: I would hope you'd say asked
8  and answered.
9  　　　MR. HAMBRICK: It hasn't been asked.
10  　　　MR. TROY: Well, I thought it had.
11  BY MR. TROY:
12  　Q　Any discussions, to your knowledge, about
13  Brandon Raub, a returning Marine veteran?
14  　A　No, sir.
15  　Q　So your testimony under oath is the first
16  time that this subject came to your attention was on
17  August 15th through John Wyman?
18  　A　No.  It was through Terry Granger when she
19  asked me to run --
20  　Q　And when was that?  Do you know?
21  　A　I -- I recall it being August 15th.
22  　Q　All right.  Look at what's been marked, I
23  believe, as Plaintiff's Exhibit Number 5 -- or excuse
24  me.  Paris Exhibit Number 5.  Well, then it's --
25  that's the wrong one, Jay, if I'm --

Page 26

1  　　　MR. MINCKS: I have that marked as 6.
2  　A　Is it a single page?
3  BY MR. TROY:
4  　Q　Six.
5  　　　MR. TROY: I'm sorry.
6  　　　MR. HAMBRICK: No problem.
7  　A　Six.
8  BY MR. TROY:
9  　Q　Is that the reference -- is that -- does
10  that Exhibit Number 6, is that the reference that you
11  just made to being approached or contacted by Agent
12  Granger?
13  　A　Yes.
14  　Q　And you indicated that you used some
15  information sources from the Chesterfield Police
16  Department to follow up on the request of Agent
17  Granger?
18  　　　MR. MINCKS: Asked and answered.
19  BY MR. TROY:
20  　Q　Correct?
21  　A　Correct.
22  　Q　And what did you find?
23  　A　I found very little, if any, contact.  I
24  believe he had a -- a summons issued to him.  I don't
25  think there was much else.

Page 27

1  　Q　Summons for what?
2  　A　I don't recall.  It --
3  　Q　An expired inspection sticker?
4  　A　Possibly.
5  　Q　Anything beyond an inspired -- expired
6  inspection --
7  　A　No, sir.
8  　Q　-- sticker?
9  　A　No, sir.
10  　Q　And what did you report?
11  　A　What I just said.
12  　Q　In your notes --
13  　　　MR. HAMBRICK: We're back to Exhibit 1?
14  I'm sorry.
15  　　　MR. TROY: I'm sorry.  Yes.  Thank you,
16  Jay.
17  BY MR. TROY:
18  　Q　In your notes on Exhibit 1, I'm still at
19  the final paragraph of the first page, it talks about
20  Special Agent Terry Granger receiving certain
21  information.  Then it goes on, The concern from that
22  complainant who knew Brandon Raub was recent Facebook
23  postings.
24  　　　Do you see that?
25  　A　Yes, sir.

Page 28

1  　　　MR. MINCKS: Objection.  That's not what
2  it says, Tony.
3  　　　MR. TROY: I'm just trying to get his
4  direction down to the final question.
5  　　　MR. MINCKS: But you're premising that
6  this is what it says.  It doesn't say that.  So just
7  trying to make sure that if you're going to premise it
8  as it's saying that, then at least read it verbatim.
9  　　　MR. TROY: Well, I'll examine the way I
10  want to examine.
11  　　　MR. MINCKS: Well, I just want you to do
12  it the way that it's fair.
13  　　　MR. TROY: Well, I'm doing it in a fair
14  way as well.
15  BY MR. TROY:
16  　Q　"The complainant in this matter," it says,
17  "forwarded the Facebook postings."
18  　　　When did you first see those Facebook
19  postings?
20  　A　It was either the 15th or the 16th.  I'm
21  not sure exactly what day.
22  　Q　Prior to confronting Mr. Raub at his home,
23  had you read and observed and thought about those
24  Facebook postings?
25  　A　Yes.

Page 29

1      MR. HAMBRICK: Just for the record, can we
2  clarify that when you say "Facebook postings," we're
3  talking about the email from Howard Bullen?
4      MR. TROY: Yes.
5      MR. MINCKS: Also clarify that when you
6  say confronted him, you meant talked to him at his
7  house?
8      THE DEPONENT: Yes.
9      MR. TROY: I meant confronted.
10     MR. MINCKS: Okay.
11     MR. HAMBRICK: Objection as to the
12  characterization of confronted, then.
13 BY MR. TROY:
14     Q    All right.  Then you go on to say, "After
15  conducting preliminary background database checks on
16  Raub."
17         Is that the database we just finished
18  talking about, finding out that he had one summons for
19  an expired inspection sticker?
20     A    That would have been my -- my -- the
21  database checks that I ran.
22     Q    And is that the one that determined that
23  the only thing outstanding was a summons for an
24  inspired -- expired inspection sticker?
25     A    That information came from that database,

Page 30

1  yes, sir.
2      Q    And you had no other information?
3          I'm trying to get to the point here.
4  "After conducting preliminary background database
5  checks on Raub."  Do you see that sentence?
6      A    Yes.
7      Q    And that's your words, correct?
8      A    Correct.
9      Q    And that's the database check that
10  determined that he had a summons for an inspection
11  sticker, and that's all you had, correct?
12     A    Correct.
13     Q    All right.  "It was determined by the FBI
14  that contact needed to be made by" -- "with Brandon
15  Raub."  Why?
16     MR. HAMBRICK: Objection.  You can ask him
17  if he made the decision or if the reason was explained
18  to him.  Otherwise, if you know, answer.
19     A    I did not make the decision.
20 BY MR. TROY:
21     Q    Well, it says, "After conducting
22  preliminary background database checks on Raub, it was
23  determined by the FBI that contact needed to be made
24  with Brandon Raub."
25         When you say "FBI," is that the Joint

Page 31

1  Terrorism Task Force?
2      A    Yes.
3      Q    And that's a task force that you're a part
4  of?
5      A    Yes, sir.
6      Q    And so why did your Joint Terrorism Task
7  Force make a determination, after checking his
8  database, that he had to be contacted?
9      MR. MINCKS: Objection to form.  It's not
10  his task force.  It's the FBI's task force.
11 BY MR. TROY:
12     Q    The task force that you're a part of.
13     MR. MINCKS: Number two, there's no
14  foundation that he knows the reason, but --
15     MR. HAMBRICK: If you know any reason, you
16  can answer.  If not, don't answer and say I don't
17  know.
18     A    It was based on information that we had
19  from his Facebook postings from that email.  And
20  that's the crux.  It wasn't -- it wasn't based on the
21  fact that we ran a database check and only saw a
22  uniformed summons for an expired state inspection.
23 BY MR. TROY:
24     Q    All right.  All right.  Then you go on in
25  this.  At the very end, these are still your notes,

Page 32

1  so -- at about 6:30 -- excuse me, 6:10 on Thursday,
2  the 16th of August, you made contact with Brandon
3  Raub, correct?
4      A    Yes.
5      Q    And then it says, "After speaking with
6  Brandon Raub, it was determined that a call to Crisis
7  Intervention to discuss if Brandon Raub could be
8  evaluated would be made.  After speaking with Crisis,
9  it was determined that Brandon Raub should be brought
10  in for an evaluation."  Then it says "NFD."
11         What's that?
12     A    No further developments.
13     Q    All right.  And the person you spoke to at
14  Crisis to make these determinations was Michael
15  Campbell?
16     A    Yes, sir.
17     Q    Did you speak to anybody else other than
18  Michael Campbell?
19     A    No, sir.
20     Q    And the determinations were made whether
21  he -- not whether he should be seized, but whether he
22  should be brought in for an evaluation; is that
23  correct?
24     MR. HAMBRICK: Objection.  I'm not sure
25  what the difference is.  So vague.

Page 33

BY MR. TROY:
 1   Q   Is that correct?
 2   A   I'm not sure I understand the question.
 3  Can you --
 4  BY MR. TROY:
 5   Q   He was being brought in for an evaluation,
 6  correct?
 7   A   Correct.
 8   Q   So he was not being brought in because
 9  there was a determination made at the scene that he
10  was mentally incompetent; is that correct?
11   A   Are you asking me -- what are you asking
12  me here?
13   Q   Well, weren't you the person who indicated
14  that he should be brought in -- should be detained,
15  seized and brought in?
16   A   I was the person who -- one of the persons
17  who talked to him at his front door.
18   Q   Yes, sir.
19   A   Okay. After talking to him and discussing
20  it with Agent Granger, we decided we needed to call
21  and have him evaluated.
22   Q   All right. But you had no training in
23  mental health other than autism, correct?
24       MR. MINCKS: Objection. That wasn't his

Page 34

testimony at all.
 1  BY MR. TROY:
 2   Q   Well, what training in mental health did
 3  you have other than autism training?
 4       MR. MINCKS: It's asked and answered. He
 5  already told you.
 6       MR. HAMBRICK: Well, I think he testified
 7  that he had experience from the job. That was his
 8  answer. So --
 9  BY MR. TROY:
10   Q   Tell me what the basis of that experience
11  is.
12   A   Dealing with mentally ill subjects.
13   Q   How many?
14   A   In the last couple years, probably about
15  five to six. We had one a couple months prior to that
16  in Henrico.
17   Q   How many prior to the detention of
18  Mr. Raub?
19   A   In how many years or what time period?
20   Q   Well, let's say five years prior to -- a
21  five-year period -- well, let me make it more clear.
22       From April '09 when you became a member of
23  the Joint Terrorism Task Force up until August of 2012
24  when you were dealing with Mr. Raub, how many

Page 35

experiences did you have with dealing with mentally --
 1  potentially mentally ill individuals?
 2   A   I really can't say for sure.
 3   Q   Well, you indicated a moment ago it was
 4  five or six. Are those five or six after Mr. Raub or
 5  before Mr. Raub?
 6   A   Before.
 7   Q   Before?
 8   A   Yes, sir.
 9   Q   Any after Mr. Raub?
10   A   Yes. We -- not direct contact, but, you
11  know, information of assisting.
12   Q   So what information did you have at the
13  time you determined Mr. Raub would be taken in other
14  than a discussion with him, a discussion with
15  Mr. Campbell? And you say you did have and reviewed
16  the Facebook postings at that time?
17       MR. HAMBRICK: Objection. That's --
18  BY MR. TROY:
19   Q   Is that correct?
20       MR. HAMBRICK: Objection. That's a
21  compound question. It's also vague.
22  BY MR. TROY:
23   Q   Is that correct; those three things?
24       MR. HAMBRICK: Objection. It's compound.

Page 36

 1   A   Can you say it again, please?
 2  BY MR. TROY:
 3   Q   I'm just trying to find out what
 4  information you had about Mr. Raub other than -- well,
 5  let me -- you had -- did you have information about
 6  Mr. Raub regarding the Facebook postings? I'm talking
 7  now at the time you determined that he should be taken
 8  in for an evaluation.
 9   A   Yes.
10   Q   You had reviewed the Facebook postings?
11   A   I reviewed the email that was forwarded
12  through.
13   Q   All right. You had spoken to Mr. Raub?
14   A   Yes, sir.
15   Q   And -- all right. And you had talked to
16  Mr. Campbell?
17   A   Yes, sir.
18   Q   Was there anything else that you had other
19  than those three in determining that Mr. Raub should
20  be taken in for an evaluation?
21       MR. MINCKS: Objection. Asked and
22  answered. He's already testified there's other
23  things.
24       MR. TROY: Come on, guys. Give me a
25  break.

Page 37

1      MR. MINCKS: He did.  He did.  You're
2  trying to tie him down.  He's already testified beyond
3  your question.
4      MR. TROY: Yes, I'm trying to tie him
5  down, and I get, you know, you on this end and
6  compound question on this end.  And so I'm trying to
7  get out of a compound question.
8  BY MR. TROY:
9      Q    Do you understand what the question is,
10  Detective Paris?
11     MR. MINCKS: Tony, the reason for the
12  objection is that you're asking him -- you're trying
13  to tie him down to specifics when he's already
14  testified beyond those specifics in answer to the same
15  question.  That's why it's asked and answered.
16  BY MR. TROY:
17     Q    I'm trying to find out if you had any
18  other information other than those three things when
19  you determined that Mr. Raub should be taken in?
20     MR. MINCKS: Same objection.  He's already
21  answered that there were more things.
22  BY MR. TROY:
23     Q    Can you answer the question, please?
24     MR. MINCKS: He already did, Tony.  That's
25  why there was an objection.

Page 38

1      MR. TROY: Is he being instructed not to
2  answer?
3      MR. MINCKS: Not by me.  I don't represent
4  him.
5      A    I don't recall -- I don't think so.
6  BY MR. TROY:
7      Q    Okay.  Fair enough.
8      All right.  Let's go to the second page of
9  Exhibit Number 1.  Are the -- this number 11, are
10  these your notes as well on page 2 of Exhibit Number
11  1?  It says "Supplement 8/22/2012 at 1417."
12     MR. HAMBRICK: For the record, page 2 is
13  page 9 of 13.  It's just the second page of this.
14     MR. TROY: Yes.
15     MR. HAMBRICK: I just --
16     A    Yes, sir.
17  BY MR. TROY:
18     Q    All right.  You were -- I'm not on to the
19  next exhibit yet.
20     So this was a Wednesday.  Why were you
21  reconstructing -- the seizure took place on a
22  Thursday.  This is not quite a week later, and you're
23  reconstructing what was happening.
24     Why that period of time for this
25  reconstruction of notes?  And I don't mean

Page 39

1  "reconstruction" in any ill-mannered way.
2      A    I wanted to document what happened in more
3  detail, what had transpired.
4      Q    So you talked first about the email --
5  8/15 email from Agent Granger.  That's the one we've
6  already discussed; is that correct?
7      A    Yes, sir.
8      Q    And you requested a LINX, L-I-N-X, check?
9      A    Yes.
10     Q    By Crime Analyst Bonnie Nalepa?
11     A    Yes.
12     Q    Is she a Chesterfield County person?
13     A    Yes, sir.
14     Q    What is LINX -- a LINX?
15     A    It's a statewide search in all the police
16  databases.
17     Q    All right.  And that showed a uniform
18  summons for an expired state inspection in 2010.
19  That's as to Brandon Raub, correct?
20     A    Yes, sir.
21     Q    That's the one we've talked about?
22     A    Yes, sir.
23     Q    Then you talk about a Brently Michael
24  Raub.  But that's his brother and not him?
25     A    That's correct.

Page 40

1      Q    And you communicated this back to Agent
2  Granger, and she had opened an assessment concern over
3  the Facebook statements posted, correct?
4      A    Yes.
5      Q    And these were postings on a public
6  Facebook and on the Facebook page of Brandon Raub that
7  was brought to the attention of the FBI, correct?
8      A    I can't say if it was on his public
9  Facebook or not because I never actually saw his
10  public Facebook.
11     Q    What did you see?
12     A    I saw a forwarded email with a cut and
13  paste of it.
14     Q    Well, in your notes here, trying to
15  reconstruct everything, these are your words that
16  Agent Granger advised you she opened an assessment on
17  Brandon Raub, correct?
18     A    Yes, sir.
19     Q    And it was based on a concern over
20  Facebook statements posted to a public Facebook page
21  and on the Facebook page of Brandon Raub that was
22  brought to the attention of the FBI?
23     A    Yes.
24     Q    Now, when you talk about a public Facebook
25  page and a Facebook page, is that two different

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Paris
October 17, 2013

Page 41

1  Facebooks?
2      A    I don't know.  I don't know.  I -- I don't
3  know the difference.
4      Q    Well, when you say "a public Facebook
5  page" and "the Facebook page," did you intend those
6  words to be synonymous or are they intended to mean
7  two different things?
8          MR. HAMBRICK: Objection.  You can answer
9  if you understand it.
10     A    Let me just read it real quick and make
11 sure I -- are you asking me if I understand the
12 difference between --
13 BY MR. TROY:
14     Q    These are your words, correct?  I'm just
15 trying to find out what you were writing down.
16     A    Okay.
17     Q    And you wrote down "a public Facebook
18 page" and "the Facebook page."  Are those one in the
19 same or were there two different sources of
20 information that had been obtained regarding Brandon
21 Raub's postings?
22     A    I don't know.
23     Q    Do you know if there was a private
24 Facebook posting that was accessed by the Joint
25 Terrorism Task Force or anybody else that was

Page 42

1  investigating Brandon Raub?
2          MR. HAMBRICK: Objection.  Asked and
3  answered.  You can answer.
4      A    I don't know.
5  BY MR. TROY:
6      Q    Well, then let me go back to my question.
7          Did you intend these two phrases, "public
8  Facebook page" and "the Facebook page" to be
9  synonymous when you wrote it?
10         MR. MINCKS: Tony, I'm going to have to
11 object.  This -- he is clearly reporting what was told
12 to him by Granger.
13         MR. TROY: These are his words, and he can
14 certainly interpret them.
15         MR. MINCKS: But his words describing what
16 Granger told him.  You're asking him the intent behind
17 the words.  These are Granger's words.  So I'm
18 objecting.
19         MR. PIEPGRASS: There's nothing here that
20 says these were Granger's words.
21         MR. MINCKS: It very clearly says it.
22         MR. HAMBRICK: For the record, the Bullen
23 email is the one that says some were on the public
24 Facebook page and some were on his personal Facebook
25 page.  And if you want to show him that email and ask

Page 43

1  him if that's the basis for why he wrote what he
2  wrote, then I'm happy -- I would invite you to.
3          MR. TROY: Sure, I'd be happy to do that.
4  Is that right here further down on page 2?  Second
5  page, rather.
6          MR. HAMBRICK: It's on the Bullen email,
7  which I know you have.
8          MR. TROY: Yes.  We're getting to that.
9          MR. HAMBRICK: Well, instead of dancing
10 around for 20 minutes asking vague questions --
11 BY MR. TROY:
12     Q    Let me direct your attention to what I
13 think has been marked as Exhibit Number 7.
14     A    Okay.
15     Q    Do you have that in front of you?
16     A    I'm looking at this.  Is that what you're
17 referring to?
18     Q    Yes, sir.
19     A    Okay.
20     Q    On the second page of Exhibit Number 7 --
21     A    Yes.
22     Q    -- there is, on that page, an email from a
23 Howard Bullen to a Jason Fullerton.  Do you see that?
24     A    Yes.
25     Q    Who is Jason Fullerton?

Page 44

1      A    He's an FBI agent.
2      Q    Is he part of the Joint Terrorism Task
3  Force?
4      A    No, sir.
5      Q    And then it is an email from Mr. Bullen,
6  and on the end it lists his -- what is posted on a
7  public Facebook page.  Do you see in the second
8  paragraph, the Facebook page, "Dear Illuminati" and
9  a -- a Facebook citation?
10     A    Yes, sir, I see that.
11     Q    And it says, "Some of the specific posts
12 that have given me concern that it is possibly more
13 than just extremist rhetoric are:"  And then it lists
14 a number of bullet points --
15     A    Yes.
16     Q    -- correct?
17     A    Yes, sir.
18     Q    And then on the last page of that exhibit,
19 "Much of the same rhetoric is also on his personal
20 Facebook page."  And it gives two bullet points on
21 that --
22     A    Yes, sir.
23     Q    -- correct?
24     A    Yes.
25     Q    Did the FBI have access to the personal

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Paris
October 17, 2013

Page 45

1  Facebook page?
2       MR. HAMBRICK: Objection.  Do not answer
3  that question.  If you want to ask him what he knew
4  about, you're more than welcome to.
5       A    I don't know if they did or they didn't.
6  I don't know.
7  BY MR. TROY:
8       Q    Did you have any information what was
9  posted on his personal Facebook page beyond what is
10 reflected on the last page of Exhibit Number 7?
11      A    No, sir.
12      Q    Now, a little out of order, but during all
13 of this, the secret service were brought in and
14 contacted -- contacted and brought in on this matter,
15 correct?
16      A    Yes.
17      Q    And is that because of the comments about
18 the two former President Bushs?
19      A    Yes.
20      Q    All right.  And those comments are
21 reflected on the last page of Exhibit Number 7,
22 correct?
23      A    Yes.
24      Q    All right.  What about those comments made
25 you determine or someone determine that the secret

Page 46

1  service should be brought in?
2       MR. HAMBRICK: Objection.  Lack of
3  foundation.  If you made the decision, answer.  If
4  you -- if you know why the decision was made, you can
5  answer, but don't speculate.
6       A    I'm not going to speculate.  I don't know.
7  BY MR. TROY:
8       Q    Were those, to your knowledge, determined
9  to be threats against the former presidents?
10      MR. HAMBRICK: Same objection.
11      A    You're asking me my opinion of these?
12 BY MR. TROY:
13      Q    I'm asking to your knowledge, were these
14 comments viewed as threats against -- against the
15 former two presidents?
16      MR. HAMBRICK: Objection.  Viewed by whom?
17      MR. TROY: Read back the question, please.
18      (Record read.)
19      MR. HAMBRICK: Same objection.
20      A    By me or by other people or --
21 BY MR. TROY:
22      Q    Did you have any discussion with anyone
23 that -- where these were viewed as threats against the
24 former two presidents?
25      A    I don't recall.

Page 47

1       Q    Did you view them as threats against --
2       A    Did I view them as threats?
3       Q    Yes.
4       A    I'd be speculating as far as what I felt
5  at the time about these.  I don't know if I'd view
6  them as threats, but I'd view them as something we
7  need to notify the secret service about.  That would
8  be my opinion on it.
9  BY MR. TROY:
10      Q    You were aware that both the Commonwealth
11 Attorney and the U.S. Attorney had been notified and
12 determined that these did not constitute any criminal
13 wrongdoing, correct?
14      A    Yes.
15      Q    All right.  Let's go back to Exhibit
16 Number 1.  Halfway down, the paragraph starts, "On
17 August 16th, 2012, I was informed by SSA John Wyman
18 that contact would be made with Brandon Raub to
19 determine whether he is capable of acts of violence to
20 the public or government and to determine if there is
21 a need for Crisis Intervention to conduct an
22 evaluation," correct?
23      A    Yes, sir.  I wrote that.
24      Q    When he was taken into custody, was a
25 basis of him being taken into custody a determination

Page 48

1  that he was capable of acts of violence to the public
2  or government?
3       MR. MINCKS: Object to the form.
4       MR. HAMBRICK: By him?  By whom?
5       MR. TROY: He's part of the people who
6  took him into custody.
7  BY MR. TROY:
8       Q    Was that a basis for the determination?
9       MR. MINCKS: Object to the form of the
10 question.
11      MR. HAMBRICK: Objection.
12      MR. MINCKS: Go ahead.
13      A    Can you say the question again, please?
14 BY MR. TROY:
15      Q    Well, let's go back and read what you're
16 saying here.  These are your words still?
17      A    Yes, sir.
18      Q    It was determined that contact would be
19 made to determine, my word, one, whether Brandon Raub
20 was capable of acts of violence to the public or the
21 government or, two, to determine if there was a need
22 for Crisis Intervention to conduct an evaluation.
23      MR. HAMBRICK: Objection because you
24 changed the wording of the statement to an alternative
25 as opposed to a compound statement.  Is there a

Page 49

1  question?
2  BY MR. TROY:
3     Q    My question is, you know, when it was
4  determined that he should be taken into custody, was
5  it because that it was a determination that he was
6  capable of acts of violence to the public or the
7  government?
8          MR. MINCKS: Objection to the form of the
9  question.
10    A    Yes.
11 BY MR. TROY:
12    Q    Okay.  And also that there was a need for
13 Crisis Intervention?
14    A    Well, felt like he needed to talk to a
15 professional.
16    Q    On the next page, the third page of
17 Exhibit Number 1, it's page 10 of 13, "I telephoned
18 our ECC to determine calls for service at."
19         What is ECC?
20    A    Emergency Communication Center.
21    Q    And what were you trying to determine by
22 making contact with the ECC?
23    A    Determine if the house was flagged, if it
24 was a residence that we needed to be concerned with
25 prior to making contact.

Page 50

1     Q    In what respect?
2     A    If there was previous incidents out there
3  that would cause us to be -- to take extra precaution
4  or -- it's -- we do that with residents where there's
5  potential for volatile situations.
6     Q    Okay.  Then you called the Commonwealth's
7  Attorney's Office at the request of Special Agent
8  Wyman to determine if any state criminal laws were
9  violated, correct?
10    A    Yes.
11    Q    And you spoke to a Dennis Collins?
12    A    Yes.
13    Q    Who is he?
14    A    He's a Deputy Commonwealth Attorney,
15 Chesterfield County.
16    Q    And he advised you, based on the
17 information provided, Raub did not violate any
18 criminal law?
19    A    Yes, sir.
20    Q    And he gave you a reason why?
21    A    Correct.
22    Q    Then a similar call was made to the
23 United States Attorney's Office, correct?
24    A    Yes.
25    Q    And so the response back from the

Page 51

1  United States Attorney's Office, no federal law was
2  violated, correct?
3     A    Yes.
4     Q    And there's more.  Who did you talk to at
5  the U.S. Attorney's Office?
6     A    I didn't.
7     Q    Who -- who contacted the U.S. Attorney's
8  Office?
9     A    John Wyman did.
10    Q    Special Agent?
11    A    He's Supervisor John Wyman.
12    Q    Did he tell you --
13    A    If I recall correctly.
14    Q    Do you know who he spoke to?
15    A    Oh, I can't think of his name.  I
16 apologize.
17         MR. HAMBRICK: Is this -- how is this
18 relevant to any of this?
19         MR. TROY: Trying to find out what basis
20 they had when they determined that they were going to
21 take him in.
22         MR. HAMBRICK: He's already said that he
23 was advised that there was no criminal violation
24 committed.  So -- so what does it matter who he spoke
25 to?

Page 52

1  BY MR. TROY:
2     Q    Do you know who he spoke to?
3         MR. MINCKS: I'm going -- I am going to
4  object.  Tony, we're so far off out of the scope of
5  this.
6  BY MR. TROY:
7     Q    Do you know who he spoke to?
8     A    I can't recall at this point.  No.
9     Q    Was it Mr. Hambrick, if you know?
10    A    No, sir.
11    Q    Okay.  No, you don't know or no, it was
12 not Mr. Hambrick?
13    A    It was not Mr. Hambrick, no, sir.
14    Q    When was this call made to the ECC, if you
15 know?
16    A    I probably would have made it on --
17         MR. HAMBRICK: If you know, answer.  If
18 you don't know, don't guess.
19    A    I don't -- I don't recall the same -- the
20 exact date.
21 BY MR. TROY:
22    Q    Was it the same date, the 16th of August,
23 when you were going out there?
24    A    I cannot say for sure.
25    Q    Let me ask you to flip back to the prior

Page 53

1  page. At the top it says "Page 9 of 13."
2      Do you see that?
3  A   Yes.
4  Q   Go to the paragraph we've been talking
5  about on August 16th, 2012. You informed Special
6  Agent -- excuse me, John Wyman you were going to make
7  contact with Brandon Raub. Then at the last sentence
8  of that paragraph, "After further information was
9  received from complainants, the timeline to make
10  contact with Brandon Raub was moved to 8/16, Thursday
11  afternoon."
12      It was going to be on a Friday, not a
13  Thursday, correct?
14  A   Yes.
15      MR. MINCKS: Tony, I'm going to have to
16  object to the question because you've completely
17  turned the premise of the whole question upside
18  down --
19      MR. TROY: All right.
20      MR. MINCKS: -- from what is in the
21  writing. I mean, you've said it completely 180
22  degrees wrong.
23      MR. TROY: It says what it says.
24      MR. MINCKS: It does. It does. It most
25  definitely does.

Page 54

1      MR. TROY: If you think it's unfair, you
2  can make an argument later.
3      MR. MINCKS: I'm actually trying to get to
4  that point now.
5  BY MR. TROY:
6  Q   What was it that determined that the
7  timeline had to be moved forward from that Friday to
8  Thursday?
9  A   I received a phone call the morning of the
10  16th around about 10:30 from Supervisor Special Agent
11  John Wyman and said, "We got to go tonight. The
12  postings are a little more volatile. They're getting
13  a little bit more violent oriented and we can't wait
14  until Friday. We've got to go tonight."
15      I recall that phone call because I know
16  where I was at that time.
17  Q   Well, was there a monitoring then going on
18  of the Facebook postings?
19      MR. HAMBRICK: Objection.
20  BY MR. TROY:
21  Q   I mean, we went through --
22      MR. HAMBRICK: Ask him what he knows.
23      MR. TROY: Let me finish the question
24  first before you object.
25  BY MR. TROY:

Page 55

1  Q   Go back to Exhibit Number 7. This is
2  the -- what we call the Bullen email. On the second
3  page of Exhibit Number 7.
4  A   Okay.
5  Q   That was received on August 15th, is that
6  correct, at 7:58, almost 8?
7      MR. HAMBRICK: You're talking about the
8  root email from Bullen to Fullerton?
9      MR. TROY: Correct.
10      MR. HAMBRICK: Okay.
11  A   Yes.
12  BY MR. TROY:
13  Q   Is that the email that determined things
14  had to be moved up?
15      MR. HAMBRICK: Objection. He is not the
16  one who made the decision.
17  BY MR. TROY:
18  Q   If you know.
19      MR. HAMBRICK: Lack of foundation.
20  A   I don't know if that's it. No, sir.
21  BY MR. TROY:
22  Q   Do you know of anything else?
23  A   I don't.
24  Q   Well, you indicated, I think, and I may be
25  misphrasing, and I'm sure there are plenty of people

Page 56

1  who are going to object if I do, but something to the
2  effect that you moved it -- it was moved forward
3  because the postings were becoming -- I forgot the
4  exact phrase, but of more concern. Is that a fair
5  statement of your prior testimony --
6      MR. HAMBRICK: Objection.
7  BY MR. TROY:
8  Q   -- a few minutes ago?
9      MR. MINCKS: I'll object because he said
10  more violent, but go ahead. I'm sorry.
11      MR. HAMBRICK: I know it's hard when you
12  get a question -- that was a paraphrasing of his
13  testimony that the postings had become more violent
14  and that's why it was moved up. I'll --
15  BY MR. TROY:
16  Q   More violent, more concerned, whatever.
17      Something happened that it was decided
18  that you had to move it up from the 17th, the Friday,
19  to Thursday, correct?
20  A   Yes, sir.
21  Q   Not you personally, but it was going to be
22  moved up? "It" being the confrontation or the visit
23  to Mr. Raub.
24      MR. MINCKS: Objection to the
25  characterization as confrontation.

Page 57

BY MR. TROY:
1  Q    What gentle word would you want me to use?
3      MR. HAMBRICK: Interview.
4  A    Interview.
5      MR. HAMBRICK: Interview would work.
6  BY MR. TROY:
7  Q    The polite interview of Mr. Raub --
8  A    Yes.
9  Q    -- was moved from the 17th to the 16th?
10     To your knowledge, was there anything
11 other than the Bullen email, as reflected in Exhibit
12 Number 7, that constituted the basis for the
13 determination to move it?
14 A    I don't even know if this was the basis.
15 I was just told by my supervisor that we were going to
16 move it up, that we were going to move it from the
17 17th to the 16th.  What that information was, I didn't
18 know at that point.
19 Q    Well, you knew it was something that was
20 brought to their attention --
21 A    Yes, sir.
22 Q    -- of a more serious nature?
23 A    Yes, sir.
24 Q    Do you know if there was a monitoring
25 going on of Brandon Raub's Facebook?

Page 58

1      MR. HAMBRICK: Do not answer that
2  question.  Well, actually, you can answer that
3  question.  Do you know if any -- if there was any
4  monitoring?
5  A    I don't know.
6  BY MR. TROY:
7  Q    All right.
8  A    I do not.
9  Q    So to your knowledge, other -- you have no
10 knowledge of what may have done it other than the
11 Bullen email, Exhibit Number 7 --
12     MR. HAMBRICK: Objection.  Asked and
13 answered.
14 BY MR. TROY:
15 Q    -- in your opinion or in your knowledge?
16     MR. HAMBRICK: You're asking him to
17 speculate because he already said he doesn't --
18     MR. TROY: I'm asking him for his
19 knowledge.  I'm not asking him to speculate a thing.
20     MR. HAMBRICK: And he said he doesn't even
21 know if the Bullen email was what did it.
22     MR. TROY: Okay.
23     MR. HAMBRICK: He said four times he
24 doesn't know what did it.
25     MR. TROY: All right.

Page 59

BY MR. TROY:
1  Q    Let's move on to Exhibit Number 2.  Do you
3  have what has been marked as Paris Exhibit Number 2
4  front of you?
5  A    I have Exhibit 2.
6  Q    Yes, sir.
7  A    Okay.
8  Q    Can you identify that exhibit?
9  A    Yes, sir.
10 Q    What is it?
11 A    This is -- this would have been a
12 narrative.  It's -- it's a lot like Exhibit 1.
13 Q    Well, it is.  I will tell you and
14 stipulate that it is, but I was just trying to figure
15 out why this was created when you had what is now
16 marked as Exhibit Number 1.  What was the purpose of
17 this as opposed to Exhibit Number 1?  "This" being
18 Exhibit Number 2.
19 A    I'm not sure I understand what your
20 question is.
21 Q    Well, is this -- what is Exhibit -- let me
22 rephrase -- let me ask you again.  What is Exhibit
23 Number 2, and why was it created?
24 A    It looks like -- it looks like a narrative
25 that -- let me make sure I'm understanding this is

Page 60

1  mine.
2  Q    Well, it's bad form to ask another
3  question when one is pending, but did you create what
4  has been marked as Paris Exhibit Number 2?
5  A    Well, it -- I want to make sure this is --
6  this is my --
7      MR. HAMBRICK: You can take your time and
8  review it.  There's -- you need to do that before you
9  lay claim to it.
10 A    What are you asking me about Exhibit 2,
11 sir?
12 BY MR. TROY:
13 Q    Did you create Exhibit Number 2?
14 A    It appears that I did.  This looks like a
15 document that I did.  But I'm having difficulty with
16 not having the report number and our patch on there
17 and that.  Just --
18 Q    No.  I understand.  That's why I was
19 asking the question, you know, why was it created by
20 you?
21 A    I'm not sure -- just to document what
22 happened.
23 Q    Exhibit Number 1 documented what happened,
24 correct?
25 A    Yes, sir.

---

Page 61

1   Q   So why did we create what is now Paris
2   Exhibit Number 2?
3       MR. HAMBRICK: Objection.  Asked and
4   answered.
5   A   I had to document what had happened at
6   the -- with this particular situation.
7   BY MR. TROY:
8   Q   All right.  On page 2 of Exhibit Number 2,
9   the fourth paragraph down starting at, "At 1800 I
10  arrived at the staging area."  The last sentence of
11  that paragraph, "Agent Granger did a briefing prior to
12  going to his residence with all present at the staging
13  area."
14      What did she state?
15  A   She -- if I remember correctly, she
16  basically gave a synopsis of why we were there, why we
17  were going to approach Mr. Raub, and the whole reason
18  behind why we were going to interview him, just to
19  see, you know, where he was mentally.
20  Q   And did she discuss, at that staging area,
21  the postings that had been made?
22  A   She did.
23  Q   And what was said about the postings?
24  A   Just that there was some concern about
25  what was -- what he was putting out on the Facebook

---

Page 62

1   page and there was some concern maybe he might act out
2   in a violent manner.
3   Q   So when you were approaching him, you
4   thought he might act violently toward you and Agent
5   Granger?
6   A   We didn't know.  I mean, we have no idea
7   of knowing.  So --
8   Q   But that was a thought?
9   A   It's always a thought when you go to
10  interview people.
11  Q   That was a specific thought with regard to
12  Brandon Raub?
13      MR. HAMBRICK: Objection.  Asked and
14  answered.  You can answer.
15  A   Quite frankly, I don't recall exactly what
16  was running through my mind when I'm walking up to his
17  front door to interview him.
18  BY MR. TROY:
19  Q   All right.  Did she discuss why a crisis
20  intervention might be necessary?  "She" being Agent
21  Granger.
22  A   No, sir.
23  Q   Did she discuss anything other than a
24  discussion about the postings and further inquiry
25  about the postings?

---

Page 63

1   A   She just gave a synopsis of why we were --
2   why we were going to go approach him, and she wanted
3   to inform everybody there that was involved what was
4   going on.
5   Q   I'm trying to find out what she said.  Can
6   you be a little more specific as to what she said?
7   A   She mentioned the postings, and she said
8   that she determined at that time she wanted her and I
9   to go, make contact with Mr. Raub.
10  Q   Why were you chosen?
11  A   Because I'm the Chesterfield
12  representative for JTTF.  That's -- would be my guess.
13  But why she chose me, I don't know for sure.
14  Q   All right.  Now let's go back to what she
15  said to the group that was gathered at the staging
16  area.  Anything -- did she discuss any mental health
17  issues at all to those present at the staging area?
18  A   She --
19      MR. MINCKS: Object to the form.  Go
20  ahead.
21  A   If I recall correctly, yes, she did.
22  BY MR. TROY:
23  Q   And what did she say?
24  A   I don't know exactly what she said.  I
25  really don't.  I don't recall exactly what was said at

---

Page 64

1   the briefing.
2   Q   You do recall comments and descriptions
3   about the postings?
4   A   I do recall that.  Yes, sir.
5   Q   Do you recall anything else specific?
6   A   Nothing specific.  I just -- this was a
7   brief overview of why we were there and why we were
8   going to make contact with Mr. Raub.
9   Q   All right.  There came a time when you had
10  a physical problem when you were talking to --
11  A   Yes, sir.
12  Q   -- Mr. Raub?
13      What happened?  Do you know?  I know you
14  fainted, but why?
15  A   That was a long day.  I could get into my
16  whole day.  It kind of explains what happened to me.
17      No lunch, no dinner, very little fluids.
18  I was probably dehydrated, malnourished, and the heat
19  got the best of me.
20  Q   It was -- what was it, August -- yeah, it
21  was August 17th.  What was the weather?
22      MR. HAMBRICK: 16th, for the record.
23  BY MR. TROY:
24  Q   16th.  I'm sorry.  16th.  What was the
25  weather?

---

Page 65

1    A    It was sunny, humid and relatively hot.
2         MR. HAMBRICK: In Richmond? Sorry.
3    A    I made the mistake of working out with my
4  football team that morning. I coach and did
5  conditioning with them that morning, not knowing that
6  I was going to be working at 7:00 at night, or didn't
7  think that was going to happen.
8  BY MR. TROY:
9    Q    Well, is there -- was there anything else
10 physically other than you think you became dehydrated,
11 no food, dehydration and it got to you?
12   A    I went and saw my doctor the following
13 day, and I did a stress test and, you know --
14   Q    Everything is fine?
15   A    Yes, sir.
16   Q    All right. I'm not trying to probe.
17   A    I understand.
18   Q    I'm just trying to understand if there was
19 a physical condition other than that.
20        After you fainted and recovered, you went
21 to Agent Granger's car --
22   A    Yes, sir.
23   Q    -- is that correct?
24   A    Yes, sir.
25   Q    And you called Mr. Campbell?

Page 66

1    A    Not immediately.
2    Q    You called for him to call you?
3    A    I -- I called --
4    Q    Well, let me -- what happened?
5    A    From what point? When we walked --
6    Q    After you recovered, tell me what happened
7  then.
8    A    I walked to Agent Granger's car, which was
9  parked off to the side but on the same side of the
10 street of Mr. Raub's residence. We sat in Agent
11 Granger's car.
12   Q    Okay. And then what happened next?
13   A    We observed Mr. Raub come out. First, he
14 walked out of the house, about halfway in his yard,
15 and then he walked all the way up almost entirely to
16 his mailbox, where he engaged conversation with some
17 of the law enforcement personnel that were standing
18 out there.
19   Q    And then what happened?
20   A    Terry was just checking on me. Agent
21 Granger was just checking on me, giving me water. She
22 gave me an energy bar, you know, something like that.
23 I felt fine.
24        And we determined -- she made the comment
25 to me that, "We need" -- "we need to get this guy

Page 67

1  evaluated. You know, we can't leave here without
2  doing something." This is -- there was concern of
3  potential violence.
4    Q    And what was that based on?
5    A    Our interview.
6    Q    Anything else?
7    A    It was a lot of what he said verbally and
8  nonverbally, his emotions. It was a totality of
9  several things.
10   Q    All right. So what happened next?
11   A    I called our Emergency Communications
12 Center. I identified myself. I told them where I
13 was, told them who I was with and said, "Can you have
14 crisis or mental health" -- I forget exactly what they
15 call it now. I said, "Can you have them call me? I
16 need them" -- "we need to talk to them."
17   Q    And then what happened?
18   A    Less than three minutes later, Michael
19 Campbell called me, and I was talking to him on my
20 phone.
21   Q    And was Agent Granger present?
22   A    Yes.
23   Q    And she could hear the conversation?
24   A    Yes, sir. She was sitting in the driver's
25 seat of her car. I was sitting in the passenger seat.

Page 68

1    Q    Were the doors closed and the car running
2  with air-conditioning, I hope?
3    A    Yes.
4    Q    And you described certain mannerisms to
5  Mr. Campbell?
6    A    Yes, I did.
7    Q    And what did he state?
8    A    He said yes, bring him in. He needs to be
9  evaluated.
10   Q    All right.
11   A    I can't remember exactly what he said, but
12 he concurred with --
13   Q    Was anybody else in the car while you were
14 talking to Mr. Campbell?
15   A    Just Agent Granger. It was just her and
16 I.
17   Q    No one else?
18   A    No, sir.
19   Q    Where was Officer Granderson?
20   A    He was standing behind Agent Granger's
21 car, like in the trunk area.
22   Q    Did you get out of the car and hand him
23 the phone?
24   A    Yes, I did.
25   Q    And that is why?

Page 69

1  A   I -- I wanted to be -- I knew that he,
2  being in a uniform, was going to make physical contact
3  with Mr. Raub, and I just wanted him to make sure that
4  he knew what was going on.  I wanted to make sure that
5  I had everything straight.
6  Q   All right.  All right.  Let's go to
7  Exhibit Number 3.  All right.  Do you have Exhibit
8  Number 3 in front of you?
9  A   Yes.
10  Q   And these are "Answers of Michael Campbell
11  to Interrogatories" -- "to Limited Interrogatories
12  Approved by the Court."  That's the title of the
13  document.  Do you see that?
14      THE DEPONENT: Is this --
15      MR. HAMBRICK: Yes.
16  A   Okay.
17  BY MR. TROY:
18  Q   All right.  On page 3 of that document,
19  near the bottom there's a sentence that starts,
20  "Detective Paris also informed me that Mr. Raub had
21  rapid mood swings."
22      Do you see where I'm reading?
23  A   Yes.
24  Q   "Rapid mood swings during their
25  conversation" -- and Mr. Campbell says that's another

Page 70

1  common symptom of mental instability -- "and that when
2  Detective Paris asked him about specific threats which
3  he had made, Mr. Raub would not answer his questions.
4  Detective Paris also indicated that Mr. Raub was
5  extremely serious and intense during the entirety of
6  the conversation and that he never joked or expressed
7  any kind of lightheartedness."
8      So which was it; that he was constantly
9  serious and intense or that he had mood swings?
10      MR. HAMBRICK: Objection.  The two aren't
11  mutually exclusive.
12  A   He was never in a relaxed state.  He
13  was -- what I mean by "mood swings," that he would --
14  like his chest would come out and he would have this
15  real -- and then he would kind of, I don't know, stare
16  off, like just -- but he still had that tense look,
17  but it was like -- I mean, he was up there, but he
18  would get higher and then a little bit lower, but he
19  was never in a calm state.
20  BY MR. TROY:
21  Q   Well, I should have asked you first, what
22  Mr. Campbell is describing here, is -- is that
23  accurate with regard to what you told him?
24  A   I think it's basically accurate.  Yes,
25  sir.

Page 71

1  Q   All right.  He also says, continuing on
2  page 4, that you conveyed to him that "Mr. Raub
3  represented a threat, in the immediate future, to harm
4  other individuals."
5      Is that an accurate statement of what you
6  said?
7  A   I probably used the word potentially.
8  Q   And --
9  A   I don't recall exactly everything I said
10  to Mr. Campbell.
11  Q   Did you tell Mr. Campbell that you
12  believed that Mr. Raub represented a threat in some
13  form to harm other individuals?
14  A   Yes.
15  Q   And what was that based on?
16  A   Based on the interview, based on what --
17  his responses to our questions in relation to, Are you
18  going to act in a violent manner?
19  Q   And you've indicated that he wouldn't
20  answer those questions, correct?  He wouldn't give you
21  an answer or a direct answer to those questions?
22  A   That's correct.
23  Q   And so is that the basis that you believed
24  he would harm others, because he would not answer your
25  questions?

Page 72

1      MR. HAMBRICK: Just for the record --
2      MR. MINCKS: Object to form.
3      MR. HAMBRICK: Objection.  Yeah.  He's
4  testified he based it on the email, the Howard Bullen
5  email, his discussion with Terry Granger, his
6  interactions with Raub in their entirety and his
7  discussion with Mr. Campbell.  So I just want that on
8  the record because you keep narrowing things.  So --
9      MR. TROY: The only reason I asked and I
10  narrowed is because Detective Paris indicated that it
11  was based on the interview that he had with Mr. Raub.
12  BY MR. TROY:
13  Q   You came to the conclusion, based on the
14  interview, you said a minute ago, that you felt he was
15  a threat to others; is that correct?
16      MR. MINCKS: Objection.  That does not
17  preclude all the other things also factoring into that
18  decision.  They're not mutually exclusive.  And
19  it's asked and answered, but go ahead.
20  BY MR. TROY:
21  Q   Well, you already indicated, with regard
22  to the Howard Bullen email, that you had information
23  and advice from both the Commonwealth Attorney of
24  Chesterfield and the United States Attorney's Office
25  for the United States of America, the Eastern District

---

Page 73

1 of Virginia, that no crime was committed, as reflected
2 in the emails, correct?
3   A   Yes. That's correct.
4   Q   All right. So beyond that, you had an
5 interview. The only other information you had from
6 Mr. Raub was the bulletins and the interview that you
7 had with Agent Granger, correct?
8       MR. MINCKS: Objection. Asked and
9 answered. He's already answered --
10 BY MR. TROY:
11  Q   Correct?
12      MR. MINCKS: -- Tony.
13  A   The interview and Bullen, yes, sir.
14 BY MR. TROY:
15  Q   All right. So what --
16      MR. HAMBRICK: I'm sorry. The interview
17 and the Bullen email.
18  A   There was -- there was -- obviously, the
19 interview. It was not just his verbal. It was his
20 nonverbal as well.
21 BY MR. TROY:
22  Q   I understand that. But your determination
23 that -- or your confirmation, if you want to use that,
24 that he was a threat to others was based on the
25 interview you had with Mr. Raub, correct?

---

Page 74

1       MR. MINCKS: Objection.
2       MR. HAMBRICK: And the email.
3   A   And the email. Yes, sir.
4 BY MR. TROY:
5   Q   Okay.
6       MR. MINCKS: And I have to object. Asked
7 and answered. He already has testified as to other
8 things that entered into the decision.
9 BY MR. TROY:
10  Q   Did you and Mr. Campbell discuss whether
11 he should -- "he" Mr. Campbell -- should talk to
12 Mr. Raub over the phone?
13  A   We did not, that I can recall.
14  Q   And then eventually Mr. Raub was detained
15 and transported to where?
16  A   I believe he was taken to our jail.
17  Q   All right.
18  A   But I'm not 100 percent sure.
19  Q   All right. Let me show you something with
20 regard to the jail here. This is -- while we're
21 trying to get that, let's go to Exhibit Number 4. You
22 have that in front of you?
23  A   Yes.
24  Q   This is a "Petition for Involuntary
25 Admission for Treatment." Were you involved at all in

---

Page 75

1 this stage of the proceedings involving Mr. Raub?
2   A   No, sir.
3   Q   All right. Do you see on the first page
4 of Exhibit Number 4 there are two boxes that are
5 checked? Well, there are a number of boxes checked,
6 but let me point these two boxes to you. These two
7 that are indented.
8       After the paragraph "I, the undersigned
9 petitioner." And then it's box -- the first box I
10 want to talk about, "cause serious physical harm to"
11 and the box is checked "others as evidenced by,"
12 correct?
13      MR. MINCKS: I'm going to object to any
14 questioning about this particular document since it's
15 incomplete. It says on its face that a prescreen
16 report is attached to it, and we know that attached to
17 the prescreening report was also the Bullen email. So
18 this is -- this is not the petition. This is two
19 pages of the petition.
20 BY MR. TROY:
21  Q   Do you see the box "serious physical harm
22 to self" is not checked, correct?
23  A   It doesn't appear to be, no, sir.
24  Q   Okay. The box "physical harm to others as
25 evidenced by recent behavior causing, attempting or

---

Page 76

1 threatening harm and/or" -- "and other relevant
2 information," that box is checked, correct?
3   A   Yes.
4   Q   And then the box below that, "suffer
5 serious harm to respondent's" -- "due to respondent's
6 lack of capacity to protect self from harm or to
7 provide for respondent's own basic human needs."
8       Do you see that box being checked?
9   A   I do.
10  Q   Do you have any knowledge of the basis for
11 that box being checked?
12      MR. HAMBRICK: Objection. He --
13 BY MR. TROY:
14  Q   Based on everything that you had observed?
15      MR. HAMBRICK: Objection. He testified --
16 he's never -- I think he testified he's never seen
17 this document, knows no --
18      MR. TROY: I understand that.
19      MR. HAMBRICK: -- knows nothing about that
20 and knows nothing about how this document or who
21 prepared it.
22 BY MR. TROY:
23  Q   Do you have any basis or knowledge that
24 would support that box being checked? Simple
25 question. Yes or no.

Page 77

1  MR. HAMBRICK: Objection. Objection. The
2  question is incredibly vague because you're asking him
3  what someone else might have based that checking this
4  box on --
5  MR. TROY: I'm not --
6  MR. HAMBRICK: -- instead of asking him
7  whether he would have checked the box.
8  MR. TROY: Do you want me to ask that
9  question --
10  MR. HAMBRICK: You can ask whatever
11  question you --
12  MR. TROY: -- and then see what kind of
13  objection you would get from everyone?
14  BY MR. TROY:
15  Q   Do you see the box that's checked "suffer
16  serious harm due to respondent's lack of capacity"?
17  Do you see what I'm talking about, Detective Paris?
18  A   Yes, I do, sir.
19  Q   Do you have any information that would be
20  a predicate for that box being checked?  Do you
21  personally --
22  A   I do not.
23  Q   -- Michael Paris, have any information?
24  A   I do not.
25  Q   And that includes the interview you had

Page 78

1  with Mr. Raub that day, correct?
2  MR. HAMBRICK: Objection.  Asked and
3  answered.
4  MR. TROY: It's not asked and answered.
5  MR. MINCKS: This is a --
6  BY MR. TROY:
7  Q   Detective Paris, would anything, based on
8  the interview that you and Agent Granger conducted
9  with Mr. Raub, justify that box being checked --
10  MR. HAMBRICK: Objection.
11  BY MR. TROY:
12  Q   -- in your opinion?
13  MR. MINCKS: Objection.
14  MR. HAMBRICK: Objection.
15  MR. MINCKS: Yeah.  This is prepared
16  actually by a mental health professional, and you know
17  that.  It is not prepared by Detective Paris.  This is
18  the assessment of Michael Campbell, and you know that.
19  MR. TROY: I understand that.
20  MR. MINCKS: And you've taken the
21  deposition of Michael Campbell, and you know exactly
22  when Michael Campbell himself checked this box.
23  BY MR. TROY:
24  Q   I'm asking you based on the verbal
25  communications that you had with Mr. Raub, did

Page 79

1  anything he say suggest to you that he had a lack of
2  capacity to protect himself from harm or provide for
3  his own basic human needs?
4  MR. MINCKS: Objection.  No foundation
5  that he would be able to make that determination
6  himself.  This is done by a mental health professional
7  to a magistrate.
8  A   Not that I recall, no, sir.
9  BY MR. TROY:
10  Q   Okay.  Thank you.
11  All right.  Detective Paris, let me show
12  you a video that we received, and I just want to --
13  this is a five-hour video, and since it's a two-hour
14  deposition, we're not going to run the whole thing.
15  But we can stop it along on the line.  Where is that?
16  The one with Brandon and Michael Campbell.
17  All right.
18  MR. PIEPGRASS: Do you want one with
19  Campbell in the picture too?
20  MR. TROY: Slow it down.  Yeah.
21  MR. PIEPGRASS: Okay.
22  BY MR. TROY:
23  Q   When he was transported to the
24  Chesterfield facilities, were you involved in that
25  transportation?

Page 80

1  A   I was not.
2  Q   When did you last see Mr. Raub, to your
3  knowledge?
4  A   When he was put in the back seat of the
5  patrol car at his residence.
6  Q   And then what did you do at that time?
7  A   We went -- we went back to the staging
8  area and debriefed, and I was told to go home at that
9  point --
10  Q   Okay.
11  A   -- because --
12  Q   So you had nothing to do with the
13  interview?
14  A   No, sir.
15  Q   All right.  Let me ask you this.  This is
16  a picture.  Do you recognize the picture of
17  the person --
18  A   Can you turn the face up a little bit?
19  Q   -- the person sitting there in white
20  shorts without a shirt?  Do you recognize that to be
21  Brandon Raub, the last time you saw him being
22  trans-- when he -- prior to his being transported?
23  A   I believe that's Brandon Raub in that
24  video.  Yes, sir.
25  MR. TROY: All right.  Stop it there.

---

Page 81

1  BY MR. TROY:
2     Q    That's, I will tell you, in the striped
3  shirt, Michael Campbell doing an interview.  Do you --
4  had you met Mr. Campbell prior to that?
5     A    No, sir.
6     Q    All right.  Do you recognize any of the
7  police officers that are in that picture?
8     A    I can't -- I can't make out the police
9  officer here that's closest facing us.
10    Q    All right.  It appears that some of these,
11 specifically -- let me point here.  This appears to be
12 the uniform of a Chesterfield police officer --
13    A    Yes.
14    Q    -- is that correct?
15         And the other one that was a minute ago is
16 the -- what I would suggest is the uniform of a
17 Chesterfield deputy sheriff.
18         MR. HAMBRICK:  Are you testifying or
19 asking --
20 BY MR. TROY:
21    Q    Do you recognize --
22         MR. HAMBRICK:  -- or asking him a
23 question?
24 BY MR. TROY:
25    Q    Do you recognize this area?  I'm just

---

Page 82

1  trying to find out if you know how he -- where he was
2  being held.  What does this picture show?  What
3  facility is he in --
4         MR. MINCKS:  Tony --
5  BY MR. TROY:
6     Q    -- if you know?
7         MR. MINCKS:  Tony, objection to the
8  question.  Look, if we could go back to the order.
9  This gentleman is supposed to be talking about what he
10 knew.  This -- he's already testified that what you
11 are showing him right now happened after his
12 involvement in this case ended.  He went home is what
13 he testified to.  This has nothing to do with what
14 this gentleman knows.
15         MR. TROY:  I understand.  I'm just trying
16 to ask --
17         MR. MINCKS:  So, therefore, it has nothing
18 to do with -- if I could just finish, Tony.
19         MR. TROY:  Sure.
20         MR. MINCKS:  So, therefore, it doesn't
21 have anything to do with the scope of this order.
22         MR. TROY:  All right.
23         MR. MINCKS:  Now, we both know that.
24 BY MR. TROY:
25    Q    Do you recognize that facility that

---

Page 83

1  Mr. Raub is shown in that picture?
2     A    Yes.
3     Q    And what is that facility?
4     A    It looks like a booking area.
5     Q    Where?
6     A    I believe it's in our jail, sir.
7     Q    At the county jail?
8     A    Yes.
9     Q    And whose custody, to your knowledge, was
10 Mr. Raub in at that time?
11         MR. MINCKS:  Objection to form.
12         MR. HAMBRICK:  Objection.  That calls for
13 a legal conclusion.
14         MR. MINCKS:  He was also not there.  He
15 went home.  That's what he testified to.
16         MR. HAMBRICK:  How is he -- objection.
17 He's got no foundation for that.
18 BY MR. TROY:
19    Q    Do you know whose custody he was in when
20 he was sitting there shirtless at the booking area of
21 the county -- city -- county jail?
22         MR. HAMBRICK:  Same objection.
23         MR. MINCKS:  Same objection.  Certainly
24 outside the scope of what we're supposed to be here
25 talking about.  And time is running.

---

Page 84

1  BY MR. TROY:
2     Q    Simply, do you know whose custody he was
3  in?  Yes or no.
4         MR. MINCKS:  Same objections.  Asks for a
5  legal conclusion.  There's no foundation.
6     A    At that point, I do not know.  I was not
7  there.
8  BY MR. TROY:
9     Q    Okay.  All right.  Let's go on to the next
10 exhibit, Number 5.  And this is entitled a "Community
11 Services Behavioral Health Authority Report."  Have
12 you seen this document previously?
13    A    No, sir.
14    Q    All right.  Let me direct your attention
15 to the second page of that document.
16         MR. MINCKS:  I'm going to object to any
17 questions about this particular document.  Not only
18 has he never seen it before, but it's also incomplete.
19 And as you know, Tony, there was the Bullen email that
20 was attached to this prescreen report.
21         MR. TROY:  We already have the Bullen
22 email in front of Detective Paris.
23         MR. MINCKS:  This is incomplete.
24         MR. TROY:  All right.
25         MR. MINCKS:  Same objection.

---

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Paris
October 17, 2013

Page 85

BY MR. TROY:

1  BY MR. TROY:
2      Q    On the second page it says, "Client met
3  with the FBI and secret service to explain recent
4  posts on Facebook.  Client's friends" -- something --
5  "reported client to the FBI for posting extreme
6  conspiracy theories and threats to President Bush."
7          Did you have anything to do with reporting
8  or describing the comments as threats to President
9  Bush?
10         MR. HAMBRICK: Objection.  This is --
11         MR. TROY: Okay.
12         MR. HAMBRICK: -- as I understand it,
13  Michael Campbell's characterization, if Michael
14  Campbell was the author of what he understood.
15  Detective Paris has testified he had nothing to do
16  with this, has never seen this document.  How would he
17  know why Michael Campbell or what Michael Campbell
18  meant by that?  There's no foundation.
19  BY MR. TROY:
20     Q    I think you shook your head a second ago
21  rather than verbalizing.  So we need to get it on the
22  record.  My question was do you have any knowledge of
23  where that came from?
24         MR. MINCKS: Where --
25  BY MR. TROY:

Page 86

1      Q    I think you shook your head no; is that
2  correct?
3          MR. MINCKS: Where what came from?
4      A    Can you rephrase the question again?
5  BY MR. TROY:
6      Q    The comment on the second page about
7  "extreme conspiracy theories and threats to President
8  Bush," do you see that language?
9      A    I do.
10     Q    Did you have any involvement in describing
11  to Mr. Campbell -- this is his writing, as we've
12  already heard -- that there were threats to President
13  Bush?
14     A    I wouldn't have used that language.
15     Q    Did you have a conversation with Michael
16  Campbell regarding the postings relating to the two
17  former President Bushs?
18     A    If I recall correctly, yes, I brought that
19  up.
20     Q    And what did you say, and what did
21  Mr. Campbell say?
22     A    I can't exactly remember the exact
23  conversation, but I -- when I was describing his
24  Facebook posts, I would have -- I would imagine I
25  would have probably mentioned what he wrote about "W

Page 87

1  and Daddy Bush, too," to use his words.
2      Q    All right.  Next is Exhibit Number 6.  And
3  I think we've already talked about that one; is that
4  correct?
5      A    Yes.
6      Q    Let me direct your attention to Exhibit
7  Number 7 again for a moment.  This contains the Bullen
8  email.  On the first page of Exhibit Number 7, did
9  you -- this is from Agent Wyman to both you and Agent
10  Granger, correct?
11     A    Yes.
12     Q    And did you -- this is where you did --
13  you were directed to contact and seek legal advice
14  both from the Commonwealth's Attorney of Chesterfield
15  and the United States Attorney's Office; is that
16  correct?
17     A    I was instructed to call our
18  Commonwealth's Attorney's Office.
19     Q    And you did?
20     A    I did.
21     Q    And you talked to a Dennis Collins?
22     A    Yes.
23         MR. MINCKS: Asked and answered.
24  BY MR. TROY:
25     Q    And you received a text from an old FCPD

Page 88

1  contact?
2          What is FCPD?
3          MR. HAMBRICK: Where are you?  I'm sorry.
4          MR. TROY: Oh, I'm sorry.  It's second
5  paragraph.
6          MR. HAMBRICK: Oh, first page?
7          MR. TROY: Yeah, first page.
8          MR. HAMBRICK: Got it.
9          MR. TROY: Second paragraph.
10  BY MR. TROY:
11     Q    "Below is the text of an email from an old
12  FCPD."  What is FCPD contact?
13     A    I don't know.
14     Q    Whose language -- or who wrote that
15  language, "Below is the text of an email"?  Is that
16  your writing or is it someone else's?
17     A    It's not my writing.  I didn't write that.
18     Q    How was this paragraph -- how was this
19  first page configured?  Do you know?  It's -- is it
20  all from Mr. Wyman?
21         MR. MINCKS: Object to the form of the
22  question.
23         MR. HAMBRICK: Objection.  Document speaks
24  for itself, but if you know.
25         MR. TROY: Just trying to find out what

Page 89

1    FCPD is, guys.  Something police department.
2      A    I don't know what that is.  It's not my
3    writing.
4    BY MR. TROY:
5      Q    But anyway, this is Mr. Wyman providing
6    some legal information in this email to both you and
7    Agent Granger; is that correct?
8      A    Yes.
9      Q    All right.  Let's go on to the next email,
10   Exhibit Number 8.  We've previously talked about the
11   L-I-N-X report that you requested?
12     A    Uh-huh.
13     Q    Is this the response that you received
14   from that report?
15     A    Yes.
16     Q    Or request, rather?
17     A    Yes.
18     Q    Now, the request below that, she is
19   responding at 4:14 to a request that you made at
20   1:55 --
21     A    Yes.
22     Q    -- on August 16th.  This is the same day
23   that everybody arrived at the staging area, correct?
24     A    Yes, sir.
25     Q    And it's on the below subjects.  And

Page 90

1    Brandon Raub.  It's cut off on mine.  Brently.  What
2    is the next?  I have a whole punched through mine.
3    What is --
4      A    Yeah, I do too.
5           MR. HAMBRICK: Brittany.
6           MR. PIEPGRASS: It's Brittany.
7      A    I believe it's Brittany.
8           MR. PIEPGRASS: Yeah.  It's right up here.
9    BY MR. TROY:
10     Q    And the brother.  Brittany Lee Raub.  And
11   the one above that says what?
12     A    Brently.
13     Q    Huh?
14     A    It looks like Brently.
15     Q    Brently Michael Raub.
16          You go on to say, "The two of them are
17   posting some serious stuff on their Facebook page."
18          Who are you referencing when you say "the
19   two of them"?
20     A    I -- I'm almost positive I was referring
21   to Brently and Brandon Raub.
22     Q    What was Brently posting?
23     A    I don't recall.  I honestly don't recall
24   at this time.
25     Q    Well, if the two of them were posting

Page 91

1    serious stuff, why did you talk only to Brandon Raub
2    and not to Brently Raub?
3      A    He was our subject of the assessment.  We
4    didn't open an assessment on anyone else of the three.
5      Q    But you knew that the two of them, meaning
6    Brandon and Brently, were posting, in your words,
7    serious stuff on their Facebook page, correct?
8      A    Based on this email, yes.
9      Q    Did you ask for any assessment to be
10   opened on Brently Raub?
11     A    No, sir.
12          MR. MINCKS: I'm going to object to the
13   form of that question.  There's no foundation that
14   that's his job.
15          MR. TROY: Pardon?
16          MR. MINCKS: There's no foundation that
17   that's what he would do.
18   BY MR. TROY:
19     Q    Well, what would you do --
20          MR. HAMBRICK: Objection.
21   BY MR. TROY:
22     Q    -- if you thought it was serious stuff --
23          MR. MINCKS: Now we're into speculation.
24   BY MR. TROY:
25     Q    -- and ought to be brought to the

Page 92

1    attention of the authorities?
2           MR. HAMBRICK: Objection.  He's testified
3    he didn't open an assessment.
4           MR. TROY: I think we've got to be
5    outside the scope of the order.
6           MR. TROY: Hey, your colleague is the one
7    that raised the question.
8           MR. MINCKS: No, no.  I'm just raising an
9    objection.
10          MR. TROY: Don't yell at me.
11          MR. HAMBRICK: I'm not yelling at anybody.
12   I'm just saying that --
13          MR. TROY: All right.
14   BY MR. TROY:
15     Q    Let me go to the last -- not the next one,
16   but let me go to what has been marked as Exhibit
17   Number 10, which is the very last --
18     A    Okay.
19     Q    -- document, and then we'll go back to
20   Exhibit Number 9.
21          Do you recognize Exhibit Number 10?
22     A    No, sir.
23     Q    Any idea whose handwriting that might be?
24     A    No, sir.
25     Q    Any idea what these phrases are on the

---

Page 93

1 right-hand side, "M16, M" -- can you read that, "M" --
2 is it "M240"?
3    A    Sir, I -- I'd be speculating.  I don't
4 know anything about this document.
5    Q    Do you know whether, in your knowledge,
6 Mr. Raub had access to either an old Honda, a Mercedes
7 or a red Jeep?
8    A    I don't.
9    Q    And it says a "Replica 9-millimeter
10 Luger."  Did you find a replica 9-millimeter Luger at
11 Mr. Raub's home?
12    A    His home was never searched.
13    Q    Okay.  All right.  Let's go back to
14 Exhibit Number 9.  This is the Richmond Liberty
15 Movement.  Are you familiar with that document?
16    A    No.
17    Q    Have you ever seen this document
18 previously?
19    A    It's a pretty -- pretty poor copy.  But
20 no, I don't recall seeing this document.
21    Q    Take a moment or two just to flip through
22 it, and I think you've already answered the question.
23 You've never seen the document previously?
24    A    No, sir.
25    Q    Do you know of any information where your

---

Page 94

1 task force was monitoring the, quote, Richmond Liberty
2 Movement, unquote?
3        MR. HAMBRICK: Objection.  Do not answer
4 that question.  You're supposed to ask him about his
5 knowledge relating to Brandon Raub.  Not anything
6 else.
7 BY MR. TROY:
8    Q    You can answer the question.
9        MR. HAMBRICK: No, you can't.  I told you
10 not to answer.
11 BY MR. TROY:
12    Q    Had you ever heard of or discussed the
13 Richmond Liberty Movement?
14    A    It just doesn't ring a bell with me.
15    Q    The phrase "Richmond Liberty Movement"
16 does not ring a bell?
17        MR. MINCKS: That was his testimony.
18 Asked and answered.
19    A    No, sir.
20 BY MR. TROY:
21    Q    And it's your testimony that that was not
22 the subject of any conversations that you were engaged
23 in?
24        MR. HAMBRICK: Objection.
25 BY MR. TROY:

---

Page 95

1    Q    To your knowledge.  You've never been
2 engaged any discussions regarding the Richmond Liberty
3 Movement, correct?
4        MR. HAMBRICK: With whom?
5        MR. TROY: Any discussions with anyone.
6        MR. HAMBRICK: Okay.  Do not answer that.
7 If you have -- if the question relates to Brandon
8 Raub, you can answer it.
9 BY MR. TROY:
10    Q    Detective Paris, Mr. Raub was a member of
11 the Richmond Liberty Movement.
12    A    Okay.
13    Q    Did you ever engage in any discussions
14 regarding the Richmond Liberty Movement?
15        MR. HAMBRICK: As pertaining to Brandon
16 Raub, you can answer.  Otherwise, do not answer.
17    A    Pertaining to Brandon Raub as a member of
18 the Richmond Liberty Movement?
19 BY MR. TROY:
20    Q    Well, let's start there.  Go ahead and
21 answer that question.
22    A    I -- I don't recall ever.
23    Q    And is this movement, the Richmond Liberty
24 Movement, have you ever heard of that movement prior
25 to seeing what has been marked as Exhibit Number 9?

---

Page 96

1        MR. MINCKS: Objection.  Asked and
2 answered twice.
3    A    I don't -- I don't recall hearing or
4 seeing this movement, sir.
5        MR. TROY: Okay.  Let's take a break.
6        (Recess from 3:51 p.m. until 3:53 p.m.)
7 BY MR. TROY:
8    Q    When Brandon Raub was being interviewed at
9 his home by you and Agent Granger, did he express his
10 views about the 9/11 attacks and the attack on the
11 Pentagon?
12    A    He had -- he had said that -- that the
13 government flew -- launched a missile into the
14 Pentagon, that it wasn't an airplane that hit it.  I
15 do recall him saying that.
16    Q    Did he talk about any other -- the 9/11
17 attack in New York City on the towers?
18    A    I don't recall, sir.
19    Q    All right.
20    A    I don't recall that.  I recall the
21 Pentagon.
22    Q    Do you recall where you were on 9/11?
23    A    I do.
24    Q    All right.  Did you have any friends that
25 were injured or killed in the attack on the Pentagon?

---

Page 97

1     MR. HAMBRICK: Objection.  Are we even
2  remotely close to the --
3     MR. TROY: Yeah.  It's a simple question.
4     MR. MINCKS: Objection.  We're not.
5     MR. HAMBRICK: How is that remotely close
6  to these four topics?
7     MR. TROY: I'm trying to find out if he
8  has any internal motivation of any sort, holding
9  animus against Mr. Raub for his views on how the
10  Pentagon was attacked.
11     MR. HAMBRICK: Is there any factual basis
12  for that?
13     MR. TROY: That's what I'm trying to find
14  out.
15  BY MR. TROY:
16     Q     Did you have any friends that were injured
17  or killed?
18     A     Fortunately, I did not.
19     Q     Okay.  Exhibit Number 2 that we discussed,
20  you can take a look at that.  In Exhibit Number 2, was
21  that prepared, to your knowledge, for some type of
22  internal affairs report?
23     A     I don't recall.  I can't say for sure what
24  it was prepared for.  I just don't recall the reason.
25     Q     Was there an internal affairs report

Page 98

1  connected to the detention of Mr. Raub?
2     MR. HAMBRICK: Objection.  Is that related
3  to any of these topics?
4     MR. TROY: Yes.
5  BY MR. TROY:
6     Q     Was there --
7     MR. MINCKS: The answer is no, but --
8     A     Okay.  I don't even know.
9     MR. MINCKS: Go ahead.
10     A     No.  That I'm -- that I'm -- that I can --
11     MR. TROY: His answer no was reference to
12  whether I'm outside the --
13     MR. MINCKS: Yeah.
14     MR. TROY: -- within the scope or not.
15     MR. MINCKS: Yeah.  I'm not directing your
16  answer.
17     MR. TROY: He was not providing --
18     MR. MINCKS: We're clearly outside the
19  scope.
20     MR. TROY: -- nor should he provide an
21  answer to you about whether there was any type of --
22     MR. HAMBRICK: And --
23     MR. TROY: -- internal affairs report
24  connected to the detention of Mr. Raub.
25     MR. HAMBRICK: And my question stands:

Page 99

1  What -- which one of those is that relevant to?
2     MR. MINCKS: (a), (b), (c) or (d)?
3     MR. TROY: All of the above.
4     MR. HAMBRICK: None of the above.
5     MR. MINCKS: No, really.
6     MR. HAMBRICK: I mean --
7     MR. MINCKS: The identity of John Doe
8  defendants?
9     MR. HAMBRICK: An order has to have
10  meaning.  So if you can tell me why that's relevant to
11  any of these topics, I'll certainly allow it.  But
12  otherwise, you're -- you're far afield of Judge
13  Hudson's order.
14     MR. TROY: It certainly deals with number
15  (a), if there were any internal affairs report that
16  suggested that the seizure of Mr. Raub was not
17  appropriate.
18  BY MR. TROY:
19     Q     But my question to you is was there any --
20  to your knowledge, any type of internal affairs report
21  connected with the detention of Mr. Raub?
22     MR. MINCKS: Same objection.  It's outside
23  the scope.
24     MR. HAMBRICK: Same objection.  But you
25  can answer if you know.

Page 100

1     A     I believe there was.  But officially, I
2  don't know for sure.
3  BY MR. TROY:
4     Q     And what agency conducted that internal
5  affairs report?
6     MR. HAMBRICK: Same objection.
7     A     It would have been our Chesterfield County
8  Police Department.
9  BY MR. TROY:
10     Q     All right.  And do you know the
11  conclusions of that report?
12     A     I don't.
13     MR. HAMBRICK: Okay.
14     MR. TROY: He said he didn't.
15     I don't think we have that report.
16     MR. PARTHEMOS: No.  The judge said you
17  don't -- aren't entitled to it.
18     MR. TROY: Pardon?
19     MR. PARTHEMOS: The judge said you weren't
20  entitled to it.  We just had a hearing in front of
21  Judge Lauck two weeks ago or three weeks ago, or
22  whenever it was, in which this was discussed in great
23  detail.
24     MR. TROY: And she said that?
25     MR. PARTHEMOS: Yes, sir.  You were there.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Paris
October 17, 2013

Page 101

1      MR. TROY: I've been up to other things

2  since then.

3      MR. MINCKS: Apparently.

4      MR. TROY: All right.  That's it.

5      MR. HAMBRICK: Okay.  No questions.  We'll

6  read.

7

8      (The deposition concluded at 3:58 p.m.)

9

10      And further this deponent saith not.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 103

1
2
3
4
5
6   Date                    Signature

7

8   COMMONWEALTH OF VIRGINIA, to wit:

9   COUNTY/CITY OF                    :

10

11

12          Subscribed and sworn before me this ____

13   day of _____ 2013.

14          My Commission Expires:_____/____/____

15          Notary Registration Number: _____

16

17

18   Notary Public

19

20

21

22

23

24

25

Page 102

1

2

3

4

5      I, the undersigned, _____,

6  do hereby certify that I have read my foregoing

7  deposition and that, to the best of my knowledge, said

8  deposition is true and accurate (with the exception of

9  the following corrections listed below):

10

11  Page/Line From      To        Reason

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 104

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2          I, Tracy J. Stroh, RPR, CCR, CLR, Notary

3   Public in and for the Commonwealth of Virginia,

4   National Registration Number 7108255, and whose

5   commission expires September 30, 2015, do certify that

6   the aforementioned appeared before me, was sworn by

7   me, and was thereupon examined by counsel; and that

8   the foregoing is a true, correct, and full transcript

9   of the testimony adduced.

10          I further certify that I am neither

11   related to nor associated with any counsel or party to

12   this proceeding, nor otherwise interested in the event

13   thereof.

14          Given under my hand and notarial seal at

15   Richmond, Virginia, this 28th day of October 2013.

16

17

18

19          Tracy J. Stroh, RPR, CCR, CLR
             Commonwealth of Virginia at Large

20

21

22

23

24

25

## A

**ability (1)**
24:6
**able (1)**
79:5
**above (3)**
90:11;99:3,4
**access (2)**
44:25;93:6
**accessed (1)**
41:24
**accurate (4)**
70:23,24;71:5;102:8
**act (3)**
62:1,4;71:18
**actions (2)**
21:2,14
**activity (1)**
13:15
**acts (4)**
47:19;48:1,20;49:6
**actually (4)**
40:9;54:3;58:2;
78:16
**address (3)**
6:3,4,6
**addressed (1)**
5:16
**administration (1)**
7:15
**Admission (1)**
74:25
**advice (2)**
72:23;87:13
**advised (1)**
40:16;50:16;51:23
**affairs (6)**
97:22,25;98:23;
99:15,20;100:5
**afield (2)**
11:21;99:12
**afternoon (1)**
53:11
**again (7)**
36:1;48:13;59:22;
86:4;87:7
**against (7)**
17:17;46:9,14,14,23;
47:1;97:9
**agency (1)**
100:4
**Agent (33)**
5:19;21:24,25;22:11,
23;26:11,16;27:20;
33:21;39:5;40:1,16;
44:1;50:7;51:10;53:6;
54:10;61:11;62:4,20;
65:21;66:8,10,20;
67:21;68:15,20;73:7;
78:8;87:9,9;89:7;96:9
**ago (7)**

35:4;56:8;72:14;
81:15;85:20;100:21,21
**ahead (10)**
6:2;7:14;14:2;21:7;
48:12;56:10;63:20;
72:19;95:20;98:9
**air-conditioning (1)**
68:2
**airplane (1)**
96:14
**allow (1)**
99:11
**allowed (2)**
11:22,25
**almost (3)**
55:6;66:15;90:20
**along (1)**
79:15
**alternative (1)**
48:24
**always (1)**
62:9
**America (1)**
72:25
**among (2)**
23:1,10
**Analyst (1)**
39:10
**and/or (1)**
76:1
**animus (1)**
97:9
**answered (20)**
25:8;26:18;34:5;
36:22;37:15,21;42:3;
58:13;61:4;62:14;
72:19;73:9,9;74:7;
78:3,4;87:23;93:22;
94:18;96:2
**Anthony (1)**
6:9
**apologize (1)**
51:16
**Apparently (1)**
101:3
**appear (1)**
75:23
**appears (3)**
60:14;81:10,11
**apply (1)**
12:20
**Appreciate (1)**
24:20
**approach (2)**
61:17;63:2
**approached (2)**
16:24;26:11
**approaching (1)**
62:3
**appropriate (1)**
99:17
**Approved (1)**
69:12

**approximately (2)**
10:17;19:19
**April (5)**
6:25;10:17,18;12:16;
34:23
**area (11)**
61:10,13,20;63:16,
17;68:21;80:8;81:25;
83:4,20;89:23
**areas (1)**
11:22
**argument (1)**
54:2
**around (2)**
43:10;54:10
**arrest (4)**
17:1,1,18;19:16
**arrived (2)**
61:10;89:23
**assessment (7)**
40:2,16;78:18;91:3,
4,9;92:3
**assigned (4)**
6:19;10:19;12:17;
13:7
**assist (1)**
8:15
**assisting (1)**
35:12
**associate (1)**
7:21
**assume (1)**
16:13
**assuming (1)**
16:12
**attached (3)**
75:16,16;84:20
**attack (3)**
96:10,17,25
**attacked (1)**
97:10
**attacks (1)**
96:10
**attempting (1)**
75:25
**attention (8)**
25:16;40:7,22;43:12;
57:20;84:14;87:6;92:1
**Attorney (5)**
47:11,11;50:14;
72:23;87:14
**Attorney's (8)**
50:7,23;51:1,5,7;
72:24;87:15,18
**August (15)**
7:5,25;21:21;23:2;
25:17,21;32:2;34:24;
47:17;52:22;53:5;55:5;
64:20,21;89:22
**author (1)**
85:14
**authorities (1)**
92:1

**Authority (1)**
84:11
**autism (4)**
13:19,25;33:24;34:4
**autistic (1)**
13:21
**aware (2)**
24:9;47:10

## B

**bachelor (1)**
8:19
**bachelor's (2)**
7:10;8:18
**back (18)**
8:6;10:1,16;27:13;
40:1;42:6;46:17;47:15;
48:15;50:25;52:25;
55:1;63:14;80:4,7;
82:8;92:19;93:13
**background (7)**
7:6;11:14,19;12:1;
29:15;30:4,22
**bad (1)**
60:2
**bar (1)**
66:22
**based (18)**
15:19;31:18,20;
40:19;50:16;67:4;
71:15,16,16;72:4,11,
13;73:24;76:14;77:3;
78:7,24;91:8
**basic (2)**
76:7;79:3
**basically (2)**
61:16;70:24
**basis (7)**
34:11;43:1;47:25;
48:8;51:19;57:12,14;
71:23;76:10,23;97:11
**became (2)**
34:23;65:10
**become (1)**
56:13
**becoming (1)**
56:3
**behavior (1)**
75:25
**Behavioral (1)**
84:11
**behind (3)**
42:16;61:18;68:20
**belief (1)**
25:4
**beliefs (1)**
24:23
**bell (2)**
94:14,16
**below (7)**
16:11;76:4;88:11,15;
89:18,25;102:9

**best (3)**
13:2;64:19;102:7
**beyond (2)**
27:5;37:2,14;45:9;
73:4
**big (2)**
24:18,20
**bit (4)**
11:13;54:13;70:18;
80:18
**Bonnie (1)**
39:10
**booking (2)**
83:4,20
**born (2)**
7:7,8
**both (8)**
8:24;21:15;47:10;
72:23;82:23;87:9,14;
89:6
**bottom (2)**
18:22;69:19
**Boulders (1)**
8:12
**Bowen (6)**
16:11,18,21,24;
17:13;18:12
**box (16)**
75:9,9,11,21,24;76:2,
4,8,11,24;77:4,7,15,20;
78:9,22
**boxes (3)**
75:4,5,6
**Brandon (39)**
15:23;19:16;24:13,
18;25:1,3,6,13;27:22;
30:14,24;32:2,6,7,9;
39:19;40:6,17,21;
41:20;42:1;47:18;
48:19;53:7,10;57:25;
62:12;79:16;80:21,23;
90:1,21;91:1,6;94:5;
95:7,15,17;96:8
**break (2)**
36:25;96:5
**Brently (10)**
39:23;90:1,12,14,15,
21,22;91:2,6,10
**brief (3)**
20:19,19;64:7
**briefing (2)**
61:11;64:1
**briefly (1)**
12:4
**bring (1)**
68:8
**Brittany (4)**
90:5,6,7,10
**brother (2)**
39:24;90:10
**brought (14)**
32:9,22;33:6,9,15,
16;40:7,22;45:13,14;

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 29 of 95 PageID# 1214

Brandon Raub v.                                                                    Michael Paris
Daniel Lee Bowen, et al.                                                        October 17, 2013

46:1;57:20;86:18;
91:25
**Bullen (18)**
29:3;42:22;43:6,23;
44:5;55:2,8;57:11;
58:11,21;72:4,22;
73:13,17;75:17;84:19,
21;87:7
**bullet (2)**
44:14,20
**bulletins (1)**
73:6
**Bush (5)**
85:6,9;86:8,13;87:1
**Bushs (2)**
45:18;86:17

**C**

**call (13)**
5:20;12:13;32:6;
33:21;50:22;52:14;
54:9,15;55:2;66:2;
67:15,15;87:17
**called (9)**
12:11,12;19:6;50:6;
65:25;66:2,3;67:11,19
**calls (2)**
49:18;83:12
**calm (1)**
70:19
**Came (9)**
8:6;10:1,16;25:16;
29:25;64:9;72:13;
85:23;86:3
**Campbell (29)**
32:15,18;35:16;
36:16;65:25;67:19;
68:5,14;69:10,25;
70:22;71:10,11;72:7;
74:10,11;78:18,21,22;
79:16,19;81:3,4;85:14,
17,17;86:11,16,21
**Campbell's (1)**
85:13
**can (44)**
5:20;6:4;14:1;15:8;
17:11,12;20:16,24;
23:5,11;24:13;25:1;
29:1;30:16;31:16;33:4;
36:1;37:23;41:8;42:3,
13;46:4;48:13;54:2;
58:2;59:8;60:7;62:14;
63:5;67:13,15;74:13;
77:10;79:15;80:18;
86:4;93:1;94:8;95:8,
16;97:20;98:10;99:10,
25
**candidate (1)**
13:2
**capable (4)**
47:19;48:1,20;49:6
**capacity (4)**

13:2;76:6;77:16;
79:2
**car (9)**
65:21;66:8,11;67:25;
68:1,13,21,22;80:5
**Carpenter (2)**
15:16;18:8
**Case (2)**
14:8;82:12
**cause (3)**
16:22;50:3;75:10
**causing (1)**
75:25
**Center (5)**
8:11,13;11:12;49:20;
67:12
**certain (4)**
21:2,14;27:20;68:4
**certainly (4)**
42:14;83:23;99:11,
14
**certification (1)**
11:12
**certified (1)**
11:13
**certify (1)**
102:6
**changed (1)**
48:24
**characterization (3)**
29:12;56:25;85:13
**check (5)**
22:12,23;30:9;31:21;
39:8
**checked (14)**
22:22;75:5,5,11,22;
76:2,8,11,24;77:7,15,
20;78:9,22
**checking (4)**
31:7;66:20,21;77:3
**checks (4)**
29:15,21;30:5,22
**chest (1)**
70:14
**Chesterfield (22)**
6:18;7:25;8:2;10:3,7,
11,12;13:10;14:7;18:2;
22:3,17;26:15;39:12;
50:15;63:11;72:24;
79:24;81:12,17;87:14;
100:7
**chose (1)**
63:13
**chosen (2)**
12:23;63:10
**citation (1)**
44:9
**city (2)**
83:21;96:17
**claim (1)**
60:9
**clarify (2)**
29:2,5

**clear (1)**
34:22
**clearance (1)**
12:25
**clearly (3)**
42:11,21;98:18
**Client (2)**
85:2,5
**clients (1)**
11:16
**Client's (1)**
85:4
**close (2)**
97:2,5
**closed (1)**
68:1
**closest (1)**
81:9
**clothes (1)**
11:3
**coach (1)**
65:4
**Collar (5)**
8:5,11,16;11:11,14
**colleague (1)**
92:6
**college (3)**
7:9;8:24;9:20
**Collins (2)**
50:11;87:21
**comment (2)**
66:24;86:6
**commentary (1)**
15:21
**comments (8)**
15:23,24;45:17,20,
24;46:14;64:2;85:8
**committed (2)**
51:24;73:1
**common (1)**
70:1
**Commonwealth (3)**
47:10;50:14;72:23
**Commonwealth's (3)**
50:6;87:14,18
**communicated (1)**
40:1
**Communication (1)**
49:20
**Communications (2)**
67:11;78:25
**Community (1)**
84:10
**Compared (1)**
15:2
**complainant (2)**
27:22;28:16
**complainants (1)**
53:9
**complete (2)**
14:17,20
**completely (2)**
53:16,21

**compound (5)**
35:22,25;37:6,7;
48:25
**concern (8)**
27:21;40:2,19;44:12;
56:4;61:24;62:1;67:2
**concerned (2)**
49:24;56:16
**concluded (1)**
101:8
**conclusion (3)**
72:13;83:13;84:5
**conclusions (1)**
100:11
**concurred (1)**
68:12
**condition (1)**
65:19
**conditioning (1)**
65:5
**conduct (3)**
11:6;47:21;48:22
**conducted (2)**
78:8;100:4
**conducting (3)**
29:15;30:4,21
**configured (1)**
88:19
**confirmation (1)**
73:23
**confrontation (2)**
56:22,25
**confronted (3)**
29:6,9,12
**confronting (1)**
28:22
**connected (3)**
98:1,24;99:21
**conspiracy (2)**
85:6;86:7
**constantly (1)**
70:8
**constitute (1)**
47:12
**constituted (1)**
57:12
**Constitution (1)**
15:25
**contact (19)**
22:13,15;26:23;
30:14,23;32:2;35:11;
47:18;48:18;49:22,25;
53:7,10;63:9;64:8;
69:2;87:13;88:1,12
**contacted (5)**
26:11;31:8;45:14,14;
51:7
**contains (1)**
87:7
**continuing (1)**
71:1
**conversation (6)**
66:16;67:23;69:25;

70:6;86:15,23
**conversations (2)**
22:5;94:22
**conveyed (1)**
71:2
**copy (1)**
93:19
**corrections (1)**
102:9
**correctly (5)**
10:11;51:13;61:15;
63:21;86:18
**County (5)**
8:2;10:8;14:7;39:12;
50:15;83:7,21,21;
100:7
**couple (4)**
8:1;19:15;34:15,16
**court (2)**
9:13;69:12
**create (3)**
60:3,13;61:1
**created (3)**
59:15,23;60:19
**Crime (8)**
8:5,11,16;11:6,12,
14;39:10;73:1
**criminal (5)**
7:11;47:12;50:8,18;
51:23
**Crisis (8)**
32:6,8,14;47:21;
48:22;49:13;62:19;
67:14
**crux (1)**
31:20
**currently (1)**
6:10
**cursing (1)**
15:24
**custody (7)**
47:24,25;48:6;49:4;
83:9,19;84:2
**cut (2)**
40:12;90:1

**D**

**Daddy (1)**
87:1
**dancing (1)**
43:9
**danger (1)**
24:23
**database (9)**
29:15,17,21,25;30:4,
9,22;31:8,21
**databases (2)**
22:13;39:16
**date (2)**
52:20,22
**day (7)**
16:23;28:21;64:15,

16;65:13;78:1;89:22
**days (4)**
19:16,19;20:1,10
**dealing (4)**
14:23;34:13,25;35:1
**deals (1)**
99:14
**Dear (1)**
44:8
**debriefed (1)**
80:8
**decided (2)**
33:21;56:17
**decision (7)**
30:17,19;46:3,4;
55:16;72:18;74:8
**defendants (1)**
99:8
**definitely (1)**
53:25
**degree (2)**
8:18,20
**degrees (1)**
53:22
**dehydrated (2)**
64:18;65:10
**dehydration (1)**
65:11
**Dennis (2)**
50:11;87:21
**department (20)**
7:21;8:2,4,7;10:1,2,
5,12,13,15;11:15;13:1,
6,8,11;14:7;18:2;
26:16;89:1;100:8
**Department's (1)**
22:17
**DEPONENT (5)**
9:11,15;29:8;69:14;
101:10
**deposition (7)**
24:2,3;78:21;79:14;
101:8;102:7,8
**Deputy (2)**
50:14;81:17
**describe (1)**
19:10
**described (1)**
68:4
**describing (5)**
42:15;70:22;85:8;
86:10,23
**descriptions (1)**
64:2
**designation (1)**
16:19
**detail (2)**
39:3;100:23
**detained (3)**
16:24;33:15;74:14
**Detective (14)**
5:17;22:12;37:10;
69:20;70:2,4;72:10;

77:17;78:7,17;79:11;
84:22;85:15;95:10
**detention (10)**
19:16;20:2;21:3,4,
17;23:23;34:18;98:1,
24;99:21
**determination (8)**
31:7;33:10;47:25;
48:8;49:5;57:13;73:22;
79:5
**determinations (2)**
32:14,20
**determine (7)**
45:25,25;47:19,20;
48:19,21;49:18,21,23;
50:8
**determined (18)**
29:22;30:10,13,23;
32:6,9;35:14;36:7;
37:19;46:8;47:12;
48:18;49:4;51:20;54:6;
55:13;63:8;66:24
**determining (1)**
36:19
**developments (1)**
32:12
**difference (3)**
32:25;41:3,12
**different (3)**
40:25;41:7,19
**difficulty (1)**
60:15
**dinner (1)**
64:17
**DIRECT (6)**
5:14;35:11;43:12;
71:21;84:14;87:6
**directed (1)**
87:13
**directing (1)**
98:15
**direction (1)**
28:4
**directly (1)**
23:25
**discovery (1)**
24:1
**discuss (6)**
32:7;61:20;62:19,23;
63:16;74:10
**discussed (7)**
22:25;23:7,10;39:6;
94:12;97:19;100:22
**discussing (1)**
33:20
**discussion (7)**
24:11;35:15,15;
46:22;62:24;72:5,7
**discussions (9)**
17:16;23:13;24:8,25;
25:5,12;95:2,5,13
**District (1)**
72:25

**doctor (1)**
65:12
**document (26)**
14:16,19,21,24;17:4;
19:5;39:2;60:15,21;
61:5;69:13,18;75:14;
76:17,20;84:12,15,17;
85:16;88:23;92:19;
93:4,15,17,20,23
**documented (1)**
60:23
**Doe (1)**
99:7
**done (2)**
58:10;79:6
**door (2)**
33:18;62:17
**doors (1)**
68:1
**down (12)**
9:19;28:4;37:2,5,13;
41:15,17;43:4;47:16;
53:18;61:9;79:20
**driver's (1)**
67:24
**due (2)**
76:5;77:16
**during (7)**
9:4,20;13:13;20:6;
45:12;69:24;70:5
**duties (2)**
11:1,4

**E**

**early (1)**
16:25
**earning (1)**
9:22
**easier (1)**
9:13
**East (1)**
6:11
**Eastern (1)**
72:25
**ECC (4)**
49:18,19,22;52:14
**education (1)**
7:7
**effect (1)**
56:2
**either (3)**
13:14;28:20;93:6
**electrician (1)**
8:1
**else (14)**
24:14;26:25;32:17;
36:18;41:25;55:22;
64:5;65:9;67:6;68:13,
17;77:3;91:4;94:6
**else's (1)**
88:16
**email (33)**

22:10;29:3;31:19;
36:11;39:4,5;40:12;
42:23,25;43:6,22;44:5;
55:2,8,13;57:11;58:11,
21;72:4,5,22;73:17;
74:2,3;75:17;84:19,22;
87:8;88:11,15;89:6,9;
91:8
**emails (1)**
73:2
**Emergency (2)**
49:20;67:11
**emotions (1)**
67:8
**employed (2)**
10:7;13:14
**employment (4)**
6:3;7:17,18;9:4
**encourage (1)**
20:8
**end (4)**
31:25;37:5,6;44:6
**ended (1)**
82:12
**energy (1)**
66:22
**enforcement (4)**
6:5;8:15;13:15;
66:17
**engage (1)**
95:13
**engaged (3)**
66:16;94:22;95:2
**enough (1)**
38:7
**entered (1)**
74:8
**entirely (1)**
66:15
**entirety (2)**
70:5;72:6
**entitled (4)**
14:6;84:10;100:17,
20
**Erie (1)**
7:10
**evaluated (4)**
32:8;33:22;67:1;
68:9
**evaluation (7)**
32:10,22;33:6;36:8,
20;47:22;48:22
**even (4)**
57:14;58:20;97:1;
98:8
**eventually (1)**
74:14
**everybody (2)**
63:3;89:23
**everyone (1)**
77:13
**evidenced (2)**
75:11,25

**evolved (1)**
12:9
**exact (3)**
52:20;56:4;86:22
**exactly (9)**
28:21;62:15;63:24,
25;67:14;68:11;71:9;
78:21;86:22
**EXAMINATION (1)**
5:14
**examine (2)**
28:9,10
**examiner (1)**
11:13
**exception (1)**
102:8
**exclusive (2)**
70:11;72:18
**Excuse (4)**
10:21;25:23;32:1;
53:6
**Exhibit (68)**
5:1,2,3,4,5,6,7,8,9,
10;14:6;18:2,2,25;19:2,
7,8,9;25:23,24;26:10;
27:13,18;38:9,10,19;
43:13,20;44:18;45:10,
21;47:15;49:17;55:1,3;
57:11;58:11;59:2,3,5,8,
12,16,17,18,21,22;
60:4,10,13,23;61:2,8;
69:7,7;74:21;75:4;
84:10;87:2,6,8;89:10;
92:16,20,21;93:14;
95:25;97:19,20
**exhibits (2)**
14:3,4
**experience (1)**
13:23;34:8,11
**experiences (1)**
35:1
**expired (6)**
27:3,5;29:19,24;
31:22;39:18
**explain (1)**
85:3
**explained (1)**
30:17
**explains (1)**
64:16
**exposure (1)**
13:23
**express (1)**
96:9
**expressed (1)**
70:6
**extra (1)**
50:3
**extreme (2)**
85:5;86:7
**extremely (1)**
70:5
**extremist (1)**

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 31 of 95 PageID# 1216

Brandon Raub v.                                                                    Michael Paris
Daniel Lee Bowen, et al.                                                        October 17, 2013

44:13

# F

**face (4)**
14:16,19;75:15;
80:18
**Facebook (43)**
23:14;24:10;27:22;
28:17,18,24;29:2;
31:19;35:17;36:6,10;
40:3,6,6,9,10,20,20,21,
24,25;41:4,5,17,18,24;
42:8,8,24,24;44:7,8,9,
20;45:1,9;54:18;57:25;
61:25;85:4;86:24;
90:17;91:7
**Facebooks (1)**
41:1
**facilities (1)**
79:24
**facility (4)**
6:13;82:3,25;83:3
**facing (1)**
81:9
**fact (1)**
31:21
**factoring (1)**
72:17
**factual (1)**
97:11
**fainted (2)**
64:14;65:20
**fair (7)**
21:11;23:23;24:15;
28:12,13;38:7;56:4
**familiar (1)**
93:15
**family (1)**
15:23
**far (4)**
11:21;47:4;52:4;
99:12
**FBI (14)**
6:10,19;12:19;13:1;
21:20;30:13,23,25;
40:7,22;44:1,25;85:3,5
**FBI's (1)**
31:10
**FCPD (5)**
87:25;88:2,12,12;
89:1
**federal (2)**
12:11;51:1
**federally (1)**
8:14
**felt (5)**
13:1;47:4;49:14;
66:23;72:14
**few (1)**
56:8
**field (2)**
6:10;21:21

figure (2)
20:4;59:14
**final (2)**
27:19;28:4
**financial (1)**
11:7
**find (13)**
11:7;24:24;26:22;
36:3;37:17;41:15;
51:19;63:5;82:1;88:25;
93:10;97:7,13
**finding (1)**
29:18
**fine (5)**
5:18,23;6:7;65:14;
66:23
**finish (2)**
54:23;82:18
**finished (1)**
29:17
**finishes (1)**
9:9
**first (18)**
7:17;14:10;15:14;
19:6,8;25:15;27:19;
28:18;39:4;54:24;
66:13;70:21;75:3,9;
87:8;88:6,7,19
**five (4)**
34:16,21;35:5,5
**five-hour (1)**
79:13
**five-year (1)**
34:22
**flagged (1)**
49:23
**flew (1)**
96:13
**flip (2)**
52:25;93:21
**fluids (1)**
64:17
**follow (1)**
26:16
**following (2)**
65:12;102:9
**follows (1)**
5:13
**food (1)**
65:11
**football (1)**
65:4
**Force (22)**
6:20;12:9,11,19;
13:7;21:21;22:7,20;
23:1,10,13;24:9;31:1,3,
7,10,10,12;34:24;
41:25;44:3;94:1
**foregoing (1)**
102:6
**forget (1)**
67:14
**forgot (1)**

56:3
**Form (12)**
19:20;31:9;48:3,9;
49:8;60:2;63:19;71:13;
72:2;83:11;88:21;
91:13
**former (5)**
45:18;46:9,15,24;
86:17
**Fortunately (1)**
97:18
**forward (2)**
54:7;56:2
**forwarded (3)**
28:17;36:11;40:12
**found (1)**
26:23
**foundation (9)**
31:14;46:3;55:19;
79:4;83:17;84:5;85:18;
91:13,16
**four (4)**
8:19;20:2;58:23;
97:6
**fourth (1)**
61:9
**frankly (1)**
62:15
**fraud (1)**
11:13
**Friday (4)**
53:12;54:7,14;56:18
**friends (3)**
85:4;96:24;97:16
**front (9)**
14:3;33:18;43:15;
59:4;62:17;69:8;74:22;
84:22;100:20
**full (3)**
6:2;14:7;15:3
**Fullerton (3)**
43:23,25;55:8
**full-time (3)**
6:19;9:1,22
**funded (1)**
8:14
**further (5)**
32:12;43:4;53:8;
62:24;101:10
**future (1)**
71:3

# G

**gathered (1)**
63:15
**gave (4)**
50:20;61:16;63:1;
66:22
**gentle (1)**
57:2
**gentleman (2)**
82:9,14

given (2)
24:3;44:12
**gives (1)**
44:20
**giving (1)**
66:21
**goes (1)**
27:21
**government (5)**
47:20;48:2,21;49:7;
96:13
**Granderson (2)**
18:17;68:19
**Granger (24)**
22:11,23;25:18;
26:12,17,27:20;33:21;
39:5;40:2,16;42:12,16;
61:11;62:5,21;66:21;
67:21;68:15;72:5;73:7;
78:8;87:10;89:7;96:9
**Granger's (6)**
42:17,20;65:21;66:8,
11;68:20
**great (1)**
100:22
**grew (1)**
7:8
**Group (2)**
12:13;63:15
**guess (4)**
12:24;13:1;52:18;
63:12
**guy (1)**
66:25
**guys (2)**
36:24;89:1

# H

**half (2)**
7:20,22
**Halfway (2)**
47:16;66:14
**HAMBRICK (124)**
6:4;9:9,12;11:18,21,
24;13:3;15:8;16:13;
17:4,9;18:3;19:22,25;
20:7,15;23:4,15,19;
24:12,17;25:2,9;26:6;
27:13;29:1,11;30:16;
31:15;32:24;34:7;
35:18,21,25;38:12,15;
41:8;42:2,22;43:6,9;
45:2;46:2,10,16,19;
48:4,11,23;51:17,22;
52:9,12,13,17;54:19,
22;55:7,10,15,19;56:6,
11;57:3,5;58:1,12,16,
20,23;60:7;61:3;62:13;
64:22;65:2;69:15;
70:10;72:1,3;73:16;
74:2;76:12,15,19;77:1,
6,10;78:2,10,14;81:18,

22;83:12,16,22;85:10,
12;88:3,6,8,23;90:5;
91:20;92:2,11;94:3,9,
24;95:4,6,15;97:1,5,11;
98:2,22,25;99:4,6,9,24;
100:6,13;101:5
**hand (1)**
68:22
**handwriting (1)**
92:23
**happen (1)**
65:7
**happened (17)**
16:3;20:12,18;39:2;
56:17;60:22,23;61:5;
64:13,16;66:4,6,12,19;
67:10,17;82:11
**happening (1)**
38:23
**happy (3)**
19:9;43:2,3
**hard (1)**
56:11
**harm (11)**
71:3,13,24;75:10,21,
24;76:1,5,6;77:16;79:2
**head (2)**
85:20;86:1
**headquarters (1)**
6:23
**health (9)**
13:16,17;33:24;34:3;
63:16;67:14;78:16;
79:6;84:11
**hear (1)**
67:23
**heard (4)**
23:25;86:12;94:12;
95:24
**hearing (2)**
96:3;100:20
**heat (1)**
64:18
**held (1)**
82:2
**Henrico (1)**
34:17
**hereby (1)**
102:6
**Here's (1)**
24:18
**Hey (1)**
92:6
**hiding (1)**
11:8
**higher (1)**
70:18
**himself (3)**
78:22;79:2,6
**hired (1)**
8:2
**history (1)**
7:18

**hit (1)**
96:14
**holding (1)**
97:8
**home (8)**
6:6;28:22;80:8;
82:12;83:15;93:11,12;
96:9
**Honda (1)**
93:6
**honestly (1)**
90:23
**hope (2)**
25:7;68:2
**hot (1)**
65:1
**house (3)**
29:7;49:23;66:14
**Howard (4)**
29:3;43:23;72:4,22
**Hudson's (1)**
99:13
**Huh (1)**
90:13
**human (2)**
76:7;79:3
**humid (1)**
65:1

**I**

**idea (3)**
62:6;92:23,25
**identified (1)**
67:12
**identify (1)**
59:8
**identity (1)**
99:7
**ill (2)**
34:13;35:2
**ill-mannered (1)**
39:1
**Illuminati (1)**
44:8
**imagine (1)**
86:24
**immediate (1)**
71:3
**immediately (1)**
66:1
**impair (1)**
24:6
**important (1)**
9:17
**Inactive (1)**
14:9
**Incident (3)**
14:7,8;15:2
**incidents (1)**
50:2
**includes (1)**
77:25

**Including (1)**
20:21
**incompetent (1)**
33:11
**incomplete (5)**
14:20,24;75:15;
84:18,23
**incorrect (1)**
16:23
**incredibly (1)**
77:2
**indented (1)**
75:7
**indicated (8)**
26:14;33:14;35:4;
55:24;70:4;71:19;
72:10,21
**indicates (3)**
14:17,20;24:22
**indicating (1)**
16:23
**individuals (4)**
13:17;35:2;71:4,13
**inform (1)**
63:3
**information (23)**
21:14;26:15;27:21;
29:25;30:2;31:18;
35:12,13;36:4,5;37:18;
41:20;45:8;50:17;53:8;
57:17;72:22;73:5;76:2;
77:19,23;89:6;93:25
**informed (1)**
47:17;53:5;69:20
**injured (1)**
96:25;97:16
**inquiry (1)**
62:24
**in-service (1)**
13:20
**inspection (7)**
27:3,6;29:19,24;
30:10;31:22;39:18
**inspired (2)**
27:5;29:24
**instability (1)**
70:1
**instead (3)**
20:9;43:9;77:6
**instructed (2)**
38:1;87:17
**intend (2)**
41:5;42:7
**intended (1)**
41:6
**intense (2)**
70:5,9
**intent (1)**
42:16
**interaction (1)**
12:25
**interactions (1)**
72:6

**internal (7)**
97:8,22,25;98:23;
99:15,20;100:4
**interpret (1)**
42:14
**Interrogatories (2)**
69:11,11
**interrupted (1)**
9:18
**interstate (1)**
8:15
**Intervention (5)**
32:7;47:21;48:22;
49:13;62:20
**Interview (21)**
57:3,4,5,7;61:18;
62:10,17;67:5;71:16;
72:11,14;73:5,6,13,16,
19,25;77:25;78:8;
80:13;81:3
**interviewed (1)**
96:8
**into (10)**
12:9;47:24,25;48:6;
49:4;64:15;72:17;74:8;
91:23;96:13
**investigated (1)**
11:5
**Investigating (2)**
11:16;42:1
**investigations (1)**
11:7
**investigative (3)**
8:10;10:22;12:5
**invite (1)**
43:2
**Involuntary (1)**
74:24
**involved (3)**
63:3;74:25;79:24
**involvement (2)**
82:12;86:10
**involving (5)**
22:3,6,7;25:5;75:1
**issued (1)**
26:24
**issues (2)**
13:17;63:17

**J**

**jail (5)**
74:16,20;83:6,7,21
**Jason (2)**
43:23,25
**Jay (2)**
25:25;27:16
**JC (2)**
7:19,23
**Jeep (1)**
93:7
**job (3)**
11:6;34:8;91:14

**jobs (1)**
9:7
**John (9)**
21:22,24;25:17;
47:17;51:9,11;53:6;
54:11;99:7
**Joint (15)**
6:19;12:19;13:7;
21:20;22:6,20;23:1,10,
12;24:9;30:25;31:6;
34:24;41:24;44:2
**joked (1)**
70:6
**JTTF (1)**
63:12
**Judge (4)**
99:12;100:16,19,21
**July (1)**
8:6
**jurisdictions (1)**
12:10
**justice (2)**
7:11,16
**justify (1)**
78:9

**K**

**Kaufmann's (1)**
7:20
**keep (2)**
6:4;72:8
**killed (2)**
96:25;97:17
**kind (5)**
10:24;64:16;70:7,15;
77:12
**knew (12)**
20:5,8;23:20,20;
25:5;27:22;45:3;57:19;
69:1,4;82:10;91:5
**knowing (2)**
62:7;65:5
**knowledge (23)**
23:9,12;24:1,11;
25:12;46:8,13;57:10;
58:9,10,15,19;76:10,
23;80:3;83:9;85:22;
93:5;94:5;95:1;97:21;
99:20;102:7
**knows (6)**
31:14;54:22;76:17,
19,20;82:14

**L**

**laborer (1)**
8:1
**Lack (5)**
46:2;55:19;76:6;
77:16;79:1
**language (4)**
86:8,14;88:14,15

**last (10)**
34:15;44:18;45:10,
21;53:7;61:10;80:2,21;
92:15,17
**later (6)**
15:15;19:19;20:10;
38:22;54:2;67:18
**Lauck (1)**
100:21
**launched (1)**
96:13
**law (6)**
6:5;8:15;13:15;
50:18;51:1;66:17
**laws (1)**
50:8
**lay (1)**
60:9
**least (1)**
28:8
**leave (1)**
67:1
**led (1)**
23:22
**Lee (1)**
90:10
**Left (2)**
8:4;11:15
**legal (4)**
83:13;84:5;87:13;
89:6
**Less (1)**
67:18
**Liberty (9)**
93:14;94:1,13,15;
95:2,11,14,18,23
**Lieutenant (2)**
15:16;18:8
**lightheartedness (1)**
70:7
**limitations (1)**
19:25
**Limited (1)**
69:11
**line (1)**
79:15
**LINX (3)**
39:8,14,14
**L-I-N-X (2)**
39:8;89:11
**listed (1)**
102:9
**lists (2)**
44:6,13
**little (12)**
9:19;11:13;12:1;
18:11;26:23;45:12;
54:12,13;63:6;64:17;
70:18;80:18
**local (2)**
8:15;12:10
**long (4)**
6:24;7:3;12:14;

64:15
**look (5)**
16:10;25:22;70:16;
82:8;97:20
**looking (1)**
43:16
**looks (6)**
15:9;59:24,24;60:14;
83:4;90:14
**loss (3)**
7:19,21,22
**lot (3)**
11:7;59:12;67:7
**lower (1)**
70:18
**Luger (2)**
93:10,10
**lunch (1)**
64:17

**M**

**M16 (1)**
93:1
**M240 (1)**
93:2
**Magistrate (3)**
16:22,25;79:7
**mailbox (1)**
66:16
**makes (1)**
9:13
**making (3)**
15:23;49:22,25
**malnourished (1)**
64:18
**management (3)**
22:14,16,18
**manager (3)**
7:19,23;8:11
**manner (2)**
62:2;71:18
**mannerisms (1)**
68:4
**many (4)**
34:14,18,20,25
**Marine (1)**
25:13
**marked (18)**
5:1,2,3,4,5,6,7,8,9,
10;25:22;26:1;43:13;
59:3,16;60:4;92:16;
95:25
**master's (5)**
7:15;8:21,25;9:2,23
**matter (3)**
28:16;45:14;51:24
**May (9)**
10:21;12:7;14:5;
18:6,19;23:24;24:8;
55:24;58:10
**maybe (1)**
62:1

**mean (10)**
14:25;18:4;38:25;
41:6;53:21;54:21;62:6;
70:13,17;99:6
**meaning (2)**
91:5;99:10
**meant (3)**
29:6,9;85:18
**medications (1)**
24:5
**member (3)**
34:23;95:10,17
**members (1)**
23:1
**mental (9)**
13:16,17;33:24;34:3;
63:16;67:14;70:1;
78:16;79:6
**mentally (5)**
33:11;34:13;35:1,2;
61:19
**mentioned (2)**
63:7;86:25
**Mercedes (1)**
93:6
**Mercyhurst (2)**
7:13,13
**met (2)**
81:4;85:2
**Metropolitan (1)**
12:12
**MICHAEL (24)**
5:12,20,22,23,24;6:1,
9;32:14,18;39:23;
67:18;69:10;77:23;
78:18,21,22;79:16;
81:3;85:13,13,17,17;
86:15;90:15
**might (5)**
62:1,4,20;77:3;92:23
**Mike (2)**
5:20,22
**MINCKS (91)**
14:12,16,19,23;15:1,
4;17:12;18:24;19:1,4,
8,20;21:5;26:1,18;
28:1,5,11;29:5,10;31:9,
13;33:25;34:5;36:21;
37:1,11,20,24;38:3;
42:10,15,21;48:3,9,12;
49:8;52:3;53:15,20,24;
54:3;56:9,24;63:19;
72:2,16;73:8,12;74:1,
6;75:13;78:5,13,15,20;
79:4;82:4,7,17,20,23;
83:11,14,23;84:4,16,
23,25;85:24;86:3;
87:23;88:21;91:12,16,
23;92:4,8;94:17;96:1;
97:4;98:7,9,13,15,18;
99:2,5,7,22;101:3
**mind (2)**
9:18;62:16

**mine (3)**
60:1;90:1,2
**minute (2)**
72:14;81:15
**minutes (3)**
43:10;56:8;67:18
**misphrasing (1)**
55:25
**missile (1)**
96:13
**mistake (1)**
65:3
**moment (3)**
35:4;87:7;93:21
**money (1)**
11:8
**monitoring (4)**
54:17;57:24;58:4;
94:1
**months (3)**
8:1,6;34:16
**mood (4)**
69:21,24;70:9,13
**more (19)**
9:19;10:21;15:8;
25:6;34:22;37:21;39:2;
44:12;45:4;51:4;54:12,
13;56:4,10,13,16,16;
57:22;63:6
**morning (4)**
16:25;54:9;65:4,5
**most (1)**
53:24
**motivation (1)**
97:8
**move (6)**
25:1;56:18;57:13,16,
16;59:2
**Moved (9)**
7:24;53:10;54:7;
55:14;56:2,2,14,22;
57:9
**Movement (12)**
93:15;94:2,13,15;
95:3,11,14,18,23,24,
24;96:4
**MSOG (1)**
12:13
**much (2)**
26:25;44:19
**multiple (1)**
15:10
**mutually (2)**
70:11;72:18
**myself (1)**
67:12

**N**

**Nalepa (1)**
39:10
**name (6)**
6:2;10:23,23;16:14;

22:25;51:15
**narrative (2)**
59:12,24
**narrowed (1)**
72:10
**narrowing (1)**
72:8
**National (3)**
8:5,11;11:11
**nature (1)**
57:22
**near (2)**
18:21;69:19
**necessary (1)**
62:20
**need (10)**
47:7,21;48:21;49:12;
60:8;66:25,25;67:16,
16;85:21
**needed (5)**
30:14,23;33:21;
49:14,24
**needs (3)**
68:8;76:7;79:3
**new (4)**
6:13;10:24,25;96:17
**next (12)**
12:3,4;16:23;38:19;
49:16;66:12;67:10;
84:9;87:2;89:9;90:2;
92:15
**NFD (1)**
32:10
**night (1)**
65:6
**ninesic (1)**
14:4
**none (2)**
14:1;99:4
**nonprofit (1)**
8:14
**nonverbal (1)**
73:20
**nonverbally (1)**
67:8
**nor (1)**
98:20
**note (2)**
19:13,19
**notes (11)**
14:11;15:7,9;20:12;
21:1;27:12,18;31:25;
38:10,25;40:14
**notified (2)**
21:19;47:11
**notify (1)**
47:7
**nowhere (1)**
25:3
**Number (61)**
5:1,2,3,4,5,6,7,8,9,
10;14:6,8;18:23;25:23,
24;26:10;31:13;38:9,9,

10;43:13,20;44:14;
45:10,21;47:16;49:17;
55:1,3;57:12;58:11;
59:2,3,16,17,18,23;
60:4,13,16,23;61:2,8;
69:7,8;74:21;75:4,5;
84:10;87:2,7,8;89:10;
92:17,20,21;93:14;
95:25;97:19,20;99:14

**O**

**oath (1)**
25:15
**object (17)**
14:12;21:5;42:11;
48:3,9;52:4;53:16;
54:24;56:1,9;63:19;
72:2;74:6;75:13;84:16;
88:21;91:12
**objecting (1)**
42:18
**objection (77)**
14:21;17:4,9,12;
18:3;19:20;20:15;23:4,
15;24:12,16;28:1;
29:11;30:16;31:9;
32:24;33:25;35:18,21,
25;36:21;37:12,20,25;
41:8;42:2;45:2;46:2,
10,16,19;48:11,23;
49:8;54:19;55:15;56:6,
24;58:12;61:3;62:13;
70:10;72:3,16;73:8;
74:1;76:12,15;77:1,1,
13;78:2,10,13,14;79:4;
82:7;83:11,12,16,22,
23;84:25;85:10;88:23;
91:20;92:2,9;94:3,24;
96:1;97:1,4;98:2;
99:22,24;100:6
**objections (1)**
84:4
**observed (3)**
28:23;66:13;76:14
**obtain (1)**
17:17
**obtained (2)**
11:12;41:20
**obviously (1)**
73:18
**October (1)**
8:3
**off (4)**
52:4;66:9;70:16;
90:1
**offenses (1)**
8:16
**office (13)**
6:11;8:12,12;10:8;
21:21;50:7,23;51:1,5,
8;72:24;87:15,18
**Officer (11)**

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 34 of 95 PageID# 1219

Brandon Raub v.                                                                    Michael Paris
Daniel Lee Bowen, et al.                                                        October 17, 2013

16:11,18,21,24;
17:13;18:12,14,17;
68:19;81:9,12
**officers (2)**
17:17;81:7
**officially (1)**
100:1
**old (3)**
87:25;88:11;93:6
**one (27)**
7:13;12:9;13:20;
21:16;24:19,21;25:25;
29:18,22;33:17;34:16;
39:5,21;41:18;42:23;
48:19;55:16;60:3;
68:17;79:16,18;81:15;
87:3;90:11;92:6,15;
99:1
**only (6)**
29:23;31:21;72:9;
73:5;84:17;91:1
**open (2)**
91:4;92:3
**opened (3)**
40:2,16;91:10
**operations (2)**
10:19;12:12
**opinion (5)**
17:7;46:11;47:8;
58:15;78:12
**opposed (2)**
48:25;59:17
**order (6)**
45:12;82:8,21;92:5;
99:9,13
**organized (1)**
11:5
**oriented (1)**
54:13
**others (5)**
71:24;72:15;73:24;
75:11,24
**Otherwise (3)**
30:18;95:16;99:12
**ought (1)**
91:25
**out (32)**
6:10,13,17,21;11:7;
20:4;24:24;29:18;36:3;
37:7,17;41:15;45:12;
50:2;51:19;52:4,23;
59:15;61:25;62:1;63:5;
65:3;66:13,14,18;
68:22;70:14;81:8;82:1;
88:25;97:7,14
**outside (5)**
83:24;92:5;98:12,18;
99:22
**outstanding (1)**
29:23
**over (3)**
40:2,19;74:12
**overview (1)**

64:7
**own (3)**
24:1;76:7;79:3

—————————

# P

**Page (64)**
14:9,25;15:19;18:22,
24,25;19:1,2,4,7,8,11;
26:2;27:19;38:8,10,12,
13,13;40:6,20,21,25,
25;41:5,5,18,18;42:8,8,
24,25;43:4,5,20,22;
44:7,8,18,20;45:1,9,10,
21;49:16,16,17;53:1,1;
55:3;61:8;62:1;69:18;
71:2;75:3;84:15;85:2;
86:6;87:8;88:6,7,19;
90:17;91:7
**Page/Line (1)**
102:11
**pages (1)**
75:19
**paragraph (18)**
14:10;15:14,21;
16:10;17:3,8;20:19;
27:19;44:8;47:16;53:4,
8;61:9,11;75:8;88:5,9,
18
**paraphrase (1)**
15:22
**paraphrasing (1)**
56:12
**Pardon (4)**
14:18;19:3;91:15;
100:18
**Parham (3)**
6:11,15,21
**PARIS (21)**
5:12,17,19;6:9;
25:24;37:10;59:3;60:4;
61:1;69:20;70:2,4;
72:10;77:17,23;78:7,
17;79:11;84:22;85:15;
95:10
**Park (1)**
8:12
**parked (1)**
66:9
**part (6)**
22:6;24:17;31:3,12;
44:2;48:5
**PARTHEMOS (4)**
19:5;100:16,19,25
**particular (3)**
61:6;75:14;84:17
**particularly (1)**
11:5
**part-time (2)**
9:7,20
**passenger (1)**
67:25
**paste (1)**

40:13
**patch (1)**
60:16
**patrol (3)**
10:20;12:4;80:5
**pending (1)**
60:3
**Penney's (2)**
7:20,23
**Pennsylvania (3)**
7:8,9,10
**Pentagon (5)**
96:11,14,21,25;
97:10
**people (9)**
15:10;17:25;18:1,4;
23:20;46:20;48:5;
55:25;62:10
**percent (1)**
74:18
**period (5)**
8:8;13:13;34:20,22;
38:24
**person (6)**
32:13;33:14,17;
39:12;80:17,19
**personal (4)**
42:24;44:19,25;45:9
**personally (2)**
18:13;56:21;77:21
**personnel (1)**
66:17
**persons (1)**
33:17
**pertaining (2)**
95:15,17
**Petition (3)**
74:24;75:18,19
**petitioner (1)**
75:9
**phone (5)**
54:9,15;67:20;68:23;
74:12
**phrase (2)**
56:4;94:15
**phrases (2)**
42:7;92:25
**physical (6)**
64:10;65:19;69:2;
75:10,21,24
**physically (1)**
65:10
**picture (6)**
79:19;80:16,16;81:7;
82:2;83:1
**PIEPGRASS (5)**
42:19;79:18,21;90:6,
8
**place (3)**
6:3,5;38:21
**plain (1)**
11:3
**plaintiff (2)**

24:24;25:1
**plaintiff's (3)**
24:23;25:4,23
**please (5)**
20:25;36:1;37:23;
46:17;48:13
**plenty (1)**
55:25
**pm (3)**
96:6,6;101:8
**point (9)**
30:3;52:8;54:4;
57:18;66:5;75:6;80:9;
81:11;84:6
**points (2)**
44:14,20
**Police (20)**
8:2;10:1,5,11,13,15;
13:10;14:7;18:2,14;
22:13,14,17;26:15;
39:15;81:7,8,12;89:1;
100:8
**polite (1)**
57:7
**poor (1)**
93:19
**posed (1)**
24:23
**position (1)**
12:21
**positive (1)**
90:20
**Possibly (2)**
27:4;44:12
**posted (4)**
40:3,20;44:6;45:9
**posting (6)**
41:24;85:5;90:17,22,
25;91:6
**postings (23)**
24:10;27:23;28:17,
19,24;29:2;31:19;
35:17;36:6,10;40:5;
41:21;54:12,18;56:3,
13;61:21,23;62:24,25;
63:7;64:3;86:16
**posts (3)**
44:11;85:4;86:24
**potential (2)**
50:5;67:3
**potentially (1)**
35:2;71:7
**precaution (1)**
50:3
**preclude (1)**
72:17
**predicate (1)**
77:20
**preliminary (3)**
29:15;30:4,22
**premise (2)**
28:7;53:17
**premising (1)**

28:5
**prepared (6)**
14:11;76:21;78:15,
17;97:21,24
**prescreen (2)**
75:15;84:20
**prescreening (1)**
75:17
**present (3)**
61:12;63:17;67:21
**presented (1)**
16:22
**President (5)**
45:18;85:6,8;86:7,
12,17
**presidents (3)**
46:9,15,24
**pretty (3)**
11:21;93:19,19
**prevention (3)**
7:19,21,23
**previous (1)**
50:2
**previously (6)**
18:10,15;84:12;
89:10;93:18,23
**prior (18)**
20:21;21:3,15,16,17;
22:5;23:2;28:22;34:16,
18,21;49:25;52:25;
56:5;61:11;80:22;81:4;
95:24
**private (2)**
13:15;41:23
**probable (1)**
16:22
**probably (6)**
10:20;34:15;52:16;
64:18;71:7;86:25
**probe (1)**
65:16
**problem (3)**
6:8;26:6;64:10
**problems (1)**
13:18
**proceedings (1)**
75:1
**professional (3)**
49:15;78:16;79:6
**protect (2)**
76:6;79:2
**provide (3)**
76:7;79:2;98:20
**provided (1)**
50:17
**providing (2)**
89:5;98:17
**public (15)**
13:15;40:5,8,10,20,
24;41:4,17;42:7,23;
44:7;47:20;48:1,20;
49:6
**punched (1)**

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 35 of 95 PageID# 1220

Brandon Raub v.                                                                    Michael Paris
Daniel Lee Bowen, et al.                                                        October 17, 2013

90:2
**purpose (1)**
  59:16
**put (3)**
  12:8;14:4;80:4
**putting (1)**
  61:25

## Q

**quick (2)**
  7:6;41:10
**quite (2)**
  38:22;62:15
**quote (2)**
  15:2;94:1

## R

**raised (2)**
  7:7;92:7
**raising (1)**
  92:8
**ran (2)**
  29:21;31:21
**rapid (2)**
  69:21,24
**rather (3)**
  43:5;85:21;89:16
**Raub (97)**
  16:24;17:18;19:16;
  20:22;21:3,4,15;22:7,
  15;23:23;24:13,18;
  25:1,3,6,13;27:22;
  28:22;29:16;30:5,15,
  22,24;32:3,6,7,9;34:19,
  25;35:5,6,10,14;36:4,6,
  13,19;37:19;39:19,24;
  40:6,17,21;42:1;47:18;
  48:19;50:17;53:7,10;
  56:23;57:7;61:17;
  62:12;63:9;64:8,12;
  66:13;69:3,20;70:3,4;
  71:2,12;72:6,11;73:6,
  25;74:12,14;75:1;78:1,
  9,25;80:2,21,23;83:1,
  10;90:1,10,15,21;91:1,
  2,10;93:6;94:5;95:8,
  10,16,17;96:8;97:9;
  98:1,24;99:16,21
**Raub's (6)**
  15:23;22:25;41:21;
  57:25;66:10;93:11
**read (11)**
  16:17,21;28:8,23;
  41:10;46:17,18;48:15;
  93:1;101:6;102:6
**reading (3)**
  17:2,7;69:22
**real (2)**
  41:10;70:15
**really (5)**
  10:22;12:24;35:3;

63:25;99:5
**reason (9)**
  30:17;31:14,15;
  37:11;50:20;61:17;
  72:9;97:24;102:11
**recall (33)**
  14:1;18:16;23:11;
  25:21;27:2;38:5;46:25;
  51:13;52:8,19;54:15;
  62:15;63:21,25;64:2,4,
  5;71:9;74:13;79:8;
  86:18;90:23,23;93:20;
  95:22;96:3,15,18,20,
  20,22;97:23,24
**received (8)**
  13:20;22:10;53:9;
  54:9;55:5;79:12;87:25;
  89:13
**receiving (2)**
  21:15;27:20
**recent (3)**
  27:22;75:25;85:3
**Recess (1)**
  96:6
**recognize (7)**
  80:16,20;81:6,21,25;
  82:25;92:21
**recommendations (1)**
  17:22
**reconstruct (1)**
  40:15
**reconstructing (2)**
  38:21,23
**reconstruction (2)**
  38:25;39:1
**record (10)**
  6:6;22:18;29:1;
  38:12;42:22;46:18;
  64:22;72:1,8;85:22
**records (2)**
  22:13,16
**recovered (2)**
  65:20;66:6
**red (1)**
  93:7
**reference (3)**
  26:9,10;98:11
**referencing (1)**
  90:18
**referring (2)**
  43:17;90:20
**reflect (3)**
  20:12,17;21:1
**reflected (4)**
  45:10,21;57:11;73:1
**reflects (1)**
  21:14
**regard (8)**
  13:16,24;15:24;22:2;
  62:11;70:23;72:21;
  74:20
**regarding (7)**
  21:15;24:10;36:6;

41:20;86:16;95:2,14
**related (1)**
  98:2
**relates (3)**
  24:12,14;95:7
**relating (2)**
  86:16;94:5
**relation (1)**
  71:17
**relatively (1)**
  65:1
**relaxed (1)**
  70:12
**relevant (5)**
  20:2;51:18;76:1;
  99:1,10
**remember (3)**
  61:15;68:11;86:22
**remotely (1)**
  97:2,5
**rephrase (4)**
  20:24;21:13;59:22;
  86:4
**Replica (2)**
  93:9,10
**Report (20)**
  14:8,11;15:3,18;
  27:10;60:16;75:16,17;
  84:11,20;89:11,14;
  97:22,25;98:23;99:15,
  20;100:5,11,15
**reported (1)**
  85:5
**reporter (1)**
  9:13
**reporting (2)**
  42:11;85:7
**represent (1)**
  38:3
**representative (1)**
  63:12
**represented (2)**
  71:3,12
**request (7)**
  16:6;22:22;26:16;
  50:7;89:16,18,19
**requested (2)**
  39:8;89:11
**residence (5)**
  20:22;49:24;61:12;
  66:10;80:5
**resident (3)**
  7:1,3;22:3
**residents (1)**
  50:4
**resisting (2)**
  17:1,18
**respect (1)**
  50:1
**respond (1)**
  24:6
**respondent's (4)**
  76:5,5,7;77:16

**responding (1)**
  89:19
**response (2)**
  50:25;89:13
**responses (1)**
  71:17
**returning (5)**
  23:13;24:10,24,25;
  25:13
**review (1)**
  60:8
**reviewed (3)**
  35:16;36:10,11
**rhetoric (2)**
  44:13,19
**Richmond (14)**
  6:10,11;7:24;22:12;
  65:2;93:14;94:1,13,15;
  95:2,11,14,18,23
**right (79)**
  6:1,1,17;8:17;9:18;
  12:3,14,18,20;13:13;
  14:2;15:1,5,20;16:5;
  17:25;18:12,21;19:15,
  18;22:2,25;24:22;
  25:22;29:14;30:13;
  31:24,24;32:13;33:23;
  36:13,15;38:8,18;
  39:17;43:4;45:20,24;
  47:15;53:19;58:7,25;
  61:8;62:19;63:14;64:9;
  65:16;67:10;68:10;
  69:6,6,7,18;71:1;73:4,
  15;74:17,19;75:3;
  79:11,17;80:15,25;
  81:6,10;82:11,22;84:9,
  14,24;87:2;89:9;90:8;
  92:13;93:13;96:19,24;
  100:10;101:4
**right-hand (1)**
  93:1
**ring (2)**
  94:14,16
**Road (2)**
  6:11,21
**root (1)**
  55:8
**roughly (1)**
  7:20
**run (2)**
  25:19;79:14
**running (3)**
  62:16;68:1;83:25

## S

**saith (1)**
  101:10
**same (19)**
  7:16;17:12;37:14,20;
  41:19;44:19;46:10,19;
  52:19,22;66:9;83:22,
  23;84:4,25;89:22;

99:22,24;100:6
**sat (1)**
  66:10
**saw (5)**
  31:21;40:9,12;65:12;
  80:21
**saying (4)**
  28:8;48:16;92:12;
  96:15
**scene (1)**
  33:10
**school (2)**
  7:9,12
**scope (7)**
  52:4;82:21;83:24;
  92:5;98:14,19;99:23
**search (1)**
  39:15
**searched (1)**
  93:12
**seat (3)**
  67:25,25;80:4
**second (13)**
  17:2;38:8,13;43:4,
  20;44:7;55:2;84:15;
  85:2,20;86:6;88:4,9
**secret (4)**
  45:13,25;47:7;85:3
**section (1)**
  10:25
**security (1)**
  7:11
**seeing (3)**
  93:20;95:25;96:4
**seek (1)**
  87:13
**seized (2)**
  32:21;33:16
**seizure (6)**
  20:6,9,13,14;38:21;
  99:16
**self (2)**
  75:22;76:6
**sentence (4)**
  30:5;53:7;61:10;
  69:19
**September (2)**
  8:6;10:18
**serious (11)**
  57:22;70:5,9;75:10,
  21;76:5;77:16;90:17;
  91:1,7,22
**service (5)**
  45:13;46:1;47:7;
  49:18;85:3
**Services (1)**
  84:11
**several (1)**
  67:9
**Sharon (1)**
  7:8
**sheriff (1)**
  81:17

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 36 of 95 PageID# 1221

Brandon Raub v.                                                    Michael Paris
Daniel Lee Bowen, et al.                                        October 17, 2013

**Sheriff's (1)**
10:8
**shift (1)**
15:15
**shirt (2)**
80:20;81:3
**shirtless (1)**
83:20
**shook (2)**
85:20;86:1
**shorts (1)**
80:20
**show (4)**
42:25;74:19;79:11;
82:2
**showed (1)**
39:17
**showing (1)**
82:11
**shown (1)**
83:1
**side (3)**
66:9,9;93:1
**similar (1)**
50:22
**Simple (2)**
76:24;97:3
**Simply (1)**
84:2
**single (1)**
26:2
**sitting (4)**
67:24,25;80:19;
83:20
**situation (2)**
22:3;61:6
**situations (1)**
50:5
**Six (5)**
26:4,7;34:16;35:5,5
**Slow (1)**
79:20
**someone (3)**
45:25;77:3;88:16
**sorry (11)**
9:11,15;26:5;27:14,
15;56:10;64:24;65:2;
73:16;88:3,4
**sort (2)**
24:6;97:8
**sources (2)**
26:15;41:19
**speak (3)**
17:13;23:25;32:17
**speaking (2)**
32:5,8
**speaks (3)**
17:5;21:6;88:23
**Special (9)**
12:12;21:24,25;
22:11;27:20;50:7;
51:10;53:5;54:10
**specific (7)**

15:8;44:11;62:11;
63:6;64:5,6;70:2
**specifically (1)**
81:11
**specifics (2)**
37:13,14
**speculate (4)**
46:5,6;58:17,19
**speculating (2)**
47:4;93:3
**speculation (1)**
91:23
**spoke (6)**
32:13;50:11;51:14,
24;52:2,7
**spoken (1)**
36:13
**squad (1)**
22:1
**SSA (1)**
47:17
**stage (1)**
75:1
**staging (7)**
61:10,12,20;63:15,
17;80:7;89:23
**standing (2)**
66:17;68:20
**stands (1)**
98:25
**stare (1)**
70:15
**start (2)**
9:12;95:20
**started (1)**
14:2
**starting (1)**
61:9
**starts (2)**
47:16;69:19
**state (10)**
6:2;8:15;12:10;
31:22;39:18;50:8;
61:14;68:7;70:12,19
**statement (4)**
48:24,25;56:5;71:5
**statements (2)**
40:3,20
**States (5)**
50:23;51:1;72:24,25;
87:15
**statewide (1)**
39:15
**status (1)**
14:8
**stick (1)**
25:2
**sticker (5)**
27:3,8;29:19,24;
30:11
**still (6)**
10:12;12:12;27:18;
31:25;48:16;70:16

**stipulate (1)**
59:14
**stop (2)**
79:15;80:25
**store (1)**
7:21
**straight (1)**
69:5
**street (1)**
66:10
**stress (1)**
65:13
**strict (1)**
19:23
**striped (1)**
81:2
**stuff (4)**
90:17;91:1,7,22
**subject (5)**
11:22;24:11;25:16;
91:3;94:22
**subjects (3)**
13:21;34:13;89:25
**subsequent (1)**
21:3
**suffer (2)**
76:4;77:15
**suggest (2)**
79:1;81:16
**suggested (2)**
13:6;99:16
**summary (2)**
20:18,19
**summons (7)**
26:24;27:1;29:18,23;
30:10;31:22;39:18
**sunny (1)**
65:1
**supervisor (4)**
21:25;51:11;54:10;
57:15
**supervisory (1)**
21:25
**Supplement (2)**
18:23;38:11
**supplemental (1)**
19:13
**support (2)**
8:10;76:24
**supposed (4)**
23:19;82:9;83:24;
94:4
**sure (25)**
5:24;13:20;16:15,20;
21:9;28:7,21;32:24;
33:3;35:3;41:11;43:3;
52:24;55:25;59:19,25;
60:5,21;63:13;69:3,4;
74:18;82:19;97:23;
100:2
**surveillance (1)**
11:6
**suspected (1)**

13:17
**swings (4)**
69:21,24;70:9,13
**switched (1)**
19:10
**sworn (1)**
5:13
**symptom (1)**
70:1
**synonymous (2)**
41:6;42:9
**synopsis (2)**
61:16;63:1
**system (1)**
22:14

---

## T

**talk (9)**
39:23;40:24;49:14;
51:4;67:16;74:11;
75:10;91:1;96:16
**talked (8)**
29:6;33:18;36:15;
39:4,21;87:3,21;89:10
**talking (12)**
29:3,18;33:20;36:6;
53:4;55:7;64:10;67:19;
68:14;77:17;82:9;
83:25
**talks (2)**
24:17;27:19
**Task (23)**
6:20;12:9,11,19;
13:7;21:20,20;22:7,20;
23:1,10,12;24:9;31:1,3,
6,10,10,12;34:24;
41:25;44:2;94:1
**team (1)**
65:4
**telephoned (1)**
49:17
**tense (1)**
70:16
**Terrorism (14)**
6:20;12:19;21:20;
22:6,20;23:1,10,12;
24:9;31:1,6;34:24;
41:25;44:2
**Terry (5)**
22:11;25:18;27:20;
66:20;72:5
**test (1)**
65:13
**testified (14)**
5:13;34:7;36:22;
37:2,14;72:4;74:7;
76:15,16;82:10,13;
83:15;85:15;92:2
**testifying (1)**
81:18
**testimony (6)**
25:15;34:1;56:5,13;

94:17,21
**theories (2)**
85:6;86:7
**therefore (2)**
82:17,20
**thinking (1)**
20:5
**third (1)**
49:16
**thought (8)**
19:1;25:10;28:23;
62:4,8,9,11;91:22
**thoughts (1)**
21:2
**threat (4)**
71:3,12;72:15;73:24
**threatening (1)**
76:1
**threats (11)**
46:9,14,23;47:1,2,6;
70:2;85:6,8;86:7,12
**three (7)**
9:7;35:24;36:19;
37:18;67:18;91:4;
100:21
**Thursday (5)**
32:1;38:22;53:10,13;
54:8;56:19
**tie (3)**
37:2,4,13
**till (1)**
10:18
**timeline (2)**
53:9;54:7
**times (1)**
58:23
**title (1)**
69:12
**told (9)**
34:6;42:11,16;57:15;
67:12,13;70:23;80:8;
94:9
**tonight (2)**
54:11,14
**Tony (15)**
11:18;14:12;18:24;
19:22;28:2;37:11,24;
42:10;52:4;53:15;
73:12;82:4,7,18;84:19
**took (2)**
38:21;48:6
**top (4)**
14:9,10;15:15;53:1
**topics (4)**
20:3;97:6;98:3;
99:11
**totality (2)**
20:17;67:8
**toward (1)**
62:4
**towers (1)**
96:17
**training (9)**

11:10;13:16,19,20,
22,24;33:23;34:3,4
**trans- (1)**
80:22
**transferred (1)**
10:21
**transpired (1)**
39:3
**transpiring (2)**
20:21;21:2
**transportation (1)**
79:25
**transported (3)**
74:15;79:23;80:22
**Treatment (1)**
74:25
**TROY (213)**
5:15;6:7,12;9:16;
11:20,23;12:1,2;13:5;
14:14,18,22,25;15:2,5,
6,11,13;16:16;17:6,10,
15;18:5,7,25;19:3,6,9,
12,24;20:4,11,20;
21:10;23:8,18,21;
24:15,20;25:7,10,11;
26:3,5,8,19;27:15,17;
28:3,9,13,15;29:4,9,13;
30:20;31:11,23;33:1,5;
34:2,10;35:19,23;36:2,
24;37:4,8,16,22;38:1,6,
14,17;41:13;42:5,13;
43:3,8,11;45:7;46:7,12,
17,21;47:9;48:5,7,14;
49:2,11;51:19;52:1,6,
21;53:19,23;54:1,5,20,
23,25;55:9,12,17,21;
56:7,15;57:1,6;58:6,14,
18,22,25;59:1;60:12;
61:7;62:18;63:22;
64:23;65:8;69:17;
70:20;72:9,12,20;
73:10,14,21;74:4,9;
75:20;76:13,18,22;
77:5,8,12,14;78:4,6,11,
19,23;79:9,20,22;
80:25;81:1,20,24;82:5,
15,19,22,24;83:18;
84:1,8,21,24;85:1,11,
19,25;86:5;87:24;88:4,
7,9,10,25;89:4;90:9;
91:15,18,21,24;92:6,
10,13,14;94:7,11,20,
25;95:5,9,19;96:5,7;
97:3,7,13,15;98:4,5,11,
14,17,20,23;99:3,14,
18;100:3,9,14,18,24;
101:1,4
**true (1)**
102:8
**trunk (1)**
68:21
**try (1)**
21:13

**trying (31)**
11:23;15:11;16:25;
17:17;20:4;23:22;
24:23;28:3,7;30:3;
36:3;37:2,4,6,12,17;
40:14;41:15;49:21;
51:19;54:3;59:14;63:5;
65:16,18;74:21;82:1,
15;88:25;97:7,13
**turn (1)**
80:18
**turned (1)**
53:17
**twice (1)**
96:2
**two (26)**
7:23;19:19;20:1,9;
31:13;40:25;41:7,19;
42:7;44:20;45:18;
46:15,24;48:21;70:10;
75:4,6,6,18;86:16;
90:16,19,25;91:5;
93:21;100:21
**two-hour (1)**
79:13
**type (6)**
8:16;11:8;13:15;
97:21;98:21;99:20

**U**

**under (1)**
25:15
**undergrad- (1)**
9:6
**undergraduate (1)**
8:25
**undersigned (2)**
75:8;102:5
**understood (2)**
23:25;85:14
**unfair (1)**
54:1
**uniform (6)**
10:19;11:2;39:17;
69:2;81:12,16
**uniformed (1)**
31:22
**unit (13)**
10:22;16:6,6,7,9,11,
18,18,21;18:5,5,5,17
**United (5)**
50:23;51:1;72:24,25;
87:15
**university (1)**
7:16
**unquote (1)**
94:2
**up (17)**
7:8;8:12;19:19;
26:16;34:24;55:14;
56:14,18,22;57:16;
62:16;66:15;70:17;

80:18;86:19;90:8;
101:1
**upside (1)**
53:17
**up-to-date (1)**
7:18
**use (3)**
57:2;73:23;87:1
**used (3)**
26:14;71:7;86:14

**V**

**Vague (6)**
18:3;20:15;32:25;
35:22;43:10;77:2
**various (1)**
13:14
**verbal (2)**
73:19;78:24
**verbalizing (1)**
85:21
**verbally (1)**
67:7
**verbatim (1)**
28:8
**veteran (2)**
24:24;25:13
**veterans (3)**
23:13;24:10,25
**video (1)**
79:12,13;80:24
**view (4)**
47:1,2,5,6
**viewed (3)**
46:14,16,23
**views (2)**
96:10;97:9
**violate (1)**
50:17
**violated (2)**
50:9;51:2
**violation (1)**
51:23
**violence (5)**
47:19;48:1,20;49:6;
67:3
**violent (6)**
54:13;56:10,13,16;
62:2;71:18
**violently (1)**
62:4
**Virginia (5)**
7:1,4,24,24;73:1
**visit (1)**
56:22
**visitation (1)**
20:22
**volatile (2)**
50:5;54:12

**W**

**Wade (1)**
22:12
**Wait (2)**
9:9;54:13
**walked (4)**
66:5,8,14,15
**walking (1)**
62:16
**warrant (1)**
17:1,17
**water (1)**
66:21
**Way (6)**
6:13;28:9,12,14;
39:1;66:15
**weather (1)**
64:21,25
**Wednesday (2)**
21:21;38:20
**week (1)**
38:22
**weeks (2)**
100:21,21
**welcome (1)**
25:6;45:4
**weren't (1)**
33:14;100:19
**western (1)**
7:9
**what's (2)**
25:22;32:11
**whenever (1)**
100:22
**White (6)**
8:5,11,16;11:11,14;
80:19
**whole (6)**
8:24;53:17;61:17;
64:16;79:14;90:2
**whose (5)**
83:9,19;84:2;88:14;
92:23
**within (1)**
98:14
**without (2)**
67:1;80:20
**word (4)**
7:13;48:19;57:2;
71:7
**wording (1)**
48:24
**words (12)**
30:7;40:15;41:6,14;
42:13,15,17,17,20;
48:16;87:1;91:6
**wore (1)**
11:3
**work (8)**
6:5,17,21;13:2;
17:25;18:1,17;57:5
**worked (7)**
8:5;9:19;10:20;
11:14;18:10,15,19

**working (7)**
6:10;7:25;8:23,23;
9:1;65:3,6
**write (1)**
88:17
**writing (6)**
41:15;53:21;86:11;
88:16,17;89:3
**written (1)**
15:10
**wrong (5)**
15:23;25:25;53:22
**wrongdoing (1)**
47:13
**wrote (8)**
15:18;41:17;42:9;
43:1,2;47:23;86:25;
88:14
**Wyman (14)**
21:22,23,24;22:8;
25:17;47:17;50:8;51:9,
11;53:6;54:11;87:9;
88:20;89:5

**Y**

**yard (1)**
66:14
**year (4)**
7:20,22;8:18;13:20
**years (5)**
7:23;8:19;34:15,20,
21
**yell (1)**
92:10
**yelling (1)**
92:11
**York (1)**
96:17

**Z**

**Znotens (1)**
16:22

**0**

**04 (2)**
8:8,10
**05 (5)**
8:9,10;9:25;10:17,18
**06 (1)**
12:7
**09 (2)**
10:17;34:23

**1**

**1 (18)**
5:1;14:6;18:22,25,
25;19:2,8,9;27:13,18;
38:9,11;47:16;49:17;
59:12,16,17;60:23

**Brandon Raub v.**
**Daniel Lee Bowen, et al.**

**1:55 (1)**
  89:20
**10 (5)**
  5:10;18:23;49:17;
  92:17,21
**10:30 (1)**
  54:10
**100 (1)**
  74:18
**10th (1)**
  8:3
**11 (1)**
  38:9
**13 (6)**
  8:6;14:9,25;38:13;
  49:17;53:1
**1417 (1)**
  38:11
**15th (8)**
  21:21;22:10;23:2,7;
  25:17,21;28:20;55:5
**16th (12)**
  28:20;32:2;47:17;
  52:22;53:5;54:10;57:9,
  17;64:22,24,24;89:22
**17th (4)**
  56:18;57:9,17;64:21
**180 (1)**
  53:21
**1800 (1)**
  61:9
**1970 (1)**
  6:11
**1989 (2)**
  7:25;8:3

---

**2**

**2 (17)**
  5:2;38:10,12;43:4;
  59:2,3,5,18,23;60:4,10,
  13;61:2,8,8;97:19,20
**20 (1)**
  43:10
**2004 (3)**
  8:4,6;11:15
**2005 (1)**
  8:7
**2006 (2)**
  10:19,21
**2009 (2)**
  6:25;12:16
**2010 (1)**
  39:18
**2012 (4)**
  21:22;34:24;47:17;
  53:5
**2232 (1)**
  18:23

---

**3**

**3 (4)**

5:3;69:7,8,18
**3:51 (1)**
  96:6
**3:53 (1)**
  96:6
**3:58 (1)**
  101:8
**30 (1)**
  18:5
**310 (5)**
  16:9,11,18,21;18:5

---

**4**

**4 (6)**
  5:4;18:24;19:1;71:2;
  74:21;75:4
**4:14 (1)**
  89:19

---

**5**

**5 (4)**
  5:5;25:23,24;84:10

---

**6**

**6 (4)**
  5:6;26:1,10;87:2
**6:10 (1)**
  32:1
**6:30 (1)**
  32:1

---

**7**

**7 (11)**
  5:7;43:13,20;45:10,
  21;55:1,3;57:12;58:11;
  87:7,8
**7:00 (1)**
  65:6
**7:58 (1)**
  55:6

---

**8**

**8 (7)**
  5:8;14:9,25;19:2,4;
  55:6;89:10
**8/15 (1)**
  39:5
**8/16 (1)**
  53:10
**8/18/2012 (1)**
  18:23
**8/22/2012 (1)**
  38:11
**82 (1)**
  8:19
**86 (2)**
  8:19,22
**89 (2)**

7:5;8:22

---

**9**

**9 (6)**
  5:9;38:13;53:1;
  92:20;93:14;95:25
**9/11 (3)**
  96:10,16,22
**99 (5)**
  16:6,6,7;18:5,17
**9-millimeter (2)**
  93:9,10

**Chesterfield County Police**
**Incident Full Report**
**Incident Number 201208160230**
**Case Status: Inactive**
Page 8 of 13
08/29/2012
15:03

Later in the shift I heard Unit 599's radio traffic on TAC requesting a supervisor to assist with irate family members. Due to 599/Petrini being on light duty I responded to assist until supervision could arrive. Unit 30/Lt Carpenter and Unit 99 arrived and began speaking with the family members. The family became increasingly disrespectful to Unit 30 and Unit 99. A male subject stepped within close proximity to Unit 99 and, only after being asked several times to back up, did the subject comply. As Unit 30 explained the situation to the family, their tone and attitude increased and Unit 30 asked the family to leave the property. Unit 30 advised the family several times to exit the building. As the family walked down the sidewalk toward Lori Road they continued to make comments and curse. The family made comments about the constitution and this did not cease until the family reached the end of the sidewalk at Lori Road.

At the request of Unit 99 I relieved Unit 310 and once the TDO was issued the subject was transported to John Randolph Hospital.

-
-
-
-

Supplement   on 08/17/2012   at 07:18

Unit 99 Officer Granderson

-
Officer Bowen Unit 310 presented probable cause to Magistrate Znotens regarding possible charges of assault and resisting arrest; warrants were denied. Magistrate Znotens held the opinion that since the police believed that Raub was a mental case, certain aggression to law enforcement should be expected as a part of the business. NFD

-

10. Supplement   on 08/18/2012   at 22:32

Detective Paris, unit 685

-
Detective Paris assigned to the FBI JTTF Richmond field office was notified on Wednesday, 8/15/2012 by Supervisor Special Agent (SSA) John Wyman of a situation involving a resident of Chesterfield. SSA Wyman explained that Special Agent Terry Granger was case agent to conduct an assessment of a subject by the name of Brandon Raub. Special Agent Terry Granger informed me that she received information from a subject who knows Brandon Raub and whose name the FBI wishes not to disclose at this time. The concern from the complainant who knew Brand Raub and had stayed in contact with him over the years was from recent Facebook postings that Brandon Raub posted on his Facebook page. The complainant in this matter forwarded the Facebook postings which over the last week became more threatening and with greater frequency. It was determined based on the Facebook postings that we would notify the Richmond US Secret Service. After conducting preliminary background database checks on Raub, it was determined by the FBI that contact needed to be made with Brandon Raub. Thursday, 8/16/2012 at approximately 1810 hours contact was made with Brandon Raub by Detective Paris and Special Agent Terry Granger. After speaking with Brandon Raub it was determined that a call to Crisis Intervention to discuss if Brandon Raub could be



**EXHIBIT**
#1
TJS 10/17/13

Case 3:13-cv-00328-HEH-MHL   Document 90-2   Filed 11/18/13   Page 40 of 95 PageID# 1225

**Chesterfield County Police**                    Page 9 of 13
**Incident Full Report**                            08/29/2012
**Incident Number 201208160230**                      15:03
**Case Status: Inactive**

evaluated would be made. After speaking with Crisis it was determined that Brandon Raub should be brought in for an evaluation. NFD

11. Supplement   on 08/22/2012   at 14:17

Corporal Detective Michael Paris, unit 685.

On 8/15/2012 I received an email from SA Terry Granger, FBI JTTF Richmond Field Office. In her email agent Granger asked me and Richmond detective George Wade to check our agency data bases for any police contact with Brandon James Raub. I checked police contact of Brandon Raub in RMS and requested a Linx check by Crime Analyst Bonnie Nalepa on 8/16/2012. Search results in RMS showed that Raub received a uniform summons for an expired state inspection in 2010. The Linx check showed a report 200704190143 regarding a threatening letter. This complaint listed Brently Michael Raub as miscellaneous/other in the incident people field with an address of 2912 Bensley Road. I communicated this to SA Granger who in turn informed me that she had opened an assessment on Brandon Raub. Concern over Facebook statements posted
to a public Facebook page and on the Facebook page of Brandon Raub was brought to the attention of the FBI.

On 8/16/2012 I was informed by SSA John Wyman that contact would be made with Brandon Raub to determine whether he is capable of acts of violence to the public or government and to determine if there is a need for Crisis Intervention to conduct an evaluation. The initial plan was to make contact with Brandon Raub Friday, 8/17/2012. After further information was received from complainants the time line to make contact with Brandon Raub was moved to 8/16/2012, Thursday afternoon.

Below are Facebook postings that drew concern and a need to make contact with Brandon Raub.

-        15 August 2012: "This is revenge. Know that before you die."
-        14 August 2012: "Richmond is not yours. I'm about to shake some shit up."
-        14 August 2012: "This is the start of you dying. Planned spittin with heart
of Lion."
-        14 August 2012: "Leader of the New School. Bringing Back the Old School.
MY LIFE WILL BE A DOCUMENTARY."
-        13 August 2012: "I'm gunning whoever run the town."
-        10 August 2012: "W, you're under arrest bitch."
-        7 August 2012: "The World will Find This."
-        29 July 2012: "I know ya'll are reading this, and I truly wonder if you know
what's about to happen."
-        29 July 2012: "W, you'll be one of the first people dragged out of your
house and arrested."
-        29 July 2012: "And Daddy Bush, too"

Much of the same rhetoric is also on his personal Facebook page:
-        14 August 2012: "The Revolution will come for me. Men will be at my door
soon to pick me up to lead it ;)"
-        13 August 2012: "You should understand that many of the things I have said
here are for the world to see."

Case 3:13-cv-00328-HEH-MHL  Document 90-2  Filed 11/18/13  Page 41 of 95 PageID# 1226

**Chesterfield County Police**                    Page 10 of 13
**Incident Full Report**                           08/29/2012
**Incident Number  201208160230**                     15:03
**Case Status: Inactive**

I telephoned our ECC to determine calls for service at 2912 Bensley Road and to see
if the address was flagged. No calls for service were on record in the last several
months. I called our Commonwealth Attorneys office by request of SSA John Wyman to
determine if any state criminal laws were violated. I spoke to Dennis Collins who
advised that based on the information Raub did not violate a criminal law. If there
was a direct threat to a specific person or persons a criminal violation may have
occurred. A similar call was made to the US Attorney's office. The response back
from the US Attorney's office was that no federal law was violated but perhaps the
US Secret Service should be contacted based on some of the posts directed at the
former Bush presidents. Contact was made with the Richmond Secret Service Field
Office and SA Alan Blisick would assist in the matter.

I called Captain Badgerow Unit 14 to inform him of this matter. I told
Captain Badgerow that the FBI wanted to make contact with Raub to see what mental
state he is in and if he needed evaluated by Crisis Intervention. The complainants
who provided information to the FBI were concerned that what was posted on Facebook
was more than just Raub stating rhetoric. The complainants know Raub and strongly
felt that he may pose an extreme threat to government and/or the public. Captain
Badgerow advised me to contact the Watch Commander, Eric Hartman and advise him of
the situation. A request by the FBI to have one or two uniformed CPD officers to be
present during the initial contact of Raub was also discussed.

I called Lieutenant Eric Hartman to advise him of this matter at approximately 1530
hours. Lt. Hartman informed me that he did not have any units available at this time
because they were out on calls. I advised Lt. Hartman that the time for making
contact with Raub was projected to be at 17:30 hours. Lt. Hartman said he may have
a few units freed up by that time. Lt. Hartman asked that I call him when we
expect to make contact with Raub.

At 1515 hours I left the Richmond FBI Field Office and drove to the area of 2912
Bensley Road to determine if anyone was at the residence. After driving by the
house I observed two vehicles in the driveway. It appeared that someone was in fact
at the residence because the front screen/storm door was the only door closed at the
front entrance.

It was determined that we would stage behind Bensley Elementary at 18:10 hours
because Secret Service agent Alan Blisick would be arriving later than 1730 hours.
I called Lt Hartman to advise the staging time and location. Lt. Hartman said he
would get one uniformed unit at the staging area at 1810 hours.

At 1800 I arrived at the staging area. Shortly after Sergeant Mathew McCartney and
Officer Daniel Bowen arrived. SA Terry Granger, SA William Vigorito, SA Nick Elder
and SA Bruce Perry from the Richmond FBI Field Office were present. Secret Service
Agent Alan Blisick was also present at approximately 1805 hours. SA Granger and I
would be the two persons making contact with Brandon Raub. All other present would
be near the residence on the perimeter.

At approximately 1815 hours SA Granger and I went to the residence of Brandon Raub,
2912 Bensley Road. Brandon Raub came to the front door wearing only white shorts.
Raub was asked if he was Brandon Raub. He replied who wants to know. At that time
both SA Granger and I showed Raub our badges and ID's. Again we asked Raub if he
was Brandon Raub. He replied that he is Brandon Raub and wanted to know why the FBI
was standing at his front door. SA Granger told Raub that we were there to talk to

RAUB010

him about some of the posts he made on Facebook. Raub replied that he was the person who made the postings. SA Granger advised Raub that some of his friends were concerned about his welfare and we were here to ask him questions about his welfare and the Facebook posts. Raub appeared to be extremely intense and emotional upon responding to our questions regarding his Facebook posts. Raub never answered whether he intends to commit violent acts. He would ask us questions such as do you know that the federal government launched a missile into the pentagon and that there was no airplane that flew into the structure on 911. Raub asked us why we were not arresting members of the federal government for their crimes against American citizens right now. He said that the federal government flies planes over our houses to expose us to Thorium. Raub said that the US Marines should arrest all government officials who are not for the people. When asked about his Facebook posts, Raub went on to say that we will all see very soon what all of this means. Raub would at times become calm and then he would change his emotional state and become very intense with his mannerisms and verbal communication. SA Granger advised Raub that he was free to post his opinions as long as he did not intend to harm others. Raub never made a statement regarding his intensions of violence or non violence. When Raub was asked about his intensions to commit violence he would make an anti government statement and not answer the question. Raub would also ask us questions when he was asked about his intensions to commit violence. Raub gave us every indication that he was serious about what he posted and that it was not just rhetoric. Raubs demeanor, tone of voice, non verbal behavior, facial expressions, and response to our questions all were factors in contacting Crisis Intervention to request an evaluation of Brandon Raub.

Prior to the conclusion of the interview, about 20-25 minutes of contact with Raub I began to have physical medical problems. After approximately 3-5 minutes of struggling to stand on my feet, experiencing dizziness, weakness, and hot flashes I eventually collapsed to the ground. According to SA Granger I was unconscious for 1-2 minutes. When I woke up I was lying face down on the ground near Raub's front porch. According to SA Granger Raub did not move from the front door. He stood inside the entry way of the house at the front door. The perimeter units moved to the front of the residence on the street.

I was able to walk back to SA Grangers vehicle parked on the street. While sitting in the vehicle I observed Raub walk to the end of his driveway and engage in conversation mainly with Secret Service Agent Alan Blisick. SA Blisick was standing on the street in front of Raub's residence. Another Chesterfield County Police unit was present, that being Sergeant Russell Granderson. SA Granger and I decided to contact Crisis Intervention to request evaluation on Brandon Raub. I called ECC and asked that they request Crisis Intervention call me. Less than three minutes later I received a call from Michael Campbell of Crisis Intervention. After informing Campbell of our contact with Brandon Raub, Campbell advised me to bring Raub in for evaluation. I asked Campbell to repeat his decision to evaluated Raub to one of the uniformed officers on the scene. I handed my phone to Sergeant Russell Granderson and ask that he hear directly from Campbell on the decision to evaluate Raub.

Officer Bowen and Sgt. Granderson approached Raub. Raub resisted by attempting to struggle from being handcuffed. Once in handcuffs an attempt to get Raub was made to get him a shirt and footwear was made. While at the front door area of his residence Brently Raub and a w/f arrives at the residence in a red SUV. At that time Raub was escorted to a marked patrol vehicle parked in the driveway. As Raub was being escorting to the patrol vehicle he began to resist and he became aggressive

RAUB011

**Chesterfield County Police**
**Incident Full Report**
**Incident Number 201208160230**
**Case Status: Inactive**
Page 12 of 13
08/29/2012
15:03

toward Officer Bowen and Sgt. Granderson. Raub lunged to the side and was forced to the ground near a chain link fence. He was then brought to his feet and was eventually placed in the rear seat of the patrol vehicle. He was then transported for evaluation.

12. Supplement   on 08/26/2012   at 13:19

Ofc Kracke, Unit 264

While working the Central Desk, I was informed there were two gentleman out on Rt 10 and Lori Road, holding up protest signs. One of the subjects was wearing a yellow polo shirt with blue jeans and carrying a handgun on his side. The other subject was a white male, wearing a white shirt with dark stripes and khaki short. He also was carrying a handgun on his side. It is unknown what type of handguns these are but it appears they are some type of pistols.

The subjects were holding two signs. One of the signs stated "Freedom of speech is not a mental illness or crime". The second sign, "Protect rights and don't infringe on them".

Unit 488/Whitlock and Unit 345/Floyd, along with Unit 95/Sgt Mccartney were up at this location. The two subjects walked to the back of the Police Department in front of the Administration Building. Unit 345 observed the white male in the white shirt get into a red Mustang, Virginia license 1317TP. I ran the license and it came back to a Richardson, Christopher Michael at 1825 E Marshall Street, Apt 203 Richmond, Virginia 23223. The descriptors were a 6'1", 190 pounds, brown and gray, dob is 1/31/1978. I ran a criminal history, but nothing came back on that subject.

The two subjects then walked back to the front of the Police Building and started protesting once again. A white female with long brown hair came up and stood beside the subjects for a few minutes and then she left.

Unit 74/Sgt Mccann was advised of the situation as well as Unit 25/Lt Hartman. NFD

6. Supervisor Summary   on 08/17/2012   at 05:03

Lt. E. F. Carpenter Unit 30
Re: Assisting Secret Service and FBI

On 8/16/2012 Lt. Carpenter was informed by day work supervision that the Secret Service and the FBI request our assistance in reference to subject by the name of Brando RAUB posting disturbing statements on the internet. Officer Bowen Unit 310 and Sgt. Granderson Unit 99 responded to the residence to assist. While at the residence I was informed by Sgt. Granderson that Mr. Raub resisted arrest and assaulted him will attempting to place RAUB in custody for evaluation.

RAUB012

EXHIBIT

#Z

JS 10/17/13

Corporal Detective Michael Paris, unit 885.

On 8/15/2012 I received an email from SA Terry Granger, FBI JTTF Richmond Field Office. In her email agent Granger asked me and Richmond detective George Wade to check our agency data bases for any police contact with Brandon James Raub. I checked police contact of Brandon Raub in RMS and requested a Linx check by Crime Analyst Bonnie Nalepa on 8/16/2012. Search results in RMS showed that Raub received a uniform summons for an expired state inspection in 2010. The Linx check showed a report 200704190143 regarding a threatening letter. This complaint listed Brently Michael Raub as miscellaneous/other in the incident people field with an address of 2912 Bensley Road. I communicated this to SA Granger who in turn informed me that she had opened an assessment on Brandon Raub. Concern over Facebook statements posted to a public Facebook page and on the Facebook page of Brandon Raub was brought to the attention of the FBI.

On 8/16/2012 I was informed by SSA John Wyman that contact would be made with Brandon Raub to determine whether he is capable of acts of violence to the public or government and to determine if there is a need for Crisis Intervention to conduct an evaluation. The initial plan was to make contact with Brandon Raub Friday, 8/17/2012. After further information was received from complainants the time line to make contact with Brandon Raub was moved to 8/16/2012,

I telephoned our ECC to determine calls for service at 2912 Bensley Road and to see if the address was flagged. No calls for service were on record in the last several months. I called our Commonwealth Attorneys office by request of SSA John Wyman to determine if any state criminal laws were violated. I spoke to Dennis Collins who advised that based on the information Raub did not violate a criminal law. If there was a direct threat to a specific person or persons a criminal violation may have occurred. A similar call was made to the US Attorney's office by SSA John Wyman and agent Granger. The response back from the US Attorney's office was that no federal law was violated but perhaps the US Secret Service should be contacted based on some of the posts directed at the former Bush presidents. Contact was made with the Richmond Secret Service Field Office and SA Alan Blisick would assist in the matter.

I called Captain Badgerow Unit 14 to inform him of this matter. I told Captain Badgerow that the FBI wanted to make contact with Raub to see what mental state he is in and if he needed to be evaluated by Crisis Intervention. The complainants who provided information to the FBI were concerned that what was posted on Facebook was more than just Raub stating rhetoric. The complainants know Raub and strongly felt that he may pose an extreme threat to government and/or the public. Captain Badgerow advised me to contact the Watch Commander, Eric Hartman and advise him of the situation. A request by the FBI to have one or two uniformed CPD officers to be present during the initial contact of Raub was also discussed.

I called Lieutenant Eric Hartman to advise him of this matter at approximately 1530 hours. Lt. Hartman informed me that he did not have any units available at this time

because they were out on calls. I advised Lt. Hartman that the time for making contact with Raub was projected to be at 17:30 hours. Lt. Hartman said he may have a few units freed up by that time. Lt. Hartman asked that I call him when we expect to make contact with Raub.

At 1515 hours I left the Richmond FBI Field Office and drove to the area of 2912 Bensley Road to determine if anyone was at the residence. After driving by the house I observed two vehicles in the driveway. It appeared that someone was in fact at the residence because the front screen/storm door was the only door closed at the front entrance.

It was determined that we would stage behind Bensley Elementary at 18:10 hours because Secret Service agent Alan Blisick would be arriving later than 1730 hours. I called Lt Hartman to advise the staging time and location. Lt. Hartman said he would get one uniformed unit at the staging area at 1810 hours.

At 1800 I arrived at the staging area. Shortly after Sergeant Mathew McCartney and Officer Daniel Bowen arrived. SA Terry Granger, SA William Vigorito, SA Nick Elder and SA Bruce Perry from the Richmond FBI Field Office were present. Secret Service Agent Alan Blisick was also present at approximately 1805/1815 hours. SA Granger and I would be the two persons making contact with Brandon Raub. All others present would be near the residence on the perimeter. My conversations with the Chesterfield units were brief in nature. I did not discuss any particular matter with the uniformed officer from Chesterfield. I did mention to Sergeant McCartney that we would be calling Crisis Intervention if it was determined that Raub needed to be evaluated. Agent Granger did a briefing prior to going to his residence with all present at the staging area.

At approximately 1815/1830 hours SA Granger and I went to the residence of Brandon Raub, 2912 Bensley Road. Brandon Raub came to the front door wearing only white shorts. Raub was asked if he was Brandon Raub. He replied who wants to know. At that time both SA Granger and I showed Raub our badges and ID's. Again we asked Raub if he was Brandon Raub. He replied that he is Brandon Raub and wanted to know why the FBI was standing at his front door. SA Granger told Raub that we were there to talk to him about some of the posts he made on Facebook. Raub replied that he was the person who made the postings. SA Granger advised Raub that some of his friends were concerned about his welfare and we were here to ask him questions about his welfare and the Facebook posts. Raub appeared to be extremely intense and emotional upon responding to our questions regarding his Facebook posts. Raub never answered whether he intends to commit violent acts. He would ask us questions such as do you know that the federal government launched a missile into the pentagon and that there was no airplane that flew into the structure on 911. Raub asked us why we were not arresting members of the federal government for their crimes against American citizens right now. He said that the federal government flies planes over our houses to expose us to Thorium. Raub said that the US Marines should arrest all government officials who are not for the people. When asked about his Facebook posts, Raub went on to say that we will all see very soon what all of this means. Raub would at times become calm and then he would

change his emotional state and become very intense with his mannerisms and verbal communication. SA Granger advised Raub that he was free to post his opinions as long as he did not intend to harm others. Raub never made a statement regarding his intensions of violence or non violence. When Raub was asked about his intensions to commit violence he would make an anti government statement and not answer the question. Raub would also ask us questions when he was asked about his intensions to commit violence. Raub gave us every indication that he was serious about what he posted and that it was not just rhetoric. Raubs demeanor, tone of voice, non verbal behavior, facial expressions, and response to our questions all were factors in contacting Crisis Intervention to request an evaluation of Brandon Raub.

Prior to the conclusion of the interview, about 20-25 minutes of contact with Raub I began to have physical medical problems. After approximately 3-5 minutes of struggling to stand on my feet, experiencing dizziness, weakness, and hot flashes I eventually collapsed to the ground. According to SA Granger I was unconscious for 1-2 minutes. When I woke up I was lying face down on the ground near Raub's front porch. According to SA Granger Raub did not move from the front door. He stood inside the entry way of the house at the front door. The perimeter units moved to the front of the residence on the street.

I was able to walk back to SA Grangers vehicle parked on the street. While sitting in the vehicle I observed Raub walk to the end of his driveway and engage in conversation mainly with Secret Service Agent Alan Blisick. SA Blisick was standing on the street in front of Raub's residence. Another Chesterfield County Police unit was present, that being Sergeant Russell Granderson. SA Granger and I decided to contact Crisis Intervention to request evaluation on Brandon Raub. I called ECC and asked that they request Crisis Intervention call me. Less than three minutes later I received a call from Michael Campbell of Crisis Intervention. After informing Campbell of our contact with Brandon Raub, Campbell advised me to bring Raub in for evaluation. I asked Campbell to repeat his decision to evaluate Raub to one of the uniformed officers on the scene. I handed my phone to Sergeant Russell Granderson and ask that he hear directly from Campbell on the decision to evaluate Raub. AS I handed the phone to Sergeant Granderson,

Officer Bowen and Sgt. Granderson approached Raub. Both Granderson and Bowen did not move in quickly when approaching Raub. They positioned themselves between Raub and his residence. All of this took over two minutes, possibly longer before conversation between one of the officers and Raub took place. Raub was engaged in conversation with SA Blisick and SA Bruce Perry as Sergeant Granderson and Officer Bowen approached Raub. I don't recall who spoke to Raub, Granderson or Bowen. I was standing next to the front passenger door of agent Granger's vehicle which was facing in the direction of Raub, Officer Bowen and Sergeant Granderson. Raub resisted by attempting to struggle from being handcuffed. This was a brief struggle/resistance from Raub. Once in handcuffs an attempt to get Raub a shirt and footwear because he was not wearing any footwear or shirt. While at the front door area of his residence Brently Raub and a w/f arrived at the residence in a red SUV. At that time Raub was escorted to a marked patrol vehicle parked in the driveway. As Raub was being escorting to the patrol vehicle he

began to resist and he became aggressive toward Officer Bowen and Sgt. Granderson. Raub lunged to the side and was forced to the ground near a chain link fence. He was then brought to his feet and was eventually placed in the rear seat of the patrol vehicle. He was then transported for evaluation.

RAUB044

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRANDON RAUB,

Plaintiff,

v.                                          Case No. 3:13CV328

DANIEL LEE BOWEN, et. al.,

Defendants.

## ANSWERS OF MICHAEL CAMPBELL TO LIMITED
## INTERROGATORIES APPROVED BY THE COURT

COMES NOW the Defendant, Michael Campbell, pursuant to the Court's Order of
August 2, 2013, and states the following in response to the areas of discovery approved by the
Court in paragraph 2 of its Order:

1.      Paragraph 2 (a) of the Order:

QUESTION: The nature and source of information supporting Michael
Campbell's belief that Brandon Raub posed a danger to himself or others, including the extent to
which Campbell learned about the content of emails attached to the Prescreening Report, which
has been filed under seal:

ANSWER:    I am a senior clinician and certified prescreener for Chesterfield County
Emergency Services. I am employed by the Chesterfield County Community Services Board
("CCSB"), more commonly referred to as the Chesterfield County Department of Mental Health
Support Services. On Thursday, August 16, 2012, I was at work, in the Rogers Building, which
houses the CCSB Emergency Services offices. At approximately 7:15 p.m. that evening, I
received a telephone call from an employee of the Chesterfield County Emergency
Communication Center ("ECC") requesting that I telephone Chesterfield County Police

Detective Michael Paris at a telephone number which was provided to me by the ECC employee. It is common for me to receive such requests, because Chesterfield County police officers seek input from me as to whether they have sufficient cause to detain temporarily an individual so that I can evaluate the individual under Va. Code §§ 37.2-808 and 37.2-809 and determine whether the individual needs to be evaluated by Emergency Services and requires emergency psychiatric services. I receive numerous calls of this type from police officers every month.

Upon receiving the telephone call from the ECC, I immediately telephoned Detective Paris, who promptly answered the telephone. Detective Paris informed me that he was conducting an investigation in conjunction with the FBI and Secret Service, involving a man named Brandon Raub. He was at Mr. Raub's residence and had just finished interviewing Mr. Raub. He informed me that Mr. Raub was an ex-marine who had made substantial, specific threats of violence against other people. Detective Paris informed me that, in his judgment, the threats were sufficiently serious that he had probable cause to detain Mr. Raub for an evaluation pursuant to Va. Code § 37.2-808(G).

I asked Detective Paris what kind of threats Mr. Raub had made, whether he had indicated any intent to harm himself, what evidence he had that Mr. Raub was mentally ill, whether Mr. Raub was using drugs or alcohol, and whether he thought Mr. Raub was a threat to cause harm to himself or others. Detective Paris informed me that Mr. Raub had made online threats about killing people, that he believed that the United States government had perpetrated the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, and that he believed that the government was committing atrocities on American citizens by dropping a radioactive substance called Thorium on them from airplanes. Detective Paris indicated to me that these statements and threats were made over the internet, and he described the language of

some of the threats to me. Although I do not remember the exact wording of any of the threats now, they were specific threats of violent action against human beings.

Detective Paris further informed me that the FBI had been alerted to Mr. Raub's potential threat by another former marine who had been a superior officer to Mr. Raub when they were in the U.S. Marines Corp. This other marine had indicated that Mr. Raub's behavior had changed recently by becoming more extreme. According to the other marine, Mr. Raub's behavior had become more odd and unusual. The other marine was concerned that Mr. Raub was the kind of person who might carry out the threats he was making. Detective Paris expressed to me his concern that, because of his military training, Mr. Raub had the knowledge and experience necessary to carry out his threats. Detective Paris also expressed concern that Mr. Raub might have access to weapons and explosive materials. Detective Paris also informed me that Mr. Raub did not appear to be using alcohol and did not appear to be a threat to cause harm to himself, but he was unsure as to whether or not Mr. Raub was taking any drugs.

I also asked Detective Paris to describe Mr. Raub's behavior during the course of Detective Paris' interview of Mr. Raub. Detective Paris indicated that while Mr. Raub was speaking to him, Mr. Raub appeared preoccupied and distracted. Mr. Raub would make eye contact with Detective Paris for a few seconds, but then his eyes would rove away while he continued to talk before returning to Detective Paris. In my professional experience, this phenomenon can sometimes be evidence of psychosis. It can indicate that the subject is distracted by some internal stimulus. Detective Paris also informed me that Mr. Raub had rapid mood swings during their conversation – another common symptom of mental instability – and that when Detective Paris asked him about the specific threats which he had made, Mr. Raub would not answer his questions. Detective Paris also indicated that Mr. Raub was extremely

serious and intense during the entirety of the conversation, and that he never joked or expressed any kind of light-heartedness.

After describing these symptoms to me, Detective Paris conveyed to me that as a result of his interview with Mr. Raub, he shared the concerns of Mr. Raub's marine acquaintance that Mr. Raub represented a threat, in the immediate future, to harm other individuals. Based upon the information which Detective Paris shared with me, I agreed with Detective Paris. I believed that Detective Paris had confirmed that the information which he had received from Mr. Raub's marine acquaintance was credible, that the change in Mr. Raub's behavior, and his demeanor during his conversation with Detective Paris were possible evidence of mental illness, and that Mr. Raub was likely to have the means, knowledge, expertise, access, and desire to harm other individuals. In my clinical experience, there was sufficient evidence, and there were sufficient safety concerns, to support the detention of Mr. Raub for a mental health evaluation. I did not ask to speak with Mr. Raub over the phone because I already had more than enough evidence based on Detective Paris' first hand observation to warrant an evaluation.

I informed Detective Paris that I concurred in his judgment and thought that Mr. Raub should be temporarily detained and brought in so that I could evaluate him in person to determine if he needed to receive additional mental health emergency services. After I informed Detective Paris that I concurred with his evaluation, we concluded our conversation. The conversation lasted approximately 10-15 minutes.

Approximately 30 minutes later, Mr. Raub arrived at the Chesterfield County Jail, where I performed my evaluation of him. He was transported there by Chesterfield County Police Officer Daniel Bowen. Also present was Chesterfield County Police Sergeant Russell Granderson.

I interviewed Mr. Raub for approximately 15 minutes while he was at the Jail. I was unable to interview him for a longer period of time because after the first 15 minutes, Mr. Raub informed me that he "chose not to answer" any more of my questions. During the 15 minute interview, I observed in Mr. Raub the same preoccupation and distractability which Detective Paris had described to me in our telephone conversation. Observing this phenomenon strengthened my opinion that Mr. Raub was responding to some internal stimulus. Mr. Raub also described to me his belief that the 9/11 terror attacks were perpetrated by the United States government, and that the United States government was exposing the American public to Thorium, a radioactive material, by dropping it on people from airplanes. Mr. Raub told me that a revolution was about to begin, and that he was going to lead it. I considered these statements to be evidence of paranoia and delusions of grandeur. I also asked Mr. Raub if he felt justified in following through with the threats which had caused the law enforcement officials to detain him, and he responded by saying "I certainly do, wouldn't you?"

I still needed to review all of the evidence of Mr. Raub's violent tendencies, including information concerning the specific threats which Mr. Raub had made. I was aware that the law enforcement officials knew the exact wording of the threats that Mr. Raub had made, as communicated to me by Detective Paris when we had spoken by telephone when Detective Paris was at Mr. Raub's home. Although one of the law enforcement officers had provided me with copies of some of Mr. Raub's Facebook posts, these posts were not specific enough or threatening enough, in my opinion, to meet the standards for a temporary detention order, and they also did not provide the input from Mr. Raub's marine acquaintance about the recent changes in Mr. Raub's behavior. Therefore, I asked the law enforcement officers to provide me with the communications which they had received from Mr. Raub's friends. When I did that, a

secret service agent, who had arrived at the Jail while I was interviewing Mr. Raub, provided me with a copy of the two page email from Mr. Raub's marine acquaintance that I attached as the last two pages of my 10-page Prescreening Report.

After I read this email, I was convinced that Mr. Raub met the standards under Va. Code §37.2-809 for the issuance of a temporary detention order so that he could receive further evaluation and mental health treatment. I left the Jail and returned to my office where I finished filling out the Prescreening Report which I had begun filling out while I interviewed Mr. Raub. At the same time, I began the process of finding a mental health facility where Mr. Raub could be admitted for further evaluation. It had been my hope that Poplar Springs Hospital, which has an excellent mental health facility for treating military veterans, would be able to treat Mr. Raub. However, Poplar Springs could not accommodate Mr. Raub, so I arranged for him to be admitted to John Randolph Medical Center. Once I had made arrangements for Mr. Raub to be admitted to John Randolph, I completed the petition for a Temporary Detention Order, which is attached to the Complaint in this case as Exhibit A, and I sent the petition by facsimile to the Chesterfield County Magistrate. As part of my Petition, I submitted a copy of the Prescreening Report including a copy of the email message from Mr. Raub's marine acquaintance, which the Secret Service agent had given to me. A copy of what I submitted to the Magistrate was filed under seal in this matter.

2.      Paragraph 2(b) of the Order:

QUESTION: The content of any telephone call between Defendant Campbell and a John Doe Defendant shortly before Plaintiff's arrest and detention, including the identity of the John Doe Defendant who spoke to Defendant Campbell by telephone.

ANSWER: The only telephone conversation which I had is the conversation between myself and Detective Michael Paris, which is described in detail in my Answer to Paragraph 2(a) of the Order, set forth above in paragraph numbered one of this Answer.

3. Paragraph 2(c) of the Order:

QUESTION: The extent to which Defendants Bowen and Granderson relied on any representations made by the John Doe Defendants or the professional judgment of Defendant Campbell in deciding to arrest Plaintiff.

ANSWER: I have no information concerning this request.

4. Paragraph 2(d) of the Order:

QUESTION: The identities of the John Doe Defendants if known or ascertainable with due diligence.

ANSWER: I have no information concerning this request. My attorneys have informed me that they provided to Mr. Raub's attorneys all information that they have in response to this request when they served the Rule 26(a) disclosures on my behalf on July 31, 2013.

Michael Campbell

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing Answers of Michael

Campbell to Limited Interrogatories Approved by the Court was hand delivered, this 16th day of

August, 2013, to:

Anthony F. Troy, VSB #05985
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Eighth and Main Building, Suite 1450
707 East Main Street
Richmond, VA   23219
ttroy@eckertseamans.com
Attorney for the Plaintiff Brandon Raub

William H. Hurd, VSB #16967
Stephen C. Piepgrass, VSB #71361
TROUTMAN SANDERS LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, VA   23219
william.hurd@troutmansanders.com
stephen.piepgrass@troutmansanders.com
Attorney for the Plaintiff Brandon Raub

COMMONWEALTH OF VIRGINIA:
COUNTY OF CHESTERFIELD, to wit:

I, Pamela Tuck Craze , a Notary Public in and for the
Commonwealth and County aforesaid, do hereby certify that Michael Campbell, whose name is
signed to the foregoing Answers to Interrogatories, has acknowledged the same before me in my
jurisdiction aforesaid and sworn that the information contained therein is correct to the best of
his knowledge and belief.

Given under by hand this 14 day of August, 2013.

My Commission expires: 1-31-2015

Registration I.D.: 708 1968

Pamela Tuck Craze

Jeffrey L. Mincks, VSB #18317
County Attorney
Stylian P. Parthemos, VSB #17360
Deputy County Attorney
Julie A. C. Seyfarth, VSB #46207
Assistant County Attorney
Counsel for the Defendants Michael Campbell,
 Daniel Lee Bowen, and Russell Morgan Granderson
P. O. Box 40
Chesterfield, VA 23832
(804) 748-1491 (telephone)
(804) 717-6297 (facsimile)
mincksj@chesterfield.gov



PAMELA TUCK CRAZE
Commonwealth of Virginia
Notary Public
Commission No. 7081968
My Commission Expires 1/31/20 15

**PETITION OR INVOLUNTARY ADMISSION FOR TREATMENT**

Commonwealth of Virginia

VA. CODE §§ 16.1-340; 16.1-340.1; 19.2-169.6; 19.2-182.9; 37.2-808 through 37.2-819

Temporary Detention Order No. _____

Case No. _____

Hearing Date and Time _____

[ ] General District Court
[ ] Juvenile and Domestic Relations District Court

Chesterfield
CITY OR COUNTY

In re  Brandon  Rawls
NAME OF RESPONDENT

DATE OF BIRTH _____   male
GENDER

2912  Beasley  Nook  Court
RESIDENCE ADDRESS

MAILING ADDRESS IF DIFFERENT

N. Chesterfield   VA   23237
CITY   STATE   ZIP CODE

CITY   STATE   ZIP CODE

Chesterfield County Jail
NAME AND ADDRESS OF CURRENT LOCATION OF RESPONDENT

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

Michael Campbell   CSB Prescreener
NAME OF PETITIONER   PETITIONER'S RELATIONSHIP TO RESPONDENT

Chesterfield Mental Health Support Services   ( 804 ) 717-6850
NAME OF AGENCY OR FACILITY OF PETITIONER (IF APPLICABLE)   FACSIMILE NUMBER

6801 Lucy Corr Blvd   ( 804 ) 748-6356
ADDRESS OF PETITIONER   TELEPHONE NUMBER

Chesterfield   VA   23832   ( _____ ) _____
CITY   STATE   ZIP CODE   ALTERNATE TELEPHONE NUMBER

I, the undersigned petitioner, being a responsible person, hereby file this petition pursuant to Virginia Code

[X] §§ 37.2-805 through 37.2-819 (Adult Cases Only) and state that the respondent is unwilling to volunteer or incapable of volunteering for hospitalization or treatment, has a mental illness and is in need of hospitalization or treatment, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future:

    [X] cause serious physical harm to [ ] self [X] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or

    [X] suffer serious harm due to respondent's lack of capacity to protect self from harm or to provide for respondent's own basic human needs

    [X] The preadmission screening report has been prepared by the community services board and the report is attached.

    [ ] An initial mandatory outpatient treatment plan has been prepared by the community services board and is attached.

[ ] This petition is filed pursuant to Virginia Code § 37.2-817(C) prior to the expiration of the involuntary admission order entered

    on _____, to continue such order, of which the respondent is the subject, for a period not to exceed 180 days.
    DATE

[ ] This motion for mandatory outpatient treatment is filed pursuant to Virginia Code § 37.2-805 or § 37.2-817(C) as the respondent has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or was involuntarily admitted pursuant to § 37.2-817(C), and on at least two previous occasions within 36 months preceding the date of the hearing, has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or has been involuntarily admitted pursuant to § 37.2-817.

[ ] § 19.2-169.6 and as the person having custody over the respondent, who is an inmate, state that the inmate has a mental illness; there exists a substantial likelihood that, as a result of a mental illness, the inmate will, in the near future,

    [ ] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and any other relevant information, or

    [ ] suffers serious harm due to his lack of capacity to protect himself from harm as evidenced by recent behavior and any other relevant information;

and the inmate requires treatment in a hospital rather than a local correctional facility.

[ ] § 19.2-182.9 and state that the respondent, who is an acquittee on conditional release

    [ ] has violated the conditions of the respondent's release, or

    [ ] is no longer a proper subject for conditional release,

and the respondent requires inpatient hospitalization.



FORM DC-4001 (MASTER, PAGE ONE OF TWO) 07/12

Temporary Detention Order No. ▒▒▒▒▒▒▒▒

Case No. ▒▒▒▒▒▒▒▒

[✓] § 16.1-340 or § 16.1-340.1 (Juvenile Cases Only) and state that because of mental illness, the respondent, who is a juvenile:

    [▢] presents a serious danger to [✓] self [▢] others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats, or

    [▢] is experiencing a serious deterioration of the ability to care for self in a developmentally age-appropriate manner, as evidenced by delusionary thinking or by a significant impairment of functioning in hydration, nutrition, self-protection, or self-control,

and the juvenile is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment.

[▢] The juvenile is currently detained in a detention home or shelter care facility by order of the

▒▒▒▒▒▒▒▒▒▒▒▒, Juvenile and Domestic Relations District Court. To the extent known,
NAME OF COURT

the following charges against the juvenile are the basis of the detention in the detention home or shelter care facility:

▒▒▒▒▒▒▒▒▒▒▒▒
CHARGE

▒▒▒▒▒▒▒▒▒▒▒▒
CHARGE

[✓] See attached sheet for additional charges.

To the extent known, the names and addresses of the juvenile's parents are as follows:

▒▒▒▒▒▒▒▒▒▒▒▒
NAME OF MOTHER AND ADDRESS

▒▒▒▒▒▒▒▒▒▒▒▒
NAME OF FATHER AND ADDRESS

I request that the respondent be examined and accorded such assistance as provided by law. In support of this petition, I further state as follows: *See prescription*

▒▒▒▒▒▒▒▒▒▒▒▒
DATE

_Alated Campbell_ MSW
PETITIONER

The petitioner appeared this date before the undersigned and, upon being duly sworn, made oath that the facts stated in this petition are true based on the petitioner's knowledge.

_____
DATE

[ ] JUDGE  [ ] MAGISTRATE  [ ] SPECIAL JUSTICE  [ ] CLERK

FOR NOTARY PUBLIC'S USE ONLY:

State of .................................... [ ] City  [ ] County of ....................................................

Acknowledged, subscribed and sworn to before me this .............. day of ................................................, 20 ....................

by ....................................................................................

_____
DATE

NOTARY PUBLIC
Notary Registration No. ................................. (My commission expires ...................)

Aug. 17. 2012 12:04AM    MH CHESTERFIELD CRISIS.    No. 0970    P. 2

Community Services    rd/Behavioral Health Authority:    Consumer ID#

Date: 8-16-12 _____ Time: From 7:40 ☐am ☒pm · To _____ ☐am ☐pm
Time under court order: _____ Time not under court order: _____

Emergency Custody Order: ☒Yes ☐No    ☐Magistrate Issued    ☒Law Enforcement Issued (Paperless)
Date and Time Executed: 8-16-12    7:40
Extension: ☒Yes ☒No  Reason: _Search in for a bad._    (identify facility/medical evaluation/other good cause)
Evaluation: ☒In-person  or ☐Two-way electronic video and audio
Petitioner _Michael Campbell_    Phone: _____
Translator and language: _____    Phone: _____

DISPOSITION  ☐Recommitment  ☒TDO  ☐Voluntary  ☐CSU  ☐Safety Plan  ☐Release  ☐Referral  ☐Other _____

HOSPITAL/FACILITY _John Randolph_    Case/TDO #: _____

## Personal Information

First Name: _Brandon_ Middle: _____ Last Name: _Raub_ DOB: 4-16-86 Age: 26

SSN: 473 - 15 - 1519   (M)F   W   N   6'1"   180   Blond   Blue
                        (Gender) (Race) (Hispenic Origin) (Height) (Weight) (Hair Color) (Eye Color)

Address: 2912 Bentley Bensly N. Chesterfield Va 23237 ChesT
         (Street)              (City)        (State)  (Zip Code)  (County)

Phone: 804 334-2671 Home/Cell   Marital Status: S   Spouse Name: _____

School Division (If applicable): _____ School Attending: _____ Grade: _____ Special Ed.: Y or N

(If under age 18)
Mother: _Kathleen_ Address: _Some_    Phone: _Same._ Home/Cell

Father: _____ Address: _____    Phone: _____ Home/Cell

Legal Custodian  ☐ Unknown  Name: _____ Phone: _____ Address: _____
Legal Guardian   ☐ Unknown  Name: _____ Phone: _____ Address: _____

Emergency Contact: Name _____ Relationship to Person: _____ Phone _____

Address: _____
         (Street)              (City)        (State)  (Zip Code)  (County)
CSB of Residence: _Chesterfield._

CSB Code: 01 Contacted: ☒Yes ☐No _Michael Campbell_ 804-748-6356.
                                    (Name)                    (Phone)
Employment Status: ☐ Unknown _____    Education Level: (All ages) _____
Employer: _____    Phone: _____
Military Status: ☐ Unknown _Inactive_ _Duty_ _USMC_    Start Year: _____ End Year: _____
SSI  ☐Yes ☐ No ☐ Unknown    SSDI ☐Yes ☐ No ☐ Unknown

Medicaid: ☐Yes ☐ No ☐ Unknown # _____    Subscriber Name: _____

Medicare: ☐Yes ☐ No ☐ Unknown # _____ Part D: ☐Yes ☐No _____ Plan

Insurance: ☒Yes ☐ No ☐ Unknown _____
                                  (Name of Company/ Group/Plan/Number)

## Local Use

Current Location: _Chesterfield Jail._

Hospital Bed Confirmed By: _Dr Durron._    Phone: _____

Presenter / Staff Name & Credentials: _Michael Campbell msw._

Medical Clearance: ☒Yes ☐ No If yes, where? _John Randolph_

Collateral Contacts: _____

EXHIBIT
#5
MS 10/17/3
PENGAD 800-631-6989

EXHIBIT
C
PENGAD 800-631-6989
TTS 10/1/13

**Collateral Sources**

☐ Individual Requesting Evaluation   ☐ Family/Significant Other/Guardian   ☐ Treatment Records
☐ Treating Physician/Psychiatrist    ☐ CSB Case Manager or Other Staff                ☒ Police/First Responders
☐ CIT Officer                        ☐ WRAP Plan              ☐ Advance Directive      ☐ Safety & Support Plan
Is CSA (Comprehensive Services Act) involved with minor?  ☐Yes  ☐ No  ☐ Unknown
Is Department of Social Services involved with individual?  ☐Yes  ☐ No  ☐ Unknown
Comments: _Friends   reported  To  the  FBI_

**Presenting Crisis Situation**

Referral Source: _Richm. Chesterfield Police_, Consultation Location: _Chest. jail._
Reason for Referral: _Client has been posting threatening information on_
_the internet. Client believes that 911 was a conspiracy_
_caused by the US_

Assessment:

_Client met with the FBI and Secret Service_
_To explain recent posts on Facebook. Client's friends_
_reported client to the FBI for posting extreme conspiracy_
_theories and threats To President/Bush. This Counselor_
_asked client about why the authorities were involved and_
_he stated because they knew I am on to them._
_Client was cooperative but refused to answer anymore_
_questions. Client was attempting to explain the conspiracy_
_theories to the officers. According to client's friends,_
_His behaviors have become much more extreme recently_
_and they state this behavior is "not him". This counselor_
_contacted client's mother. She shares the same beliefs_
_and supports her sons behaviors. Due to unpredictable behaviors_
_and threats on the internet, a TDO is being requested_
_To provide treatment and further evaluation. Please see a copy_
_of tweets made (attached)._

- 10/03/2012 WED 11:39 FAX                                                    ☒004/011

Case 3:13-cv-00328-HEH-MHL  Document 90-2  Filed 11/18/13  Page 61 of 95 PageID# 1246
     Aug. 17. 2012 12:05AM   MH CHESTERFIELD CRISIS                        No. 0970   P. 4

**Behavioral Heal   reatment/Services**

Current Outpatient Treatment: ☐ Yes ☒ No ☐ Unknown    ☐ Behavioral Health (MH - SA)   ☐ Developmental Services

☐ Private Provider or ☐ CSB   Name: _____   Phone: _____

Case Manager: _____   Phone: _____

Psychiatrist: _____   Phone: _____

Prior Inpatient Treatment: ☐ Yes ☒ No ☐ Unknown    ☐ Behavioral Health (MH - SA)   ☐ Developmental Services

Name/Location of Last Tx facility: _____   Adm. Date: _____ Discharge Date: _____

Number of Hospitalizations: _____

Ever in a State facility? ☐ Yes ☐ No   Name: _____   Date: ___ _____

Ever in a Crisis Stabilization Unit? ☐ Yes ☐ No   Name: _____   Date: _____

Other: _____

| ☐ WRAP Plan | ☐ MOT | ☐ PACT/ICT | ☐ NGRI | ☐ Advance Directive | ☐ Safety & Support Plan | ☐ Group Home |
☐ Day Treatment   ☐ Prevention Services   ☐ In-Home Provider Name: _____ ☐ Other: _____

## Substance Abuse Assessment

☐ No current use      ☒ No history of use      ☐ Refuses to answer

Current use listed below:

| Drug Type | Priority | Age 1ˢᵗ Use | Frequency of Use and Amount | Method of Use | Date of Last Use and Amount |
|---|---|---|---|---|---|
| | Primary | | | | |
| | Secondary | | | | |
| | Tertiary | | | | |

History of substance abuse ☐   (Drugs, alcohol, mood altering substances, marijuana, prescription medications, inhalants)

Comment: _____
_____

Have you or anyone else ever felt you had a drug or alcohol problem? ☐ Yes ☒ No

Have you received inpatient or outpatient SA treatment? ☐ Yes ☒ No   Maintenance services?   ☐ Yes ☐ No

Number of prior episodes of any drug: _____   Detoxification treatment?   ☐ Yes ☐ No

Name/Location of last treatment facility: _____   Date of Discharge: ____ _____

| | Current withdrawal (Past 24 hours) | History of withdrawal |
|---|---|---|
| Tremors | | |
| Headaches | | |
| Vomiting (Blood present) ☐ Yes ☐ No | | |
| Nausea | | |
| Diarrhea (Blood present) ☐ Yes ☐ No | | |
| Sweating | | |
| Paranoia | | |
| DTs | | |
| Other | | |

BAC: ___  Time: _____   Lab Results: _____   ☐ Unable to Test
Tobacco use? ☐ Yes ☐ No   Type: _____
Pregnant Status: ☐ Yes ☐ No ☐ Unknown   Pregnant and using substances? ☐ Yes ☐ No ☐ Unknown

. 10/03/2012 WED 11:40 FAX                                                                @005/011

Case 3:13-cv-00328-HEH-MHL  Document 90-2  Filed 11/18/13  Page 62 of 95 PageID# 1247
Aug. 17. 2012_12:05AM___MH CHESTERFIELD CRISIS_____No. 0970  P. 5

**Mental Status Ex:**

| | | |
|---|---|---|
| Appearance: | ☐ WNL | ☐ unkempt  ☐ poor hygiene  ☑ tense  ☐ rigid |

Behavior/Motor
Disturbances:  ☐ WNL  ☒ agitated  ☒ guarded  ☐ tremor  ☐ manic  ☐ impulsive  ☐ psychomotor retardation
                                ☐ tearful  ☐ easily startled  ☒ distracted  ☐ hysterical  ☐ restless

Orientation:  ☒ WNL  ☐ Disoriented to:  o time  o place  o person  o situation

Speech:  ☐ WNL  ☐ pressured  ☒ slowed  ☐ soft  ☐ loud  ☐ slurred  ☐ incoherent

Mood:  ☐ WNL  ☐ depressed  ☐ angry  ☐ hostile  ☐ euphoric  ☒ anxious  ☐ anhedonic  ☐ withdrawn

Range of Affect:  ☐ WNL  ☐ constricted  ☐ blunted  ☐ flat  ☒ labile  ☐ inappropriate

Thought Content:  ☐ WNL  ☐ impaired  ☐ unfocused  ☐ unreasonable  ☐ preoccupation  ☒ delusions  ☐ thought insertion
                                ☒ grandiose  ☐ ideas of reference  ☒ paranoid  ☐ obsessions  ☐ phobias

Thought Process:  ☐ WNL  ☐ illogical  ☐ abstract  ☐ concrete  ☐ incoherent  ☐ perseverative  ☒ impaired concentration
                                ☐ loose associations  ☐ flight of ideas  ☐ circumstantial  ☐ blocking  ☐ tangential

Sensory:  ☒ WNL  ☐ illusions  ☐ flashbacks  ☐ Hallucinations:  o auditory  o visual  o olfactory  o tactile

Memory:  ☒ WNL  ☐ Impaired:  o recent  o remote  o immediate

Appetite:  ☒ WNL  ☐ increased  ☐ decreased  Weight:  o stable  o loss  o gain

Sleep:  ☒ WNL  ☐ hypersomnia  ☐ onset problem  ☐ maintenance problem

Insight:  ☐ WNL  ☐ blaming  ☒ little  ☐ none

Judgement:  ☐ WNL  ☐ impaired  ☒ poor

Estimated Intellectual Functioning: ☐ Above average  ☒ Average  ☐ Below average  ☐ Diagnosed MR  ☐ Unable to determine

Able to provide historical information: ☒ Yes  ☐ No  Explain: _____

Reliability of self report ☐ Good  ☒ Fair  ☐ Poor  Explain: _Would not offer answers to certain question_

**Significant Clinical Findings** (further describe any symptoms checked above)

_Client had long pauses before answering questions._
_Very labile w/ the secret service._

_____

_____

_____

_____

_____

_____

_____

_____

_____

Ω  |  ʌ  ɪ

## Medical

Primary Care Provi...:  _Would  not  provide._ _____  Phone: _____

Medical history and current medical symptoms or issues:
_healthy_

Medication:       **Please see attached medication list** ☐       **Please see attached medical addendum** ☐

Current prescribed psychotropic and other medications (include dosage, schedule, etc. if known)

| Name | Dose | Schedule | Physician |
|------|------|----------|-----------|
| 1. _none_ | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |

Has individual followed recommended medication plan? ☐ Yes  ☐ No  Explain: _____
Has individual followed recommended recovery plan?  ☐ Yes  ☐ No  N/A ☐ Explain: _____
Recent medication change?  ☐ Yes  ☐ No  ☐ Unknown  Date of change: _____
Describe change: _____
Allergies (including food) or adverse side effects to medications:  ☐ Yes  ☐ No  ☐ Unknown
Describe: _____

## Legal Data

Legal Status: _Would  not  respond_ ☐ Unknown
Is individual serving a sentence?   ☐ Yes  ☒ No  ☐ Unknown   Details: _____
Is individual NGRI Conditional Release? (Adults only)  ☐ Yes  ☒ No  ☐ Unknown  Details: _____
Is individual on probation or parole? ☐ Yes  ☒ No  ☐ Unknown  Contact Person: _____
Pending legal charges?   ☐ Yes   ☐ No  ☒ Unknown  Charges: _____
Date of hearing if known: _____  Court of Jurisdiction _____

If a minor: Judge: _____  Attorney: _____  GAL: _____
Has individual come from detention?  ☐ Yes  ☐ No  ☐ Unknown
Juvenile Detention Center: _____

| (Facility Name) | (Address) | (Telephone) | (Fax) |
|------|------|------|------|

## Diagnosis DSM IV R (P- Provisional, H-Historical)

Axis I  _psychotic  D/O  Nos_ Axis I _____  Axis I _____

Axis II  _deferred._ _____ Axis II _____

Axis III  _none_. _____

Axis IV Psychosocial and Environmental (Check all that apply)_____
☒ Support group    ☐ Social /Environmental    ☐ Educational    ☐ Domestic  ☐ Occupational    ☐ Housing  ☐ Economic
☐ Health Care     ☐ Legal System       ☐ Other _____

Axis V  GAF Current: _40_ _____     Highest past year, if known: _____

Name: _A_ -- _l_     _n_ - _t_

Individual Service Planning

Individuals who may be helpful in treatment planning.

| Name | Telephone | Relationship |
|------|-----------|--------------|
| 1. | | |
| 2. | | |
| 3. | | |

□ Family Member  □ Guardian  Name:_____ may be contacted with information that is directly relevant to their involvement with the individual's health care, including location and general condition. (32.1-127.1:03(D34))

□ Individual agrees          □ Individual lacks capacity

□ Individual objects          □ Emergency makes it practically impossible to agree or object.

## Outcome of the emergency evaluation or ECO

□ No further treatment required, or

□ Individual declined referral and no involuntary action taken, or

□ Referred to voluntary crisis stabilization unit, or

□ Referred to voluntary outpatient or community treatment other than crisis stabilization, or

□ Referred to voluntary inpatient admission and treatment,

    and

□ Petitioner and  □ Treating physician notified of disposition if TDO not recommended.

□ Recommitment recommended by CSB

☒ TDO recommended by CSB

□ Hearing and commitment process has been explained to the individual.

CSB consulted with magistrate about alternative transportation  □ Yes  ☒No

☒ CSB does not recommend alternative transportation.

□ CSB recommends alternative transportation by _____

                                        (Name)

37.2-809-1

□ Consideration of 10 day inpatient admission by health care agent pursuant to advance directive _____

                                        (Name of Agent)

□ Consideration of 10 day inpatient admission by designated guardian pursuant to guardianship order_____

                                        (Name of Guardian)

Name: Bm..../.. D.. l.

. 10/03/2012 WED 11:40 FAX ⬜0008/011

Case 3:13-cv-00328-HEH-MHL Document 90-2 Filed 11/18/13 Page 65 of 95 PageID# 1250
Aug. 17. 2012—12:05AM MH CHESTERFIELD CRISIS No. 0970 P. 8

**Risk Assessment** 11cal Options

### Minor 16.1-340.1

Because of mental illness:

☐ The minor presents a serious danger to ☐self or ☐others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats; or

☐ Is experiencing a serious deterioration of his ability to care for himself in a developmentally age appropriate manner, as evidenced by: ☐delusional thinking or ☐by a significant impairment of functioning in hydration, nutrition, self protection or self control; and

☐The minor is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment. Findings:_____

The minor's parents/guardians ☐were or ☐were not consulted. The minor's treating or examining physician, if applicable, ☐ was or ☐was not consulted.

Treatment and support options:
Inpatient treatment ☐is or ☐is not the least restrictive alternative that meets the minor's needs
☐ Outpatient or less restrictive services has been tried with the following results:

_____

☐ Outpatient or less restrictive service has *not* been tried and is *not* likely to be adequate because:

_____

### Adult 37.2-809

It appears from all evidence readily available that the person:

☒.Has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future:

☒Cause serious physical harm to ☐ self or ☒others as evidenced by recent behavior, causing, attempting, or threatening harm, and other relevant information, or,

☐ Suffer serious harm due to his lack of capacity to ☐protect himself from harm or ☐provide for his basic human needs (" not applicable under Virginia Code19.2-169.6) and

☒Is in need of hospitalization or treatment.
Findings:_____

_____

**Capacity for adults and minors age 14 and older**

| | | | | | |
|---|---|---|---|---|---|
| Able to maintain and communicate choice | ☐ Yes | ☒No | Able to understand consequences | ☒Yes | ☐ No |
| Able to understand relevant information | ☐ Yes | ☒No | Willing to be treated voluntarily | ☐ Yes | ☒No |

**Risk Factors**
☐ Aggressive behavior, ☐ Sexual acting out ☐ Self injurious behavior ☐ Elopement, ☐ Actively psychotic
☐ Suicidal ideation ☒Homicidal ideation ☐ Plan ☒Access to weapons potential.
☒Other_____

**Protective Factors**_____

**Final Disposition**
____ ꓕꓵ0_____

_____

_____

_____

Preadmission Screening Evaluator Signature    MS W    8-6-12 on    Date    Board
Electronically signed ☐

Preadmission Screening Evaluator Signature    Date    Board
Electronically signed ☐

Print Name Here (not required if electronically signed)

Print Name Here (Not required if electronically signed)

Na—n,

. 10/03/2012 WED 11:41 FAX  ☒009/011

Case 3:13-cv-00328-HEH-MHL  Document 90-2  Filed 11/18/13  Page 66 of 95 PageID# 1251

Aug. 17. 2012 12:05AM careMH CHESTERFIELD CRISIS──────for the individual's placement No. 0970  P. 9 .1-340.4 (Minor) or 37.2-816 (Adult;

Name of Individual. _____  Date: _____  Time: _____  ☐am ☐pm
☐ No further treatment required.
☐ Has or ☐ does not have sufficient capacity to accept treatment (N/A for minors under age 14 except for Outpatient treatment)
☐ Is or ☐ is not willing to be treated voluntarily (* not applicable under Virginia Code19.2-169.6)
☐ Voluntary community treatment at the ☐ CSB (specify) _____
      Or ☐ other (specify) _____
☐ Voluntary admission to a crisis stabilization program (specify) _____
☐ Adult: Voluntary inpatient treatment because individual requires hospitalization and has indicated that he/she will agree to a voluntary period of treatment up to 72 hours and will give the facility 48 hours notice to leave in lieu of involuntary admission.
☐ Minor: Voluntary inpatient treatment of minor younger than 14 or non-objecting minor 14 years of age or older.
☐ Minor: Parental admission of an objecting minor 14 years of age or older pursuant to 16.1-339.

## Minor 16.1-340.4  ☐ Under age 14  ☐ Age 14 or Older

Custodial parent or guardian ☐is or ☐is not willing to consent to voluntary admission (for inpatient treatment only)
☐ Because of Mental Illness meets the criteria for involuntary admission or mandatory outpatient treatment as follows:
☐ The minor presents a serious danger to self or others to the extent that severe or irremediable injury is likely to result, as evidence by recent acts or threats or: ☐ Is experiencing a serious deterioration of his ability to care for himself in a developmentally age appropriate manner. As evidenced by: delusional thinking or significant impairment of functioning in: ☐hydration ☐nutrition ☐self protection ☐ self control. ☐ The minor is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment. Is the parent or guardian with whom the minor resides willing to approve any proposed commitment? ☐ Yes  ☐ No  ☐ Unavailable
If no, is such treatment necessary to protect the minor's life, health, safety or normal development?  ☐ Yes  ☐ No
❖Therefore the CSB recommends:
A. ☐ Involuntary admission and inpatient treatment, as there are no less restrictive alternatives to inpatient treatment.
    ☐ Alternative transportation

B. ☐ Mandatory outpatient treatment not to exceed 90 days because: The minor, if 14 years of age or older, and his parents or guardians ☐have sufficient capacity to understand the stipulations of the minor's treatment, ☐ have expressed an interest in the minor's living in the community and have agreed to abide by the minor's treatment plan, and ☐ are deemed to the capacity to comply with the treatment plan and understand and adhere to conditions and requirements of the treatment and services; and ☐ The ordered treatment can be delivered on an outpatient basis by the Community Services Board or a designated provider.

C. ☐ Do the best interests of the minor require an order directing either or both of the minor's parents or guardian to comply with reasonable conditions relating to the minor's treatment? ☐Yes ☐No

## Adult 37.2-816

☐ Because of Mental Illness meets the criteria for involuntary admission or mandatory outpatient treatment(* not applicable under Virginia Code19.2-169.6) as follows:
☐ There is a substantial likelihood of serious physical harm to ☐self or ☐others in the near future as a result of mental illness as evidenced by recent behavior causing, attempting or threatening harm and other relevant information, if any, or
☐ There is substantial likelihood that, as a result of mental illness, in the near future he/she will suffer serious harm due to a lack of capacity ☐ to protect him/herself from harm or ☐ to provide for his/her basic human needs(* not applicable under Virginia Code19.2-169.6) .
❖Therefore the CSB recommends:

A. ☐ Involuntary admission and inpatient treatment; as there are no less restrictive alternatives to inpatient treatment.
    ☐ Alternative transportation

B. ☐ Mandatory outpatient treatment because ☐ less restrictive alternatives to involuntary treatment that would offer an opportunity for improvement of his/her condition have been investigated and ☐ are deemed to be appropriate, and the person ☐ has sufficient capacity to understand the stipulations of his/her treatment, ☐ has expressed an interest in living in the community and ☐ has agreed to abide by his/her treatment plan, and ☐ is deemed to have the capacity to comply with the treatment plan and ☐ understand and ☐ adhere to conditions and requirements of the treatment and services. The recommended treatment ☐ can be delivered on an outpatient basis by the ☐ CSB or ☐ designated provider(s) specify: _____

C. ☐ Physician discharge to mandatory outpatient treatment following inpatient admission pursuant to 37.2-8117 (C1) and (C2). The individual meets the criteria as follows: ☐ The person has a history of lack of compliance with treatment for mental illness that at least twice within the past 36 months has resulted in the person being subject to an order for involuntary admission; ☐ In view of the person's treatment history and current behavior, the person is in need of mandatory outpatient treatment following inpatient treatment in order to prevent a relapse or deterioration; ☐ as a result of mental illness, the person is unlikely to voluntarily participate in outpatient treatment unless the court enters an order authorizing discharge to mandatory outpatient treatment following inpatient; and ☐the person is likely to benefit from mandatory outpatient treatment.

Preadmission Screening Evaluator Signature  or  Electronically signed  ☐ _____  Date _____  Board _____

Print Name Here  (Not required if electronically signed) _____  Representative CSB _____

## Parthemos, Stylian

| | |
|---|---|
| From: | Paris, Michael <Michael.Paris@ic.fbi.gov> |
| ѕnt: | Friday, August 16, 2013 8:52 AM |
| ,o: | Parthemos, Stylian |
| Subject: | FW: Database checks |

TFO, Michael Paris
FBI, sq. 5
Richmond Field Office
Office: 804-627-4788
Mobile:804-640-6128

**From:** Granger, Terry L.
**Sent:** Wednesday, August 15, 2012 9:05 AM
**To:** Paris, Michael; Wade, George B.
**Subject:** Database checks

Hey Mike and George – when you guys get a chance, could you please do your Department checks on this guy: Brandon J. Raub, DOB: 4/16/86, SSN: 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, address: 2912 Bensley Road, Chesterfield, VA. He seems to have no criminal charges but I would be curious to see if there have been any encounters with him. Thanks very much.

T.



1

## Parthemos, Stylian

From:               Paris, Michael <Michael.Paris@ic.fbi.gov>
ent:                Friday, August 16, 2013 8:54 AM
ro:                 Parthemos, Stylian
Subject:            FW: B. Raub Contact Information



TFO, Michael Paris
FBI, sq. 5
Richmond Field Office
Office: 804-627-4788
Mobile:804-640-6128

**From:** Wyman, John V.
**Sent:** Thursday, August 16, 2012 1:58 PM
**To:** Granger, Terry L.; Paris, Michael
**Cc:** Tedeschi, Quintin C.
**Subject:** FW: B. Raub Contact Information

Mike – Please talk to Terry and, if she agrees, find the on call CA to see whether there is anything we could do with the below to obtain state charges. I tried Q, but can't get him on the phone. I looked at an old email regarding VA charges. Not sure if there is anything that we could use in this situation. I am going to call USAO to see if they can think of anything.

below is the text of an email from an old FCPD contact regarding communication of threats. Not a clear fit, but maybe there's another statute that would be close.

```
In the state of virginia, it is a class 5 felony for a person to send a letter or an
electronic communication to a person that is life threatening or serious bodily injury in
manner (terrorist related). It is a class 6 felony if you can't prove that it is terrorism
related.

What this means is if you have a target, and he sends a letter, text message, email, youtube
video etc, specifically threatening the life of someone or a group, it is a class 5 felony
which carries a 1 to 10 year sentence. You don't need an overt act to occur after, just the
act of sending such a threat over electronic communication and that recipient to be in fear
is enough

All you need to show for the terrorism part is that the suspect is doing it for the sake of
allah, you don't need to tie him to a terrorist organization

18.2-60. Threats of death or bodily injury to a person or member of hisfamily; threats to
commit serious bodily harm to persons on school property;penalty.
A. 1. Any person who knowingly communicates, in a writing, including anelectronically
transmitted communication producing a visual or electronicmessage, a threat to kill or do
bodily injury to a person, regarding thatperson or any member of his family, and the threat
places such person inreasonable apprehension of death or bodily injury to himself or his
 milymember, is guilty of a Class 6 felony. However, any person who violates thissubsection
 ith the intent to commit an act of terrorism as defined in 18.2-46.4 is guilty of a Class 5
felony
```

1

RAUB046

**From:** Granger, Terry L.
**Sent:** Thursday, August 16, 2012 1:34 PM
**o:** Wyman, John V.
**Subject:** FW: B. Raub Contact Information

This guy sent some specific posts – it is worrisome I think

**From:** Fullerton, Jason
**Sent:** Thursday, August 16, 2012 10:55 AM
**To:** Granger, Terry L.
**Subject:** Fw: B. Raub Contact Information

FYI

**From:** Howard Bullen <bullenhr@hotmail.com>
**To:** Fullerton, Jason
**Sent:** Wed Aug 15 19:58:47 2012
**Subject:** B. Raub Contact Information

Jason,

Thanks for your time on the phone this afternoon. As promised, here is Brandon Raub's contact information:

Phone:
        760.518.9393
.ddress:
        2912 Bensley Road
        Richmond, VA 23237

I served with Raub in Iraq in 2006-2007 as part of C Co 4thCEB in direct support of 3rd Battalion 4th Marines in Al Qaim. During that time I was the Heavy Equipment Chief and Squad Leader in the platoon. Raub was not one of my direct reports but I did work closely with him during the deployment and kept in touch for a few years after returning.

My concern, and one shared by Sean Lawlor who contacted you on Sunday the 12th of August, is that over the past few months Raub has been posting increasingly threatening and action-oriented posts on Facebook. I've attempted to get in touch with him a few times recently but his phone is off and when I reach out to him on Facebook he'll only talk about "9/11 being a conspiracy". The posts are all vague, but there is a repetitive theme of "the world will see this/ this is here for the world to find and understand". Much of this is posted to a public Facebook page, "Dear Illuminati" (https://www.facebook.com/#!/groups/293409887424989/) which from what I gather is directed at a "secret government conspiracy". Some of the specific posts that have given me concern that it is possibly more than just extremist rhetoric are:

- 15 August 2012: "This is revenge. Know that before you die."
- 14 August 2012: "Richmond is not yours. I'm about to shake some shit up."
- 14 August 2012: "This is the start of you dying. Planned spittin with heart of Lion."
- 14 August 2012: "Leader of the New School. Bringing Back the Old School. MY LIFE WILL BE A DOCUMENTARY."
- 13 August 2012: "I'm gunning whoever run the town."

2

RAUB047

- 10 August 2012: "W, you're under arrest bitch."
- 7 August 2012: "The World will Find This."
- 29 July 2012: "I know ya'll are reading this, and I truly wonder if you know what's about to happen."
- 29 July 2012: "W, you'll be one of the first people dragged out of your house and arrested."
- 29 July 2012: "And Daddy Bush, too"

Much of the same rhetoric is also on his personal Facebook page:

- 14 August 2012: "The Revolution will come for me. Men will be at my door soon to pick me up to lead it ;)"
- 13 August 2012: "You should understand that many of the things I have said here are for the world to see."

I know that much of this is typical extremist language, but knowing his personality I feel he genuinely believes in this and is not simply looking for attention.

Thanks again for your time, and please let me know if you need any additional information or would like to speak further.

Very respectfully,

Howard Bullen
910.548.3829
BullenHR@hotmail.com

RAUB048

## Parthemos, Stylian

From:       Paris, Michael
:nt:        Tuesday, September 18, 2012 11:39 AM
:o:         Parthemos, Stylian
Subject:    FW: LINX (email Raub case)



Corporal Detective Michael Paris, Unit 685
Chesterfield County Police Department
TFO, JTTF, Richmond FBI Field Office
804-640-6128

---

**From:** Nalepa, Bonnie
**Sent:** Thursday, August 16, 2012 4:14 PM
**To:** Paris, Michael
**Subject:** RE: LINX

Mike, Brandon doesn't have anything to note (traffic, FI); Brently has been involved in residential B&E's with Chesterfield back in 2005, I'm going to forward you in a separate email on Threatening Letter.....Brittany was arrested for drugs in 2009 - all of these reports are in Chesterfield.

nnie Nalepa, Intelligence Analyst
.ulti Jurisdictional Special Operation Group
Chesterfield County Police Department
Crime Analysis & Intelligence Unit
804-768-7564 - Office/Voicemail
804-308-6031 - Cell
804-745-1083 or 1084 - Fax

---

**From:** Paris, Michael
**Sent:** Thursday, August 16, 2012 1:55 PM
**To:** Nalepa, Bonnie
**Subject:** LINX

Bonnie,

I was hoping you could check LINX on the below subjects.

They live in Cfield and 2 of them are posting some serious stuff on their Facebook page.

Brandon James Raub- w/m, 2912 Bensley Road Chesterfield, VA, 4/16/1986, 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

Brently Michael Raub, w/m, 2912 Bensley Raod, 8/31/1990, 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

ttany Lee Raub, w/f, 3825 Silver Mews Lane 23237, 9/23/1988, 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

1

RAUB049

Corporal Detective Michael Paris, Unit 685
Chesterfield County Police Department
TFO, JTTF, Richmond FBI Field Office
804-640-6128

RAUB050

(10) Richmond Liberty Movement

https://www.facebook.com/raub.brando



Nonprofits & Activis

⚪ July 25 at 6:54pm via InfoWarriorst

 Johnny Law

"THESE are the times that try men
the sunshine patriot will, in this (
their country; but he that stands
thanks of man and woman. Tyrar
conquered; yet we have this cons
the conflict, the more glorious th
cheap, we esteem too lightly: it i
thing its value. Heaven knows ho
goods; and it would be strange i
freedom should not be highly rat
enforce her tyranny, has declared
tax) but "to bind us in all cases w
that manner, is not slavery, then
slavery upon earth. Even the exp
unlimited a power can belong on
– Thomas Paine



Founders Revolution:
ow.ly

Source: The American G

🔾 July 25 at 4:15pm via HootSuite

 Dave Grain

a must watch

AMERICA IN
www.youtub
BONNIE LEG
/bonnie-legi
http://sound

Share · July 25 at 9:17am

 Brandon J Raub Rise America
July 25 at 3:45pm,

Johnny Law

"...if magistrates are no farther m
promote the good of the commu

Michael Gordon added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.

Rodney Rodis shared Batton
Lash's photo.

Sabina Kanovnik Doherty
commented on Shawn
Christopher's post: "ty"

Rodney Rodis commented
on his activity: "I know"

Sabina Kanovnik Doherty
likes Debbie Hiscock's post.

Brian Temke was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.

Jeremy Kranz
I am in asia the next two

Barak Babcock

Becky Jefferies

Brian Pauley

Ceci Sanchez

James Howell

Jayne Pauley Parker

Jeff Sabean

Jim Meehan

John Meister

Julia Fullerton

Kim Willems

Ray Doherty

Rodney Rodis



EXHIBIT
#9
TJS 10/7/13
FENGAD 800-631-6989



It's time to abolish the States.....( this one)>>>

www.ForgottenMen.com



A New Constitutional / ow.ly
by Mark Kreslins – www

♫ August 8 at 7:15am via HootSuite

**Johnny Law**

"We're told there's no legitimate a rifle that looks menacing becau flash suppressor. Even though it hunting rife: One pull of the trig ger, one bullet is fired. Maybe it i (more bullets to fire without relo; rifle. That's the extent of the fun Ok. Let's apply the same logic to



Using The Same lo ow.ly
by Eric Peters – www

♫ August 8 at 5:00am via HootSuite

**Johnny Law**

"...let us examine whether it [the preserve the invaluable blessings inestimable rights of mankind. If be found to contain principles th liberty, — if it tends to establish tyrannical aristocracy, — let us in alterations and amendments. Mo are called upon by every motive i wise and candid judgment. In for country like this, the greatest car powers, and guard against an ab should be so formed as not to sw the general government ought to objects; and the states should re own internal police. We should c


**Michael Gordon** added a new photo to the album Mobile Uploads. — at Montrose Dog Beach.


**Rodney Rodis** shared Batton Lash's photo.


**Sabina Kanovnik Doherty** commented on Shawn Christopher's post: "ty"


**Rodney Rodis** commented on his activity: "i know"


**Sabina Kanovnik Doherty** likes Debbie Hiscock's post.


**Brian Temke** was tagged at Chili's Grill & Bar with Melissa Miller Temke and 2 other people.


**Jeremy Kranz**
I am in asia the next two

 Barak Babcock

 Becky Jefferies

Brian Pauley

 Ceci Sanchez

James Howell

 Jayne Pauley Parker

 Jeff Sabean

 Jim Meehan

 John Meister

Julia Fullerton

 Kim Willems

 Ray Doherty

 Rodney Rodis

https://www.facebook.com/raub.brando

(10)

Source: New York Ratify

⚑ August 6 at 9:16am via HootSuite

Johnny Law

"No taxation without representati
the colonial era. Under the Const
representative in Congress. Our
representative. What does it mea
you ever given it serious thought
www.sas4liberty.wordpress.com

What is a Representat
ow.ly

by Scott Strzelczk ~ An
generation's core princ
of representation. Thos

⚑ August 6 at 6:35am via HootSuite

Creators Child

http://www.activistpost.com/20
deposits-was.html

Activist Post: Afgha
"Economic Prize" A
www.activistpost.co
Cool lets all fight an
two, three,What are.

Share · August 6 at 6:06am

Creators Child This concern o
resources was stated long ago
economic presence in the regi
area's independence are also d
interests (page 148)."

August 6 at 6:23am

Johnny Law

by Mike Maharrey – www.ientnA

Garbage in Garbag
ow.ly

There is an old sayir
in, garbage out. Cor
= 30. Now imagine :

Michael Gordon added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.

Rodney Rodis shared Batton
Lash's photo.

Sabina Kanovnik Doherty
commented on Shawn
Christopher's post: "ty"

Rodney Rodis commented
on his activity: "I know"

Sabina Kanovnik Doherty
likes Debbie Hiscock's post.

Brian Temke was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.

Jeremy Kranz
I am in asia the next two

Barak Babcock

Becky Jefferies

Brian Pauley

Ceci Sanchez

James Howell

Jayne Pauley Parker

Jeff Sabean

Jim Meehan

John Meister

Julia Fullerton

Kim Willems

Ray Doherty

Rodney Rodis

RAUB016



**Johnny Law**

Article V of the Constitution prov

The Congress, whenever two thir
necessary, shall propose Amendr
the

Application of the Legislatures of
shall

...

See More

James Madison and th
Proposing Amendmen
ow.ly

by Robert G. Natelson

 August 6 at 1:30am via HootSuite

**Johnny Law**

"For which categories of crime do
most intensely – those against pr
itself? The gravest crimes in the {
invariably not invasions of perso{
own contentment: for example, t
the enemy, failure to register for{
overthrow the gov
ernment. Murder is pursued hapl
policeman, or Gott soll hüten, an
failure to pay a private debt is, if
income tax evasion is punished v
counterfeiting the State's money,
than forging private checks, etc.
that the State is far more interest
than in defending the rights of pr
– Murray N. Rothbard
Source: War, Peace, and the State

August 4 at 2:20am via HootSuite

**jonnny Law**

"Have gentlemen no respect to th
people in the adopting states? Lo
Massachusetts. These two great :
objections to that government as
only nineteen in Massachusetts, \

---

**Michael Gordon** added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.

 **Rodney Rodis** shared Batton
Lash's photo.

 **Sabina Kanovnik Doherty**
commented on Shawn
Christopher's post: "ty"

**Rodney Rodis** commented
on his activity: "i know"

 **Sabina Kanovnik Doherty**
likes Debbie Hiscock's post.

**Brian Temke** was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.

 **Jeremy Kranz**
I am in asia the next two

**Barak Babcock**

**Becky Jefferies**

**Brian Pauley**

**Ceci Sanchez**

**James Howell**

**Jayne Pauley Parker**

**Jeff Sabean**

**Jim Meehan**

**John Meister**

**Julia Fullerton**

**Kim Willems**

**Ray Doherty**

 **Rodney Rodis**

[10]

is it not worth while to turn your
subsequent amendments to the s
have a lasting union in these circ
expect it. But if you agree to prev
union, firm and solid.
I cannot conclude without saying
with it, if subsequent amendmen
Oppressions will be carried on as
adjustments and accommodation
it my duty, if this government is
go home. I shall act as I think my
gentleman will do the same... If y
freemen, stipulate that there are
heaven can take from you, you s
you; not otherwise."
– Patrick Henry



Founders Revolution:
ow.ly
Source: Virginia Ratifyin

🖒 August 3 at 4:00am via HootSuite



Johnny Law

This article is excerpted from A E
Character of our Federal Governn
Justice Joseph Story's widely este
Constitution of the United States
centralized government. Upshur
as a compact created by a confec
states, each possessing the powe
citizens against the federal gover
withdraw from it. This selection ć
summarizes many of his argume



Our Federal Goverr
ow.ly
by Abel Parker Upsh



🖒 August 3 at 1:35am via HootSuite

---

**Michael Gordon** added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.

**Rodney Rodis** shared Batton
Lash's photo.

**Sabina Kanovnik Doherty**
commented on Shawn
Christopher's post: "ty"

**Rodney Rodis** commented
on his activity: "i know"

**Sabina Kanovnik Doherty**
likes Debbie Hiscock's post.

**Brian Temke** was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.

**Jeremy Kranz**
I am in asia the next two

Barak Babcock

Becky Jefferies

Brian Pauley

Ceci Sanchez

James Howell

Jayne Pauley Parker

Jeff Sabean

Jim Meehan

John Meister

Julia Fullerton

Kim Willems

Ray Doherty

Rodney Rodis

---



"It is so difficult to argue intelligi

To:

between the Union and the mem
itself into the view, and even into
strenuously contending for the u
being created by the social comp
oppression from abroad we look
S. to be exerted according to the
against oppression from within,
to the sovereign power of the Sta
the sovereignty of the State is eq
sovereignty of each is but a mor
that of the Union are each a mor
precisely equal.""

– James Madison


Founders Revolution:
ow.ly
Source: Sovereignty – 1

July 30 at 4:05pm via HootSuite


**Brandon J Raub**
The Whole World will know of the
July 30 at 2:53pm


**Johnny Law**
"Two hundred and twenty–four y
three days of debate and by a fir
New Hampshire convention voted
the previous year in Philadelphia.
Constitution was officially ratified
nine states — the number requir
establishment of the Constitution


224th Anniversary
ow.ly
by Joe Wolverton II –

July 30 at 2:07pm via HootSuite

**Johnny Law**
"if you ask those that claim to un
they've heard of either Justice Jos
Constitution or St. George Tucke
you'll most likely find many are f


**Michael Gordon** added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.


**Rodney Rodis** shared Batton
Lash's photo.


**Sabina Kanovnik Doherty**
commented on Shawn
Christopher's post: "ty"


**Rodney Rodis** commented
on his activity: "I know"


**Sabina Kanovnik Doherty**
likes Debbie Hiscock's post.


**Brian Temke** was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.


**Jeremy Kranz**
I am in asia the next two


Barak Babcock


Becky Jefferies


Brian Pauley


Cecl Sanchez


James Howell


Jayne Pauley Parker


Jeff Sabean


Jim Meehan


John Meister


Julia Fullerton


Kim Willems


Ray Doherty


Rodney Rodis



www.sas4liberty.wordpress.com



St. George Tucker – Vi<br>
ow.ly<br>
by Scott Strzelczyk – A

July 29 at 11:00am via HootSuite

Johnny Law

"My wife and I have been debatin homeschooling our two boys insi private Christian school. We have of pre-school there. We are pleas troubled by some of the negative even there vs. the negative aspec public schools. Also, having read homeschooling and seen statistic kids score higher and perform be private school counterparts, we t way. Not to mention the high cos school......">>>



Homeschooling: Will I Skills?<br>
ow.ly<br>
by Brent Lawler

July 24 at 4:15am via HootSuite

Creators Child Homeschoolin dramatically risen through yea network with like minded pare issue it once was. Go for it! July 28 at 8:11am ·   1

Johnny Law

Have you figured out yet that Wa itself....even if we "vote the bums last one of them, the mechanism built up around the "seat of gove effective change through conveni understand this and are talking a Listen in and be part of the solut

listen live today @ 1200pm–200 are in the Frederick MD area, or c

---

 Michael Gordon added a new photo to the album Mobile Uploads. — at Montrose Dog Beach.

Rodney Rodis shared Batton Lash's photo.

Sabina Kanovnik Doherty commented on Shawn Christopher's post: "ty"

Rodney Rodis commented on his activity: "I know"

Sabina Kanovnik Doherty likes Debbie Hiscock's post.

Brian Temke was tagged at Chili's Grill & Bar with Melissa Miller Temke and 2 other people.

Jeremy Kranz I am in asia the next two

Barak Babcock

Becky Jefferies

Brian Pauley

Ceci Sanchez

James Howell

Jayne Pauley Parker

Jeff Sabean

Jim Meehan

John Meister

Julia Fullerton

Kim Willems

Ray Doherty

 Rodney Rodis

 **Michael Gordon** added a new photo to the album Mobile Uploads. — at Montrose Dog Beach.

 forgottenmen.com

The Forgotten Men f economic challenge: and Federalism.

 **Rodney Rodis** shared Batton Lash's photo.

July 28 at 5:45am via HootSuite

 **Sabina Kanovnik Doherty** commented on Shawn Christopher's post: "ty"

 Johnny Law

 **Rodney Rodis** commented on his activity: "i know"

".....After a pursuit of seven long out is at length brought within o suffering courage of yours was a United States of America through has placed her in the chair of ind again to bless—whom? A country cherish your worth and reward y your return to private life, with te admiration, longing to divide wit your gallantry has given, and tho preserved? Is this the case? Or is upon your rights, disdains your c Have you not, more than once, si known your wants to Congress? and policy should have anticipate you not lately, in the meek langu begged from their justice, what y their favour? How have you been you are called to consider tomor

 **Sabina Kanovnik Doherty** likes Debbie Hiscock's post.

 **Brian Temke** was tagged at Chili's Grill & Bar with Melissa Miller Temke and 2 other people.

 **Jeremy Kranz** I am in asia the next two

 Barak Babcock

 Becky Jefferies

 Brian Pauley

Cecl Sanchez

 James Howell

 Jayne Pauley Parker

 Founders Revolution: ow.ly
John Armstrong – Marc

 Jeff Sabean

 Jim Meehan

 John Meister

July 27 at 7:15am via HootSuite

Julia Fullerton

 Johnny Law

 Kim Willems

"Too many people today believe i the Federalist Papers are the defi original intent of the Constitution further from the truth, though it appear as the truth. Despite this Federalist Papers were little more persuading reluctant New York v form of government they didn't v www......

 Ray Doherty

 Rodney Rodis

(10) Richmond Liberty Movement

https://www.facebook.com/raub.brandor

**10.**

by Joel McDurmon –

↻ July 27 at 5:10am via HootSuite

Brandon J Raub added photos to



July 26 at 9:02am

**John Jackson**

Help support a passionate young
the Republican National Conventi
"recommend" and share!! They ca
movement in any form!!

Please send me to
ireport.cnn.com
My name is Jennifer
am 23 years old and
finished in early Aug
Business Economics.

↻ July 26 at 6:46am via InfoWarriorsL

**John Jackson**

Get rid of the RINO and support t
Gerson who is running for congri
August 14, 2012 in Minnesota's

---

**Michael Gordon** added a
new photo to the album
Mobile Uploads. — at
Montrose Dog Beach.

**Rodney Rodis** shared Batton
Lash's photo.

**Sabina Kanovnik Doherty**
commented on Shawn
Christopher's post: "ty"

**Rodney Rodis** commented
on his activity: "i know"

**Sabina Kanovnik Doherty**
likes Debbie Hiscock's post.

**Brian Temke** was tagged at
Chili's Grill & Bar with Melissa
Miller Temke and 2 other
people.

**Jeremy Kranz**
I am in asia the next two

Barak Babcock

Becky Jefferies

Brian Pauley

Ceci Sanchez

James Howell

Jayne Pauley Parker

Jeff Sabean

Jim Meehan

John Meister

Julia Fullerton

Kim Willems

Ray Doherty

Rodney Rodis



Brendon J Raub
August 8

This is the size of a Boeing 757 relative to the size of the hole in the side of the pentagon.

Share
▶
• 1 share

  ○ Creators Child Do the math - SHARED.
    August 8 at 11:23am

  ○ ⁴Dustin Lee Meadows Yep, the Government Blew up the Pentagon as well...Question where did the
    flying plane go?
    August 8 at 11:24am

  ○ ⁴Dustin Lee Meadows second of all that Boeing is to scale
    August 8 at 11:27am

  ○ Brandon J Raub Dustin, shut your mouth.
    August 8 at 7:11pm

  ⌄ Brandon J Raub Actually. by all means continue. make yourself look like an idiot.
    August 8 at 7:12pm

  ○ ⁴Dustin Lee Meadows yeah Brandon you and your conspiracy theories are making the Tea Party look
    genius
    August 8 at 8:5 1p.m.

RAUB023

o     Brandon J Raub Dustin. the sad thing about you is how stupid youre going to feel.
Thursday at 6:26am

o     Brandon J Raub It was a missle ;)
Thursday at 6:38am

o     Dustin Lee Meadows how stupid I'm goind to feel when what??
Thursday at 7:49am

o     Kati Wood The only conspiracy is the life you are living, Dustin. You think you are free and that you know the truth, but you are not free and you have been feed lies. By all means though, continue to be a slave. It is what they want after all; a country full of ill-informed workers who believe whatever they say.
Yesterday at 11:43am

o     Dustin Lee Meadows i feel like I'm reading from the God damn communist manifesto lol. Yeah I'm the pawn. Do you not realize I've studied how politics works?? I've forgotten more about "The System" then you know. But if you wanna believe that we didn't land on...See More

Yesterday at 1:37pm

o     Brandon J Raub You are a pawn.
16 hours ago · 1

    Brandon J Raub And Dustin, the information you've studied is trash. You're gonna feel like a child. Just keep drinking the coolade you good little Nazi.
5 hours ago

RAUB024



RAUB025

(10) Profile Pictures

https://www.facebook.com/brandon.raub?sk=photo



RAUB026   8/12/12 2:34 PM

(10) December 7, 2011



RAUB027     3/12/12 2:35 PM

(10) December 7, 2011



RAUB028   8/12/12 2:37 PM

(10) Profile Pictures



Sp

T
tl

RAUB029       8/12/12 2:34 PM



**Brandon J I**
August 8

This is the size of a E
size of the hole in the

Share

1 share



RAUB030

(10) Wall Photos



RAUB031



**Brandon J Raub**
The Whole World will know of the Richmod Liberty Movement
July 30 at 2:53pm



RAUB032



 **Brandon J |**
16 hours ago

Genschman

Share

Rebekah Yocum like

 **Cathleen Thom**
6 hours ago

 **Jesse Cash U ne**
4 hours ago

Sponsored

 Barack Obama s
photo.



69,063     8

The Spartan Diet?
thespartandiet.blogs...

 Lea
30C
sha



 **Brandon J I**
August 8

This is the size of a E
size of the hole in the

Share

1 share

 **Creators Child I**
August 8 at 11:2

 **Dustin Lee Mea**
Blew up the Pent
where did the fly
August 8 at 11:2

 **Dustin Lee Mea**
Boeing is to scal
August 8 at 11:2

 **Brandon J Raub**
August 8 at 7:11

 **Brandon J Raub**
continue, make v
August 8 at 7:12

 **Dustin Lee Mea**
and your conspli
the Tea Party loc
August 8 at 8:31

RAUB035



RAUB036 8/12/12 2:35 PM

Replica  9mm Luger

- explosives background
         - Schools
- Combat engineers

- Access to Several cars
     - old honda
     - Mortidez
     - red jeep

M16
M240 Golf - Mounted
M249 Saw          machine gun

Marine Corp Martial Arts
        - gray belt
        - can fight th



RAUB033