# In The Matter Of:

*Brandon Raub v.*
*Daniel Lee Bowen, et al.*

---

*Michael Campbell*
*October 1, 2013*

---

*Chandler & Halasz, Inc.*
*PO Box 9349*
*Richmond, Virginia 23227*
*(804)730-1222 Fax (866)882-5809*
*TracyJStroh@gmail.com*

Original File 01OCT13 CAMPBELL.txt
Min-U-Script® with Word Index

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        RICHMOND DIVISION

 3

 4

 5   BRANDON RAUB,

 6              Plaintiff,

 7         v.                        Case No.
                                     3:13cv328 HEH
 8   DANIEL LEE BOWEN, et al.,

 9              Defendants.

10

11   * * * * * * * * * * * * * * * * * * * * * * *

12         DEPOSITION OF MICHAEL CAMPBELL

13   * * * * * * * * * * * * * * * * * * * * * * *

14

15              October 1, 2013

16

17           Chesterfield, Virginia

18

19

20

21

22           CHANDLER and HALASZ, INC.
23           Stenographic Court Reporters
                  P.O. Box 9349
24            Richmond, Virginia 23227
                 (804)730-1222
25   Reported by:  Tracy J. Stroh, RPR, CCR, CLR
```

Page 2

```
 1              Deposition of MICHAEL CAMPBELL, taken by

 2   and before Tracy J. Stroh, RPR, CCR, CLR and Notary

 3   Public, in and for the Commonwealth of Virginia at

 4   large, pursuant to Rule 30 of the Federal Rules of

 5   Civil Procedure, and by notice to take deposition;

 6   commencing at 2:00 p.m., October 1, 2013, at

 7   Chesterfield County Attorney's Office, 9901 Lori Road,

 8   Suite 503, Chesterfield, Virginia.

 9

10   Appearances:

11           TROUTMAN SANDERS
             1001 Haxall Point
12           Richmond, Virginia 23219
             By:  WILLIAM H. HURD, ESQ.
13                STEPHEN C. PIEPGRASS, ESQ.

14                and

15           ECKERT SEAMANS CHERIN & MELLOTT, LLC
             707 East Main Street, Suite 1450
16           Richmond, Virginia 23219
             By:  ANTHONY F. TROY, ESQ.
17
18           attorneys, of counsel for Plaintiff

19

20           CHESTERFIELD COUNTY ATTORNEY'S OFFICE
             By:  JEFFREY L. MINCKS, ESQ.
21                STYLIAN P. PARTHEMOS, ESQ.
                  JULIE A.C. SEYFARTH, ESQ.
22           County Attorney, Deputy County Attorney
             and Assistant County Attorney,
23           respectively, of counsel for Defendants

24

25
```

Page 3

```
 1                    I N D E X

 2                    DEPONENT

 3              MICHAEL CAMPBELL

 4   Examination By:                          Page

 5   Direct   - MR. HURD                         4

 6

 7                    EXHIBITS

 8   Exhibit      Description                  Page

 9   A        Answers of Michael Campbell to    6
              Limited Interrogatories approved
10            by the Court
     B        Petition for Involuntary          7
11            Admission for Treatment
     C        Prescreening Report               7
12   D        Chain of emails                  10
     E        Progress Note Report             11
13
```

```
14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1         (Mr. Troy is not present.)

 2

 3         MICHAEL CAMPBELL,

 4    was sworn and testified as follows:

 5         DIRECT EXAMINATION

 6   BY MR. HURD:

 7    Q    Mr. Campbell, good afternoon.

 8    A    Good afternoon.

 9    Q    My name is William Hurd, and I represent,

10   as you know, Brandon Raub in this lawsuit.

11    A    Uh-huh.

12    Q    Because we're confined to two hours today,

13   I'm going to try and move fairly briskly, but if at

14   any time there's a question I ask that you don't

15   understand, please let me know that and I'll try to

16   rephrase it.  I'm not trying to be confusing.  Is that

17   okay?

18    A    That's okay.

19    Q    I'm going to begin by showing you some

20   documents and ask if you can identify them.  First is

21   marked as Exhibit A, entitled "Answers of Michael

22   Campbell to Limited Interrogatories Approved by the

23   Court."

24         Can you identify that --

25    A    Yes, I can.
```

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 5

1    Q    -- document?
2         And is that the document that you, in
3    fact, submitted, having reviewed it and signed it
4    under oath?
5    A    It appears so.
6         MR. MINCKS: Did you look through the
7    whole?
8         THE DEPONENT: Look through the whole
9    thing?
10        MR. MINCKS: Yeah, make sure that it is.
11   A    Yes.
12   BY MR. HURD:
13   Q    So Mr. Campbell, Exhibit A, then, is a
14   true copy of your sworn statement in this case?
15   A    It appears to be so, uh-huh.
16   Q    You took several minutes to read through
17   it, correct?
18   A    Correct.
19   Q    As you were reading through it, did
20   anything occur to you that was inaccurate in the
21   statement?
22   A    Not that I can recall.
23   Q    As you read through it, did anything occur
24   to you that was omitted from your statement?
25   A    Not that I can recall.

Page 6

1    Q    I'm going to now show you -- before I do,
2    I would ask that Exhibit A be introduced into the
3    record as Deposition Exhibit A.
4         (Exhibit A was marked.)
5    BY MR. HURD:
6    Q    I'm now going to show you, Mr. Campbell, a
7    document marked Exhibit B and ask if you can identify
8    this document, consisting of two pages, as a true copy
9    of the Petition for Involuntary Admission for
10   Treatment that you filed against Brandon Raub on
11   August 16th, 2012, except for the absence of any
12   attachments?
13        MR. MINCKS: Just to object.  The
14   attachments actually are part of the petition.  So
15   with that objection, go ahead.
16   A    Okay.  What was the question?
17   BY MR. HURD:
18   Q    The document marked as Exhibit B --
19   A    Uh-huh.
20   Q    -- is this, in fact, an accurate copy of
21   the Petition for Involuntary Treatment of Brandon Raub
22   that you filed on August 16th, 2012, except for the
23   fact that this particular document does not have any
24   attachments to it?
25   A    Well, the birth date is blacked out.

Page 7

1    Q    Correct.
2    A    Other than that, it appears to be the
3    same.
4    Q    Okay.  Thank you.
5         MR. HURD: I would ask this be introduced,
6    then, as Exhibit B.
7         (Exhibit B was marked.)
8    BY MR. HURD:
9    Q    Next I'm going to show you a document
10   marked as Exhibit C and ask if you can identify
11   Exhibit 3(sic) as a copy of the Prescreening Report
12   that you attached to the Petition for Involuntary
13   Treatment on August 16th, 2012, except for the absence
14   of any emails being attached to this document?
15   A    You said Exhibit 3 or Exhibit C?
16   Q    Exhibit C.
17   A    Appears to be so.
18        MR. HURD: I would then ask that Exhibit C
19   be introduced into evidence as an exhibit to this
20   deposition.
21        (Exhibit C was marked.)
22   BY MR. HURD:
23   Q    Mr. Campbell, I'm now going to show you an
24   exhibit marked D and ask if you can identify this
25   document?

Page 8

1    A    Yes.  Appears to be --
2    Q    What is the document?
3    A    It's an email that I received.
4    Q    For the record, this is an email --
5    actually, it's an email chain, isn't it?
6         It has several from -- from/sent,
7    from/sent, from/sent?
8    A    Uh-huh.
9    Q    Is that correct?
10   A    Yes, it is.
11   Q    Now, the earliest email, in terms of date
12   in this chain, is dated August 15th, 2012; is that
13   correct?
14        MR. MINCKS: Objection.  The document
15   speaks for itself.
16        MR. HURD: I'm trying to lay a foundation.
17   BY MR. HURD:
18   Q    Is that correct?
19        MR. MINCKS: Same objection.  Go ahead.
20   A    Okay.  Can you ask the question again?
21   BY MR. HURD:
22   Q    Yes.  The earliest email in this email
23   chain, I'm asking you to tell me if you agree that it
24   is a -- an email dated August 15th, 2012?
25        MR. MINCKS: Same objection.  Go ahead.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 9

1    A    That's true.
2  BY MR. HURD:
3    Q    Okay.  Now, Mr. Campbell, I'm going to ask
4  you to take Exhibit A, if you would, and turn to the
5  bottom of page 5.  Second line from the bottom, you'll
6  see where it begins with the sentence, "Therefore,"
7  kind of in the middle?
8    A    Yes.
9    Q    Would you read the next two sentences,
10  please, out loud?
11    A    "Therefore, I asked the law enforcement
12  officers to provide me with the communications which
13  they had received from Mr. Raub's friends.  When I did
14  that, a secret service agent, who had arrived at the
15  jail while I was interviewing Mr. Raub, provided me
16  with a copy of the two-page email from Mr. Raub's
17  Marine acquaintance that I attached as the last two
18  pages of my ten-page Prescreening Report.
19    Q    Now, is the email that you have
20  identified -- strike that.
21        Is the email marked as Exhibit D the
22  two-page email that you are referring to in the
23  statement you just read?
24    A    That is the exhibit.
25    Q    So the answer is yes?

Page 10

1    A    Yes.
2        (Exhibit D was marked.)
3  BY MR. HURD:
4    Q    And I'm going to show you another document
5  marked as Exhibit E and ask if you can identify this
6  document?
7    A    The question is do I recognize the --
8    Q    Yes.  Can you tell us what it is?
9    A    It's a progress note.
10    Q    Does this Progress Note Report pertain to
11  Brandon Raub?
12    A    Yes, it does.
13    Q    And there's a section at the top that
14  is -- comes under a little heading called "Narrative";
15  is that correct?
16    A    That's correct.
17    Q    And then there's a paragraph that begins
18  with the words "Client's friends and fellow Marines";
19  is that correct?
20    A    That's correct.
21    Q    And at the bottom of that paragraph, there
22  is then the notation, "Electronically signed by
23  Campbell, Michael, MSW"; is that correct?
24    A    Correct.
25    Q    And can you tell me, is, in fact, this a

Page 11

1  Progress Note Report on Brandon Raub that you entered
2  into the records?
3    A    Yes, it is.
4    Q    And that electronic signature is, in fact,
5  your signature?
6    A    Yes, it is.
7        MR. HURD: I would ask this be introduced,
8  then, as Exhibit E to the deposition.
9        (Exhibit E was marked.)
10  BY MR. HURD:
11    Q    Mr. Campbell, prior to this involuntary
12  commitment of Brandon Raub, on how many occasions had
13  you provided prescreening on a temporary detention
14  order?
15        MR. MINCKS: Objection to the form of the
16  question in reference to the commitment, but go ahead.
17  You can answer the question.
18    A    Okay.
19  BY MR. HURD:
20    Q    Let me rephrase the question.
21        Prior to the issuing of a temporary
22  detention order against Brandon Raub on August 16th,
23  2012, on how many occasions had you done prescreening
24  in connection with a temporary detention order?
25        MR. MINCKS: Objection.  This gentleman

Page 12

1  does not issue TDOs, but go ahead and answer the
2  question if you can.
3    A    Can you repeat the question again?
4  BY MR. HURD:
5    Q    All right.  Let me rephrase the question.
6        Prior to your filing a petition against
7  Brandon Raub on August 16th, 2012, on how many
8  occasions had you filed a Petition for Involuntary
9  Commitment?
10    A    I can't answer that.  I don't know the
11  number.
12    Q    Is it more than 12?
13    A    I'd say it's more than 12.
14    Q    Is it more than a hundred?
15    A    I would say it's close to a hundred.  I
16  can't say if it was over or less.
17    Q    Over what period of time have you been
18  involved in this kind of work?
19    A    I started in December 1st of 2008 and
20  currently am doing the same job.
21    Q    When you began in December 2008, was that
22  for Chesterfield County?
23    A    Yes, it was.
24    Q    And before 2008 doing that work for
25  Chesterfield County, what did you do?

Page 13

1  A   Before 2008, I was a -- I ran a drug
2  court, juvenile drug court for Hanover County
3  Community Services Board.
4  Q   Okay.  Prior to December 2008, had you
5  been involved previously in mental health evaluations
6  in connection with temporary detention issues?
7          MR. MINCKS: Object to the form of the
8  question, but go ahead and answer it.
9  A   I was prescreen certified prior to 2008
10 before coming to Chesterfield County.
11 BY MR. HURD:
12 Q   When did your prescreen certification
13 occur?
14 A   I can't give you the exact date.
15 Q   Can you give me a range?
16 A   I'm going to estimate it, approximately
17 2008.
18 Q   Okay.
19 A   I'm sorry.  I'm sorry.  I started here in
20 2008.
21     I would say 2006 with Hanover County.
22 Q   If you could look, please, at the document
23 marked Exhibit C, the prescreen report.  Let me go
24 through this with you and ask you some questions.
25 A   Okay.

Page 14

1          (Mr. Troy entered the room.)
2          MR. HURD: Let the record note the
3  entrance of Tony Troy.
4  BY MR. HURD:
5  Q   Mr. Campbell, as I look through this
6  Prescreening Report marked as Exhibit C, there are a
7  number of boxes on various pages.  Some boxes are
8  checked and some boxes are not checked; is that
9  correct?
10 A   That's correct.
11 Q   Is it fair to conclude that if you checked
12 a box, that represents that you focused on the
13 question posed by that portion of the report and
14 decided it was appropriate to check the box?
15 A   Can you ask the question again?
16 Q   Where a box is checked on Exhibit C --
17 A   Uh-huh.
18 Q   -- may we conclude that you considered the
19 issue presented by that portion of the report and
20 decided it was appropriate to check that particular
21 box?
22 A   Yes.
23 Q   May we conclude that if a box is not
24 checked on the report, that you considered the issue
25 presented by that particular part of the report and

Page 15

1  decided it would not be appropriate to check that box?
2          MR. MINCKS: Check that box or a box?  I'm
3  sorry.  I didn't --
4  BY MR. HURD:
5  Q   If -- if we see a box where there is no
6  check, may we conclude that you considered the issue
7  presented by that particular portion of the form and
8  concluded it was inappropriate to check that box?
9  A   I'm not sure what you mean by
10 "inappropriate."
11 Q   Well, if a box is not checked, does that
12 mean that it was your opinion the box should not be
13 checked?
14 A   It could mean that.
15 Q   What else could it mean?
16 A   It could mean that I didn't have the
17 information to check that box.
18 Q   Could it mean anything else?
19 A   It could mean the question was refused to
20 be answered.  I can't think of any others at this
21 time.
22 Q   Okay.  So if a box is not checked, that
23 means you either thought it was inappropriate to check
24 the box or that you didn't have the information to
25 make a decision on whether to check the box or that

Page 16

1  Mr. Raub did not answer the question that pertained to
2  the box?
3          MR. MINCKS: Objection.  Asked and
4  answered.
5  BY MR. HURD:
6  Q   Is that correct?
7          MR. MINCKS: Objection.  Asked and
8  answered.
9  BY MR. HURD:
10 Q   Is that correct?
11         MR. MINCKS: Same objection.
12         MR. HURD: Are you instructing the witness
13 not to answer?
14         MR. MINCKS: No.  I'm objecting to your
15 question.  You keep asking it.  My job is to object to
16 it.  So --
17         MR. HURD: Well, it's a fair question.
18         MR. TROY: Your client is looking to you
19 for your advice whether he should answer or not.
20         MR. MINCKS: Answer it if you can.
21 BY MR. HURD:
22 Q   If a box is not checked, is it fair, then,
23 to conclude that either you thought it was
24 inappropriate to check the box or you did not have
25 enough information to allow you to decide whether to

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 17

1 check the box or Mr. Raub did not answer a question
2 that would allow you to check the box?
3    MR. MINCKS: Same objection. Asked and
4 answered. Go ahead and answer again.
5    A    Those would be some of the reasons. There
6 could be other reasons.
7 BY MR. HURD:
8    Q    Can you give us any reasons today?
9    A    I could -- if it was -- it could be that I
10 didn't have the information at the time. I can't
11 think of right offhand, but I'm sure if I thought for
12 a while, I could find another reason why a box
13 wouldn't be checked. Whether it would be a box that I
14 meant to come back to and didn't, that's a
15 possibility. There could be others.
16    Q    If you look at the Exhibit C, the first
17 line that says "Time: From 7:40 p.m." Do you see that
18 part?
19    A    Yes, I do.
20    Q    Then also it says "To" and there's a
21 blank.
22    A    Uh-huh.
23    Q    Can you tell us how long your evaluation
24 of Brandon Raub lasted?
25    A    The evaluation --

Page 18

1    MR. MINCKS: I'm going to object to the
2 form of the question in that those may be unconnected
3 thoughts --
4    MR. HURD: All right.
5    MR. MINCKS: -- but go ahead and answer
6 the question.
7 BY MR. HURD:
8    Q    Well, let me rephrase the question.
9    You see the entry that says "Time: From"
10 and "7:40" is written in.
11    A    Yes.
12    Q    What does 7:40 refer to?
13    A    The time 7:40 could -- it could be the
14 time that I received the call.
15    Q    Call from Michael Paris?
16    A    Yes.
17    Q    Okay. What else could it be?
18    A    I'd have to look over the notes. It could
19 be the time that the interview started.
20    Q    Okay.
21    A    But I can't distinguish at this time what
22 that was.
23    Q    Can you tell us why the -- can you tell us
24 what information is called for by the line that says
25 "To" and then there's a blank, "a.m." or "p.m."?

Page 19

1    Is that blank to be used to indicate the
2 end of your evaluation?
3    A    I usually fill that out when there's
4 resolution to this -- to the -- to the situation.
5    Q    What does that mean?
6    A    That everything is -- everything is done.
7 Everything is completed.
8    Q    Everything done by you is completed or
9 everything done by the system is completed?
10    A    I have several jobs to do, and the last --
11 in this case, it would be when I had confirmation from
12 a hospital.
13    Q    Okay. Now, there was a period of time
14 when you had Brandon Raub in your presence on the day
15 of April -- strike that, of August 16, 2012, correct?
16    A    Correct.
17    Q    And during that time you interviewed him;
18 is that correct?
19    A    That is correct.
20    Q    How long did that interview take?
21    A    I can't give you an exact time. I can
22 give you an approximate time.
23    Q    Give me approximate time, please.
24    A    I would say approximately 15 minutes.
25    Q    Was a videotape made of that interview?

Page 20

1    A    I believe there is video. I don't know --
2 I didn't make it. I would assume that there's video
3 at the jail.
4    Q    You interviewed Brandon Raub at the jail;
5 is that correct?
6    A    That's correct.
7    Q    And where in the jail did you interview
8 him?
9    A    It's the area, I believe they call it
10 intake, located next to the magistrate's office.
11    Q    Do you know whether or not an audio
12 recording was made of that interview?
13    A    I can't say for certain. I can assume
14 there's one.
15    Q    Okay. And if a videotape or an audiotape
16 was made, would -- would that have been something --
17 who would have made that tape?
18    A    I don't know.
19    Q    Then why do you assume one was made?
20    A    I assume everything at the jail is -- is
21 on tape.
22    Q    Okay. Did you make any handwritten notes
23 about your interview with Brandon Raub?
24    A    Did I make any handwritten notes?
25    Q    Right.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 21

1    A    I had this form here that I put notes on.
2    Q    Okay.  Other than the form --
3         MR. MINCKS: And you're referring to --
4         MR. HURD: Exhibit C.
5         MR. MINCKS: -- Exhibit C.
6  BY MR. HURD:
7    Q    Other than the handwritten notations made
8  on Exhibit C, did you make any handwritten notes of
9  your interview with Brandon Raub?
10   A    I don't believe I did.
11   Q    Did you make any handwritten notes of your
12 conversation with Michael Paris earlier in the day?
13   A    I don't believe I did.
14   Q    Did you make any other kinds of notes
15 about your conversation with Michael Paris earlier in
16 the day, for example, on a computer, typewriter or
17 something other than handwritten?
18   A    I believe I wrote the phone number down to
19 contact him.
20   Q    Okay.
21   A    Other than notes, I believe that's it.
22 No -- no other notes on the computer.
23   Q    When you were interviewing Brandon Raub at
24 the jail, who else was present?
25   A    I don't know their names, but I remember a

Page 22

1  police officer was close by.
2    Q    Now, when you say "a police officer was
3  close by," do you mean by that a uniformed
4  Chesterfield police officer?
5    A    I believe he was uniformed.
6    Q    Was anyone else close by at the time that
7  you interviewed Brandon Raub?
8    A    I'd say there was others close by.  But as
9  far as, you know -- there were other people present,
10 but I wouldn't -- depending on the definition of
11 "close by."
12   Q    Was anyone else in the room with you when
13 you interviewed Brandon Raub?
14   A    It's a big room.  We were set against the
15 wall.  There were other people in the room because
16 there really isn't distinguishable rooms.  It's not a
17 closed off room.
18   Q    Who else was in the room?
19   A    There was sheriff's deputies.  There were
20 Chesterfield police officers.
21   Q    Do you know the names?
22   A    I don't.
23   Q    Other than sheriff's deputies and
24 Chesterfield police officers, was anyone else in the
25 room?

Page 23

1    A    At what time?
2    Q    At the time you were interviewing Brandon
3  Raub.
4    A    At the time I was interviewing him, I'm
5  sure there was -- I can't say -- I can't say I'm sure.
6  There were jail staff, perhaps.
7    Q    At the time you were interviewing Brandon
8  Raub, do you know if any FBI agent was in the room at
9  that time?
10   A    At the time I was interviewing him?
11   Q    Yes.
12   A    I don't know if there was or not.
13   Q    At the time you were interviewing Brandon
14 Raub, do you know if any secret service agent was in
15 the room with you?
16   A    I can't say for sure if they were in the
17 room or not.
18   Q    Was a secret service agent nearby at the
19 time you interviewed Brandon Raub?
20   A    At the time of interviewing?
21   Q    Yes.
22   A    I don't know.
23   Q    Who else, if anyone -- strike that.
24        Was there anyone who was in a position to
25 overhear your interview with Brandon Raub?

Page 24

1         MR. MINCKS: Object to the form of the
2  question.  Go ahead and answer.
3    A    I -- if the officer was listening, he
4  could have overheard.
5  BY MR. HURD:
6    Q    Anyone else?
7    A    Not that I can recall.
8    Q    Is there a privacy consideration that goes
9  into the -- giving one of these interviews?
10        MR. MINCKS: Object to the form of the
11 question.  Go ahead and answer.
12   A    From my understanding, not -- not into a
13 crisis situation.
14 BY MR. HURD:
15   Q    So you think you were able to interview a
16 person who is being prescreened in the view of other
17 people?
18        MR. MINCKS: Object to the form of the
19 question.  Go ahead and answer.
20   A    A person that I'm prescreening, if there's
21 information to be obtained from an outside source,
22 that confidentiality does not apply.
23 BY MR. HURD:
24   Q    Okay.  But you would not -- strike that.
25        On August the 16th, who did you talk to

Page 25

1 about Brandon Raub, starting with the first time?
2    A    Who did I talk to?
3    Q    Yes, about Brandon Raub.
4    A    The first person would be a phone call
5 from Detective Paris.
6    Q    Did he call you?
7    A    He called communications.  Communications
8 called me.
9    Q    Okay.
10    A    I called him.
11    Q    Okay.  And what time was that?
12    A    I can't say for sure.
13    Q    Approximately what time was that?
14    A    Right around 7:40, approximately.
15    Q    How long did that phone call last?
16    A    I can't give an exact time.
17    Q    Approximately.
18    A    Ten to 15 minutes.
19    Q    During the period between your calling of
20 Detective Paris and your hanging up the phone, did you
21 speak on the phone with anyone other than Michael
22 Paris?
23    A    Can you state the time, from --
24    Q    From the time that you -- you say you
25 actually called Michael Paris?

Page 26

1    A    Correct.
2    Q    He answered the phone, correct?
3    A    Yes.
4    Q    Between the time that he answered the
5 phone --
6    A    Uh-huh.
7    Q    -- and the time that you hung up the phone
8 from that conversation, did you speak to anyone over
9 that phone other than Michael Paris?
10         MR. MINCKS: Object to the form of the
11 question.  Go ahead and answer.
12    A    Not that I can recall.
13 BY MR. HURD:
14    Q    Do you recall being asked to repeat any
15 comment you made so that anybody else might be able to
16 hear it, again, in this phone conversation?
17    A    With Mr. -- with Detective Paris?
18    Q    Yes.
19    A    Not that I can recall.
20    Q    Okay.  Who else, then, did you speak to,
21 after that phone conversation was over with, the phone
22 call with Michael Paris, who else did you speak to
23 that day about Brandon Raub?
24    A    I believe it was Sergeant Granderson.
25    Q    Okay.  Who else?

Page 27

1    A    The officer that brought Brandon Raub into
2 the -- into the jail, and I can't recall his name.
3    Q    Was that officer a uniformed Chesterfield
4 police officer?
5    A    I'm sorry.
6    Q    Was that person, that officer, a uniformed
7 Chesterfield police officer?
8    A    Yes.
9    Q    Okay.  Other than Granderson and the
10 officer who brought Raub into the jail, who else did
11 you speak to on August 16th about Brandon Raub?
12    A    I spoke with Brandon.  I spoke with
13 Brandon's mother.  I spoke with someone -- I'm trying
14 to think of -- I'm not sure if it was FBI or if it was
15 secret service.
16    Q    And was that person a man or a woman?
17    A    It was a man.
18    Q    Do you recall that person's name?
19    A    I do not.
20    Q    Other than the people you've listed thus
21 far, did you speak with anyone else on August 16th
22 about Brandon Raub?
23    A    I'm trying to remember.  I believe I spoke
24 with Larry Barnett.
25    Q    Who is Larry Barnett?

Page 28

1    A    He is my manager with Emergency Services.
2    Q    Did you speak with anyone else on
3 August 16th about Brandon Raub?
4    A    Not that I can recall.
5    Q    If you'll look back at Exhibit A, look
6 again at the last two lines of page 5, the top part of
7 page 6.  Does the statement where you say "I asked law
8 enforcement officers to provide me with the
9 communications which they had received from Mr. Raub's
10 friends" --
11    A    Yes.
12    Q    Who were those law enforcement officers
13 that you asked that of?
14    A    That was either the FBI person or the
15 secret service person.  I didn't know which one.
16    Q    Okay.  But there was -- there was really
17 only, then, one law enforcement officer to which you
18 made that request, to whom you made that request?
19    A    To see the --
20    Q    The communications, yes.
21    A    To see the communications?
22    Q    Yes.  You used the plural, and I'm trying
23 to figure out if there was more than one person there
24 to whom you made that request.
25    A    I believe that was the only one.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 29

1    Q    Okay.  And then you go on to say, "When I
2  did that, a secret service agent, who had arrived at
3  the jail while I was interviewing Mr. Raub, provided
4  me with a copy of the two-page email from Mr. Raub's
5  Marine acquaintance."
6         Is that what that says?
7    A    Yes.
8    Q    Is that secret service agent the person
9  that you just described as being the man that could
10  have been secret service, could have been FBI?
11    A    Yes.
12    Q    What was the nature of your conversation
13  with Larry Barnett that night?
14    A    He's my manager and just wanted to inform
15  him that I was doing a TDO.
16    Q    Was -- did he give you any information
17  about Brandon Raub?
18    A    No.
19    Q    Was this phone call -- strike that.
20         Was this conversation you had with Larry
21  Barnett between your phone call with Michael Paris and
22  your in-person interview --
23    A    No.
24    Q    -- or was it after your in-person
25  interview of Brandon Raub?

Page 30

1    A    It was after.
2    Q    Did you speak with Howard Bullen that
3  night?
4    A    I can't recall who Howard Bullen is.
5    Q    Okay.  If you'll look at what's been
6  marked as Exhibit D, the email.  That email purports
7  to be from a person named Howard Bullen; is that
8  correct?
9    A    That's correct.
10    Q    And his name appears at the end of that
11  email; is that correct?
12    A    Correct.
13    Q    And there's a phone number there under his
14  name; is that correct?
15    A    Correct.
16    Q    Did you attempt to call Howard Bullen on
17  August 16th?
18    A    I can't recall if I did or not.
19    Q    Did you attempt to email Howard Bullen?
20    A    I didn't attempt to email.
21    Q    What did Officer Granderson tell you on
22  August 16th about Brandon Raub?
23    A    I don't have the exact wording, but he
24  gave me background on the situation at the house.
25    Q    Okay.  And what did he tell you about the

Page 31

1  house?
2    A    That it was, at the time, fairly
3  confusing.
4    Q    Okay.  The officer who brought Raub to the
5  jail, what did he tell you about Brandon Raub.
6         (Ms. Seyfarth exited the room.)
7    A    When I got to the jail, he said he's
8  calmed down -- again, I don't have the exact wording.
9  He has calmed down a good bit.
10  BY MR. HURD:
11    Q    Who was at the jail first, you or Brandon
12  Raub?
13    A    Brandon.
14    Q    Looking again, if you would, at the first
15  page of Exhibit --
16    A    Of which one?
17    Q    Your Prescreen Report.  Was that
18  exhibit --
19    A    This one.
20    Q    D?  Is that D?
21    A    C.
22    Q    C.  Exhibit C.
23         Looking at the first page of Exhibit C,
24  there is a line called "Extension"?
25    A    Yes.

Page 32

1    Q    What does that mean?
2    A    That means if the TDO or the ECO goes over
3  a certain time, you can request an extension from the
4  magistrate.
5    Q    You have checked both boxes, yes and no?
6    A    Uh-huh.
7    Q    Can you explain that?
8    A    At first, I checked no because I was
9  dealing -- I do a lot of -- I do a lot of interactions
10  with Poplar Springs Hospital, and it looked like a
11  possibility, a good possibility that they were going
12  to be accepting of Mr. Raub.  And usually when I get
13  to that far, I assume that it's a done deal.
14         However, in this case, it kept going up
15  the chain to the management, to the doctor, and then
16  the doctor stated that we are not willing -- we are
17  not a willing facility.
18    Q    Which doctor said that?
19    A    I can't recall.
20    Q    What did he say when he told you that they
21  were not a willing facility?
22    A    It wasn't the doctor.  It was the person
23  at intake through Poplar Springs Hospital that said
24  that they are not a willing facility.
25    Q    Now, this intake person who told you that,

Page 33

1 was that the final person you spoke with or the first
2 person you spoke with at Poplar Springs?
3     A    It wasn't -- the first person is the
4 receptionist.
5     Q    Okay.
6     A    Sends you back to intake.  When I got back
7 to intake, this was the person that I spoke with.
8          And usually when you speak with an intake
9 worker, it's their case.  So that's the person that
10 you go to for information.
11     Q    Okay.  Do you recall this person's name?
12     A    I don't.
13     Q    And did this person give you a reason why
14 they were not willing to take Brandon Raub?
15     A    Just that they were unwilling --
16 apologizing that they were an unwilling facility.
17     Q    What information had you conveyed about
18 Brandon Raub to this person at Poplar Springs?
19     A    When you request a hospital bed --
20          (Ms. Seyfarth entered the room.)
21     A    -- at first, it's verbal.  You give
22 background information of what you've -- of what you
23 have seen, all the information involved.
24          The second, they'll request the
25 prescreening.  So you send the prescreening off.  They

Page 34

1 take that information.  They do whatever reports they
2 do, and they take it to the doctor whether to accept
3 or not.
4 BY MR. HURD:
5     Q    Okay.  So then the decision not to accept
6 was made by a doctor at Poplar Springs?
7          MR. MINCKS:  Objection to the form of the
8 question.  Go ahead.
9     A    I believe so.
10     Q    Do you know that doctor's name?
11     A    I do not.
12     Q    So just to recap, the doctor at Poplar
13 Springs made the decision not to accept Brandon Raub
14 after he had reviewed your Prescreening Report?
15          MR. MINCKS:  Objection.  He said he did
16 not know how that decision was made, didn't know who
17 the doctor was who made the decision.  So to the
18 extent to which you can answer the question, go ahead.
19     A    Say the -- what's the question again?
20 BY MR. HURD:
21     Q    The -- Poplar Springs rejected the
22 placement of Brandon Raub at that facility.
23     A    Uh-huh, yes.
24     Q    That decision was made by a doctor at
25 Poplar Springs?

Page 35

1     A    Yes.
2     Q    That decision was made by that doctor
3 after you had sent to Poplar Springs your Prescreening
4 Report?
5     A    And after I discussed the case with them.
6     Q    With the doctor?
7     A    With the intake staff.
8     Q    Okay.  What other facilities, if any, did
9 you call on August 16th looking for a bed for Brandon
10 Raub?
11          MR. MINCKS:  You know, we are well outside
12 the scope of discovery.  I'm going to go ahead and let
13 you continue on, but we're not even in the ballpark,
14 Bill.
15          MR. HURD:  It's part of the statement.
16          MR. MINCKS:  No.  The statement is not the
17 scope of discovery.  The scope of discovery is these
18 four provisions in paragraph 2 of Judge Hudson's
19 order.  We all know what the scope of discovery is.
20 So you're outside of it.  And I'm going to let it go,
21 but we're out.
22 BY MR. HURD:
23     Q    What other -- what other facilities did
24 you call on August 16th trying to find a bed for
25 Brandon Raub?

Page 36

1     A    I may have called Tucker's.  I can't say
2 for certain.  I usually go in order.  And John
3 Randolph.
4     Q    Did you call the McGuire Center, McGuire
5 Hospital?
6     A    I did not.
7     Q    On the first page of Exhibit C, there's a
8 entry that says "CBS Code: 11."  With a does that
9 mean?
10     A    Chesterfield Community Service Board.
11 That's our code is 011.
12     Q    What does 011 mean?
13     A    I don't know.
14     Q    Oh, I understand.  So --
15          MR. MINCKS:  You mean other than 011.
16 BY MR. HURD:
17     Q    So by 011, that refers to Chesterfield as
18 the community service board involved in this action;
19 is that --
20     A    Yes.
21     Q    Okay.  Was there any discussion between
22 you and Detective Paris about trying to persuade
23 Brandon Raub to come in for your evaluation?
24     A    I'm sorry.  Was there a discussion?
25     Q    Was there any discussion between you and

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

---

Page 37

1  Detective Paris about the possibility of trying to
2  persuade Brandon Raub to come in for an evaluation, as
3  opposed to seizing him?
4       MR. MINCKS: Object to the form of the
5  question.  Go ahead.
6    A    I don't believe so.
7  BY MR. HURD:
8    Q    Is that unusual?
9       MR. MINCKS: Is what unusual?
10 BY MR. HURD:
11   Q    Is it unusual to have a person seized
12 without trying first to persuade them to come
13 involuntarily?
14      MR. MINCKS: Object to the form of the
15 question.  Go ahead.
16   A    No.
17 BY MR. HURD:
18   Q    Did you discuss with Officer Paris where
19 he would be brought, to the jail or to the mental
20 health facility or some other place?
21   A    I can't recall the decision to bring him
22 to the jail.
23   Q    Do you know who made that decision?
24   A    I can't recall if it was myself or if it
25 was Detective Paris.

---

Page 38

1    Q    Do you -- do you routinely conduct
2  evaluations in the jail rather than at the mental
3  health facility after closing hours?
4       MR. MINCKS: Object to the form of the
5  question.
6    A    Do I?
7  BY MR. HURD:
8    Q    Uh-huh.
9    A    I do a lot of assessments at the jail.
10 That's part of my job.  Now, the assessments at the
11 jail -- are you -- there's different assessments.  I'm
12 confused about --
13   Q    Well, I'm asking what -- what I'm trying
14 to get at is why the assessment was not done at the
15 mental health center in Chesterfield.
16      MR. MINCKS: Object to the form of the
17 question.  Go ahead and answer it if -- well, it's not
18 really a question, but --
19 BY MR. HURD:
20   Q    Do you know why?
21   A    For safety reasons.
22   Q    And who told you that?
23   A    That was between -- the decision between
24 Detective Paris and myself.
25   Q    And when was that decision made?

---

Page 39

1    A    That was made prior to bringing him in.
2    Q    Was that decision made over the phone call
3  between you and Detective Paris?
4    A    I would think so, yes.
5       MR. MINCKS: Again, I would ask you not to
6  speculate.  If you know, you know, and if you don't,
7  you don't, but --
8       THE DEPONENT: Okay.
9  BY MR. HURD:
10   Q    How many phone calls did you have on
11 August 16th with Detective Paris?
12   A    I can't answer definitely.
13   Q    Can you recall more than one?
14   A    I can't.
15   Q    Okay.  If you look at the Prescreening
16 Report, page 3, please.
17      MR. MINCKS: Page 3 as referenced by what
18 number?  Oh, okay.  I see.
19      MR. HURD: Well, actually, it's -- I think
20 it's actually page 2.  It has a -- it's page 2.  On
21 page 2 of the Prescreening Report.
22      MR. TROY: Exhibit C.
23      MR. HURD: Exhibit C.
24 BY MR. HURD:
25   Q    There is a section entitled "Presenting

---

Page 40

1  Crisis Situation"?
2       MR. MINCKS: And this is -- make sure
3  we're on the same page.  This is the one that says
4  "P. 3" at the top?
5       MR. HURD: Yes.
6       MR. MINCKS: Okay.  Gotcha.
7       MR. HURD: It appears to be a fax
8  notation, P, period, 3, correct?
9       MR. MINCKS: Don't know.
10 BY MR. HURD:
11   Q    Do you see the part that says "Presenting
12 Crisis Situation"?
13   A    Yes.
14   Q    All right.  And then it says, within that
15 category, "Reason for Referral"?
16   A    Yes.
17   Q    And then it says, "Client has been posting
18 threatening information on the Internet.  Client
19 believes that 9/11 was a conspiracy caused by the US."
20      Is that what it says?
21   A    Correct.
22   Q    What was the source of that information?
23   A    The source would be from Detective Paris.
24   Q    Further down in that page, under the
25 heading "Assessment," go to the second line, if you

---

Page 41

1 would, and do you see the right-hand side that begins
2 a sentence with the words "Client's friends"?
3    A    Yes.
4    Q    Would you read that sentence?
5    A    "Client's friends reported client to the
6 FBI for posting extreme conspiracy theories and
7 threats to President Bush."
8    Q    Now, who told you that?
9    A    Detective Paris.
10   Q    Anybody else tell you that?
11   A    Not that I can recall.
12   Q    If you'll count down in the same section,
13 "Assessment," one, two, three, four, five, six, seven,
14 I believe it's eight lines down, there's a sentence
15 that begins with the word "According"?
16   A    Yes.
17   Q    Would you read that sentence, please?
18   A    "According to client's friends, his
19 behaviors have become much more extreme recently, and
20 they state this behavior is, quote, not him."
21   Q    Where did that information come from?
22   A    That either -- one of two sources.  I
23 can't recall which one.
24   Q    What are the possibilities?
25   A    One would be Detective Paris.  The other

Page 42

1 would be the federal officer that gave me the
2 information.
3    Q    That gave you the email that you referred
4 to in your statement?
5    A    Correct.
6    Q    What behaviors are you referring to when
7 you say "his behaviors have become much more extreme
8 recently"?
9    A    The rhetoric of which he was -- of the
10 conspiracy theories and the insistence on talking
11 about it constantly, which is off of baseline,
12 according to the information that I received.
13   Q    Now, this information is what you observed
14 personally or what was given you by somebody else?
15       MR. MINCKS: Which behavior?
16       MR. HURD: What Mr. Campbell has referred
17 to.
18       MR. MINCKS: Well, he was referring to two
19 different kinds of behavior, but go ahead answer the
20 question if you can.
21 BY MR. HURD:
22   Q    Well, let's pull it apart, then.  All
23 right.
24       So the behaviors that are being referred
25 to in the sentence you read a moment ago, include,

Page 43

1 number one, the posting of rhetoric on the Internet,
2 and also his talking about conspiracy theories; is
3 that correct?
4    A    The behavior -- I didn't witness the
5 behaviors between him and his friends.  I can't state
6 what that behavior -- I can state what was reported to
7 me.
8    Q    Well, what behaviors were reported to you
9 that you are -- had in mind when you wrote down
10 "behaviors have become much more extreme recently"?
11   A    That would be the constant referral to the
12 conspiracy theories and the government to blame for
13 atrocities during 9/11.
14   Q    Any other behaviors?
15   A    At the time, I'm -- these were the
16 behaviors that I was concerned with.
17   Q    Now, you put in quotations the words "not
18 him."
19   A    Uh-huh.
20   Q    Why did you put those words in quotations?
21   A    The first thing I look for is a drastic
22 change in behavior, and by saying "not him" shows a
23 drastic change in had behavior.
24       His baseline, meaning he wasn't a
25 conspiracy theorist prior to with his friends, with

Page 44

1 the relationship they had with him.  This was all new
2 after they lost touch with him for a period.
3       So they were saying that this is
4 something -- either something could have happened.
5 They didn't know why this change in behavior has
6 occurred, but to them, this behavior is not the person
7 that they knew while they served with him in the
8 Marine Corps.
9    Q    And by "behavior," you mean his posting
10 and discussion of conspiracy theories?
11   A    And the -- the, you know, expressing
12 violence.  They said he was not a violent person.
13   Q    Well, we'll come back to that in a moment.
14       Did you talk with Raub's mother about
15 changes in behavior?
16   A    I did.
17   Q    And she told you there were no such
18 changes, correct?
19   A    She did.
20   Q    And she also told you that she shares the
21 same conspiracy theories that her son espouses?
22   A    She didn't say conspiracy theories.
23   Q    Okay.  She has the same political beliefs
24 this her son espouses?
25   A    If you want to call it political beliefs.

Page 45

1    She shares -- she shares the same --
2    (Mr. Parthemos exited the room.)
3    A    -- paranoia of the government.
4  BY MR. HURD:
5    Q    Okay.  And by "paranoia of the
6  government," do you mean the -- Mr. Raub's statement
7  that he believes that the US Government caused the
8  atrocities of 9/11?
9    A    Amongst others, yes.
10    Q    What are the others?
11    A    Specifically, I can't say.  The
12  conversation didn't last very long.
13    Q    So there was a point in your conversation
14  with Brandon Raub where he stopped talking to you?
15    A    There is.
16    Q    How long into the 15 minutes or so of your
17  interview with him did he stop talking to you?
18    MR. MINCKS: Object to the form of the
19  question.  Go ahead.
20    A    I'd say right up to the end.
21  BY MR. HURD:
22    Q    He talked to you for about 15 minutes and
23  then he stopped talking?  Is that what you're saying?
24  I don't understand your answer.  I'm sorry.
25    MR. MINCKS: Well, there's no question.

Page 46

1  And I don't think what he said was not understandable,
2  but --
3    MR. HURD: Let me rephrase the question,
4  then.
5    (Mr. Parthemos entered the room.)
6  BY MR. HURD:
7    Q    How long did Brandon Raub talk to you
8  during your interview on August 16th, 2012?
9    A    I couldn't give you an exact time.
10    Q    Give me an approximation.
11    MR. MINCKS: It's actually asked and
12  answered.  Go ahead.
13  BY MR. HURD:
14    Q    Give me an approximation.
15    A    I want to say approximately 15 minutes.
16    Q    Okay.  And then after that period of time,
17  do I understand you to be saying that he made the
18  decision not to talk to you any further?
19    MR. MINCKS: Objection.  He can't -- he
20  can't answer for what decisions he was making.  Go
21  ahead and answer the question.
22    A    I assume that's what he meant when he
23  said, "I choose not to answer any more questions."
24  BY MR. HURD:
25    Q    Okay.  Or was he terminating the

Page 47

1  discussion with you, as opposed to your terminating
2  your discussion with him?
3    MR. MINCKS: Is that a question?
4  BY MR. HURD:
5    Q    Is that fair to say?
6    A    Say it again.  I'm sorry.
7    Q    Is it fair to say that Mr. Raub terminated
8  the conversation with you rather than your terminating
9  the conversation with him?
10    A    Yes.
11    Q    Also on this page, third to fourth line
12  from the bottom, toward the right-hand side, it says,
13  "Due to unpredictable behavior and threats on the
14  Internet, a TDO is being requested to provide
15  treatment and further evaluation."
16    Do you see that statement?
17    A    Yes, I do.
18    Q    What unpredictable behaviors are you
19  referring to?
20    A    What unpredictable behaviors?
21    Q    Uh-huh.
22    A    I would say the unpredictable behaviors in
23  this case is the fear of the unknown of what he is
24  capable of and what he is not capable of.
25    There were many, many red flags as I

Page 48

1  interviewed Brandon, as I interviewed the people
2  around him, as I read the reports that came in.
3    And someone that has drastically changed
4  their baseline thinking and blaming this on the
5  government, blaming atrocities on the government,
6  exploding the Pentagon by the government and feeling
7  that he has been somehow chosen to be a leader of this
8  oncoming revolution to me is unpredictable behaviors.
9    Q    Okay.
10    A    And that's -- I can't say specifically one
11  behavior.
12    Q    So you did not witness any -- any
13  unpredictable behaviors, did you?
14    A    Did I witness any?
15    Q    Any unpredictable --
16    A    I did not.
17    Q    -- behaviors?
18    A    No.
19    Q    You refer also to "threats on the
20  Internet."  What threats do you have in mind in
21  writing this part of the sentence?
22    A    The threats -- I -- there was -- what am I
23  looking for?  Is this mine?  No, that's yours.
24    MR. MINCKS: Well, the -- you can use it.
25    THE DEPONENT: Okay.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 49

1      MR. MINCKS: Is it okay if he uses it?
2      MR. HURD: Certainly.
3      A     Okay.  Some of the definition -- or some
4  of the -- there's some statements kind of -- that are
5  very concerning.
6          "This is revenge.  Know that before you
7  die."
8          "Richmond is not yours.  I'm about to
9  shake some shit up."
10         "This is the start of you dying.  Planned
11  spittin with heart of a lion."
12         Leader of the New School.  Bringing back
13  the Old School.  My life will be a documentary."
14         "I'm gunning whoever run the town."
15         "W, you're under arrest bitch."
16         "The world will find this."
17         "I know ya'll all are reading this, and I
18  truly wonder if you know what's about to happen."
19         "W, you'll be one of the first people
20  dragged out of your house and arrested."
21         "And daddy Bush, too."
22         "The revolution will come for me.  Men
23  will be at my door soon to pick me up to lead it."
24         "You should understand that many of the
25  things I have said here are for the world to see."

Page 50

1          Would be the concerning quotes.
2      Q     The -- so all those quotes gave you
3  concern?  All the quotations you just read you view as
4  threats; is that --
5      A     They are certainly red flags.
6      Q     Are they threats?
7      A     Are they threats?
8      Q     Yes.
9      A     I say they would be.
10     Q     Are they specific threats?
11         MR. MINCKS: Object to the form of the
12  question.  Go ahead.
13     A     I'd say they are.
14  BY MR. HURD:
15     Q     Did you see any hallucinations or evidence
16  of hallucinations in Brandon Raub?
17     A     Hallucinations?
18     Q     Yes.
19         MR. MINCKS: Object to the form the
20  question.  Go ahead.
21     A     Specific, no.
22  BY MR. HURD:
23     Q     Did you observe any disorganized speech in
24  Brandon Raub?
25     A     No.

Page 51

1      Q     Did you observe any catatonic behavior in
2  Brandon Raub?
3      A     No.
4      Q     Did you observe any grossly disorganized
5  behavior in Brandon Raub?
6          MR. MINCKS: Any what kind of?
7          MR. HURD: Grossly disorganized behavior.
8      A     No.
9  BY MR. HURD:
10     Q     If you would turn two pages over?
11     A     To what?  From which form?
12     Q     I'm sorry.  In Exhibit C, the Prescreen
13  Report.
14     A     Uh-huh.  The Mental Status Exam page?
15     Q     Yes.
16     A     All right.
17     Q     Down at the bottom, there's a portion that
18  says "Significant Clinical Findings (further describe
19  any symptoms checked above"?
20     A     Uh-huh.
21     Q     You say, "Client had long pauses before
22  answering questions"; is that correct?
23     A     Correct.
24     Q     Now, is that an explanation of the box you
25  checked under "Speech" where it says "slowed" or what

Page 52

1  does that mean?
2          MR. MINCKS: Object to the form of the
3  question.  Go ahead.
4      A     Parts of it, yes.
5  BY MR. HURD:
6      Q     What are the other parts?
7      A     It appears he was searching for something,
8  and it didn't seem -- it didn't seem natural as far as
9  having -- as far as having a conversation.
10     Q     Okay.  So it wasn't like a regular
11  conversation that people might have on the street
12  discussing the weather or baseball game or even
13  politics?
14         MR. MINCKS: Objection to the form of the
15  question.
16  BY MR. HURD:
17     Q     Is that what you mean?
18         MR. MINCKS: Same objection.  Go ahead.
19     A     No.
20  BY MR. HURD:
21     Q     What do you mean?
22     A     I mean the questions that I would ask
23  partly didn't seem to register with what was going on,
24  and there was a blank, kind of a blank stare.  Not
25  making eye contact, kind of looking through and then

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

---

Page 53

1  coming around and trying to answer the question.  Then
2  having the question repeated for him.
3      It wasn't -- it appeared that there was
4  something very distractible with him, which is the red
5  flag that I look for.
6      Q   You say, "Very labile with the secret
7  service"?
8      A   Uh-huh.
9      Q   All right.  Now, is that why you checked
10 the box "labile" in the "Range of Affect" category
11 earlier in the page?
12         MR. MINCKS: Object to the form of the
13 question.  Go ahead.
14     A   Yes.
15 BY MR. HURD:
16     Q   There's an area called "Thought Content"?
17     A   Uh-huh.
18     Q   Now, you've already said that you believe
19 that his views about the United States Government
20 reflect paranoia.  Is that why you checked the box
21 "paranoid"?
22         MR. MINCKS: That's not what he said.
23 That wasn't his testimony at all, but go ahead and --
24 BY MR. HURD:
25     Q   Why did you check the box "paranoid"?

---

Page 54

1      A   Because I felt that he was paranoid.
2      Q   Based on what?
3      A   Based on the fact that -- the distrust,
4  the extreme distrust of the government.
5      Q   How about --
6          MR. MINCKS: I don't think he was done
7  with his answer.
8  BY MR. HURD:
9      Q   Excuse me.
10         MR. MINCKS: Go ahead.
11     A   Okay.  I see someone is paranoid when they
12 feel that they are being watched and being marked and
13 being the potential risk that's going on in his mind;
14 that he's going to be this leader of a revolution,
15 that he's been chosen for it and that the
16 United States Government knows this.  And that's part
17 of his distrust of the government.
18 BY MR. HURD:
19     Q   Okay.  You've marked "delusions" as well
20 under "Thought Content"?
21     A   Yes.
22     Q   And what delusions are you talking about?
23 The same ones you talked about before?
24         MR. MINCKS: Objection.  There's two
25 questions in there.

---

Page 55

1      A   Okay.
2          MR. MINCKS: I think the question is why
3  did you check the box.
4      A   Why did I check the "delusions" box?
5  BY MR. HURD:
6      Q   Uh-huh.
7      A   Is that the question?
8          The idea that the United States Government
9  is dropping thorium through jet trails is delusional.
10 The fact that the United States sent a missile into
11 the Pentagon is delusional.  The fact that he feels
12 that he has been chosen to lead this revolution is
13 delusional thinking.
14     Q   You checked, later on the page, under the
15 category of "Insight," the category "little."  What is
16 the basis for that?
17     A   He was offering little information, and
18 the information he did offer, the insight to me is
19 does this person -- can they know what's going on
20 around him.  And at the time, I didn't feel he did.
21     Q   Well, he was not -- you did not mark him
22 as being disoriented, correct?
23     A   No.
24     Q   That was within normal limits, his
25 orientation, correct?

---

Page 56

1      A   Say that again.
2      Q   His orientation was within normal limits
3  with respect to time, place, person and situation,
4  correct?
5      A   Correct.
6      Q   So is the lack of insight you're referring
7  to the same combination of beliefs you've discussed
8  earlier with respect to delusions and paranoia?
9      A   Yeah.
10         MR. MINCKS: Object to the form of the
11 question.  He's answered the question.
12         MR. HURD: Please don't interrupt.
13         MR. MINCKS: I'm sorry.
14         MR. HURD: I'll tell you what.  I will
15 give you a standing objection to the form of the
16 question, if that's helpful to you, from this point
17 forward.
18         MR. MINCKS: Well, no.  So long as you
19 continue to ask questions that are objection as to
20 form, I have to object to them.  It's the only way I
21 preserve them.  You know that.
22         But my only question was he had already
23 asked and answered the question that you just asked
24 him.
25         MR. HURD: I don't believe he had.

---

Page 57

1    MR. MINCKS: Okay. I think he had, but go
2  ahead. I'm not going to stop him.
3    A    What -- what's the question?
4  BY MR. HURD:
5    Q    The "little" -- is the reason that you
6  checked "little" under the category of "Insight"
7  because you believed he had little insight into the
8  situations involving the Pentagon and 9/11 and the
9  thorium and all that, those conspiracy theories?
10   MR. MINCKS: Same objection. Go ahead.
11   A    Insight is to know what's going on around
12 him.
13   Now, there's -- I would say that's what I
14 checked. Because he still felt that he is -- you
15 know, that these things were happening. It's not
16 really reality what's going on. That's why I checked
17 "little."
18 BY MR. HURD:
19   Q    Okay. And the things going on are the
20 things that I mentioned in my question: The Pentagon,
21 9/11 and the thorium?
22   A    Yes.
23   Q    Is it fair to say that you checked "poor"
24 under "Judgment" for the same reasons?
25   A    Yes.

Page 58

1    Q    Later on in the same page, there's a
2  category saying "Reliability of self-report." You've
3  checked "fair" and say "would not offer answers to
4  certain questions."
5    Do you recall what questions he would not
6  offer answers to?
7    A    I can't recall.
8    Q    On the next page, at the bottom of the
9  page, there's a category called "Diagnosis DSM IV R."
10   Do you see that part?
11   A    Yes.
12   Q    Now, does DSM IV R stand for -- well, what
13 does it stand for?
14   A    The Diagnostic and Statistics Manual IV
15 Revised.
16   Q    What is the difference between DSM IV R
17 and DSM IV TR?
18   A    TR, I believe, is the new one -- or the
19 DSM V just came out. R was just prior to the TR.
20   Q    You say DSM V just came out. Was that
21 after August 16th, 2012?
22   A    I can't recall the date it came out.
23   Q    Which -- which manual did you use in
24 answering this portion of the form, the DSM IV R or
25 the DSM IV TR?

Page 59

1    A    I have a DSM IV R.
2    Q    So that would be the answer; you used the
3  DSM IV R?
4    A    Yes, it is.
5    Q    Under "Axis I," you have an entry. What
6  is Axis I in DSM IV R?
7    A    A diagnosis is in five axes.
8    Q    Okay.
9    A    Okay. The first part is -- is a mental
10 health disorder. The second is more of a personality
11 disorder. Third is medical conditions. Fourth is the
12 contributing circumstances of their environment, and
13 fifth is a global assessment scale done by zero to 100
14 of their current functioning.
15   Q    Your entry on Axis I is "Psychosis, D/O
16 NOS"?
17   A    Yes.
18   MR. MINCKS: Objection.
19 BY MR. HURD:
20   Q    Or "Psychotic D/O NOS"; is that correct?
21   A    It is psychotic disorder. NOS is Not
22 Otherwise Specified.
23   Q    Okay. And if I wanted to know what that
24 meant, I would go to DSM IV R and I would look it up;
25 is that correct?

Page 60

1    A    That's correct.
2    Q    Under "Axis IV," you have checked off the
3  box "Support group"; is that right?
4    A    Yes.
5    Q    What is the basis -- what does that mean?
6  What is the basis for it?
7    First let me ask what does that mean?
8    Q    What does what mean?
9    A    Checking off the box "Support group."
10   A    You look for things that are within the
11 environment that can be -- that can exacerbate the
12 mental disorder.
13   Q    Okay. And why did you check off "Support
14 group"?
15   A    I checked -- the support group that he has
16 is all conspiracy theorists, and therefore, it
17 continues his belief in the conspiracy theories.
18   Q    Now, who is his support group and why do
19 you say they all believe in conspiracy theories?
20   A    I don't know -- I don't know their names.
21   Q    What leads you to check off -- what leads
22 you to the conclusion that his support group all
23 believes in conspiracy theories?
24   A    By the conversation I had with his mother.
25   Q    Okay. Can you tell us about that?

Page 61

1    A    About what?
2    Q    About your conversation with his mother.
3    A    I first called to see if there's any -- if
4  she's noticed any changes in behavior recently.  Then
5  I brought up, I wanted to ask her if she was aware of
6  some of the beliefs that he holds.  And she said that
7  she was -- she talked.  She wasn't threatening or
8  wasn't -- but she was upset, saying that there is
9  nothing -- there is nothing wrong with him and a lot
10  of us believe the same beliefs he does.
11    Q    Okay.  And did you ask her who she meant
12  when she said "a lot of us"?
13    A    I didn't have time to.
14    Q    How was that conversation terminated?  Did
15  she terminate is or did you terminate it?
16    A    I believe she terminated it.
17    Q    You then have an "Axis V," a GAF score of
18  40.  Tell me again, did you say what GAF meant?
19    A    I did.
20    Q    And it is?  I'm sorry.
21    A    Global Assessment Functioning.
22    Q    What is the basis for giving him a 40?
23    A    The basis is according to his beliefs, I
24  think it impacts his ability to function in the
25  community, in work environment, in a school

Page 62

1  environment.  And that's why I gave the 40.
2    Q    I take it that on this zero to 100 scale,
3  that 100 is at the better end than zero?
4    A    Correct.
5        MR. MINCKS: Object to the form of the
6  question.
7        MR. TROY: What's wrong with that
8  question?
9        MR. MINCKS: It's not an issue of better.
10  It's an issue of functioning.  It's an improper --
11        MR. TROY: Okay.  I was just wondering.
12        MR. MINCKS: It was an improper
13  attribution to --
14        MR. HURD: I think Mr. Campbell and I
15  would agree that 100 percent functioning is better
16  than no functioning.
17  BY MR. HURD:
18    Q    If you would turn to the next page of the
19  Prescreening Report and then the next page of the
20  Prescreening Report.  If you look down toward the
21  bottom, and this is the page that has the "P. 8" in
22  the upper right-hand corner, which I believe to be a
23  fax mark.  But on this page, toward the bottom, it
24  says, "Capacity for adults and minors age 14 and
25  older."

Page 63

1        Do you see that part?
2    A    Yes.
3    Q    And there's a -- a line there that says
4  "Able to maintain and communicate choice," and you've
5  marked "no."
6        What is the basis for that decision to
7  mark it?
8    A    Looking at the -- at the choice of a need
9  for additional help, he did not feel he needed
10  additional help.
11    Q    Okay.  And the next line is "Able to
12  understand relevant information."  You've marked that
13  "no" as well.  What does that mean?  Why did you mark
14  that?
15    A    For the same reason; that he didn't
16  believe that he was in need of any further assistance.
17    Q    And the next category says "Risk Factors."
18        Do you see that?
19    A    Yes.
20    Q    There is a check mark beside "Homicidal
21  ideation"?
22    A    Uh-huh.
23    Q    A check mark beside "Access to weapons,"
24  with the word "potential" written in by you; is that
25  correct?

Page 64

1    A    That's correct.
2    Q    And also a check mark by the box "Other."
3        What evidence did you rely upon to
4  substantiate the presence of homicidal ideation?
5    A    I would go back to the email that I
6  received with his statements.
7    Q    This is the email from Howard Bullen that
8  has been marked as Exhibit D?
9    A    Yes.  "This is revenge.  Know that before
10  you die."
11        "This is the start of you dying."
12        These are all homicidal ideation to me.
13    Q    What specifically was Mr. Raub's homicidal
14  plan?  Did he indicate any such plan to you in your
15  conversation with him?
16    A    No.
17    Q    Did he communicate, in discussing --
18  strike that.
19        Did he communicate, in his conversation
20  with you, any intended target of any homicide?
21    A    In speaking with me?
22    Q    Yes.
23    A    No.
24    Q    Did he communicate, in speaking with you,
25  any homicidal ideation or is it simply the email?

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 65

1   A    When he terminated the conversation, I
2  asked him, you know, do you feel justified in the
3  statements that you have made and the risk of other
4  people.  I can't say his exact wording.  He said
5  something on the lines of, "If you knew" -- "if you
6  know what I knew, wouldn't you?"
7   Q    Okay.  Anything else with respect to
8  homicidal ideation that was the basis for the box?
9   A    Other than the emails, no.
10   Q    Okay.  You also checked the box "Access to
11  weapons" and wrote in the word "potential"?
12   A    Yes.
13   Q    What caused you to check that box and make
14  that change to the statement?
15   A    When I spoke with Detective Paris, he said
16  he didn't know if there were weapons on there -- in
17  the house or on Mr. Raub.
18       With someone that's been trained in
19  demolition and explosives, I felt he had the knowledge
20  that he could potentially be extremely dangerous.
21   Q    Did you ask him whether he had any weapons
22  in his home?
23   A    I don't recall.
24   Q    Were any weapons found on his person when
25  he was brought into the jail?

Page 66

1   A    I don't recall.
2   Q    Now, in our society, it's pretty easy for
3  any law-abiding citizen who has not been found to have
4  a mental illness to obtain a weapon, is it not?
5   A    I'm sorry.
6   Q    In our society, it's pretty easy for any
7  person to obtain a weapon if they don't have a felony
8  conviction or a mental health issue?
9       MR. MINCKS: That's outside the scope of
10  discovery.
11       MR. HURD: It has --
12       MR. MINCKS: You don't have to answer that
13  question.
14       MR. HURD: Access to weapons.  I'm trying
15  to probe that.
16       MR. MINCKS: You don't have to answer that
17  question.  That's outside the scope of the discovery
18  that the judge has ordered.
19  BY MR. HURD:
20   Q    What facts do you have, if any, that give
21  Mr. Raub greater access to weapons than to -- than I
22  would have or you would have?
23       MR. MINCKS: Objection.  There's no
24  foundation that there's been any testimony about any
25  greater access, but go ahead and answer the question

Page 67

1  if you can.
2   A    I would say it's the knowledge and the
3  training that he's received in demolitions and
4  explosives.
5  BY MR. HURD:
6   Q    Okay.  And that would be true of most
7  Marine veterans, correct?
8       MR. MINCKS: There's no foundation that he
9  could possibly answer that question, but answer it if
10  you know.
11   A    What's the question?
12  BY MR. HURD:
13   Q    That would be true of most Marine
14  veterans, would it not, training in weapons and
15  explosives?
16   A    I can't answer that.  I'm not a former
17  Marine.
18   Q    Do you have any military service?
19   A    I do not.
20   Q    Why did you check the box "Other"?
21  There's written in there.  I'm wondering why you
22  checked it.
23   A    Going back to -- from everything that I've
24  heard and everything that I've read, that there's --
25  that there's red flags.  And it's not one potential,

Page 68

1  you know, this, this, this or this that -- that puts
2  it in -- that kind of cements your decision.  It's a
3  bunch of things that does.  And that's why I checked
4  "Other."
5       It's the -- kind of the -- the change in
6  behavior.  The -- you know, the emails sent, the
7  fellow Marine Corps -- you know, Marines that he's
8  served with notifying the federal government that this
9  guy has the capability and this guy is serious about
10  what he's talking about.
11       It was eerie on the interview with him as
12  he has said that he is right and is willing to do
13  whatever in a situation that he finds himself in as
14  far as feeling justified for what he does.
15       All of that together made me say, we have
16  to take a look at this guy.  And that's part of the
17  other risk factors.
18   Q    Okay.  Anything else?
19   A    Not that I can recall.
20   Q    Mr. Campbell, if you would look in the
21  middle of this same page on the Prescreening Report,
22  there's a category that says "Adult 37.2-809"; is that
23  correct?
24   A    Yes.
25   Q    And then there's a box that's checked that

Page 69

1  says "Has a mental illness" and so forth?
2      A    Yes.
3      Q    And under that, there's a box that's
4  checked that says "Cause serious physical harm"?
5      A    Yes.
6      Q    And then there's a box that says "Suffer
7  serious harm due to his lack of capacity" and so
8  forth.
9          Do you see that box?
10     A    Yes.
11     Q    That box is not checked, is it?
12     A    It is not checked.
13     Q    Now, I'm going to ask you to compare that
14 to Exhibit B, which is the petition you filed.  Do you
15 see that the same -- the same boxes are presented by
16 the form as on the Prescreening Report?
17     A    Say -- what's the question?  I'm sorry.
18     Q    Can you compare the boxes in the
19 statements on the form, on the petition that was
20 labeled Exhibit B --
21     A    Uh-huh.
22     Q    -- with the statements in the boxes on the
23 page of the presentence(sic) report that you have in
24 front of you that we just talked about a moment ago?
25         The verbiage is the same, is it not, on

Page 70

1  the forms?
2      A    Yes, it is.
3      Q    Now, on the Prescreening Report, you did
4  not check the box that says "Suffer serious harm due
5  to his lack of capacity" and so forth, but you did
6  check that box on the petition, did you not?
7      A    I did.
8      Q    Can you explain the discrepancy?
9      A    With the delusional thoughts, making
10 himself -- if he suffers serious harm due to
11 respondent's lack of capacity.  I think there's a
12 strong likelihood that he puts himself at harm's risk
13 with the thought that he had.
14     Q    Okay.  Now, is there a reason why you did
15 not check that box on the Prescreening Report?
16     A    There isn't.
17     Q    In your interview with Brandon Raub, was
18 there any discussion about the -- the statements on
19 the -- let me back up.
20         I'm trying to understand the sequence.  As
21 I read the statement that was marked Exhibit A, you
22 did not receive the email from Howard Bullen until
23 pretty much the end of your assessment process; is
24 that correct?
25     A    That is Exhibit A?

Page 71

1      Q    Yes.  Right.  And it's in front of you as
2  well.
3          At the bottom of page 5, top of page 6 is
4  where you discuss receiving the email; is that
5  correct?
6      A    Yes.
7      Q    And at that point in the process of
8  evaluating Brandon Raub, had your interview with him
9  already been concluded?
10     A    At the point when I received --
11     Q    At the point when you received the copy of
12 the Howard Bullen email --
13     A    Exhibit D.
14     Q    Exhibit D. -- that you discuss at the
15 bottom of page 5, top of page 6 of your statement, at
16 the time you received that email, had your interview
17 with Brandon Raub already been concluded?
18     A    Yes.
19     Q    Okay.  So then at the time you interviewed
20 him, you did not have before you the specific verbiage
21 that is contained in that Howard Bullen email?
22     A    Can you say that again?
23     Q    At the time you interviewed Brandon Raub,
24 you did not know about the language that he used
25 that's quoted in the Howard Bullen email?

Page 72

1      A    It was along the lines when I talked with
2  Detective Paris.  I am not sure if he read this
3  verbatim, but he made strong reference to it.  But I
4  didn't see this until after I interviewed Mr. Raub.
5      Q    Okay.  And the conversation you just
6  referred to with Detective Paris was your phone call
7  conversation?
8      A    That's correct.
9      Q    By the way, did you have any other
10 conversations off the phone with Detective Paris that
11 day?
12     A    No, I don't believe I did.
13     Q    Okay.  When the -- the federal agent, be
14 it FBI or secret service, gave you the Howard Bullen
15 email, what, if anything, did he say to you about
16 Brandon Raub?
17     A    I can't recall.  I can't recall.  I recall
18 having a conversation.
19     Q    Okay.
20     A    I don't recall exactly what the
21 conversation was.
22     Q    Let me see, if I may, the Exhibit B.
23         Prior to this assessment of Brandon Raub,
24 on how many occasions, if any, had you previously
25 worked with the FBI or secret service?

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 73

1      MR. MINCKS: Object to the form of the
2  question.  Go ahead and answer.
3      A    I can't recall.  I want to say two.
4  That's -- that's an estimate of saying two.
5  BY MR. HURD:
6      Q    Okay.  And on those two occasions, was
7  that while you were employed at Chesterfield County
8  Mental Health?
9      A    Yes.
10     Q    Do you recall the years of those two
11 events?
12     A    No.
13     Q    Do you recall the names of the people
14 involved?
15     A    No.
16     Q    Did Detective Paris, during the phone call
17 on August 16th, ever tell you that he had lost
18 consciousness at the scene of Brandon Raub's home?
19     A    He did not.
20     Q    Have you since become aware that he lost
21 consciousness at the scene?
22     A    I heard that.
23     Q    If he had told you that he had lost
24 consciousness at the scene, would that have -- strike
25 that.

Page 74

1          When you spoke with Detective Paris, you
2  did not ask to speak with anyone else at the scene,
3  did you?
4      A    I can't recall if I did or not.
5      Q    Well, did you ask to speak to Brandon
6  Raub?
7      A    No, I didn't.
8      Q    Did you ask to speak to Terry Granger?
9      A    No.  I don't know who Terry Granger is.
10     Q    Did you ask to speak to any other law
11 enforcement officer at the scene to confirm what
12 Detective Paris was telling you about his
13 observations?
14     A    Not that I can recall.
15     Q    If -- if you had been told at the time of
16 the phone call that Detective Paris had lost
17 consciousness for a couple minutes at the scene and
18 lay face down in the dirt while he was unconscious,
19 would that have made you want to speak to another
20 observer at the scene?
21         MR. MINCKS: Object to the form and to
22 speculation.  You're asking him to speculate.  Go
23 ahead and answer.
24         THE DEPONENT: Oh, okay.
25         MR. MINCKS: If you can.

Page 75

1      A    If -- I'm sorry.
2  BY MR. HURD:
3      Q    If you had -- at the time of your call
4  with Detective Paris --
5      A    Uh-huh.
6      Q    -- if you had known that Detective Paris
7  had suffered some medical episode, had lost
8  consciousness, fell to the ground, laid there
9  unconscious for a couple minutes --
10     A    Uh-huh.
11     Q    -- would that have made you want to speak
12 to someone else, another law enforcement observer at
13 the scene before rendering your opinion over the
14 phone?
15         MR. MINCKS: Same objection.  Asks for
16 speculation.  Go ahead.
17     A    I would be concerned for his safety, but
18 as far as if I could -- if he was -- I think I would
19 be able to tell if he wasn't making sense.  Then I
20 would certainly request to speak to anyone else.
21 BY MR. HURD:
22     Q    Do -- what's your title, for the record,
23 Mr. Campbell, at Chesterfield Mental Health?
24     A    I'm a senior clinician in the Emergency
   Services.

Page 76

1      Q    Okay.  How many other clinicians are there
2  in the Emergency Services?
3      A    Total?
4      Q    Uh-huh.
5      A    Eleven.
6      Q    Okay.  Do clinicians in Emergency Services
7  ever go out into the field to interview someone who is
8  suspected of having mental health issues?
9      A    That's not our practice.
10     Q    Is it -- is it your practice to -- to
11 attempt to speak to -- over the telephone with people
12 who are having -- alleged to be having mental health
13 issues before bringing them in?
14     A    Sometimes.
15     Q    Would you say that you speak with them
16 over the phone before making a decision about their
17 being brought in more than you don't talk to them or
18 less than you talk to them?
19         What is the majority of practice there?
20         MR. MINCKS: We are way beyond the scope,
21 but go ahead and answer the question.
22     A    I would say -- a pure estimate?
23 BY MR. HURD:
24     Q    Uh-huh.
25     A    Probably 60/40.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

---

Page 77

1  Q    Which way?
2  A    Sixty that I talk to.  Forty that I don't.
3  Q    Okay.  When you spoke with Detective Paris
4  over the phone -- I want to focus on that point in
5  time.  Not your prescreening assessment.
6        When you spoke with Detective Paris over
7  the phone, who was it that you understood that Brandon
8  Raub was threatening to harm?
9        MR. MINCKS: Object to the form of the
10 question.  Go ahead.
11 A    I didn't put a -- I didn't put a name on
12 it.  I put -- I believe President Bush was mentioned.
13 I'm not sure.  That may have come later.  There wasn't
14 a particular one person that I can recall.
15 BY MR. HURD:
16 Q    So then at the time that -- I'm going to
17 repeat myself because of your counsel's objection to
18 the form of my question.
19       So to clarify, other than the possibility
20 of President Bush, Detective Paris did not indicate to
21 you any specific person that was the subject of a
22 threat of harm for Mr. Raub?
23 A    Not a specific person.
24       MR. MINCKS: That was a different
25 question, but -- see, I don't object when they're --

---

Page 78

1  BY MR. HURD:
2  Q    What, if anything, did Detective Paris say
3  to you over the phone to indicate that the -- that any
4  harm from Brandon Raub would be carried out in the
5  near future?
6  A    What did he say --
7  Q    What did Detective Paris say to you that
8  made you believe, if you did, that Raub would cause
9  harm in the near future?
10 A    I think there were several things he said.
11 Q    Okay.
12 A    One was that there was several Marines
13 that were concerned, several Marines that knew
14 Brandon, knew how effective he was, how, you know, he
15 was an expert with explosives, and in his current
16 communications with them, they felt that he was at
17 extreme risk of doing something to hurt people.
18       That is why they went to the federal
19 authorities.
20 Q    Okay.
21 A    The quotes that he put on Facebook that
22 were read, I don't know if they were read verbatim, if
23 you have a change in behavior, if you have the
24 know-how, if you have experience and you're having
25 these thoughts and you have this delusion that you are

---

Page 79

1  the one that's been chosen to rise up and lead this
2  rebellion revolution, I felt that there was extreme
3  danger of someone like Brandon.  I don't know what
4  happened to cause that, but it sounds like something
5  did.
6        I wanted him to be -- to have further
7  treatment to find out what happened.
8  Q    So you're basing your -- your -- let me
9  strike that.
10       What I'm trying to get at, Mr. Campbell,
11 is -- is not why you felt that Brandon Raub was going
12 to cause harm at some point.
13 A    Uh-huh.
14 Q    My specific question is what did Detective
15 Paris say to you on the phone, if anything -- he may
16 not have said anything.
17       What, if anything, did Detective Paris say
18 to you on the phone to suggest that Brandon Raub was
19 likely to cause harm in the near future?  Emphasize in
20 the near future.
21       MR. MINCKS: Objection.  That was your
22 question before.  He has answered that question
23 specifically.  So it's asked and answered.
24       MR. HURD: I don't believe so.
25       MR. MINCKS: No, he did.  It's asked and

---

Page 80

1  answered.  Go ahead, if there's anything else you need
2  to say.
3  BY MR. HURD:
4  Q    In the near future?
5        MR. MINCKS: Same.  Same objection.  It's
6  asked and answered.  You asked him that question.  He
7  answered it.
8        MR. HURD: I don't believe he did.
9        MR. MINCKS: We were all here in the room.
10 We all heard it.  So -- yeah.  I mean, go ahead, if
11 you've got anything else to say on the subject.
12 A    That was -- that was it.
13 BY MR. HURD:
14 Q    Okay.  When you faxed the Prescreening
15 Report to Poplar Springs Hospital, was it sent with a
16 cover sheet?
17 A    I can't recall.  I like to think I sent a
18 cover sheet, but I can't say definitely I did.
19 Q    Would that have been your practice, to put
20 a cover sheet on it and to say, in the cover sheet,
21 something about, "I'm requesting a space at Poplar
22 Springs"?
23 A    No.  I usually put to whoever, from me,
24 and that's pretty much it.
25 Q    Okay.

---

Chandler & Halasz, Inc.
(804)730-1222

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

---

Page 81

1      A    Habit.
2           MR. HURD: All right.  How much time do we
3  have left?
4           THE COURT REPORTER: Fifteen minutes.
5           MR. HURD: I may be through, but if we can
6  take a five-minute break, I'll confer with my
7  colleagues.
8           (Recess from 3:42 p.m. until 3:53 p.m.)
9           (Mr. Parthemos is not present.)
10 BY MR. HURD:
11     Q    Mr. Campbell, as we -- as you have
12 testified today, you explained that you --
13          (Mr. Parthemos entered the room.)
14 BY MR. HURD:
15     Q    -- at the time of your assessment of
16 Brandon Raub, read the statements in the email from
17 Howard Bullen that are described as being part of
18 Brandon Raub's Facebook post, correct?
19     A    I'm sorry?
20     Q    In your testimony today, you have said
21 that in your assessment -- during your assessment of
22 Brandon Raub, that you were given the Howard Bullen
23 email?
24     A    Uh-huh.
25     Q    And that you read the Facebook posts that

---

Page 82

1  are quoted in that email?
2      A    I'm not too familiar with Facebook.  I'm
3  not sure if they were Facebook.  I think that's what
4  was told to me.
5      Q    Okay.
6      A    I didn't go on Facebook.
7      Q    You're really getting to my question.
8           Did you read anything on the Internet
9  about Brandon Raub or by Brandon Raub at the time of
10 your assessment?
11     A    No.
12     Q    Did you read the hard copies of any
13 printouts of Brandon Raub's Facebook posts on the day
14 of the assessment?
15     A    When you say the -- I'm not sure.  Is this
16 the -- is this a copy of the Facebook post?
17     Q    I want to -- I want to be real clear about
18 this.  Lay aside Exhibit D for the moment, Howard
19 Bullen email.  Okay?
20     A    Uh-huh.
21     Q    Did you see any printouts of Facebook
22 posts by Brandon Raub?
23     A    I believe I did, but I can't say for
24 certain.
25     Q    Okay.  And -- and when were those given to

---

Page 83

1  you?  Who gave them to you?
2      A    I don't know who gave them to me.  I can't
3  say who gave them to me.
4      Q    What did you do with them?
5      A    I don't recall.
6      Q    Do you recall when, on August 16th,
7  somebody gave them to you?
8      A    I can't recall.
9      Q    During your phone conversation with
10 Detective Paris on the August 16th, did Detective
11 Paris characterize the -- any statements made by
12 Brandon Raub on the Internet?
13          MR. MINCKS: Objection to the form of the
14 question.  Go ahead.
15     A    Can you say that again?
16 BY MR. HURD:
17     Q    During your phone call with Detective
18 Paris on August 16th --
19     A    Uh-huh.
20     Q    -- did he characterize the statements made
21 by Brandon Raub on the Internet?
22          MR. MINCKS: Same objection.  Go ahead.
23     A    I don't know what you're defining "on the
24 Internet."  But this was something that he
25 characterized when he'd spoke with me.

---

Page 84

1  BY MR. HURD:
2      Q    Well, now, you didn't have the Howard
3  Bullen email until the end of your assessment, well
4  after --
5      A    Uh-huh.
6      Q    -- well after Brandon Raub was seized --
7      A    Yes.
8      Q    -- correct?
9      A    Correct.
10     Q    So, now, did he tell you that he used the
11 word "specific threat" in describing Brandon Raub's
12 emails or postings?
13     A    I'm having a hard time understanding the
14 question.  I -- did -- did Detective Paris?
15     Q    Yes.  Detective Paris and you talked about
16 Brandon Raub on the phone.
17     A    Yes.
18     Q    And Detective Paris talked to you about
19 the fact that Brandon Raub had made some statements on
20 the Internet, on Facebook, correct?
21     A    See, that -- you're losing me there.  I
22 don't know if these are the statements from Facebook.
23     Q    I'm not asking you that question.  Let me
24 rephrase the question.
25          Detective Paris talked to you about some

---

Page 85

1  statements that Brandon Raub had made, correct?
2    A   I can't recall.
3    Q   You don't recall whether Detective Paris
4  talked to you about statements Brandon Raub had made?
5    A   Going back to this, I recall the
6  statements here, but I don't --
7    Q   That's not my --
8    A   -- I don't know if this is Facebook or
9  not.
10    Q   That's not my question.  That's not my
11  question.
12        MR. MINCKS:  That is his answer.  And it's
13  actually an answer to your question.  He was
14  referring, by the way, to Exhibit D.
15  BY MR. HURD:
16    Q   Your statement in your answers that is
17  marked as Exhibit A includes the following:  Paris
18  informed me that Mr. Raub --
19        MS. SEYFARTH:  What page?
20        MR. MINCKS:  What page are you --
21        MR. HURD:  This is on page 2.
22        MR. MINCKS:  And where are you?
23        MR. HURD:  Second paragraph, second line,
24  middle of the line.
25  BY MR. HURD:

Page 86

1    Q   "Detective Paris informed me" -- strike
2  that.  Go down to one, two, three, three, four, five,
3  six lines down.  In the middle of the second
4  paragraph, it reads -- no, that's not it either.  All
5  right.  There we go.  Okay.  Third paragraph.
6        MR. HURD:  Thank you, Steve.
7  BY MR. HURD:
8    Q   Third paragraph, fourth line down.
9  "Detective Paris informed me that Mr. Raub had made
10  on-line threats about killing people, that he believed
11  the United States Government had perpetrated the
12  September 11, 2001, terrorist attacks on the World
13  Trade Center and the Pentagon, and that he believed
14  that the government was committing atrocities on
15  American citizens by dropping a radioactive substance
16  called thorium on them from airplanes.  Detective
17  Paris indicated to me that these statements and
18  threats were made over the Internet, and he described
19  the language of some of the threats to me.  Although I
20  do not remember the exact wording of any of the
21  threats now, they were specific threats of violent
22  action against human beings."
23        That's your statement?
24    A   Yes.
25    Q   Now, focusing on the phrase, please,

Page 87

1  "specific threats."  Now, did he characterize Raub's
2  statements as specific threats or is that a conclusion
3  that you came to based on the statements he told to
4  you?
5    A   I can't recall what was -- what was said
6  specifically.  I don't know if he used the word
7  "specific threat."
8    Q   Okay.  In discussing Brandon Raub with
9  Detective Paris over the phone, was it -- was it A or
10  B?  A, did he tell you that he believed there was
11  probable cause to seize Brandon Raub and ask if you
12  agreed, or B, did he not express his opinion about
13  whether there's probable cause and ask you for your
14  opinion?
15        MR. MINCKS:  Objection to the form of the
16  question.  That may not be the only possibilities.
17  BY MR. HURD:
18    Q   Or C, something else?
19    A   I have no idea how -- how -- I can recall
20  it going something, "This is the situation we have."
21  From that, as far as "We're going to bring him in,"
22  no.  I don't recall what the --
23    Q   Okay.
24    A   -- what the wording, because it's --
25  BY MR. HURD:

Page 88

1    Q   Let me rephrase it.
2        MR. MINCKS:  He's not done.  He's still
3  trying to talk.
4  BY MR. HURD:
5    Q   I apologize.
6        MR. MINCKS:  He's still trying to answer.
7  BY MR. HURD:
8    Q   Go ahead.
9    A   It's -- it's -- the wording is -- I
10  don't -- I don't see how I could recall that.
11    Q   I'm not asking you for specific wording.
12  I'm asking you if his phone call to you was for
13  confirmation of the opinion that he had made or was it
14  to obtain direction from you as to what to do?
15        MR. MINCKS:  Objection.  He can't testify
16  for Detective Paris.
17  BY MR. HURD:
18    Q   Insofar as Detective Paris communicated to
19  you the reason for his calling you, was it one of
20  those two reasons or something else?
21        MR. MINCKS:  Same objection.  It's
22  objectionable as to form.  You're asking him to
23  testify as to the thought process of Detective Paris.
24        MR. HURD:  No.  I'm asking what Detective
25  Paris communicated and conveyed to Mr. Campbell.

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

Page 89

1  BY MR. HURD:
2      Q    Was he seeking confirmation for a decision
3  he had made or was he seeking guidance from you as to
4  what decision to make?
5          MR. MINCKS: Same objection.  Go ahead.
6  You can answer.
7      A    I'm going to say guidance.  I'm going to
8  say guidance.
9      Q    Okay.
10         MR. HURD: All right.  Tony?  Steve?
11         Thank you for your time.  As your lawyers
12  will tell you, you have the right to read these after
13  they're typed up by the court reporter and to indicate
14  any errors you think she has made in transcribing your
15  testimony or you may waive that right, and Mr. Mincks
16  will advise you on that point.
17         MR. MINCKS: We recommend that you read.
18         THE DEPONENT: Okay.
19
20         (The deposition concluded at 4:03 p.m.)
21
22         And further this deponent saith not.
23
24
25

Page 90

1
2
3
4
5          I, the undersigned, _____,
6  do hereby certify that I have read my foregoing
7  deposition and that, to the best of my knowledge, said
8  deposition is true and accurate (with the exception of
9  the following corrections listed below):
10
11  Page/Line  From       To          Reason
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 91

1
2
3
4
5
    Date                        Signature
6
7
8  COMMONWEALTH OF VIRGINIA, to wit:
9  COUNTY/CITY OF                         :
10
11
12         Subscribed and sworn before me this ____
13  day of _____  2013.
14         My Commission Expires:_____/____/____
15         Notary Registration Number: _____
16
17
18  Notary Public
19
20
21
22
23
24
25

Page 92

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
2          I, Tracy J. Stroh, RPR, CCR, CLR, Notary
3  Public in and for the Commonwealth of Virginia,
4  National Registration Number 7108255, and whose
5  commission expires September 30, 2015, do certify that
6  the aforementioned appeared before me, was sworn by
7  me, and was thereupon examined by counsel; and that
8  the foregoing is a true, correct, and full transcript
9  of the testimony adduced.
10         I further certify that I am neither
11  related to nor associated with any counsel or party to
12  this proceeding, nor otherwise interested in the event
13  thereof.
14         Given under my hand and notarial seal at
15  Richmond, Virginia, this 2nd day of October 2013.
16
17
18         Tracy J. Stroh, RPR, CCR, CLR
19         Commonwealth of Virginia at Large
20
21
22
23
24
25

## A

**ability (1)**
61:24
**able (5)**
24:15;26:15;63:4,11;
75:19
**above (1)**
51:19
**absence (2)**
6:11;7:13
**accept (3)**
34:2,5,13
**accepting (1)**
32:12
**Access (5)**
63:23;65:10;66:14,
21,25
**According (4)**
41:15,18;42:12;
61:23
**accurate (2)**
6:20;90:8
**acquaintance (2)**
9:17;29:5
**action (2)**
36:18;86:22
**actually (7)**
6:14;8:5;25:25;
39:19,20;46:11;85:13
**additional (2)**
63:9,10
**Admission (1)**
6:9
**Adult (1)**
68:22
**adults (1)**
62:24
**advice (1)**
16:19
**advise (1)**
89:16
**Affect (1)**
53:10
**afternoon (2)**
4:7,8
**again (15)**
8:20;12:3;14:15;
17:4;26:16;28:6;31:8,
14;34:19;39:5;47:6;
56:1;61:18;71:22;
83:15
**against (5)**
6:10;11:22;12:6;
22:14;86:22
**age (1)**
62:24
**agent (7)**
9:14;23:8,14,18;
29:2,8;72:13
**ago (2)**
42:25;69:24

**agree (2)**
8:23;62:15
**agreed (1)**
87:12
**ahead (43)**
6:15;8:19,25;11:16;
12:1;13:8;17:4;18:5;
24:2,11,19;26:11;34:8,
18;35:12;37:5,15;
38:17;42:19;45:19;
46:12,21;50:12,20;
52:3,18;53:13,23;
54:10;57:2,10;66:25;
73:2;74:23;75:16;
76:21;77:10;80:1,10;
83:14,22;88:8;89:5
**airplanes (1)**
86:16
**alleged (1)**
76:12
**allow (2)**
16:25;17:2
**along (1)**
72:1
**Although (1)**
86:19
**American (1)**
86:15
**Amongst (1)**
45:9
**answered (14)**
15:20;16:4,8;17:4;
26:2,4;46:12;56:11,23;
79:22,23;80:1,6,7
**apart (1)**
42:22
**apologize (1)**
88:5
**apologizing (1)**
33:16
**appeared (1)**
53:3
**appears (8)**
5:5,15;7:2,17;8:1;
30:10;40:7;52:7
**apply (1)**
24:22
**appropriate (3)**
14:14,20;15:1
**Approved (1)**
4:22
**approximate (2)**
19:22,23
**approximately (6)**
13:16;19:24;25:13,
14,17;46:15
**approximation (2)**
46:10,14
**April (1)**
19:15
**area (2)**
20:9;53:16
**around (5)**

25:14;48:2;53:1;
55:20;57:11
**arrest (1)**
49:15
**arrested (1)**
49:20
**arrived (2)**
9:14;29:2
**aside (1)**
82:18
**assessment (14)**
38:14;40:25;41:13;
59:13;61:21;70:23;
72:23;77:5;81:15,21,
21;82:10,14;84:3
**assessments (3)**
38:9,10,11
**assistance (1)**
63:16
**assume (6)**
20:2,13,19,20;32:13;
46:22
**atrocities (4)**
43:13;45:8;48:5;
86:14
**attached (3)**
7:12,14;9:17
**attachments (3)**
6:12,14,24
**attacks (1)**
86:12
**attempt (4)**
30:16,19,20;76:11
**attribution (1)**
62:13
**audio (1)**
20:11
**audiotape (1)**
20:15
**August (23)**
6:11,22;7:13;8:12,
24;11:22;12:7;19:15;
24:25;27:11,21;28:3;
30:17,22;35:9,24;
39:11;46:8;58:21;
73:17;83:6,10,18
**authorities (1)**
78:19
**aware (2)**
61:5;73:20
**axes (1)**
59:7
**Axis (5)**
59:5,6,15;60:2;61:17

## B

**back (10)**
17:14;28:5;33:6,6;
44:13;49:12;64:5;
67:23;70:19;85:5
**background (2)**
30:24;33:22

**ballpark (1)**
35:13
**Barnett (4)**
27:24,25;29:13,21
**baseball (1)**
52:12
**Based (3)**
54:2,3;87:3
**baseline (3)**
42:11;43:24;48:4
**basing (1)**
79:8
**basis (7)**
55:16;60:5,6;61:22,
23;63:6;65:8
**become (4)**
41:19;42:7;43:10;
73:20
**bed (3)**
33:19;35:9,24
**began (1)**
12:21
**begin (1)**
4:19
**begins (4)**
9:6;10:17;41:1,15
**behavior (19)**
41:20;42:15,19;43:4,
6,22,23;44:5,6,9,15;
47:13;48:11;51:1,5,7;
61:4;68:6;78:23
**behaviors (15)**
41:19;42:6,7,24;
43:5,8,10,14,16;47:18,
20,22;48:8,13,17
**beings (1)**
86:22
**belief (1)**
60:17
**beliefs (6)**
44:23,25;56:7;61:6,
10,23
**believes (3)**
40:19;45:7;60:23
**below (1)**
90:9
**beside (2)**
63:20,23
**best (1)**
90:7
**better (3)**
62:3,9,15
**beyond (1)**
76:20
**big (1)**
22:14
**Bill (1)**
35:14
**birth (1)**
6:25
**bit (1)**
31:9
**bitch (1)**

49:15
**blacked (1)**
6:25
**blame (1)**
43:12
**blaming (2)**
48:4,5
**blank (3)**
17:21;18:25;19:1;
52:24,24
**Board (3)**
13:3;36:10,18
**both (1)**
32:5
**bottom (10)**
9:5,5;10:21;47:12;
51:17;58:8;62:21,23;
71:3,15
**box (44)**
14:12,14,16,21,23;
15:1,2,2,5,8,11,12,17,
22,24,25;16:2,22,24;
17:1,2,12,13;51:24;
53:10,20,25;55:3,4;
60:3,9;64:2;65:8,10,
13;67:20;68:25;69:3,6,
9,11;70:4,6,15
**boxes (7)**
14:7,7,8;32:5;69:15,
18,22
**Brandon (81)**
4:10;6:10,21;10:11;
11:1,12,22;12:7;17:24;
19:14;20:4,23;21:9,23;
22:7,13;23:2,7,13,19,
25;25:1,3;26:23;27:1,
11,12,22;28:3;29:17,
25;30:22;31:5,11,13;
33:14,18;34:13,22;
35:9,25;36:23;37:2;
45:14;46:7;48:1;50:16,
24;51:2,5;70:17;71:8,
17,23;72:16,23;73:18;
74:5;77:7;78:4,14;
79:3,11,18;81:16,18,
22;82:9,9,13,22;83:12,
21;84:6,11,16,19;85:1,
4;87:8,11
**Brandon's (1)**
27:13
**break (1)**
81:6
**bring (2)**
37:21;87:21
**bringing (3)**
39:1;49:12;76:13
**briskly (1)**
4:13
**brought (7)**
27:1,10;31:4;37:19;
61:5;65:25;76:17
**Bullen (15)**
30:2,4,7,16,19;64:7;

Brandon Raub v.
Daniel Lee Bowen et al.

Michael Campbell
October 1, 2013

70:22;71:12,21,25;
72:14;81:17,22;82:19;
84:3
**bunch (1)**
    68:3
**Bush (4)**
    41:7;49:21;77:12,20

### C

**call (21)**
    18:14,15;20:9;25:4,
    6,15;26:22;29:19,21;
    30:16;35:9,24;36:4;
    39:2;44:25;72:6;73:16;
    74:16;75:3;83:17;
    88:12
**called (12)**
    10:14;18:24;25:7,8,
    10,25;31:24;36:1;
    53:16;58:9;61:3;86:16
**calling (2)**
    25:19;88:19
**calls (1)**
    39:10
**calmed (2)**
    31:8,9
**came (5)**
    48:2;58:19,20,22;
    87:3
**CAMPBELL (17)**
    4:3,7,22;5:13;6:6;
    7:23;9:3;10:23;11:11;
    14:5;42:16;62:14;
    68:20;75:23;79:10;
    81:11;88:25
**can (53)**
    4:20,24,25;5:22,25;
    6:7;7:10,24;8:20;10:5,
    8,25;11:17;12:2,3;
    13:15;14:15;16:20;
    17:8,23;18:23,23;
    19:21;20:13;24:7;
    25:23;26:12,19;28:4;
    32:3,7;34:18;39:13;
    41:11;42:20;43:6;
    48:24;55:19;60:11,11,
    25;67:1;68:19;69:18;
    70:8;71:22;74:14,25;
    77:14;81:5;83:15;
    87:19;89:6
**capability (1)**
    68:9
**capable (2)**
    47:24,24
**Capacity (4)**
    62:24;69:7;70:5,11
**carried (1)**
    78:4
**case (6)**
    5:14;19:11;32:14;
    33:9;35:5;47:23
**catatonic (1)**

51:1
**category (9)**
    40:15;53:10;55:15,
    15;57:6;58:2,9;63:17;
    68:22
**Cause (7)**
    69:4;78:8;79:4,12,
    19;87:11,13
**caused (2)**
    40:19;45:7;65:13
**CBS (1)**
    36:8
**cements (1)**
    68:2
**Center (3)**
    36:4;38:15;86:13
**certain (5)**
    20:13;32:3;36:2;
    58:4;82:24
**Certainly (3)**
    49:2;50:5;75:20
**certification (1)**
    13:12
**certified (1)**
    13:9
**certify (1)**
    90:6
**chain (4)**
    8:5,12,23;32:15
**change (6)**
    43:22,23;44:5;65:14;
    68:5;78:23
**changed (1)**
    48:3
**changes (3)**
    44:15,18;61:4
**characterize (3)**
    83:11,20;87:1
**characterized (1)**
    83:25
**check (25)**
    14:14,20;15:1,2,6,8,
    17,23,25;16:24;17:1,2;
    53:25;55:3,4;60:13,21;
    63:20,23;64:2;65:13;
    67:20;70:4,6,15
**checked (31)**
    14:8,8,11,16,24;
    15:11,13,22;16:22;
    17:13;32:5,8;51:19,25;
    53:9,20;55:14;57:6,14,
    16,23;58:3;60:2,15;
    65:10;67:22;68:3,25;
    69:4,11,12
**Checking (1)**
    60:9
**Chesterfield (13)**
    12:22,25;13:10;22:4,
    20,24;27:3,7;36:10,17;
    38:15;73:7;75:23
**choice (2)**
    63:4,8
**choose (1)**

46:23
**chosen (4)**
    48:7;54:15;55:12;
    79:1
**circumstances (1)**
    59:12
**citizen (1)**
    66:3
**citizens (1)**
    86:15
**clarify (1)**
    77:19
**clear (1)**
    82:17
**client (5)**
    16:18;40:17,18;41:5;
    51:21
**Client's (4)**
    10:18;41:2,5,18
**Clinical (1)**
    51:18
**clinician (1)**
    75:24
**clinicians (2)**
    76:1,6
**close (1)**
    12:15;22:1,3,6,8,11
**closed (1)**
    22:17
**closing (1)**
    38:3
**Code (2)**
    36:8,11
**colleagues (1)**
    81:7
**combination (1)**
    56:7
**coming (2)**
    13:10;53:1
**comment (1)**
    26:15
**commitment (3)**
    11:12,16;12:9
**committing (1)**
    86:14
**communicate (4)**
    63:4;64:17,19,24
**communicated (2)**
    88:18,25
**communications (7)**
    9:12;25:7,7;28:9,20,
    21;78:16
**Community (4)**
    13:3;36:10,18;61:25
**compare (2)**
    69:13,18
**completed (3)**
    19:7,8,9
**computer (1)**
    21:16,22
**concern (1)**
    50:3
**concerned (3)**

43:16;75:17;78:13
**concerning (2)**
    49:5;50:1
**conclude (5)**
    14:11,18,23;15:6;
    16:23
**concluded (4)**
    15:8;71:9,17;89:20
**conclusion (2)**
    60:22;87:2
**conditions (1)**
    59:11
**conduct (1)**
    38:1
**confer (1)**
    81:6
**confidentiality (1)**
    24:22
**confined (1)**
    4:12
**confirm (1)**
    74:11
**confirmation (3)**
    19:11;88:13;89:2
**confused (1)**
    38:12
**confusing (2)**
    4:16;31:3
**connection (2)**
    11:24;13:6
**consciousness (5)**
    73:18,21,24;74:17;
    75:8
**consideration (1)**
    24:8
**considered (3)**
    14:18,24;15:6
**consisting (1)**
    6:8
**conspiracy (14)**
    40:19;41:6;42:10;
    43:2,12,25;44:10,21,
    22;57:9;60:16,17,19,23
**constant (1)**
    43:11
**constantly (1)**
    42:11
**contact (2)**
    21:19;52:25
**contained (1)**
    71:21
**Content (2)**
    53:16;54:20
**continue (2)**
    35:13;56:19
**continues (1)**
    60:17
**contributing (1)**
    59:12
**conversation (24)**
    21:12,15;26:8,16,21;
    29:12,20;45:12,13;
    47:8,9;52:9,11;60:24;

61:2,14;64:15,19;65:1;
    72:5,7,18,21;83:9
**conversations (1)**
    72:10
**conveyed (2)**
    33:17;88:25
**conviction (1)**
    66:8
**copies (1)**
    82:12
**copy (8)**
    5:14;6:8,20;7:11;
    9:16;29:4;71:11;82:16
**corner (1)**
    62:22
**Corps (2)**
    44:8;68:7
**corrections (1)**
    90:9
**counsel's (1)**
    77:17
**count (1)**
    41:12
**County (6)**
    12:22,25;13:2,10,21;
    73:7
**couple (2)**
    74:17;75:9
**Court (5)**
    4:23;13:2,2;81:4;
    89:13
**cover (4)**
    80:16,18,20,20
**crisis (3)**
    24:13;40:1,12
**current (1)**
    59:14;78:15
**currently (1)**
    12:20

### D

**D/O (2)**
    59:15,20
**daddy (1)**
    49:21
**danger (1)**
    79:3
**dangerous (1)**
    65:20
**date (4)**
    6:25;8:11;13:14;
    58:22
**dated (2)**
    8:12,24
**day (6)**
    19:14;21:12,16;
    26:23;72:11;82:13
**deal (1)**
    32:13
**dealing (1)**
    32:9
**December (3)**

Case 3:13-cv-00328-HEH-MHL   Document 90-6   Filed 11/18/13   Page 27 of 57 PageID# 1329

Brandon Raub v.                                                              Michael Campbell
Daniel Lee Bowen, et al.                                                        October 1, 2013

12:19,21;13:4
**decide (1)**
  16:25
**decided (3)**
  14:14,20;15:1
**decision (18)**
  15:25;34:5,13,16,17,
  24;35:2;37:21,23;
  38:23,25;39:2;46:18;
  63:6;68:2;76:16;89:2,4
**decisions (1)**
  46:20
**defining (1)**
  83:23
**definitely (2)**
  39:12;80:18
**definition (2)**
  22:10;49:3
**delusion (1)**
  78:25
**delusional (4)**
  55:9,11,13;70:9
**delusions (4)**
  54:19,22;55:4;56:8
**demolition (1)**
  65:19
**demolitions (1)**
  67:3
**depending (1)**
  22:10
**DEPONENT (6)**
  5:8;39:8;48:25;
  74:24;89:18,22
**Deposition (6)**
  6:3;7:20;11:8;89:20;
  90:7,8
**deputies (2)**
  22:19,23
**describe (1)**
  51:18
**described (3)**
  29:9;81:17;86:18
**describing (1)**
  84:11
**Detective (45)**
  25:5,20;26:17;36:22;
  37:1,25;38:24;39:3,11;
  40:23;41:9,25;65:15;
  72:2,6,10;73:16;74:1,
  12,16;75:4,6;77:3,6,20;
  78:2,7;79:14,17;83:10,
  10,17;84:14,15,18,25;
  85:3;86:1,9,16;87:9;
  88:16,18,23,24
**detention (4)**
  11:13,22,24;13:6
**Diagnosis (2)**
  58:9;59:7
**Diagnostic (1)**
  58:14
**die (2)**
  49:7;64:10
**difference (1)**

58:16
**different (3)**
  38:11;42:19;77:24
**DIRECT (1)**
  4:5
**direction (1)**
  88:14
**dirt (1)**
  74:18
**discovery (6)**
  35:12,17,17,19;
  66:10,17
**discrepancy (1)**
  70:8
**discuss (3)**
  37:18;71:4,14
**discussed (2)**
  35:5;56:7
**discussing (3)**
  52:12;64:17;87:8
**discussion (7)**
  36:21,24,25;44:10;
  47:1,2;70:18
**disorder (4)**
  59:10,11,21;60:12
**disorganized (3)**
  50:23;51:4,7
**disoriented (1)**
  55:22
**distinguish (1)**
  18:21
**distinguishable (1)**
  22:16
**distractible (1)**
  53:4
**distrust (3)**
  54:3,4,17
**doctor (11)**
  32:15,16,18,22;34:2,
  6,12,17,24;35:2,6
**doctor's (1)**
  34:10
**document (14)**
  5:1,2;6:7,8,18,23;
  7:9,14,25;8:2,14;10:4,
  6;13:22
**documentary (1)**
  49:13
**documents (1)**
  4:20
**done (9)**
  11:23;19:6,8,9;
  32:13;38:14;54:6;
  59:13;88:2
**door (1)**
  49:23
**down (13)**
  21:18;31:8,9;40:24;
  41:12,14;43:9;51:17;
  62:20;74:18;86:2,3,8
**dragged (1)**
  49:20
**drastic (2)**

43:21,23
**drastically (1)**
  48:3
**dropping (2)**
  55:9;86:15
**drug (2)**
  13:1,2
**DSM (12)**
  58:9,12,16,17,19,20,
  24,25;59:1,3,6,24
**Due (4)**
  47:13;69:7;70:4,10
**during (8)**
  19:17;25:19;43:13;
  46:8;73:16;81:21;83:9,
  17
**dying (2)**
  49:10;64:11

## E

**earlier (4)**
  21:12,15;53:11;56:8
**earliest (2)**
  8:11,22
**easy (2)**
  66:2,6
**ECO (1)**
  32:2
**eerie (1)**
  68:11
**effective (1)**
  78:14
**eight (1)**
  41:14
**either (6)**
  15:23;16:23;28:14;
  41:22;44:4;86:4
**electronic (1)**
  11:4
**Electronically (1)**
  10:22
**Eleven (1)**
  76:5
**else (28)**
  15:15,18;18:17;
  21:24;22:6,12,18,24;
  23:23;24:6;26:15,20,
  22,25;27:10,21;28:2;
  41:10;42:14;65:7;
  68:18;74:2;75:12,20;
  80:1,11;87:18;88:20
**email (33)**
  8:3,4,5,11,22,22,24;
  9:16,19,21,22;29:4;
  30:6,6,11,19,20;42:3;
  64:5,7,25;70:22;71:4,
  12,16,21,25;72:15;
  81:16,23;82:1,19;84:3
**emails (4)**
  7:14;65:9;68:6;
  84:12
**Emergency (4)**

28:1;75:24;76:2,6
**Emphasize (1)**
  79:19
**employed (1)**
  73:7
**end (6)**
  19:2;30:10;45:20;
  62:3;70:23;84:3
**enforcement (6)**
  9:11;28:8,12,17;
  74:11;75:12
**enough (1)**
  16:25
**entered (5)**
  11:1;14:1;33:20;
  46:5;81:13
**entitled (2)**
  4:21;39:25
**entrance (1)**
  14:3
**entry (4)**
  18:9;36:8;59:5,15
**environment (4)**
  59:12;60:11;61:25;
  62:1
**episode (1)**
  75:7
**errors (1)**
  89:14
**espouses (2)**
  44:21,24
**estimate (3)**
  13:16;73:4;76:22
**evaluating (1)**
  71:8
**evaluation (4)**
  17:23,25;19:2;36:23;
  37:2;47:15
**evaluations (2)**
  13:5;38:2
**even (2)**
  35:13;52:12
**events (1)**
  73:11
**evidence (3)**
  7:19;50:15;64:3
**exacerbate (1)**
  60:11
**exact (8)**
  13:14;19:21;25:16;
  30:23;31:8;46:9;65:4;
  86:20
**exactly (1)**
  72:20
**Exam (1)**
  51:14
**EXAMINATION (1)**
  4:5
**example (1)**
  21:16
**except (3)**
  6:11,22;7:13
**exception (1)**

90:8
**Excuse (1)**
  54:9
**Exhibit (53)**
  4:21;5:13;6:2,3,4,7,
  18;7:6,7,10,11,15,18,
  16,18,19,21,24;9:4,21,
  24;10:2,5;11:8,9;
  13:23;14:6,16;17:16;
  21:4,5,8;28:5;30:6;
  31:15,18,22,23;36:7;
  39:22,23;51:12;64:8;
  69:14,20;70:21,25;
  71:13,14;72:22;82:18;
  85:14,17
**exited (2)**
  31:6;45:2
**experience (1)**
  78:24
**expert (1)**
  78:15
**explain (2)**
  32:7;70:8
**explained (1)**
  81:12
**explanation (1)**
  51:24
**exploding (1)**
  48:6
**explosives (4)**
  65:19;67:4,15;78:15
**express (1)**
  87:12
**expressing (1)**
  44:11
**Extension (2)**
  31:24;32:3
**extent (1)**
  34:18
**extreme (7)**
  41:6,19;42:7;43:10;
  54:4;78:17;79:2
**extremely (1)**
  65:20
**eye (1)**
  52:25

## F

**face (1)**
  74:18
**Facebook (12)**
  78:21;81:18,25;82:2,
  3,6,13,16,21;84:20,22;
  85:8
**facilities (2)**
  35:8,23
**facility (7)**
  32:17,21,24;33:16;
  34:22;37:20;38:3
**fact (9)**
  5:3;6:20,23;10:25;
  11:4;54:3;55:10,11;

Case 3:13-cv-00328-HEH-MHL   Document 90-6   Filed 11/18/13   Page 28 of 57 PageID# 1330

Brandon Raub v.                                                          Michael Campbell
Daniel Lee Bowen, et al.                                                October 1, 2013

84:19
**Factors (2)**
  63:17;68:17
**facts (1)**
  66:20
**fair (7)**
  14:11;16:17,22;47:5,
  7;57:23;58:3
**fairly (2)**
  4:13;31:2
**familiar (1)**
  82:2
**far (8)**
  22:9;27:21;32:13;
  52:8,9;68:14;75:18;
  87:21
**fax (2)**
  40:7;62:23
**faxed (1)**
  80:14
**FBI (7)**
  23:8;27:14;28:14;
  29:10;41:6;72:14,25
**fear (1)**
  47:23
**federal (4)**
  42:1;68:8;72:13;
  78:18
**feel (4)**
  54:12;55:20;63:9;
  65:2
**feeling (2)**
  48:6;68:14
**feels (1)**
  55:11
**fell (1)**
  75:8
**fellow (2)**
  10:18;68:7
**felony (1)**
  66:7
**felt (6)**
  54:1;57:14;65:19;
  78:16;79:2,11
**field (1)**
  76:7
**Fifteen (1)**
  81:4
**fifth (1)**
  59:13
**figure (1)**
  28:23
**filed (4)**
  6:10,22;12:8;69:14
**filing (1)**
  12:6
**fill (1)**
  19:3
**final (1)**
  33:1
**find (4)**
  17:12;35:24;49:16;
  79:7

**Findings (1)**
  51:18
**finds (1)**
  68:13
**First (18)**
  4:20;17:16;25:1,4;
  31:11,14,23;32:8;33:1,
  3,21;36:7;37:12;43:21;
  49:19;59:9;60:7;61:3
**five (3)**
  41:13;59:7;86:2
**five-minute (1)**
  81:6
**flag (1)**
  53:5
**flags (3)**
  47:25;50:5;67:25
**focus (1)**
  77:4
**focused (1)**
  14:12
**focusing (1)**
  86:25
**following (2)**
  85:17;90:9
**follows (1)**
  4:4
**foregoing (1)**
  90:6
**form (36)**
  11:15;13:7;15:7;
  18:2;21:1,2;24:1,10,
  18;26:10;34:7;37:4,14;
  38:4,16;45:18;50:11,
  19;51:11;52:2,14;
  53:12;56:10,15,20;
  58:24;62:5;69:16,19;
  73:1;74:21;77:9,18;
  83:13;87:15;88:22
**former (1)**
  67:16
**forms (1)**
  70:1
**forth (3)**
  69:1,8;70:5
**Forty (1)**
  77:2
**forward (1)**
  56:17
**found (2)**
  65:24;66:3
**foundation (3)**
  8:16;66:24;67:8
**four (3)**
  35:18;41:13;86:2
**fourth (3)**
  47:11;59:11;86:8
**friends (8)**
  9:13;10:18;28:10;
  41:2,5,18;43:5,25
**from/sent (3)**
  8:6,7,7
**front (2)**

69:24;71:1
**function (1)**
  61:24
**functioning (5)**
  59:14;61:21;62:10,
  15,16
**Further (7)**
  40:24;46:18;47:15;
  51:18;63:16;79:6;
  89:22
**future (5)**
  78:5,9;79:19,20;80:4

**G**

**GAF (2)**
  61:17,18
**game (1)**
  52:12
**gave (10)**
  30:24;42:1,3;50:2;
  62:1;72:14;83:1,2,3,7
**gentleman (1)**
  11:25
**given (3)**
  42:14;81:22;82:25
**giving (2)**
  24:9;61:22
**global (2)**
  59:13;61:21
**goes (2)**
  24:8;32:2
**good (4)**
  4:7,8;31:9;32:11
**Gotcha (1)**
  40:6
**government (15)**
  43:12;45:3,6,7;48:5,
  5,6;53:19;54:4,16,17;
  55:8;68:8;86:11,14
**Granderson (3)**
  26:24;27:9;30:21
**Granger (2)**
  74:8,9
**greater (2)**
  66:21,25
**grossly (2)**
  51:4,7
**ground (1)**
  75:8
**group (6)**
  60:3,9,14,15,18,22
**guidance (3)**
  89:3,7,8
**gunning (1)**
  49:14
**guy (3)**
  68:9,9,16

**H**

**Habit (1)**
  81:1

**hallucinations (3)**
  50:15,16,17
**handwritten (6)**
  20:22,24;21:7,8,11,
  17
**hanging (1)**
  25:20
**Hanover (2)**
  13:2,21
**happen (1)**
  49:18
**happened (3)**
  44:4;79:4,7
**happening (1)**
  57:15
**hard (2)**
  82:12;84:13
**harm (4)**
  69:4,7;70:4,10;77:8,
  22;78:4,9;79:12,19
**harm's (1)**
  70:12
**heading (2)**
  10:14;40:25
**health (10)**
  13:5;37:20;38:3,15;
  59:10;66:8;73:8;75:23;
  76:8,12
**hear (1)**
  26:16
**heard (3)**
  67:24;73:22;80:10
**heart (1)**
  49:11
**help (2)**
  63:9,10
**helpful (1)**
  56:16
**hereby (1)**
  90:6
**himself (3)**
  68:13;70:10,12
**holds (1)**
  61:6
**home (2)**
  65:22;73:18
**Homicidal (6)**
  63:20;64:4,12,13,25;
  65:8
**homicide (1)**
  64:20
**hospital (6)**
  19:12;32:10,23;
  33:19;36:5;80:15
**hours (2)**
  4:12;38:3
**house (4)**
  30:24;31:1;49:20;
  65:17
**Howard (15)**
  30:2,4,7,16,19;64:7;
  70:22;71:12,21,25;
  72:14;81:17,22;82:18;

84:2
**Hudson's (1)**
  35:18
**human (1)**
  86:22
**hundred (2)**
  12:14,15
**hung (1)**
  26:7
**HURD (119)**
  4:6,9;5:12;6:5,17;
  7:5,8,18,22;8:16,17,21;
  9:2;10:3;11:7,10,19;
  12:4;13:11;14:2,4;
  15:4;16:5,9,12,17,21;
  17:7;18:4,7;21:4,6;
  24:5,14,23;26:13;
  31:10;34:4,20;35:15,
  22;36:16;37:7,10,17;
  38:7,19;39:9,19,23,24;
  40:5,7,10;42:16,21;
  45:4,21;46:3,6,13,24;
  47:4;49:2;50:14,22;
  51:7,9;52:5,16,20;
  53:15,24;54:8,18;55:5;
  56:12,14,25;57:4,18;
  59:19;62:14,17;66:11,
  14,19;67:5,12;73:5;
  75:2,21;76:23;77:15;
  78:1;79:24;80:3,8,13;
  81:2,5,10,14;83:16;
  84:1;85:15,21,23,25;
  86:6,7;87:17,25;88:4,7,
  17,24;89:1,10
**hurt (1)**
  78:17

**I**

**idea (2)**
  55:8;87:19
**ideation (5)**
  63:21;64:4,12,25;
  65:8
**identified (1)**
  9:20
**identify (6)**
  4:20,24;6:7;7:10,24;
  10:5
**illness (2)**
  66:4;69:1
**impacts (1)**
  61:24
**improper (2)**
  62:10,12
**inaccurate (1)**
  5:20
**inappropriate (4)**
  15:8;10,23;16:24
**include (1)**
  42:25
**includes (1)**
  85:17

Case 3:13-cv-00328-HEH-MHL   Document 90-6   Filed 11/18/13   Page 29 of 57 PageID# 1331

Brandon Raub v.                                                                Michael Campbell
Daniel Lee Bowen, et al.                                                       October 1, 2013

indicate (5)
19:1;64:14;77:20;
78:3;89:13
indicated (1)
86:17
inform (1)
29:14
information (21)
15:17,24;16:25;
17:10;18:24;24:21;
29:16;33:10,17,22,23;
34:1;40:18,22;41:21;
42:2,12,13;55:17,18;
63:12
informed (3)
85:18;86:1,9
in-person (1)
29:22,24
Insight (6)
55:15,18;56:6;57:6,
7,11
insistence (1)
42:10
Insofar (1)
88:18
instructing (1)
16:12
intake (7)
20:10;32:23,25;33:6,
7,8;35:7
intended (1)
64:20
interactions (1)
32:9
Internet (10)
40:18;43:1;47:14;
48:20;82:8;83:12,21,
24;84:20;86:18
Interrogatories (1)
4:22
interrupt (1)
56:12
interview (18)
18:19;19:20,25;20:7,
12,23;21:9;23:25;
24:15;29:22,25;45:17;
46:8;68:11;70:17;71:8,
16;76:7
interviewed (10)
19:17;20:4;22:7,13;
23:19;48:1,1;71:19,23;
72:4
interviewing (9)
9:15;21:23;23:2,4,7,
10,13,20;29:3
interviews (1)
24:9
into (13)
6:2;7:19;11:2;24:9,
12;27:1,2,10;45:16;
55:10;57:7;65:25;76:7
introduced (1)
6:2;7:5,19;11:7

involuntarily (1)
37:13
Involuntary (1)
6:9,21;7:12;11:11;
12:8
involved (5)
12:18;13:5;33:23;
36:18;73:14
involving (1)
57:8
issue (7)
12:1;14:19,24;15:6;
62:9,10;66:8
issues (3)
13:6;76:8,13
issuing (1)
11:21
IV (12)
58:9,12,14,16,17,24,
25;59:1,3,6,24;60:2

J

jail (19)
9:15;20:3,4,7,20;
21:24;23:6;27:2,10;
29:3;31:5,7,11;37:19,
22;38:2,9,11;65:25
jet (1)
55:9
job (3)
12:20;16:15;38:10
jobs (1)
19:10
John (1)
36:2
Judge (2)
35:18;66:18
Judgment (1)
57:24
justified (2)
65:2;68:14
juvenile (1)
13:2

K

keep (1)
16:15
kept (1)
32:14
killing (1)
86:10
kind (8)
9:7;12:18;49:4;51:6;
52:24,25;68:2,5
kinds (2)
21:14;42:19
knew (5)
44:7;65:5,6;78:13,14
know-how (1)
78:24
knowledge (3)

65:19;67:2;90:7
known (1)
75:6
knows (1)
54:16

L

labeled (1)
69:20
labile (2)
53:6,10
lack (4)
56:6;69:7;70:5,11
laid (1)
75:8
language (2)
71:24;86:19
Larry (4)
27:24,25;29:13,20
last (5)
9:17;19:10;25:15;
28:6;45:12
lasted (1)
17:24
later (3)
55:14;58:1;77:13
law (6)
9:11;28:7,12,17;
74:10;75:12
law-abiding (1)
66:3
lawsuit (1)
4:10
lawyers (1)
89:11
lay (3)
8:16;74:18;82:18
lead (3)
49:23;55:12;79:1
leader (3)
48:7;49:12;54:14
leads (2)
60:21,21
left (1)
81:3
less (2)
12:16;76:18
life (1)
49:13
likelihood (1)
70:12
likely (1)
79:19
Limited (1)
4:22
limits (2)
55:24;56:2
line (11)
9:5;17:17;18:24;
31:24;40:25;47:11;
63:3,11;85:23,24;86:8
lines (5)

28:6;41:14;65:5;
72:1;86:3
lion (1)
49:11
listed (2)
27:20;90:9
listening (1)
24:3
little (7)
10:14;55:15,17;57:5,
6,7,17
located (1)
20:10
long (8)
17:23;19:20;25:15;
45:12,16;46:7;51:21;
56:18
look (17)
5:6,8;13:22;14:5;
17:16;18:18;28:5,5;
30:5;39:15;43:21;53:5;
59:24;60:10;62:20;
68:16,20
looked (1)
32:10
looking (7)
16:18;31:14,23;35:9;
48:23;52:25;63:8
losing (1)
84:21
lost (6)
44:2;73:17,20,23;
74:16;75:7
lot (5)
32:9,9;38:9;61:9,12
loud (1)
9:10

M

magistrate (1)
32:4
magistrate's (1)
20:10
maintain (1)
63:4
majority (1)
76:19
making (5)
46:20;52:25;70:9;
75:19;76:16
man (3)
27:16,17;29:9
management (1)
32:15
manager (2)
28:1;29:14
Manual (2)
58:14,23
many (9)
11:12,23;12:7;39:10;
47:25,25;49:24;72:24;
76:1

Marine (7)
9:17;29:5;44:8;67:7,
13,17;68:7
Marines (4)
10:18;68:7;78:12,13
mark (5)
55:21;62:23;63:7,13,
20,23;64:2
marked (22)
4:21;6:4,7,18;7:7,10,
21,24;9:21;10:2,5;
11:9;13:23;14:6;30:6;
54:12,19;63:5,12;64:8;
70:21;85:17
may (11)
14:18,23;15:6;18:2;
36:1;72:22;77:13;
79:15;81:5;87:16;
89:15
McGuire (2)
36:4,4
mean (24)
15:9,12,14,15,16,18,
19;19:5;22:3;32:1;
36:9,12,15;44:9;45:6;
52:1,17,21,22;60:5,7,8;
63:13;80:10
meaning (1)
43:24
means (1)
15:23;32:2
meant (5)
17:14;46:22;59:24;
61:11,18
medical (2)
59:11;75:7
Men (1)
49:22
mental (14)
13:5;37:19;38:2,15;
51:14;59:9;60:12;66:4,
8;69:1;73:8;75:23;
76:8,12
mentioned (2)
57:20;77:12
MICHAEL (11)
4:3,21;10:23;18:15;
21:12,15;25:21,25;
26:9,22;29:21
middle (4)
9:7;68:21;85:24;
86:3
might (2)
26:15;52:11
military (1)
67:18
MINCKS (98)
5:6,10;6:13;8:14,19,
25;11:15,25;13:7;15:2;
16:3,7,11,14,20;17:3;
18:1,5;21:3,5;24:1,10,
18;26:10;34:7,15;
35:11,16;36:15;37:4,9,

14;38:4,16;39:5,17;
40:2,6,9;42:15,18;
45:18,25;46:11,19;
47:3;48:24;49:1;50:11,
19;51:6;52:2,14,18;
53:12,22;54:6,10,24;
55:2;56:10,13,18;57:1,
10;59:18;62:5,9,12;
66:9,12,16,23;67:8;
73:1;74:21,25;75:15;
76:20;77:9,24;79:21,
25;80:5,9;83:13,22;
85:12,20,22;87:15;
88:2,6,15,21;89:5,15,
17

**mind (3)**
43:9;48:20;54:13

**mine (1)**
48:23

**minors (1)**
62:24

**minutes (9)**
5:16;19;24;25:18;
45:16,22;46:15;74:17;
75:9;81:4

**missile (1)**
55:10

**moment (5)**
42:25;44:13;69:24;
82:18

**more (11)**
12:12,13,14;28:23;
39:13;41:19;42:7;
43:10;46:23;59:10;
76:17

**most (2)**
67:6,13

**mother (4)**
27:13;44:14;60:24;
61:2

**move (1)**
4:13

**MSW (1)**
10:23

**much (6)**
41:19;42:7;43:10;
70:23;80:24;81:2

**myself (3)**
37:24;38:24;77:17

**N**

**name (8)**
4:9;27:2,18;30:10,
14;33:11;34:10;77:11

**named (1)**
30:7

**names (4)**
21:25;22:21;60:20;
73:13

**Narrative (1)**
10:14

**natural (1)**

52:8

**nature (1)**
29:12

**near (5)**
78:5,9;79:19,20;80:4

**nearby (1)**
23:18

**need (3)**
63:8,16;80:1

**needed (1)**
63:9

**new (3)**
44:1;49:12;58:18

**Next (8)**
7:9;9:9;20:10;58:8;
62:18,19;63:11,17

**night (2)**
29:13;30:3

**normal (2)**
55:24;56:2

**NOS (3)**
59:16,20,21

**notation (2)**
10:22;40:8

**notations (1)**
21:7

**note (4)**
10:9,10;11:1;14:2

**notes (9)**
18:18;20:22,24;21:1,
8,11,14,21,22

**noticed (1)**
61:4

**notifying (1)**
68:8

**number (6)**
12:11;14:7;21:18;
30:13;39:18;43:1

**O**

**oath (1)**
5:4

**object (24)**
6:13;13:7;16:15;
18:1;24:1,10,18;26:10;
37:4,14;38:4,16;45:18;
50:11,19;52:2;53:12;
56:10,20;62:5;73:1;
74:21;77:9,25

**objecting (1)**
16:14

**objection (31)**
6:15;8:14,19,25;
11:15,25;16:3,7,11;
17:3;34:7,15;46:19;
52:14,18;54:24;56:15,
19;57:10;59:18;66:23;
75:15;77:17;79:21;
80:5;83:13,22;87:15;
88:15,21;89:5

**objectionable (1)**
88:22

**observations (1)**
74:13

**observe (3)**
50:23;51:1,4

**observed (1)**
42:13

**observer (2)**
74:20;75:12

**obtain (3)**
66:4,7;88:14

**obtained (1)**
24:21

**occasions (5)**
11:12,23;12:8;72:24;
73:6

**occur (3)**
5:20,23;13:13

**occurred (1)**
44:6

**off (8)**
22:17;33:25;42:11;
60:2,9,13,21;72:10

**offer (3)**
55:18;58:3,6

**offering (1)**
55:17

**offhand (1)**
17:11

**office (1)**
20:10

**officer (16)**
22:1,2,4;24:3;27:1,3,
4,6,7,10;28:17;30:21;
31:4;37:18;42:1;74:11

**officers (5)**
9:12;22:20,24;28:8,
12

**Old (1)**
49:13

**older (1)**
62:25

**omitted (1)**
5:24

**oncoming (1)**
48:8

**one (25)**
20:14,19;24:9;28:15,
17,23,25;31:16,19;
39:13;40:3;41:13,22,
23,25;43:1;48:10;
49:19;58:18;67:25;
77:14;78:12;79:1;86:2;
88:19

**ones (1)**
54:23

**on-line (1)**
86:10

**only (5)**
28:17,25;56:20,22;
87:16

**opinion (5)**
15:12;75:13;87:12,
14;88:13

**opposed (2)**
37:3;47:1

**order (5)**
11:14,22,24;35:19;
36:2

**ordered (1)**
66:18

**orientation (2)**
55:25;56:2

**others (5)**
15:20;17:15;22:8;
45:9,10

**Otherwise (1)**
59:22

**out (12)**
6:25;9:10;19:3;
28:23;35:21;49:20;
58:19,20,22;76:7;78:4;
79:7

**outside (5)**
24:21;35:11,20;66:9,
17

**over (12)**
12:16,17;18:18;26:8,
21;32:2;39:2;51:10;
75:13;76:11,16;77:4,6;
78:3;86:18;87:9

**overhear (1)**
23:25

**overheard (1)**
24:4

**P**

**page (33)**
9:5;28:6,7;31:15,23;
36:7;39:16,17,20,20,
21;40:3,24;47:11;
51:14;53:11;55:14;
58:1,8,9;62:18,19,21,
23;68:21;69:23;71:3,3,
15,15;85:19,20,21

**Page/Line (1)**
90:11

**pages (4)**
6:8;9:18;14:7;51:10

**paragraph (7)**
10:17,21;35:18;
85:23;86:4,5,8

**paranoia (4)**
45:3,5;53:20;56:8

**paranoid (4)**
53:21,25;54:1,11

**Paris (55)**
18:15;21:12,15;25:5,
20,22,25;26:9,17,22;
29:21;36:22;37:1,18,
25;38:24;39:3,11;
40:23;41:9,25;65:15;
72:2,6,10;73:16;74:1,
12,16;75:4,6;77:3,6,20;
78:2,7;79:15,17;83:10,
11,18;84:14,15,18,25;

85:3,17;86:1,9,17;
87:9;88:16,18,23,25

**part (14)**
6:14;14:25;17:18;
28:6;35:15;38:10;
40:11;48:21;54:16;
58:10;59:9;63:1;68:16;
81:17

**Parthemos (4)**
45:2;46:5;81:9,13

**particular (5)**
6:23;14:20,25;15:7;
77:14

**partly (1)**
52:23

**Parts (2)**
52:4,6

**pauses (1)**
51:21

**Pentagon (5)**
48:6;55:11;57:8,20;
86:13

**people (12)**
22:9,15;24:17;27:20;
48:1;49:19;52:11;65:4;
73:13;76:11;78:17;
86:10

**percent (1)**
62:15

**perhaps (1)**
23:6

**period (6)**
12:17;19:13;25:19;
40:8;44:2;46:16

**perpetrated (1)**
86:11

**person (29)**
24:16,20;25:4;27:6,
16;28:14,15,23;29:8;
30:7;32:22,25;33:1,2,3,
7,9,13,18;37:11;44:6,
12;55:19;56:3;65:24;
66:7;77:14,21,23

**personality (1)**
59:10

**personally (1)**
42:14

**person's (2)**
27:18;33:11

**persuade (3)**
36:22;37:2,12

**pertain (1)**
10:10

**pertained (1)**
16:1

**Petition (9)**
6:9,14,21;7:12;12:6,
8;69:14,19;70:6

**phone (33)**
21:18;25:4,15,20,21;
26:2,5,7,9,16,21,21;
29:19,21;30:13;39:2,
10;72:6,10;73:16;

Brandon Raub v.
Daniel Lee Bowen, et al.

Michael Campbell
October 1, 2013

74:16;75:14;76:16;
77:4,7;78:3;79:15,18;
83:9,17;84:16;87:9;
88:12
**phrase (1)**
86:25
**physical (1)**
69:4
**pick (1)**
49:23
**place (2)**
37:20;56:3
**placement (1)**
34:22
**plan (2)**
64:14,14
**Planned (1)**
49:10
**please (8)**
4:15;9:10;13:22;
19:23;39:16;41:17;
56:12;86:25
**plural (1)**
28:22
**pm (5)**
17:17;18:25;81:8,8;
89:20
**point (8)**
45:13;56:16;71:7,10,
11;77:4;79:12;89:16
**police (7)**
22:1,2,4,20,24;27:4,7
**political (2)**
44:23,25
**politics (1)**
52:13
**poor (1)**
57:23
**Poplar (11)**
32:10,23;33:2,18;
34:6,12,21,25;35:3;
80:15,21
**portion (5)**
14:13,19;15:7;51:17;
58:24
**posed (1)**
14:13
**position (1)**
23:24
**possibilities (2)**
41:24;87:16
**possibility (5)**
17:15;32:11,11;37:1;
77:19
**possibly (1)**
67:9
**post (2)**
81:18;82:16
**posting (4)**
40:17;41:6;43:1;
44:9
**postings (1)**
84:12

**posts (3)**
81:25;82:13,22
**potential (4)**
54:13;63:24;65:11;
67:25
**potentially (1)**
65:20
**practice (4)**
76:9,10,19;80:19
**prescreen (5)**
13:9,12,23;31:17;
51:12
**prescreened (1)**
24:16
**Prescreening (20)**
7:11;9:18;11:13,23;
14:6;24:20;33:25,25;
34:14;35:3;39:15,21;
62:19,20;68:21;69:16;
70:3,15;77:5;80:14
**presence (2)**
19:14;64:4
**present (4)**
4:1;21:24;22:9;81:9
**presented (4)**
14:19,25;15:7;69:15
**presentencesic (1)**
69:23
**Presenting (2)**
39:25;40:11
**preserve (1)**
56:21
**President (3)**
41:7;77:12,20
**pretty (4)**
66:2,6;70:23;80:24
**previously (2)**
13:5;72:24
**printouts (2)**
82:13,21
**prior (9)**
11:11,21;12:6;13:4,
9;39:1;43:25;58:19;
72:23
**privacy (1)**
24:8
**probable (2)**
87:11,13
**Probably (1)**
76:25
**probe (1)**
66:15
**process (3)**
70:23;71:7;88:23
**progress (3)**
10:9,10;11:1
**provide (3)**
9:12;28:8;47:14
**provided (3)**
9:15;11:13;29:3
**provisions (1)**
35:18
**Psychosis (1)**

59:15
**Psychotic (2)**
59:20,21
**pull (1)**
42:22
**pure (1)**
76:22
**purports (1)**
30:6
**put (9)**
21:1;43:17,20;77:11,
11,12;78:21;80:19,23
**puts (2)**
68:1;70:12

### Q

**quotations (3)**
43:17,20;50:3
**quote (1)**
41:20
**quoted (2)**
71:25;82:1
**quotes (3)**
50:1,2;78:21

### R

**radioactive (1)**
86:15
**ran (1)**
13:1
**Randolph (1)**
36:3
**range (2)**
13:15;53:10
**rather (2)**
38:2;47:8
**Raub (87)**
4:10;6:10,21;9:15;
10:11;11:1,12,22;12:7;
16:1;17:1,24;19:14;
20:4,23;21:9,23;22:7,
13;23:3,8,14,19,25;
25:1,3;26:23;27:1,10,
11,22;28:3;29:3,17,25;
30:22;31:4,5,12;32:12;
33:14,18;34:13,22;
35:10,25;36:23;37:2;
45:14;46:7;47:7;50:16,
24;51:2,5;65:17;66:21;
70:17;71:8,17,23;72:4,
16,23;74:6;77:8,22;
78:4,8;79:11,18;81:16,
22;82:9,9,22;83:12,21;
84:6,16,19;85:1,4,18;
86:9;87:8,11
**Raub's (12)**
9:13,16;28:9;29:4;
44:14;45:6;64:13;
73:18;81:18;82:13;
84:11;87:1
**read (21)**

5:16,23;9:9,23;41:4,
17;42:25;48:2;50:3;
67:24;70:21;72:2;
78:22,22;81:16,25;
82:8,12;89:12,17;90:6
**reading (2)**
5:19;49:17
**reads (1)**
86:4
**real (1)**
82:17
**reality (1)**
57:16
**really (5)**
22:16;28:16;38:18;
57:16;82:7
**reason (8)**
17:12;33:13;40:15;
57:5;63:15;70:14;
88:19;90:11
**reasons (6)**
17:5,6,8;38:21;
57:24;88:20
**rebellion (1)**
79:2
**recall (45)**
5:22,25;24:7;26:12,
14,19;27:2,18;28:4;
30:4,18;32:19;33:11;
37:21,24;39:13;41:11,
23;58:5,7,22;65:23;
66:1;68:19;72:17,17,
17,20;73:3,10,13;74:4,
14;77:14;80:17;83:5,6,
8;85:2,3,5;87:5,19,22;
88:10
**recap (1)**
34:12
**receive (1)**
70:22
**received (10)**
8:3;9:13;18:14;28:9;
42:12;64:6;67:3;71:10,
11,16
**receiving (1)**
71:4
**recently (4)**
41:19;42:8;43:10;
61:4
**receptionist (1)**
33:4
**Recess (1)**
81:8
**recognize (1)**
10:7
**recommend (1)**
89:17
**record (4)**
6:3;8:4;14:2;75:22
**recording (1)**
20:12
**records (1)**
11:2

**red (4)**
47:25;50:5;53:4;
67:25
**refer (2)**
18:12;48:19
**reference (2)**
11:16;72:3
**referenced (1)**
39:17
**Referral (2)**
40:15;43:11
**referred (4)**
42:3,16,24;72:6
**referring (7)**
9:22;21:3;42:6,18;
47:19;56:6;85:14
**refers (1)**
36:17
**reflect (1)**
53:20
**refused (1)**
15:19
**register (1)**
52:23
**regular (1)**
52:10
**rejected (1)**
34:21
**relationship (1)**
44:1
**relevant (1)**
63:12
**Reliability (1)**
58:2
**rely (1)**
64:3
**remember (3)**
21:25;27:23;86:20
**rendering (1)**
75:13
**repeat (3)**
12:3;26:14;77:17
**repeated (1)**
53:2
**rephrase (7)**
4:16;11:20;12:5;
18:8;46:3;84:24;88:1
**Report (24)**
7:11;9:18;10:10;
11:1;13:23;14:6,13,19,
24,25;31:17;34:14;
35:4;39:16,21;51:13;
62:19,20;68:21;69:16,
23;70:3,15;80:15
**reported (3)**
41:5;43:6,8
**REPORTER (2)**
81:4;89:13
**reports (2)**
34:1;48:2
**represent (1)**
4:9
**represents (1)**

Case 3:13-cv-00328-HEH-MHL   Document 90-6   Filed 11/18/13   Page 32 of 57 PageID# 1334

Brandon Raub v.                                                                    Michael Campbell
Daniel Lee Bowen, et al.                                                            October 1, 2013

14:12

**request (7)**
28:18,18,24;32:3;
33:19,24;75:20

**requested (1)**
47:14

**requesting (1)**
80:21

**resolution (1)**
19:4

**respect (3)**
56:3,8;65:7

**respondent's (1)**
70:11

**revenge (2)**
49:6;64:9

**reviewed (2)**
5:3;34:14

**Revised (1)**
58:15

**revolution (5)**
48:8;49:22;54:14;
55:12;79:2

**rhetoric (2)**
42:9;43:1

**Richmond (1)**
49:8

**right (18)**
12:5;17:11;18:4;
20:25;25:14;40:14;
42:23;45:20;51:16;
53:9;60:3;68:12;71:1;
81:2;86:5;89:10,12,15

**right-hand (3)**
41:1;47:12;62:22

**rise (1)**
79:1

**risk (6)**
54:13;63:17;65:3;
68:17;70:12;78:17

**room (16)**
14:1;22:12,14,15,17,
18,25;23:8,15,17;31:6;
33:20;45:2;46:5;80:9;
81:13

**rooms (1)**
22:16

**routinely (1)**
38:1

**run (1)**
49:14

## S

**safety (2)**
38:21;75:17

**saith (1)**
89:22

**same (29)**
7:3;8:19,25;12:20;
16:11;17:3;40:3;41:12;
44:21,23;45:1;52:18;
54:23;56:7;57:10,24;

58:1;61:10;63:15;
68:21;69:15,15,25;
75:15;80:5,5;83:22;
88:21;89:5

**saying (7)**
43:22;44:3;45:23;
46:17;58:2;61:8;73:4

**scale (2)**
59:13;62:2

**scene (8)**
73:18,21,24;74:2,11,
17,20;75:13

**School (3)**
49:12,13;61:25

**scope (7)**
35:12,17,17,19;66:9,
17;76:20

**score (1)**
61:17

**searching (1)**
52:7

**Second (7)**
9:5;33:24;40:25;
59:10;85:23,23;86:3

**secret (11)**
9:14;23:14,18;27:15;
28:15;29:2,8,10;53:6;
72:14,25

**section (3)**
10:13;39:25;41:12

**seeking (2)**
89:2,3

**seem (3)**
52:8,8,23

**seize (1)**
87:11

**seized (2)**
37:11;84:6

**seizing (1)**
37:3

**self-report (1)**
58:2

**send (1)**
33:25

**Sends (1)**
33:6

**senior (1)**
75:24

**sense (1)**
75:19

**sent (5)**
35:3;55:10;68:6;
80:15,17

**sentence (7)**
9:6;41:2,4,14,17;
42:25;48:21

**sentences (1)**
9:9

**September (1)**
86:12

**sequence (1)**
70:20

**Sergeant (1)**

26:24

**serious (5)**
68:9;69:4,7;70:4,10

**served (2)**
44:7;68:8

**service (14)**
9:14;23:14,18;27:15;
28:15;29:2,8,10;36:10,
18;53:7;67:18;72:14,
25

**Services (5)**
13:3;28:1;75:25;
76:2,6

**set (1)**
22:14

**seven (1)**
41:13

**several (6)**
5:16;8:6;19:10;
78:10,12,13

**Seyfarth (3)**
31:6;33:20;85:19

**shake (1)**
49:9

**shares (3)**
44:20;45:1,1

**sheet (4)**
80:16,18,20,20

**sheriff's (2)**
22:19,23

**shit (1)**
49:9

**show (5)**
6:1,6;7:9,23;10:4

**showing (1)**
4:19

**shows (1)**
43:22

**side (2)**
41:1;47:12

**signature (2)**
11:4,5

**signed (2)**
5:3;10:22

**Significant (1)**
51:18

**simply (1)**
64:25

**situation (8)**
19:4;24:13;30:24;
40:1,12;56:3;68:13;
87:20

**situations (1)**
57:8

**six (2)**
41:13;86:3

**Sixty (1)**
77:2

**slowed (1)**
51:25

**society (2)**
66:2,6

**somebody (2)**

42:14;83:7

**somehow (1)**
48:7

**someone (7)**
27:13;48:3;54:11;
65:18;75:12;76:7;79:3

**Sometimes (1)**
76:14

**son (2)**
44:21,24

**soon (1)**
49:23

**sorry (14)**
13:19,19;15:3;27:5;
36:24;45:24;47:6;
51:12;56:13;61:20;
66:5;69:17;75:1;81:19

**sounds (1)**
79:4

**source (1)**
24:21;40:22,23

**sources (1)**
41:22

**space (1)**
80:21

**speak (18)**
25:21;26:8,20,22;
27:11,21;28:2;30:2;
33:8;74:2,5,8,10,19;
75:11,20;76:11,15

**speaking (2)**
64:21,24

**speaks (1)**
8:15

**specific (12)**
50:10,21;71:20;
77:21,23;79:14;84:11;
86:21;87:1,2,7;88:11

**Specifically (5)**
45:11;48:10;64:13;
79:23;87:6

**Specified (1)**
59:22

**speculate (1)**
39:6;74:22

**speculation (2)**
74:22;75:16

**speech (2)**
50:23;51:25

**spittin (1)**
49:11

**spoke (12)**
27:12,12,13,23;33:1,
2,7;65:15;74:1;77:3,6;
83:25

**Springs (5)**
32:10,23;33:2,18;
34:6,13,21,25;35:3;
80:15,22

**staff (2)**
23:6;35:7

**stand (2)**
58:12,13

**standing (1)**
56:15

**stare (1)**
52:24

**start (2)**
49:10;64:11

**started (3)**
12:19;13:19;18:19

**starting (1)**
25:1

**state (3)**
25:23;41:20;43:5,6

**stated (1)**
32:16

**statement (15)**
5:14,21,24;9:23;
28:7;35:15,16;42:4;
45:6;47:16;65:14;
70:21;71:15;85:16;
86:23

**statements (17)**
49:4;64:6;65:3;
69:19,22;70:18;81:16;
83:11,20;84:19,22;
85:1,4,6;86:17;87:2,3

**States (5)**
53:19;54:16;55:8,10;
86:11

**Statistics (1)**
58:14

**Status (1)**
51:14

**Steve (2)**
86:6;89:10

**still (3)**
57:14;88:2,6

**stop (2)**
45:17;57:2

**stopped (2)**
45:14,23

**street (1)**
52:11

**strike (9)**
9:20;19:15;23:23;
24:24;29:19;64:18;
73:24;79:9;86:1

**strong (2)**
70:12;72:3

**subject (2)**
77:21;80:11

**submitted (1)**
5:3

**substance (1)**
86:15

**substantiate (1)**
64:4

**Suffer (2)**
69:6;70:4

**suffered (1)**
75:7

**suffers (1)**
70:10

**suggest (1)**

Case 3:13-cv-00328-HEH-MHL   Document 90-6   Filed 11/18/13   Page 33 of 57 PageID# 1335

Brandon Raub v.                                                                    Michael Campbell
Daniel Lee Bowen, et al.                                                            October 1, 2013

79:18
**Support (6)**
60:3,9,13,15,18,22
**sure (13)**
5:10;15:9;17:11;
23:5,5,16;25:12;27:14;
40:2;72:2;77:13;82:3,
15
**suspected (1)**
76:8
**sworn (2)**
4:4;5:14
**symptoms (1)**
51:19
**system (1)**
19:9

**T**

**talk (9)**
24:25;25:2;44:14;
46:7,18;76:17,18;77:2;
88:3
**talked (9)**
45:22;54:23;61:7;
69:24;72:1;84:15,18,
25;85:4
**talking (7)**
42:10;43:2;45:14,17,
23;54:22;68:10
**tape (2)**
20:17,21
**target (1)**
64:20
**TDO (3)**
29:15;32:2;47:14
**TDOs (1)**
12:1
**telephone (1)**
76:11
**telling (1)**
74:12
**temporary (4)**
11:13,21,24;13:6
**Ten (1)**
25:18
**ten-page (1)**
9:18
**terminate (2)**
61:15,15
**terminated (4)**
47:7;61:14,16;65:1
**terminating (3)**
46:25;47:1,8
**terms (1)**
8:11
**terrorist (1)**
86:12
**Terry (2)**
74:8,9
**testified (2)**
4:4;81:12
**testify (2)**

88:15,23
**testimony (4)**
53:23;66:24;81:20;
89:15
**theories (11)**
41:6;42:10;43:2,12;
44:10,21,22;57:9;
60:17,19,23
**theorist (1)**
43:25
**theorists (1)**
60:16
**Therefore (1)**
9:6,11;60:16
**thinking (2)**
48:4;55:13
**third (4)**
47:11;59:11;86:5,8
**thorium (4)**
55:9;57:9,21;86:16
**thought (7)**
15:23;16:23;17:11;
53:16;54:20;70:13;
88:23
**thoughts (3)**
18:3;70:9;78:25
**threat (3)**
77:22;84:11;87:7
**threatening (3)**
40:18;61:7;77:8
**threats (16)**
41:7;47:13;48:19,20,
22;50:4,6,7,10;86:10,
18,19,21,21;87:1,2
**three (3)**
41:13;86:2,2
**thus (1)**
27:20
**title (1)**
75:22
**today (4)**
4:12;17:8;81:12,20
**together (1)**
68:15
**told (10)**
32:20,25;38:22;41:8;
44:17,20;73:23;74:15;
82:4;87:3
**Tony (2)**
14:3;89:10
**took (1)**
5:16
**top (5)**
10:13;28:6;40:4;
71:3,15
**Total (1)**
76:3
**touch (1)**
44:2
**toward (3)**
47:12;62:20,23
**town (1)**
49:14

**TR (4)**
58:17,18,19,25
**Trade (1)**
86:13
**trails (1)**
55:9
**trained (1)**
65:18
**training (2)**
67:3,14
**transcribing (1)**
89:14
**Treatment (5)**
6:10,21;7:13;47:15;
79:7
**Troy (7)**
4:1;14:1,3;16:18;
39:22;62:7,11
**true (6)**
5:14;6:8;9:1;67:6,
13;90:8
**truly (1)**
49:18
**try (2)**
4:13,15
**trying (16)**
4:16;8:16;27:13,23;
28:22;35:24;36:22;
37:1,12;38:13;53:1;
66:14;70:20;79:10;
88:3,6
**Tucker's (1)**
36:1
**turn (3)**
9:4;51:10;62:18
**two (16)**
4:12;6:8;9:9,17;
28:6;41:13,22;42:18;
51:10;54:24;73:3,4,6,
10;86:2;88:20
**two-page (3)**
9:16,22;29:4
**typed (1)**
89:13
**typewriter (1)**
21:16

**U**

**unconnected (1)**
18:2
**unconscious (2)**
74:18;75:9
**under (13)**
5:4;10:14;30:13;
40:24;49:15;51:25;
54:20;55:14;57:6,24;
59:5;60:2;69:3
**undersigned (1)**
90:5
**understandable (1)**
46:1
**understood (1)**

77:7
**uniformed (4)**
22:3,5;27:3,6
**United (5)**
53:19;54:16;55:8,10;
86:11
**unknown (1)**
47:23
**unpredictable (7)**
47:13,18,20,22;48:8,
13,15
**unusual (3)**
37:8,9,11
**unwilling (2)**
33:15,16
**up (11)**
25:20;26:7;32:14;
45:20;49:9,23;59:24;
61:5;70:19;79:1;89:13
**upon (1)**
64:3
**upper (1)**
62:22
**upset (1)**
61:8
**use (2)**
48:24;58:23
**used (6)**
19:1;28:22;59:2;
71:24;84:10;87:6
**uses (1)**
49:1
**usually (5)**
19:3;32:12;33:8;
36:2;80:23

**V**

**various (1)**
14:7
**verbal (1)**
33:21
**verbatim (2)**
72:3;78:22
**verbiage (2)**
69:25;71:20
**veterans (2)**
67:7,14
**video (2)**
20:1,2
**videotape (2)**
19:25;20:15
**view (2)**
24:16;50:3
**views (1)**
53:19
**violence (1)**
44:12
**violent (2)**
44:12;86:21

**W**

**waive (1)**
89:15
**wall (1)**
22:15
**watched (1)**
54:12
**way (5)**
56:20;72:9;76:20;
77:1;85:14
**weapon (2)**
66:4,7
**weapons (8)**
63:23;65:11,16,21,
24;66:14,21;67:14
**weather (1)**
52:12
**what's (11)**
30:5;34:19;49:18;
55:19;57:3,11,16;62:7;
67:11;69:17;75:22
**whole (2)**
5:7,8
**William (1)**
4:9
**willing (6)**
32:16,17,21,24;
33:14;68:12
**within (4)**
40:14;55:24;56:2;
60:10
**without (1)**
37:12
**witness (3)**
16:12;43:4;48:12,14
**woman (1)**
27:16
**wonder (1)**
49:18
**wondering (2)**
62:11;67:21
**word (5)**
41:15;63:24;65:11;
84:11;87:6
**wording (7)**
30:23;31:8;65:4;
86:20;87:24;88:9,11
**words (4)**
10:18;41:2;43:17,20
**work (3)**
12:18,24;61:25
**worked (1)**
72:25
**worker (1)**
33:9
**world (3)**
49:16,25;86:12
**writing (1)**
48:21
**written (3)**
18:10;63:24;67:21
**wrong (2)**
61:9;62:7
**wrote (3)**

21:18;43:9;65:11

## Y

**ya'll (1)**
49:17
**years (1)**
73:10

## Z

**zero (3)**
59:13;62:2,3

## 0

**011 (4)**
36:11,12,15,17

## 1

**100 (4)**
59:13;62:2,3,15
**11 (2)**
36:8;86:12
**12 (2)**
12:12,13
**14 (1)**
62:24
**15 (5)**
19:24;25:18;45:16,
22;46:15
**15th (2)**
8:12,24
**16 (1)**
19:15
**16th (20)**
6:11,22;7:13;11:22;
12:7;24:25;27:11,21;
28:3;30:17,22;35:9,24;
39:11;46:8;58:21;
73:17;83:6,10,18
**1st (1)**
12:19

## 2

**2 (5)**
35:18;39:20,20,21;
85:21
**2001 (1)**
86:12
**2006 (1)**
13:21
**2008 (8)**
12:19,21,24;13:1,4,9,
17,20
**2012 (10)**
6:11,22;7:13;8:12,
24;11:23;12:7;19:15;
46:8;58:21

## 3

**3 (5)**
7:15;39:16,17;40:4,8
**3:42 (1)**
81:8
**3:53 (1)**
81:8
**37.2-809 (1)**
68:22
**3sic (1)**
7:11

## 4

**4:03 (1)**
89:20
**40 (3)**
61:18,22;62:1

## 5

**5 (4)**
9:5;28:6;71:3,15

## 6

**6 (3)**
28:7;71:3,15
**60/40 (1)**
76:25

## 7

**7:40 (5)**
17:17;18:10,12,13;
25:14

## 8

**8 (1)**
62:21

## 9

**9/11 (5)**
40:19;43:13;45:8;
57:8,21

EXHIBIT

A

TSS 10/1/13

PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRANDON RAUB,

     Plaintiff,

v.                                Case No. 3:13CV328

DANIEL LEE BOWEN, et. al.,

     Defendants.

## ANSWERS OF MICHAEL CAMPBELL TO LIMITED INTERROGATORIES APPROVED BY THE COURT

COMES NOW the Defendant, Michael Campbell, pursuant to the Court's Order of August 2, 2013, and states the following in response to the areas of discovery approved by the Court in paragraph 2 of its Order:

1.     Paragraph 2 (a) of the Order:

QUESTION: The nature and source of information supporting Michael Campbell's belief that Brandon Raub posed a danger to himself or others, including the extent to which Campbell learned about the content of emails attached to the Prescreening Report, which has been filed under seal:

ANSWER:     I am a senior clinician and certified prescreener for Chesterfield County Emergency Services. I am employed by the Chesterfield County Community Services Board ("CCSB"), more commonly referred to as the Chesterfield County Department of Mental Health Support Services. On Thursday, August 16, 2012, I was at work, in the Rogers Building, which houses the CCSB Emergency Services offices. At approximately 7:15 p.m. that evening, I received a telephone call from an employee of the Chesterfield County Emergency Communication Center ("ECC") requesting that I telephone Chesterfield County Police

Detective Michael Paris at a telephone number which was provided to me by the ECC employee. It is common for me to receive such requests, because Chesterfield County police officers seek input from me as to whether they have sufficient cause to detain temporarily an individual so that I can evaluate the individual under Va. Code §§ 37.2-808 and 37.2-809 and determine whether the individual needs to be evaluated by Emergency Services and requires emergency psychiatric services.   I receive numerous calls of this type from police officers every month.

Upon receiving the telephone call from the ECC, I immediately telephoned Detective Paris, who promptly answered the telephone.   Detective Paris informed me that he was conducting an investigation in conjunction with the FBI and Secret Service, involving a man named Brandon Raub.   He was at Mr. Raub's residence and had just finished interviewing Mr. Raub.   He informed me that Mr. Raub was an ex-marine who had made substantial, specific threats of violence against other people.   Detective Paris informed me that, in his judgment, the threats were sufficiently serious that he had probable cause to detain Mr. Raub for an evaluation pursuant to Va. Code § 37.2-808(G).

I asked Detective Paris what kind of threats Mr. Raub had made, whether he had indicated any intent to harm himself, what evidence he had that Mr. Raub was mentally ill, whether Mr. Raub was using drugs or alcohol, and whether he thought Mr. Raub was a threat to cause harm to himself or others.   Detective Paris informed me that Mr. Raub had made online threats about killing people, that he believed that the United States government had perpetrated the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, and that he believed that the government was committing atrocities on American citizens by dropping a radioactive substance called Thorium on them from airplanes.   Detective Paris indicated to me that these statements and threats were made over the internet, and he described the language of

some of the threats to me.  Although I do not remember the exact wording of any of the threats now, they were specific threats of violent action against human beings.

Detective Paris further informed me that the FBI had been alerted to Mr. Raub's potential threat by another former marine who had been a superior officer to Mr. Raub when they were in the U.S. Marines Corp.  This other marine had indicated that Mr. Raub's behavior had changed recently by becoming more extreme.  According to the other marine, Mr. Raub's behavior had become more odd and unusual.  The other marine was concerned that Mr. Raub was the kind of person who might carry out the threats he was making.  Detective Paris expressed to me his concern that, because of his military training, Mr. Raub had the knowledge and experience necessary to carry out his threats.  Detective Paris also expressed concern that Mr. Raub might have access to weapons and explosive materials.  Detective Paris also informed me that Mr. Raub did not appear to be using alcohol and did not appear to be a threat to cause harm to himself, but he was unsure as to whether or not Mr. Raub was taking any drugs.

I also asked Detective Paris to describe Mr. Raub's behavior during the course of Detective Paris' interview of Mr. Raub.  Detective Paris indicated that while Mr. Raub was speaking to him, Mr. Raub appeared preoccupied and distracted.  Mr. Raub would make eye contact with Detective Paris for a few seconds, but then his eyes would rove away while he continued to talk before returning to Detective Paris.  In my professional experience, this phenomenon can sometimes be evidence of psychosis.  It can indicate that the subject is distracted by some internal stimulus. Detective Paris also informed me that Mr. Raub had rapid mood swings during their conversation – another common symptom of mental instability – and that when Detective Paris asked him about the specific threats which he had made, Mr. Raub would not answer his questions.  Detective Paris also indicated that Mr. Raub was extremely

serious and intense during the entirety of the conversation, and that he never joked or expressed any kind of light-heartedness.

After describing these symptoms to me, Detective Paris conveyed to me that as a result of his interview with Mr. Raub, he shared the concerns of Mr. Raub's marine acquaintance that Mr. Raub represented a threat, in the immediate future, to harm other individuals. Based upon the information which Detective Paris shared with me, I agreed with Detective Paris. I believed that Detective Paris had confirmed that the information which he had received from Mr. Raub's marine acquaintance was credible, that the change in Mr. Raub's behavior, and his demeanor during his conversation with Detective Paris were possible evidence of mental illness, and that Mr. Raub was likely to have the means, knowledge, expertise, access, and desire to harm other individuals. In my clinical experience, there was sufficient evidence, and there were sufficient safety concerns, to support the detention of Mr. Raub for a mental health evaluation. I did not ask to speak with Mr. Raub over the phone because I already had more than enough evidence based on Detective Paris' first hand observation to warrant an evaluation.

I informed Detective Paris that I concurred in his judgment and thought that Mr. Raub should be temporarily detained and brought in so that I could evaluate him in person to determine if he needed to receive additional mental health emergency services. After I informed Detective Paris that I concurred with his evaluation, we concluded our conversation. The conversation lasted approximately 10-15 minutes.

Approximately 30 minutes later, Mr. Raub arrived at the Chesterfield County Jail, where I performed my evaluation of him. He was transported there by Chesterfield County Police Officer Daniel Bowen. Also present was Chesterfield County Police Sergeant Russell Granderson.

I interviewed Mr. Raub for approximately 15 minutes while he was at the Jail. I was unable to interview him for a longer period of time because after the first 15 minutes, Mr. Raub informed me that he "chose not to answer" any more of my questions. During the 15 minute interview, I observed in Mr. Raub the same preoccupation and distractability which Detective Paris had described to me in our telephone conversation. Observing this phenomenon strengthened my opinion that Mr. Raub was responding to some internal stimulus. Mr. Raub also described to me his belief that the 9/11 terror attacks were perpetrated by the United States government, and that the United States government was exposing the American public to Thorium, a radioactive material, by dropping it on people from airplanes. Mr. Raub told me that a revolution was about to begin, and that he was going to lead it. I considered these statements to be evidence of paranoia and delusions of grandeur. I also asked Mr. Raub if he felt justified in following through with the threats which had caused the law enforcement officials to detain him, and he responded by saying "I certainly do, wouldn't you?"

I still needed to review all of the evidence of Mr. Raub's violent tendencies, including information concerning the specific threats which Mr. Raub had made. I was aware that the law enforcement officials knew the exact wording of the threats that Mr. Raub had made, as communicated to me by Detective Paris when we had spoken by telephone when Detective Paris was at Mr. Raub's home. Although one of the law enforcement officers had provided me with copies of some of Mr. Raub's Facebook posts, these posts were not specific enough or threatening enough, in my opinion, to meet the standards for a temporary detention order, and they also did not provide the input from Mr. Raub's marine acquaintance about the recent changes in Mr. Raub's behavior. Therefore, I asked the law enforcement officers to provide me with the communications which they had received from Mr. Raub's friends. When I did that, a

secret service agent, who had arrived at the Jail while I was interviewing Mr. Raub, provided me with a copy of the two page email from Mr. Raub's marine acquaintance that I attached as the last two pages of my 10-page Prescreening Report.

After I read this email, I was convinced that Mr. Raub met the standards under Va. Code §37.2-809 for the issuance of a temporary detention order so that he could receive further evaluation and mental health treatment. I left the Jail and returned to my office where I finished filling out the Prescreening Report which I had begun filling out while I interviewed Mr. Raub. At the same time, I began the process of finding a mental health facility where Mr. Raub could be admitted for further evaluation. It had been my hope that Poplar Springs Hospital, which has an excellent mental health facility for treating military veterans, would be able to treat Mr. Raub. However, Poplar Springs could not accommodate Mr. Raub, so I arranged for him to be admitted to John Randolph Medical Center. Once I had made arrangements for Mr. Raub to be admitted to John Randolph, I completed the petition for a Temporary Detention Order, which is attached to the Complaint in this case as Exhibit A, and I sent the petition by facsimile to the Chesterfield County Magistrate. As part of my Petition, I submitted a copy of the Prescreening Report including a copy of the email message from Mr. Raub's marine acquaintance, which the Secret Service agent had given to me. A copy of what I submitted to the Magistrate was filed under seal in this matter.

2.      Paragraph 2(b) of the Order:

QUESTION: The content of any telephone call between Defendant Campbell and a John Doe Defendant shortly before Plaintiff's arrest and detention, including the identity of the John Doe Defendant who spoke to Defendant Campbell by telephone.

ANSWER:    The only telephone conversation which I had is the conversation between myself and Detective Michael Paris, which is described in detail in my Answer to Paragraph 2(a) of the Order, set forth above in paragraph numbered one of this Answer.


3.    Paragraph 2(c) of the Order:

QUESTION:  The extent to which Defendants Bowen and Granderson relied on any representations made by the John Doe Defendants or the professional judgment of Defendant Campbell in deciding to arrest Plaintiff.

ANSWER:    I have no information concerning this request.


4.    Paragraph 2(d) of the Order:

QUESTION:  The identities of the John Doe Defendants if known or ascertainable with due diligence.

ANSWER:    I have no information concerning this request.   My attorneys have informed me that they provided to Mr. Raub's attorneys all information that they have in response to this request when they served the Rule 26(a) disclosures on my behalf on July 31, 2013.


_____
Michael Campbell

COMMONWEALTH OF VIRGINIA:
COUNTY OF CHESTERFIELD, to wit:

I, _Pamela Tuck Craze_, a Notary Public in and for the Commonwealth and County aforesaid, do hereby certify that Michael Campbell, whose name is signed to the foregoing Answers to Interrogatories, has acknowledged the same before me in my jurisdiction aforesaid and sworn that the information contained therein is correct to the best of his knowledge and belief.

Given under by hand this _14_ day of August, 2013.

My Commission expires: _1-31-2015_

Registration I.D.: _708 1968_



Jeffrey L. Mincks, VSB #18317
County Attorney
Stylian P. Parthemos, VSB #17360
Deputy County Attorney
Julie A. C. Seyfarth, VSB #46207
Assistant County Attorney
Counsel for the Defendants Michael Campbell,
  Daniel Lee Bowen, and Russell Morgan Granderson
P. O. Box 40
Chesterfield, VA 23832
(804) 748-1491 (telephone)
(804) 717-6297 (facsimile)
mincksj@chesterfield.gov

PAMELA TUCK CRAZE
Commonwealth of Virginia
Notary Public
Commission No. 7081968
My Commission Expires 1/31/2015

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing Answers of Michael

Campbell to Limited Interrogatories Approved by the Court was hand delivered, this 16th day of

August, 2013, to:

Anthony F. Troy, VSB #05985
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Eighth and Main Building, Suite 1450
707 East Main Street
Richmond, VA   23219
ttroy@eckertseamans.com
Attorney for the Plaintiff Brandon Raub

William H. Hurd, VSB #16967
Stephen C. Piepgrass, VSB #71361
TROUTMAN SANDERS LLP
Troutman Sanders Building
1001 Haxall Point
Richmond, VA   23219
william.hurd@troutmansanders.com
stephen.piepgrass@troutmansanders.com
Attorney for the Plaintiff Brandon Raub

9

**PETITION FOR INVOLUNTARY ADMISSION FOR TREATMENT**

Commonwealth of Virginia
VA. CODE §§ 16.1-340; 16.1-340.1; 19.2-169.6; 19.2-182.9; 37.2-808 through 37.2-819

Temporary Detention Order No. _____
Case No. _____
Hearing Date and Time _____

[ ] General District Court
[ ] Juvenile and Domestic Relations District Court

CITY OR COUNTY: Chesterfield

In re _____ NAME OF RESPONDENT

DATE OF BIRTH _____        GENDER: Male

RESIDENCE ADDRESS: 2912 Beasley Nok Clust _____
CITY: N. Chesterfield   STATE: Va   ZIP CODE: 23237

MAILING ADDRESS IF DIFFERENT _____
CITY   STATE   ZIP CODE

NAME AND ADDRESS OF CURRENT LOCATION OF RESPONDENT: Chesterfield Crisis _____

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

NAME AND ADDRESS OF PARENT/GUARDIAN/LEGAL CUSTODIAN (IF RESPONDENT IS A JUVENILE)

NAME OF PETITIONER: _____ Campbell

PETITIONER'S RELATIONSHIP TO RESPONDENT: CSB Prescreener

NAME OF AGENCY OR FACILITY OF PETITIONER (IF APPLICABLE): Chesterfield Mental Health Support Services

FACSIMILE NUMBER: ( 804 ) 717-6660

ADDRESS OF PETITIONER: 6801 Lucy Corr Blvd.

TELEPHONE NUMBER: ( 804 ) 748-6356

CITY: Chesterfield   STATE: VA   ZIP CODE: 23832

ALTERNATE TELEPHONE NUMBER _____

I, the undersigned petitioner, being a responsible person, hereby file this petition pursuant to Virginia Code

[X] §§ 37.2-805 through 37.2-819 (Adult Cases Only) and state that the respondent is unwilling to volunteer or incapable of volunteering for hospitalization or treatment, has a mental illness and is in need of hospitalization or treatment, and that there exists a substantial likelihood that, as a result of mental illness, the respondent will, in the near future:

  [X] cause serious physical harm to [ ] self [X] others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or

  [X] suffer serious harm due to respondent's lack of capacity to protect self from harm or to provide for respondent's own basic human needs

  [X] The preadmission screening report has been prepared by the community services board and the report is attached.

  [ ] An initial mandatory outpatient treatment plan has been prepared by the community services board and is attached.

[ ] This petition is filed pursuant to Virginia Code § 37.2-817(C) prior to the expiration of the involuntary admission order entered on _____, to continue such order, of which the respondent is the subject, for a period not to exceed 180 days.
DATE

[ ] This motion for mandatory outpatient treatment is filed pursuant to Virginia Code § 37.2-805 or § 37.2-817(C) as the respondent has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or was involuntarily admitted pursuant to § 37.2-817(C), and on at least two previous occasions within 36 months preceding the date of the hearing, has been the subject of a temporary detention order and voluntarily admitted himself in accordance with § 37.2-814(B) or has been involuntarily admitted pursuant to § 37.2-817.

[ ] § 19.2-169.6 and as the person having custody over the respondent, who is an inmate, state that the inmate has a mental illness; there exists a substantial likelihood that, as a result of a mental illness, the inmate will, in the near future,

  [ ] cause serious physical harm to [ ] self [ ] others as evidenced by recent behavior causing, attempting, or threatening harm and any other relevant information, or

  [ ] suffers serious harm due to his lack of capacity to protect himself from harm as evidenced by recent behavior and any other relevant information;

and the inmate requires treatment in a hospital rather than a local correctional facility.

[ ] § 19.2-182.9 and state that the respondent, who is an acquittee on conditional release

  [ ] has violated the conditions of the respondent's release, or

  [ ] is no longer a proper subject for conditional release,

and the respondent requires inpatient hospitalization.



EXHIBIT
B
TJS 10/1/13

FORM DC-4001 (MASTER. PAGE ONE OF TWO) 07/12

Temporary Detention Order No. ▨▨▨▨▨▨▨▨

Case No. ▨▨▨▨▨▨▨▨

[☑] § 16.1-340 or § 16.1-340.1 (Juvenile Cases Only) and state that because of mental illness, the respondent, who is a juvenile:

  [☐] presents a serious danger to [☒] self [☐] others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats, or

  [☐] is experiencing a serious deterioration of the ability to care for self in a developmentally age-appropriate manner, as evidenced by delusionary thinking or by a significant impairment of functioning in hydration, nutrition, self-protection, or self-control,

and the juvenile is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment.

[☒] The juvenile is currently detained in a detention home or shelter care facility by order of the

▨▨▨▨▨▨▨▨, Juvenile and Domestic Relations District Court. To the extent known,
NAME OF COURT

the following charges against the juvenile are the basis of the detention in the detention home or shelter care facility:

▨▨▨▨▨▨▨▨
CHARGE

▨▨▨▨▨▨▨▨
CHARGE

[☐] See attached sheet for additional charges.

To the extent known, the names and addresses of the juvenile's parents are as follows:

▨▨▨▨▨▨▨▨
NAME OF MOTHER AND ADDRESS

▨▨▨▨▨▨▨▨
NAME OF FATHER AND ADDRESS

I request that the respondent be examined and accorded such assistance as provided by law. In support of this petition, I further state as follows: *see preceeding*

▨▨▨▨▨▨▨▨

8/16/12                                    *Robert Campbell* MGU
DATE                                          PETITIONER

The petitioner appeared this date before the undersigned and, upon being duly sworn, made oath that the facts stated in this petition are true based on the petitioner's knowledge.

_____                    _____
DATE                                       [ ] JUDGE  [ ] MAGISTRATE  [ ] SPECIAL JUSTICE  [ ] CLERK

---

**FOR NOTARY PUBLIC'S USE ONLY:**

State of ............................................  [ ] City  [ ] County of ............................................

Acknowledged, subscribed and sworn to before me this .............. day of ............................................, 20 ..............

by ............................................

_____                    _____
DATE                                       NOTARY PUBLIC
                                           Notary Registration No. ........................  (My commission expires ..................)

---

Aug. 17. 2012 12:04AM   MH CHESTERFIELD CRISIS - d/Behavioral Health Authority: Crisis Hold.   No. 0970   P. 2
Community Services                                                                             Consumer ID# ____

Date: 8-16-12   Time: From 7:40 ☐am ☒pm · To_____ ☐am ☐pm
Time under court order: _____   Time not under court order: _____

Emergency Custody Order: ☒Yes ☐No   ☐Magistrate Issued   ☒Law Enforcement Issued (Paperless)
Date and Time Executed: 8-16-12   7:40
Extension: ☒Yes ☒No   Reason: Searching for a bed.   (identify facility/medical evaluation/other good cause)
Evaluation: ☒In-person   or ☐Two-way electronic video and audio
Petitioner   Michael Campbell   Phone:_____
Translator and language: _____   Phone:_____

DISPOSITION  ☐Recommitment  ☒TDO  ☐Voluntary  ☐CSU  ☐ Safety Plan  ☐Release  ☐Referral  ☐Other _____

HOSPITAL/FACILITY   John Randolph   Case/TDO #:_____

## Personal Information

First Name: Brandon   Middle:_____   Last Name: Raub   DOB: 4-16-86 Age: 26

SSN: 473 - 15 - 1519   (M)F   W   N   6'1"   180   Blond   Blue.
                        (Gender) (Race) (Hispanic Origin) (Height) (Weight) (Hair Color) (Eye Color)

Address: 2912 Bentley Bensly   N. Chesterfield   Va   23237   Chest.
          (Street)              (City)           (State) (Zip Code)  (County)

Phone: 804 334-2671 Home/Cell   Marital Status: S   Spouse Name:_____

School Division (if applicable):_____   School Attending:_____   Grade:_____ Special Ed.: Y or N

(if under age 18)
Mother: Kathleen   Address: Same   Phone: Same.   Home/Cell

Father:_____   Address:_____   Phone:_____ Home/Cell

Legal Custodian  ☐ Unknown  Name:_____   Phone:_____   Address:_____
Legal Guardian   ☐ Unknown  Name:_____   Phone:_____   Address:_____

Emergency Contact: Name_____   Relationship to Person:_____   Phone_____

Address:_____
          (Street)              (City)           (State) (Zip Code)  (County)
CSB of Residence: Chesterfield.

CSB Code: 01   Contacted: ☒Yes ☐ No   Michael Campbell   804-748-6356.
                                        (Name)                (Phone)
Employment Status: ☐ Unknown_____   Education Level: (All ages)_____
Employer:_____   Phone:_____
Military Status: ☐ Unknown Inactive Duty USMC   Start Year:_____ End Year:_____
SSI ☐Yes ☐ No ☐ Unknown   SSDI ☐Yes ☐ No ☐ Unknown

Medicaid: ☐Yes ☐ No ☐ Unknown #_____   Subscriber Name:_____

Medicare: ☐Yes ☐ No ☐ Unknown #_____   Part D: ☐Yes ☐No_____   Plan

Insurance: ☒Yes ☐ No ☐ Unknown_____
                                 (Name of Company/ Group/Plan/Number)

## Local Use

Current Location: Chesterfield Jail.

Hospital Bed Confirmed By: Dn Durran.   Phone:_____

Presoriomer / Staff Name & Credentials: Michael Campbell msw.

Medical Clearance: ☒Yes ☐ No If yes, where? John Randolph

Collateral Contacts:_____

EXHIBIT
C
ENGAD 800-631-6989
TJS 10/1/13

**Collateral Sources**

☐ Individual Requesting Evaluation    ☐ Family/Significant Other/Guardian    ☐ Treatment Records
☐ Treating Physician/Psychiatrist    ☐ CSB Case Manager or Other Staff    ☒ Police/First Responders
☐ CIT Officer                        ☐ WRAP Plan          ☐ Advance Directive    ☐ Safety & Support Plan
Is CSA (Comprehensive Services Act) involved with minor?  ☐Yes  ☐ No  ☐ Unknown
Is Department of Social Services involved with individual?  ☐Yes  ☐ No  ☐ Unknown
Comments: _friends   reported   To   the   FBI_

**Presenting Crisis Situation**

Referral Source: _R. Tam. Chesterfield Police_, Consultation Location: _Chest. jail._
Reason for Referral: _Client has been posting threatening information on_
_the internet. Client believes that 911 was a conspiracy_
_caused by the U.S._

Assessment:

Client met with the FBI and Secret Service
To explain recent posts on Facebook. Client's friends
reported client to the FBI for posting extreme conspiracy
theories and threat To President / Bush. This Counselor
asked client about why the authorities were involved and
he stated because they knew I am on to threat.
Client was cooperative but refused to answer anymore
questions. Client was attempting To explain the conspiracy
theories To the officers. According to client's friends,
His behaviors have become much more extreme recently
and they state this behavior is "not him". This counselor
contacted client's mother. She shares the same beliefs
and supports her sons behaviors. Due to unpredictable behaviors
and threats on the internet a TDO is being requested
To provide Treatment and further evaluation. Please see a copy
of tweets made (attached).

☑004/011

Aug. 17. 2012 12:05AM   MH CHESTERFIELD CRISIS                    No. 0970   P. 4

## Behavioral Heal   reatment/Services

Current Outpatient Treatment: ☐ Yes ☒ No ☐ Unknown    ☐ Behavioral Health (MH - SA)   ☐ Developmental Services

☐ Private Provider or ☐ CSB   Name: _____   Phone: _____

Case Manager: _____   Phone: _____

Psychiatrist: _____   Phone: _____

Prior Inpatient Treatment: ☐ Yes ☒ No ☐ Unknown    ☐ Behavioral Health (MH - SA)   ☐ Developmental Services

Name/Location of Last Tx facility: _____   Adm. Date: _____ Discharge Date: _____

Number of Hospitalizations: _____

Ever in a State facility? ☐ Yes ☐ No   Name: _____   Date: ___ _____

Ever in a Crisis Stabilization Unit? ☐ Yes ☐ No   Name: _____   Date: _____ _____

Other: _____

☐ WRAP Plan   ☐ MOT   ☐ PACT/ACT   ☐ NGRI   ☐ Advance Directive   ☐ Safety & Support Plan   ☐ Group Home
☐ Day Treatment   ☐ Prevention Services   ☐ In-Home Provider Name: _____   ☐ Other: _____

## Substance Abuse Assessment

☐ No current use        ☒ No history of use        ☐ Refuses to answer

Current use listed below:

| Drug Type | Priority | Age 1st Use | Frequency of Use and Amount | Method of Use | Date of Last Use and Amount |
|---|---|---|---|---|---|
|  | Primary |  |  |  |  |
|  | Secondary |  |  |  |  |
|  | Tertiary |  |  |  |  |

History of substance abuse ☐   (Drugs, alcohol, mood altering substances, marijuana, prescription medications, inhalants)

Comment: _____
_____

Have you or anyone else ever felt you had a drug or alcohol problem? ☐ Yes   ☒ No

Have you received inpatient or outpatient SA treatment? ☐ Yes ☒ No   Maintenance services?   ☐ Yes ☐ No

Number of prior episodes of any drug: _____   Detoxification treatment?   ☐ Yes ☐ No

Name/Location of last treatment facility: _____   Date of Discharge: ___ _____

|  | Current withdrawal (Past 24 hours) | History of withdrawal |
|---|---|---|
| Tremors |  |  |
| Headaches |  |  |
| Vomiting (Blood present) ☐ Yes ☐ No |  |  |
| Nausea |  |  |
| Diarrhea (Blood present) ☐ Yes ☐ No |  |  |
| Sweating |  |  |
| Paranoia |  |  |
| DT's |  |  |
| Other |  |  |

BAC: ___ _____ Time: _____   Lab Results: _____   ☐ Unable to Test
Tobacco use?   ☐ Yes   ☐ No   Type: _____
Pregnant Status: ☐ Yes  ☐ No ☐ Unknown   Pregnant and using substances? ☐ Yes  ☐ No  ☐ Unknown

**Mental Status Ex:**

| | | |
|---|---|---|
| Appearance: | ☐ WNL | ☐ unkempt  ☐ poor hygiene  ☒ tense  ☐ rigid |

Behavior/Motor
Disturbances:    ☐ WNL    ☒ agitated  ☒ guarded  ☐ tremor  ☐ manic  ☐ impulsive  ☐ psychomotor retardation
                          ☐ tearful  ☐ easily startled  ☒ distracted  ☐ hysterical  ☐ restless

Orientation:    ☒ WNL    ☐ Disoriented to: ○ time  ○ place  ○ person  ○ situation

Speech:    ☐ WNL    ☐ pressured  ☒ slowed  ☐ soft  ☐ loud  ☐ slurred  ☐ incoherent

Mood:    ☐ WNL    ☐ depressed  ☐ angry  ☐ hostile  ☐ euphoric  ☒ anxious  ☐ anhedonic  ☐ withdrawn

Range of Affect:    ☐ WNL    ☐ constricted  ☐ blunted  ☐ flat  ☒ labile  ☐ inappropriate

Thought Content:    ☐ WNL    ☐ impaired  ☐ unfocused  ☐ unreasonable  ☐ preoccupation  ☒ delusions  ☐ thought insertion
                             ☒ grandiose  ☐ ideas of reference  ☒ paranoid  ☐ obsessions  ☐ phobias

Thought Process:    ☐ WNL    ☐ illogical  ☐ abstract  ☐ concrete  ☐ incoherent  ☐ perseverative  ☒ impaired concentration
                             ☐ loose associations  ☐ flight of ideas  ☐ circumstantial  ☐ blocking  ☐ tangential

Sensory:    ☒ WNL    ☐ illusions  ☐ flashbacks  ☐ Hallucinations: ○ auditory  ○ visual  ○ olfactory  ○ tactile

Memory:    ☒ WNL    ☐ Impaired:  ○ recent  ○ remote  ○ immediate

Appetite:    ☒ WNL    ☐ increased  ☐ decreased  Weight: ○ stable  ○ loss  ○ gain

Sleep:    ☒ WNL    ☐ hypersomnia    ☐ onset problem    ☐ maintenance problem

Insight:    ☐ WNL    ☐ blaming  ☒ little    ☐ none

Judgement:    ☐ WNL    ☐ impaired  ☒ poor

Estimated Intellectual Functioning: ☐ Above average  ☒ Average  ☐ Below average  ☐ Diagnosed MR  ☐ Unable to determine

Able to provide historical information: ☒ Yes  ☐ No  Explain: _____

Reliability of self report ☐ Good  ☒ Fair  ☐ Poor  Explain: Would not offer answers to certain question

**Significant Clinical Findings** (further describe any symptoms checked above)

Client had long pauses before answering questions.
Very labile w/ the secret service!

**Medical**
Primary Care Provider: Would not provide.                    Phone: _____
Medical history and current medical symptoms or issues:
healthy

Medication:   Please see attached medication list ☐   Please see attached medical addendum ☐
Current prescribed psychotropic and other medications (include dosage, schedule, etc. if known)

| | Name | Dose | Schedule | Physician |
|---|---|---|---|---|
| 1. | none. | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |

Has individual followed recommended medication plan? ☐ Yes  ☐ No  Explain: _____
Has individual followed recommended recovery plan?  ☐ Yes  ☐ No  N/A ☐ Explain: _____
Recent medication change? ☐ Yes ☐ No ☐ Unknown Date of change: _____
Describe change: _____
Allergies (including food) or adverse side effects to medications: ☐ Yes  ☐ No ☐ Unknown
Describe: _____

**Legal Data**

Legal Status: Would not respond ☐ Unknown
Is individual serving a sentence?  ☐ Yes ☒ No ☐ Unknown  Details: _____
Is individual NGRI Conditional Release? (Adults only) ☐ Yes ☒ No ☐ Unknown Details: _____
Is individual on probation or parole? ☐ Yes ☒ No ☐ Unknown  Contact Person: _____
Pending legal charges?  ☐ Yes ☐ No ☒ Unknown  Charges: _____
Date of hearing if known: _____   Court of Jurisdiction _____

If a minor: Judge: _____  Attorney: _____  GAL: _____
Has individual come from detention?  ☐ Yes  ☐ No  ☐ Unknown
Juvenile Detention Center: _____
(Facility Name)          (Address)          (Telephone)          (Fax)

**Diagnosis DSM IV R** (P- Provisional, H-Historical)

Axis I  Psychotic D/O NOS Axis I _____  Axis I _____
Axis II  deferred. _____ Axis II _____
Axis III  none.

Axis IV Psychosocial and Environmental (Check all that apply)
☒ Support group   ☐ Social /Environmental   ☐ Educational   ☐ Domestic ☐ Occupational   ☐ Housing ☐ Economic
☐ Health Care   ☐ Legal System   ☐ Other _____

Axis V  GAF Current: 40.          Highest past year, if known: _____

Name: _____

☑007/011

Aug. 17. 2012-12:05AM   MH CHESTERFIELD CRISIS                    No. 0970  P. 7

**Individual Service Planning**

Individuals who may be helpful in treatment planning.

| Name | Telephone | Relationship |
|------|-----------|--------------|
| 1. | | |
| 2. | | |
| 3. | | |

☐ Family Member  ☐ Guardian  Name:_____ may be contacted with

information that is directly relevant to their involvement with the individual's health care, including location and general condition.
(32.1-127.1:03(D34))

☐ Individual agrees          ☐ Individual lacks capacity

☐ Individual objects         ☐ Emergency makes it practically impossible to agree or object.

---

### Outcome of the emergency evaluation or ECO

☐ No further treatment required, or

☐ Individual declined referral and no involuntary action taken, or

☐ Referred to voluntary crisis stabilization unit, or

☐ Referred to voluntary outpatient or community treatment other than crisis stabilization, or

☐ Referred to voluntary inpatient admission and treatment,

    and

☐ Petitioner and ☐ Treating physician notified of disposition if TDO not recommended.

☐ Recommitment recommended by CSB

☒ TDO recommended by CSB

☐ Hearing and commitment process has been explained to the individual.

CSB consulted with magistrate about alternative transportation   ☐ Yes  ☒ No

☒ CSB does not recommend alternative transportation.

☐ CSB recommends alternative transportation by _____

                                       (Name)

37.2-809-1

☐ Consideration of 10 day inpatient admission by health care agent pursuant to advance directive _____

                                                     (Name of Agent)

☐ Consideration of 10 day inpatient admission by designated guardian pursuant to guardianship order_____

                                                    (Name of Guardian)

Name: _R_m_._/_._  _D_._ _l_.

**Risk Assessment** ical Options

## Minor 16.1-340.1

Because of mental illness:
☐ The minor presents a serious danger to ☐self or ☐others to the extent that severe or irremediable injury is likely to result, as evidenced by recent acts or threats; or
☐ Is experiencing a serious deterioration of his ability to care for himself in a developmentally age appropriate manner, as evidenced by: ☐delusional thinking or ☐by a significant impairment of functioning in hydration, nutrition, self protection or self control; and
☐The minor is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment.
Findings: _____

The minor's parents/guardians ☐were or ☐were not consulted.  The minor's treating or examining physician, if applicable,
☐ was or ☐was not consulted.

Treatment and support options:
Inpatient treatment ☐is or ☐is not the least restrictive alternative that meets the minor's needs
☐ Outpatient or less restrictive services has been tried with the following results:
_____
_____

☐ Outpatient or less restrictive service has *not* been tried and is *not* likely to be adequate because:
_____
_____

## Adult 37.2-809

It appears from all evidence readily available that the person:
☒Has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future:
☒Cause serious physical harm to ☐ self or ☒others as evidenced by recent behavior, causing, attempting, or threatening harm, and other relevant information, or,
☐ Suffer serious harm due to his lack of capacity to ☐protect himself from harm or ☐provide for his basic human needs (* not applicable under Virginia Code19.2-169.6) and
☒Is in need of hospitalization or treatment.
Findings: _____
_____
_____

**Capacity for adults and minors age 14 and older**
Able to maintain and communicate choice ☐ Yes  ☒No    Able to understand consequences  ☒Yes  ☐ No
Able to understand relevant information  ☐ Yes  ☒No    Willing to be treated voluntarily  ☐ Yes  ☒No

**Risk Factors**
☐ Aggressive behavior,  ☐ Sexual acting out  ☐ Self Injurious behavior  ☐ Elopement,  ☐ Actively psychotic
☐ Suicidal ideation  ☒Homicidal ideation  ☐ Plan  ☒Access to weapons potential.
☒Other _____

**Protective Factors** _____

**Final Disposition**
MO
_____
_____
_____
_____

_____   MSW  8-6-12 ori       _____
Preadmission Screening Evaluator Signature   Date   Board   Preadmission Screening Evaluator Signature   Date   Board
Electronically signed ☐                             Electronically signed ☐

_____                            _____
Print Name Here (not required if electronically signed)   Print Name Here (Not required if electronically signed)

☐009/011

Name of Individual. _____  Date: _____  Time: _____  ☐am ☐pm

☐ No further treatment required.
☐ Has or ☐ does not have sufficient capacity to accept treatment (N/A for minors under age 14 except for Outpatient treatment)
☐ Is or ☐ is not willing to be treated voluntarily (* not applicable under Virginia Code19.2-169.6)
☐ Voluntary community treatment at the ☐ CSB (specify) _____
     Or ☐ other (specify) _____
☐ Voluntary admission to a crisis stabilization program (specify) _____
☐ Adult: Voluntary inpatient treatment because individual requires hospitalization and has indicated that he/she will agree to a voluntary period of treatment up to 72 hours and will give the facility 48 hours notice to leave in lieu of involuntary admission.
☐ Minor: Voluntary inpatient treatment of minor younger than 14 or non-objecting minor 14 years of age or older.
☐ Minor: Parental admission of an objecting minor 14 years of age or older pursuant to 16.1-339.

**Minor 16.1-340.4**  ☐ Under age 14      ☐ Age 14 or Older
       Custodial parent or guardian ☐is or ☐is not willing to consent to voluntary admission (for inpatient treatment only)
☐ **Because of Mental Illness meets the criteria for involuntary admission or mandatory outpatient treatment as follows:**
☐ The minor presents a serious danger to self or others to the extent that severe or irremediable injury is likely to result, as evidence by recent acts or threats or: ☐ Is experiencing a serious deterioration of his ability to care for himself in a developmentally age appropriate manner. As evidenced by: delusional thinking or significant impairment of functioning in: ☐hydration ☐nutrition ☐self protection ☐ self control. ☐ The minor is in need of compulsory treatment for a mental illness and is reasonably likely to benefit from the proposed treatment.  Is the parent or guardian with whom the minor resides willing to approve any proposed commitment? ☐ Yes   ☐ No   ☐ Unavailable
If no, is such treatment necessary to protect the minor's life, health, safety or normal development?  ☐ Yes   ☐ No
❖**Therefore the CSB recommends:**
A. ☐ Involuntary admission and inpatient treatment, as there are no less restrictive alternatives to inpatient treatment.
     ☐ Alternative transportation

B. ☐ Mandatory outpatient treatment not to exceed 90 days because: The minor, if 14 years of age or older, and his parents or guardians ☐have sufficient capacity to understand the stipulations of the minor's treatment, ☐ have expressed an interest in the minor's living in the community and have agreed to abide by the minor's treatment plan, and ☐ are deemed to the capacity to comply with the treatment plan and understand and adhere to conditions and requirements of the treatment and services; and ☐ The ordered treatment can be delivered on an outpatient basis by the Community Services Board or a designated provider.

C. ☐ Do the best interests of the minor require an order directing either or both of the minor's parents or guardian to comply with reasonable conditions relating to the minor's treatment? ☐Yes ☐No

**Adult 37.2-816**
☐ **Because of Mental Illness meets the criteria for involuntary admission or mandatory outpatient treatment**(* not applicable under Virginia Code19.2-169.6) as follows:
☐ There is a substantial likelihood of serious physical harm to ☐self or ☐others in the near future as a result of mental illness as evidenced by recent behavior causing, attempting or threatening harm and other relevant information, if any, or
☐ There is substantial likelihood that, as a result of mental illness, in the near future he/she will suffer serious harm due to a lack of capacity ☐ to protect him/herself from harm or ☐ to provide for his/her basic human needs(* not applicable under Virginia Code19.2-169.6) .
❖**Therefore the CSB recommends:**

A. ☐ Involuntary admission and inpatient treatment; as there are no less restrictive alternatives to inpatient treatment.
     ☐ Alternative transportation

B. ☐ Mandatory outpatient treatment because ☐ less restrictive alternatives to involuntary treatment that would offer an opportunity for improvement of his/her condition have been investigated and ☐ are deemed to be appropriate, and the person ☐ has sufficient capacity to understand the stipulations of his/her treatment, ☐ has expressed an interest in living in the community and ☐ has agreed to abide by his/her treatment plan, and ☐ is deemed to have the capacity to comply with the treatment plan and ☐ understand and ☐ adhere to conditions and requirements of the treatment and services. The recommended treatment ☐ can be delivered on an outpatient basis by the ☐ CSB or ☐ designated provider(s) specify: _____

C. ☐ Physician discharge to mandatory outpatient treatment following inpatient admission pursuant to 37.2-8117 (C1) and (C2). The individual meets the criteria as follows: ☐ The person has a history of lack of compliance with treatment for mental illness that at least twice within the past 36 months has resulted in the person being subject to an order for involuntary admission; ☐ In view of the person's treatment history and current behavior, the person is in need of mandatory outpatient treatment following inpatient treatment in order to prevent a relapse or deterioration; ☐ as a result of mental illness, the person is unlikely to voluntarily participate in outpatient treatment unless the court enters an order authorizing discharge to mandatory outpatient treatment following inpatient; and ☐the person is likely to benefit from mandatory outpatient treatment.

Preadmission Screening Evaluator Signature   or   Electronically signed ☐     Date     Board

Print Name Here  (Not required if electronically signed)     Representative CSB

## Wyman, John V.

| | |
|---|---|
| **From:** | Granger, Terry L. |
| **Sent:** | Thursday, August 16, 2012 1:34 PM |
| **To:** | Wyman, John V. |
| **Subject:** | FW: B. Raub Contact Information |



This guy sent some specific posts – it is worrisome I think

---

**From:** Fullerton, Jason
**Sent:** Thursday, August 16, 2012 10:55 AM
**To:** Granger, Terry L.
**Subject:** Fw: B. Raub Contact Information

FYI

---

**From:** Howard Bullen <bullenhr@hotmail.com>
**To:** Fullerton, Jason
**Sent:** Wed Aug 15 19:58:47 2012
**Subject:** B. Raub Contact Information

Jason,

Thanks for your time on the phone this afternoon.  As promised, here is Brandon Raub's contact information:

Phone:
    760.518.9393
Address:
    2912 Bensley Road
    Richmond, VA 23237

I served with Raub in Iraq in 2006-2007 as part of C Co 4thCEB in direct support of 3rd Battalion 4th Marines in Al Qaim.  During that time I was the Heavy Equipment Chief and Squad Leader in the platoon.  Raub was not one of my direct reports but I did work closely with him during the deployment and kept in touch for a few years after returning.

My concern, and one shared by Sean Lawlor who contacted you on Sunday the 12th of August, is that over the past few months Raub has been posting increasingly threatening and action-oriented posts on Facebook.  I've attempted to get in touch with him a few times recently but his phone is off and when I reach out to him on Facebook he'll only talk about "9/11 being a conspiracy".  The posts are all vague, but there is a repetitive theme of "the world will see this/ this is here for the world to find and understand".  Much of this is posted to a public Facebook page, "Dear Illuminati" (https://www.facebook.com/#!/groups/293409887424989/) which from what I gather is directed at a "secret government conspiracy".  Some of the specific posts that have given me concern that it is possibly more than just extremist rhetoric are:

- 15 August 2012: "This is revenge.  Know that before you die."
- 14 August 2012: "Richmond is not yours.  I'm about to shake some shit up."
- 14 August 2012: "This is the start of you dying.  Planned spittin with heart of Lion."
- 14 August 2012: "Leader of the New School.  Bringing Back the Old School.  MY LIFE WILL BE A DOCUMENTARY."

- 13 August 2012: "I'm gunning whoever run the town."
- 10 August 2012: "W, you're under arrest bitch."
- 7 August 2012: "The World will Find This."
- 29 July 2012: "I know ya'll are reading this, and I truly wonder if you know what's about to happen."
- 29 July 2012: "W, you'll be one of the first people dragged out of your house and arrested."
- 29 July 2012: "And Daddy Bush, too"

Much of the same rhetoric is also on his personal Facebook page:
- 14 August 2012: "The Revolution will come for me.  Men will be at my door soon to pick me up to lead it ;)"
- 13 August 2012: "You should understand that many of the things I have said here are for the world to see."

I know that much of this is typical extremist language, but knowing his personality I feel he genuinely believes in this and is not simply looking for attention.

Thanks again for your time, and please let me know if you need any additional information or would like to speak further.

Very respectfully,

Howard Bullen
910.548.3829
BullenHR@hotmail.com

2



# Chesterfield Community Services Board
## Department of Mental Health Support Services
### Progress Note Report



EXHIBIT

E

TJS 10/1/13

Brandon Raub (#54086)
*For Recorded Service Dates of : 04/01/2012 - 09/26/2013*

| Cost Center | Service Provided | Start Date/Time | End Date/Time | Provider |
|---|---|---|---|---|
| Crisis | Crisis Consultation | 8/16/12  8:30 pm | 8/16/12 10:30 pm | Campbell, Michael, MSW |
| | Delivery Method: Client Present | | Place of Service: Local or Regional Jail | |

**Narrative:**
Client's friends and fellow Marines notified the FBI of increased activity on Facebook which discussed plans for action against the government. Client was detained by the police and an evaluation occured. Client, at first, refused to answer any questions. Client stated "I choose to not answer any questions at this time". This counselor discussed my role and why he was brought in for an assessment and how the process works. Client offered limited information. When Client was asked about the specific messages from facebook and the cooorespondence between former marine friends, he stated "the revolution is coming".  When asked about the threats made, client reponded "if you new of what was coming wouldnt you try to stop it". Client would not elaborate on the posts at this time. This counselor obtained permission from client to call client's mother. Mother reported that client's rights were violated and she has not seen any changes or psychotic behavior in client. Mother also stated she holds the same beliefs that her son holds and feels violated by the situation. Due to a recent change in client's behaviors and more severe posts about revolution with plans for action, This counselor feels client needs more evaluation and treatment. A TDO is being requested to provide for public safety and potential aftercare.

Electronically Signed By:  Campbell, Michael, MSW
Provider ID:   FFBD9FFCB9FC4FA88D866DFABCB82D8D                     08/20/2012

| Cost Center | Service Provided | Start Date/Time | End Date/Time | Provider |
|---|---|---|---|---|
| Crisis | Crisis: Acute Psych Inpatient Service Time | 8/21/12  9:30 am | 8/21/12  9:50 am | Moreno, Bonnie, MSW |
| | Delivery Method: Client Present | | Place of Service: Non-State Psychiatric Hos | |

**Narrative:**
Writer received notification from Sharon Davis with John Randolph that consumer is uninsured and that they are requesting ACP funding.  Consumer was committed at his hearing yesterday and is being treated by Dr. Durrani.  ACP funding to begin 08/20/12.  Writer faxed opening ACP paperwork to RAC and Karen Marsh.  Sharon reports that consumer has been refusing medication and at this point, Dr. Durrani has not ordered any medications.  They are still attempting to have consumer transferred to the VA hospital in Salem, VA.  Writer will continue to monitor.

Electronically Signed By:  Moreno, Bonnie, MSW
Provider ID:   10110D6311A54B858FA97527B035EA4D                     08/21/2012

| Cost Center | Service Provided | Start Date/Time | End Date/Time | Provider |
|---|---|---|---|---|
| Crisis | Crisis: Acute Psych Inpatient Service Time | 8/22/12 12:24 pm | 8/22/12 12:44 pm | Moreno, Bonnie, MSW |
| | Delivery Method: Client Present | | Place of Service: Non-State Psychiatric Hos | |

**Narrative:**
Writer received notification from team member Erika, that Sharon Davis with John Randolph reported consumer had been transferred to the VA hospital in Salem, VA yesterday 08/21/12.  ACP funding to end. Writer faxed discharge ACP paperwork to RAC.

Brandon Raub (#S40003)
*For Recorded Service Dates of :  04/01/2012 - 09/26/2013*

Electronically Signed By:  Moreno, Bonnie, MSW
Provider ID:   10110D6311A54B858FA97527B035EA4D                  08/22/2012

**Narrative:**
Close case to episode. Client is not requesting follow up services.

Electronically Signed By:  Campbell, Michael, MSW
Provider ID:   FFBD9FFCB9FC4FA88D866DFABCB82D8D                  09/20/2012