## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| BRANDON RAUB, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 3:13CV328–HEH |
| | ) |
| MICHAEL CAMPBELL, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION
### (Defendant's Motion for Summary Judgment)

This is a civil rights action brought under 42 U.S.C. § 1983 against Michael Campbell ("Campbell"), a Chesterfield County mental health clinician, alleging violations of Plaintiff's First and Fourth Amendment rights. In essence, Plaintiff claims that as a result of Campbell's inept mental evaluation, Plaintiff was detained without probable cause, pending a more comprehensive mental assessment. Plaintiff's core contentions are that Campbell misconstrued his comments and actions as posing a threat of imminent danger as a result of mental illness. His allegations hinge in large part on the opinion of a practicing psychologist who, after a retrospective analysis, disagrees with Campbell's conclusion. Moreover, Plaintiff alleges that the law enforcement officers' actions, abetted by Campbell, were intended to suppress his First Amendment right to criticize policies of the United States.

The case is presently before the Court on the remaining defendant,[1] Campbell's Motion for Summary Judgment, premised primarily on his contention that he is entitled to qualified immunity on the constitutional claims. Both parties have filed extensive memoranda supporting their respective positions.[2] The Court heard oral argument on February 18, 2014. For the reasons that follow, Campbell's Motion for Summary Judgment will be granted.

This case evolves from a communication sent to the Federal Bureau of Investigation by an individual who had previously served with Plaintiff Brandon Raub ("Raub") in the U.S. Marine Corps concerning disturbing information posted by Raub on the Internet. This individual described Raub's postings as being increasingly threatening in tone. (Def.'s Mem. Support Mot. Summ. J., Ex. B, Paris Dep. at 44:11–13, ECF No. 90-2; and Ex. F, Campbell Dep. at 41:18–20, ECF No. 90-6.)

Several days later, on August 15, 2012, an FBI agent requested that Detective Michael Paris ("Detective Paris") conduct a review of Chesterfield County Police Department records to determine what, if any, prior contact they had with Raub. At that time, Detective Paris was on detail to the FBI Joint Terrorism Task Force. Later that same day, Howard Bullen ("Bullen"), another former Marine who had served with Raub in Iraq, contacted the FBI to express his concern about Raub's unsettling behavior and threatening communications. Suspecting that Raub may be contemplating violent acts,

---

[1] In its original form, the complaint in this case encompassed a host of other federal and state law enforcement officials. Following discovery, the other defendants were dismissed by Plaintiff.

[2] Plaintiff requested leave to file an amended complaint adding claims for negligence and false imprisonment. This request was denied by Memorandum Opinion and Order dated January 14, 2014, on the ground that the amended complaint, as submitted, failed to plead a plausible claim on either theory. (ECF Nos. 107, 108.)

Bullen relayed a number of Raub's postings to the FBI. (Paris Dep. at 44.) These postings revealed comments by Raub that he would be chosen to lead "the revolution" and that "[m]en will be at my door soon to pick me up to lead it." (Campbell Dep. at 49:22–23.) The Facebook postings sent by Bullen to the FBI also included the following comments:

> "I'm gunning whoever run the town." (August 13, 2012)
> "This is the start of you dying. . . ." (August 14, 2012)
> "Richmond is not yours. I'm about to shake some shit up." (August 14, 2012)
> "This is revenge. Know that before you die." (August 15, 2012)

(*Id.* at 49:6–14; Paris Dep. at Ex. 7 thereto.)

Bullen further advised the FBI that in his view, Raub's Facebook postings had become increasingly threatening and action-oriented. Bullen expressed to the FBI his concern that Raub's postings were "possibly more than just extremist rhetoric" and that he personally felt Raub genuinely believed in this and was not simply looking for attention. (Paris Dep. at 44:12–13; Ex. 7 thereto.) The following day, August 16, 2012, the above described e-mail traffic was forwarded to Detective Paris. (*Id.* at Ex. 7 thereto.)

Disturbed by Raub's postings, the FBI agent supervising the Joint Terrorism Task Force requested that Chesterfield County police officers, accompanied by FBI agents, conduct an interview of Raub to determine if he posed a serious risk of violence. (*Id.* at 47:4–48:22.) According to Paris, the supervising FBI agent instructed him that "[t]he postings are a little more volatile. They're getting a little bit more violent oriented and we can't wait until Friday. We've got to go tonight." (*Id.* at 54:9–14.) Later that

3

evening, a team of law enforcement officers was assembled to perform that task. The group was comprised of three Chesterfield officers, including Detective Paris, three FBI agents, and a secret service agent.[3] As Detective Paris explained, "[i]t was determined that contact would be made to determine . . . whether Brandon Raub was capable of acts of violence to the public or . . . to determine if there was a need for Crisis Intervention to conduct an evaluation." (*Id.* at 48:18–22.)

Following preliminary planning, Detective Paris, along with an FBI agent, conducted a conversation with Raub in the doorway of his residence. When asked whether he intended to carry out the violent acts mentioned on his Facebook post, Raub gave evasive responses. (*Id.* at 70:1–3.) At one point during the interview, Raub advised Detective Paris and the agent that the federal government launched a missile into the pentagon and that there was no airplane that flew into the structure on 9/11. (*Id.* at 96:12–14.) Raub also inquired why the FBI was not taking action against government officials for their crimes against American citizens. (*Id.* at Exs. 1 and 2 thereto.) He further stated that the federal government flies planes over people's houses, exposing them to the radioactive substance thorium. (*Id.*)

The interview conducted of Raub did little to allay their concerns. At its conclusion, the FBI agent advised Detective Paris, that "[w]e need to get this guy

---

[3] In Detective Paris' opinion, Raub's comments about both former Presidents Bush were sufficiently threatening in tone to warrant notification of the U.S. Secret Service. (*Id.* at 47:5–7.)

evaluated." (*Id.* at 66:24–67:1.) Detective Paris concurred. (*Id.* at 33:21–22; 66:24–67:1–2.)[4]

At approximately 7:15 p.m. on August 16, 2012, Campbell was in his office at the Chesterfield County Department of Mental Health Support Services. (Campbell Dep. at Ex. A thereto.) He received a telephone call from the Chesterfield County Emergency Communication Center requesting that he contact Detective Paris. (*Id.* at Ex. A thereto; 25:7–8.) Campbell promptly placed the call and was advised by Detective Paris that he was assisting the FBI and Secret Service in an investigation of Raub. Detective Paris informed Campbell that in company with other Chesterfield officers and federal agents, he had just completed an interview of Raub at Raub's residence. According to Campbell, he received the following information:

> Detective Paris informed me that Mr. Raub had made on-line threats about killing people, that he believed that the United States Government had perpetrated the September 11, 2001, terrorist attacks on the World Trade Center and the Pentagon, and that he believed that the government was committing atrocities on American citizens by dropping a radioactive substance called thorium on them from airplanes. Detective Paris indicated to me that the statements and threats were made over the Internet, and he described the language of some of the threats to me. Although I do not remember the exact wording of any of the threats now, they were specific threats of violent action against human beings.

(*Id.* at 86:9–22.)

Detective Paris also advised Campbell that the FBI had received information from another individual who had served with Raub in the U.S. Marine Corps. This individual

---

[4] Detective Paris also contacted both the Chesterfield Commonwealth's Attorney's Office and the United States Attorney's Office for advice as to whether Raub had violated any state or federal law. Both responded negatively. (*Id.* at 50:6–51:3; 72:21–73:3.)

described Raub's behavior as recently becoming more extreme. Detective Paris informed Campbell that there were "several Marines that were concerned, several Marines that knew Brandon, knew how effective he was, how, you know, he was an expert with explosives, and in his current communications with them, they felt that he was at extreme risk of doing something to hurt people." (*Id.* at 78:12–17.)

During their fifteen minute conversation, at Campbell's request, Detective Paris also described Raub's behavior and rapid mood swings. Detective Paris characterized Raub as preoccupied and distracted.

> Mr. Raub would make eye contact with Detective Paris for a few seconds, but then his eyes would rove away while he continued to talk before returning to Detective Paris. In my professional experience, this phenomenon can sometimes be evidence of psychosis. It can indicate that the subject is distracted by some internal stimulus. Detective Paris also informed me that Mr. Raub had rapid mood swings during their conversation – another common symptom of instability – and that when Detective Paris asked him about the specific threats which he had made, Mr. Raub would not answer his questions.

(Def.'s Mem. Support Summ. J., Ex. E, Campbell's Ans. to Interrogs. at 3, ECF No. 90-5.) Campbell found these observations by Detective Paris to have significance in his evaluation.

At this point, Detective Paris and Special Agent Terry Granger ("Special Agent Granger") of the FBI, who assisted him with the interview, concluded "we need to get this guy evaluated. You know, we can't leave here without doing something." (Paris Dep. at 33:20–22; 66:24–67:2.) When Detective Paris sought Campbell's guidance, he concurred that an evaluation was appropriate. (Campbell's Ans. to Interrogs. at 4.) Detective Paris also advised Campbell that he "believed that Mr. Raub represented a

threat in some form to harm other individuals." (Paris Dep. at 71:11–13.) Detective

Paris concluded that there was probable cause to detain Raub for a mental health

evaluation under Va. Code § 37.2-808(8).[5] (Campbell's Ans. to Interrogs. at 2.)   Raub

was then transported to the Chesterfield County Detention Center for a mental evaluation.

Subsequently that evening, Raub was interviewed by Campbell for approximately

fifteen minutes, at which point Raub stated he chose "not to answer any more questions."

(Campbell Dep. at 46:22–23.)  During the interview, Raub demonstrated what Campbell

perceived to be symptoms of paranoia as evidenced by his statement that he believed that

the U.S. government caused the atrocities of 9/11. (*Id.* at 45:5–8.)  Raub also

demonstrated what Campbell described as red flags during the interview.  For example,

Campbell identified what he considered to be unpredictable behavior: "drastically

changed their baseline thinking and blaming this on the government, blaming atrocities

on the government, exploding the Pentagon by the government and feeling that he has

---

[5] Va. Code § 37.2-808 provides in pertinent part:

(A) Any magistrate shall issue, upon the sworn petition of any responsible
person, treating physician, or upon his own motion, an emergency custody order
when he has probable cause to believe that any person (i) has a mental illness and
that there exists a substantial likelihood that, as a result of mental illness, the
person will, in the near future, (a) cause serious physical harm to himself or others
as evidenced by recent behavior causing, attempting, or threatening harm and
other relevant information, if any, or (b) suffer serious harm due to his lack of
capacity to protect himself from harm or to provide for his basic human needs, (ii)
is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or
incapable of volunteering for hospitalization or treatment. . . .

(G) A law-enforcement officer who, based upon his observation or the reliable
reports of others, has probable cause to believe that a person meets the criteria for
emergency custody as stated in this section may take that person into custody and
transport that person to an appropriate location to assess the need for
hospitalization or treatment without prior authorization.

been somehow chosen to be a leader of this oncoming revolution to me is unpredictable behaviors." (*Id.* at 48:3–8.)

At the end of his interview with Raub, Campbell initially was hesitant to conclude that either the Internet postings described to him or the threats were sufficient in his opinion to warrant a temporary detention order. Campbell then asked the Secret Service agent to provide him with copies of the e-mails from the two individuals who had previously served with Raub in the Marine Corps. After reviewing the postings in more detail, Campbell found these communications to be extremely disturbing.

These e-mails included the following statements:

"This is revenge. Know that before you die."
"Richmond is not yours. I'm about to shake some shit up."
"This is the start of you dying. Planned spittin with heart of a lion."
"Leader of the New School. Bringing back the Old School. My life will be a documentary."
"I'm gunning whoever run the town."
"W, you're under arrest bitch."
"The world will find this."
"I know ya'll are reading this, and I truly wonder if you know what's about to happen."
"W, you'll be one of the first people dragged out of your house and arrested."
"And daddy Bush too."
"The revolution will come for me. Men will be at my door soon to pick me up to lead it."
"You should understand that many of the things I have said here are for the world to see."

(Campbell Dep. at 49:6–25.)

After reviewing the e-mails in context of the other information before him, Campbell concluded that the threats were sufficiently specific to warrant action. Campbell also determined that Raub exhibited symptoms of paranoia:

I see someone is paranoid when they feel that they are being watched and being marked and being the potential risk that's going on in his mind; that he's going to be this leader of a revolution, that he's been chosen for it and that the United States Government knows this.

(*Id.* at 54:11–16.) In Campbell's view the presentation was also consistent with delusional thinking. "The idea that the United States Government is dropping thorium through jet trails is delusional. The fact that the United States sent a missile into the Pentagon is delusional. The fact that he feels that he has been chosen to lead this revolution is delusional thinking." (*Id.* at 55:8–13.)

In Campbell's opinion, Raub also demonstrated symptoms of homicidal ideation, and in Campbell's view, presented a potential threat. "When he terminated the conversation, I asked him, you know, do you feel justified in the statements that you have made and the risk of other people. . . . He said something on the lines of, '[i]f you knew' – 'if you know what I knew, wouldn't you?'" (*Id.* at 65:1–6.) Before concluding his assessment, Campbell called Raub's mother to gain her perspective. She reported no apparent changes in behavior recently. She also added that "a lot of us" share his political views. (*Id.* at 44:23–25; 60:24–61:10.)

At this point, Campbell was convinced that Raub satisfied the standards set forth in Virginia Code § 37.2-809 for the issuance of a temporary detention order to enable Raub to receive further evaluation and mental health treatment.[6] Campbell then

---

[6] Va. Code § 37.2-809(B) sets for the standard for issuance of temporary detention orders. It reads in pertinent part:

A magistrate shall issue, upon the sworn petition of any responsible person, treating physician, or upon his own motion and only after an evaluation conducted in-person or by means of two-way electronic video and audio communication

completed preparation of his prescreening report, arranged for Raub's admission to the John Randolph Medical Center for follow-up examination, and prepared the petition for a temporary detention order.  The petition was presented to the Chesterfield County magistrate, who made the requisite finding of probable cause, issued a temporary detention order for Raub, who was then transferred to the John Randolph Medical Center for further evaluation.[7]  Raub was eventually released by order of the Circuit Court for the City of Hopewell, Virginia.  This lawsuit seeking compensatory and punitive damages followed.

In his Second Amended Complaint, alleging violations of the First, Fourth and/or Fourteenth Amendments to the U.S. Constitution, Raub maintains that his detention and examination were without probable cause and that there was a lack of evidence of mental illness to justify further evaluation.  He also contends that Campbell's actions were intended to suppress offensive political speech guaranteed by the First Amendment to the U.S. Constitution.  Based on the information and clinical impressions available on August 16, 2012, Raub contends that Campbell was grossly negligent in filing the petition for involuntary treatment.

---

system . . . by an employee or a designee of the local community services board to determine whether the person meets the criteria for temporary detention, a temporary detention order if it appears from all the evidence readily available, including any recommendation from a physician or clinical psychologist treating the person, that the person [meets the standards set forth in § 37.2-808].

[7] Following his evaluation at John Randolph Medical Center, mental health officials from that facility presented a second Petition for Involuntary Admission for Treatment to a separate Special Justice. This Petition was granted and Raub was transferred to Salem Veterans Administration Medical Center. (Second Am. Compl. ¶¶ 29–31, ECF No. 112.)

The Fourth Amendment requires that an involuntary hospitalization may be ordered "only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992). Raub's Fourth Amendment claim has two distinct strands. First, he contends that Campbell was responsible for a deprivation of his right to liberty when he was detained by two officers at his home at the direction of Campbell. Separately, Raub alleges that he was deprived of liberty when Campbell petitioned for a temporary detention order based on his flawed prescreening report. He argues that Campbell's negligent deprivation of his liberty bars qualified immunity.

In essence, Raub's claims are predicated on his belief that his personal presentation, comments, and threatening e-mails were insufficient to warrant detention for evaluation under Virginia law. Specifically, that there was "a substantial likelihood that, as a result of mental illness, [Raub] will, in the near future, (a) cause serious physical harm to himself or others . . . ." Va. Code § 37.2-808(A). Raub appears to suggest that Campbell should have found his comments and behavior to be inconsequential political commentary embraced by a number of citizens. Raub contends that "[b]y impermissibly conflating politics and psychology, Campbell caused Raub to be detained for his political views, not his mental condition." (Pl.'s Supplemental Mem. in Opp'n at 9, ECF No. 113.) Furthermore, Raub adds "[n]or does it constitute mental illness to express a desire to participate – or even lead – a revolution against a government perceived as overbearing and tyrannical." (*Id.* at 8.) This is the basis of his

First Amendment claim. Raub's reasoning is strained and strategically teases out the more ominous language of the e-mails from his analysis.

Central to Raub's position is the expert report of Catherine E. Martin, Ph.D. ("Dr. Martin"), a clinical psychologist with offices in Midlothian, Virginia. Dr. Martin, after reviewing the record evidence[8] and conducting an hour and a half long interview, concluded that Raub exhibited no signs of mental illness, delusion, or abnormalities. In Dr. Martin's opinion, the e-mail postings were too non-specific to constitute threats in the clinical sense. She also added that "[i]t is notable that in the 14-months that have elapsed since August 2012 and my interview, Raub has had no reportable incidents, no need for treatment and no medication prescribed for any mental health issues." (Pl.'s Mot. Leave File Second Amended Compl., Ex. B, Martin's Report at 22, ECF No. 101-4.)

Ultimately, Dr. Martin concluded that "[g]iven the lack of evidence of mental illness, it was a violation of professional standards – and grossly negligent – for Campbell to file the Petition for Involuntary Treatment against Raub." (*Id.* at 21.) Of course, Dr. Martin's impressions are the product of an in depth retrospective review of the record, coupled with the benefit of Raub's post-evaluation behavior. Campbell, on the other hand, conducted an emergency evaluation based on the information at hand.[9]

---

[8] In her expert report, Dr. Martin listed the materials she relied upon in formulating her opinion. These included two video tapes and fifteen documents consisting of deposition transcripts, statements of witnesses, petitions, as well as pre- and post-detention medical reports. (Pl.'s Supplemental Mem., Ex. A at 2–3.)

[9] In determining whether the decisions made by Campbell were objectively reasonable, the court makes the assessment based on how the situation was viewed by a mental health evaluator, not an experienced psychotherapist. *See Reichle v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2093 (2012).

Unfortunately for Campbell, the exigencies of the situation did not permit lengthy deliberation.

The standard for review of summary judgment motions is well established in the Fourth Circuit. Summary judgment is appropriate only if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidentiary basis on which such motions are resolved include pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any. Fed. R. Civ. P. 56(c). As the United States Supreme Court pointed out in *Anderson v. Liberty Lobby, Inc.*, the relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 477 U.S. 242, 251–52 (1986). In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party—here, Raub. *Id.* at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). The court must grant summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

13

party will bear the burden of proof at trial." *Celotox Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," or the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). In meeting this burden, the nonmoving party must "go beyond the pleadings" and present affidavits or designate specific facts in depositions, answer to interrogatories, and admissions on file to establish a genuine issue of material fact. *Celotox Corp.*, 477 U.S. at 324.

While there is spirited debate in the immediate case about the legal significance of the facts and Campbell's diagnostic impressions and conclusions, the material facts themselves do not appear to be in serious dispute. Campbell's Motion for Summary Judgment is principally predicated on his argument that he is entitled to qualified immunity.[10] Although he adamantly contends that there was no constitutional violation on his part, Campbell stresses that the constitutional concept of probable cause in the mental health context was—and still is—far from clearly established. The standard for determining whether a person poses a serious threat of public danger is an inexact science, hence, a quintessential gray area.

---

[10] Ordinarily, no factual findings are necessary to the analysis of a qualified immunity claim because "the [] issue is a purely legal one: whether the facts alleged (by the plaintiff, or, in some cases, the defendant) support a claim of violation of clearly established law." *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985); *accord Elder v. Holloway*, 510 U.S. 510, 516 (1994).

14

Qualified immunity "shield[s] [officials] from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

To determine whether Raub's claims can survive a qualified immunity-based challenge, the Court will follow the two-step inquiry laid out in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This analytical framework requires the court to determine initially whether there has been a constitutional violation, and second, whether the right violated was clearly established. *Id.*; *see also Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). The "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."[11] *Saucier*, 533 U.S. at 202. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or [Fourth Circuit] decision on point . . . ." *Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000) (citations omitted); *see Wilson v. Layne*, 141 F.3d 111, 117 (4th Cir. 1998). As the Supreme Court recognized in *Ashcroft v. al-Kidd*, although "[w]e do not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate. ___ U.S. ___, 131 S. Ct. 2074, 2083 (2011).

In *John Doe v. Broderick*, Chief Judge Traxler provided instructive guidance on the rationale underlying qualified immunity:

---

[11] In reviewing the situation Campbell confronted, it is important to be mindful of the public consequences if his decision had been different and Raub had decided to gun "whoever run the town." (Campbell Dep. at 49:14.) Dr. Martin's thought process was not encumbered by these high stakes. And, unlike Dr. Martin, Campbell did not have the benefit of hindsight.

"Qualified immunity thus provides a 'safe-harbor' from tort damages for police officers performing *objectively reasonable* actions in furtherance of their duties." This "safe-harbor" ensures that officers will not be liable for "bad guesses in gray areas" but only for "transgressing bright lines." Of course, officers are not afforded protection when they are "plainly incompetent or . . . knowingly violate the law." But, in gray areas, where the law is unsettled or murky, qualified immunity affords protection to an officer who takes an action that is not clearly forbidden -- even if the action is later deemed wrongful. Simply put, qualified immunity exists to protect those officers who reasonably believe that their actions do not violate federal law.

225 F.3d 440, 453 (4th Cir. 2000) (emphasis in original) (citations omitted).

"[T]he basic purpose of qualified immunity [] is to spare individual officials the burdens and uncertainties of standing trial in those instances where their conduct would strike an objective observer as falling within the range of reasonable judgment." *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir. 1992) (en banc) (citing *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

Given the finite well of authority dealing directly with the application of the probable cause standard to mental health officials, Raub draws an analogy to its use in the law enforcement context. The contours of the standard as applied here, however, are necessarily animated by the text of Virginia Code §§ 37.2-808 and 809. In the mental health context, the concept of probable cause focuses on the more nebulous issues of mental illness and potentiality of violence, rather than an assessment of clearly articulated facts and circumstances. While the distinction may seem subtle, it is quite significant. In the final analysis, the issue distills to whether a reasonable person, exercising professional judgment and possessing the information at hand, would have concluded that Raub, as a result of mental illness, posed an imminent threat to others.

16

A comprehensive survey of the legal landscape yields no well-lit path of analysis from either the Supreme Court[12] or the Fourth Circuit. Unlike reported cases in the Fourth Circuit discussing the entitlement of private mental evaluators to qualified immunity in connection with involuntary commitment proceedings, Campbell is clearly a state actor. *See Hall v. Quillen*, 631 F.2d 1154, 1156 (4th Cir. 1980); *S.P. v. City of Takoma Park, Md.*, 134 F.3d 260, 269–70 (4th Cir. 1998) (finding court appointed private physician not to be a state actor). While sparse, cases from other circuits have upheld qualified immunity for government officials conducting such examinations when their actions are objectively reasonable. *See Glass v. Mayas*, 984 F.2d 55, 58 (2d Cir. 1993); *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000).

Despite the absence of authority squarely on point, the Fourth Circuit has provided some edification in the context of law enforcement officers detaining individuals for mental evaluation. However, aside from the distinction noted above, it is important to keep in mind that Campbell had no statutory power to detain—only to evaluate and recommend. His petition, which was comparable to a police officer's affidavit in support of a search warrant, contained only a recitation of his observations, diagnostic impressions, and recommendation.[13]

---

[12] In *O'Connor v. Donaldson*, 422 U.S. 563, 576–77 (1975), the court discussed the constitutional implications of long term confinement of non-dangerous individuals. Its teachings have no direct application here.

[13] Typically a law enforcement officer who truthfully presents the results of his investigation to a magistrate, who in turn finds probable cause and issues a warrant, is entitled to qualified immunity—even if other officers disagree as to the thoroughness of the investigation. *See Porterfield v. Lott*, 156 F.3d 563, 567–69 (4th Cir. 1998); *Torchinsky v. Siwinski*, 942 F.2d 257, 263–64 (4th Cir. 1991). In the immediate case, there appears to be no question as to the

In *Gooden v. Howard County*, police officers were summoned to an apartment complex to investigate reports of loud screaming and yelling. 954 F.2d at 962. The officers were directed to Gooden's apartment, but left the premises after she denied being the source of the commotion. The officers returned to the apartment about one week later on reports of a long, loud, blood-chilling scream emanating from Gooden's unit. *Id.* at 962–63. As they approached the door of her apartment, the officers heard a scream from within. When confronted, Gooden initially denied any knowledge of the noise, but eventually admitted that she had "yelped" after she accidently burned herself on an iron. *Id.* at 962. Gooden declined assistance and asked the officers to leave her apartment. *Id.* The officers next interviewed the neighbor who had complained about the noise from Gooden's unit. *Id.* at 963. During their conversation with that individual, the officers heard loud "thuds" and additional screaming from Gooden's apartment. *Id.* The officers took particular note of the varying voice tones and believed that they might be the product of multiple personalities exhibited by Gooden herself. *Id.* They returned to her apartment and confronted Gooden, who appeared to have been crying and acting "strangely." *Id.*

Concluding that Gooden might be a danger to herself, the officers detained her for a mental examination. *Id.* Similar to the immediate case, upon subsequent examination,

truthfulness of Campbell's factual representations to the magistrate. At issue are his diagnostic impressions and the manner in which he conducted his evaluation.

Raub's contention that Campbell's failure to advise the magistrate that "Raub's mother, with whom he resides, 'has not seen any changes or psychotic behavior in [Raub]'" does not constitute a material omission. (Pl.'s Supplemental Mem. at 7.) As discussed *infra*, Campbell's decision to file the Petition for a Temporary Detention Order was premised on the threatening nature of the e-mails. It was not unreasonable for Campbell to discount Raub's mother's opinion of her son.

a doctor found no sign of mental illness and released her. *Id.* at 964. Gooden filed suit under 42 U.S.C. § 1983 and officers invoked qualified immunity. The district court initially denied qualified immunity as did a divided panel of the Fourth Circuit. *Id.* However, on rehearing en banc, the Fourth Circuit reversed, holding that "[i]n cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually have taken place." *Id.* at 965. In its opinion, the Fourth Circuit focused not on the clinical correctness of the officers' perceptions, but whether their perceptions were reasonable. *Id.* The Fourth Circuit concluded that under these circumstances, "the officers can hardly be faulted for taking action against what they reasonably perceived to be a genuine danger to the residents . . . or to Ms. Gooden herself." *Id.* at 966.

In *S.P. v. City of Takoma Park*, the court again had an opportunity to discuss qualified immunity in the context of a detention for a mental examination. In this case, a husband and wife had been engaged in a heated argument eventually causing the husband to leave the house. 134 F.3d 260, 264 (4th Cir. 1998). The husband contacted the Takoma Park Police Department and persuaded the dispatcher to send officers to the home to check on the possibility that his wife may be suicidal. Upon their arrival, the officers found the wife to be "visibly agitated and crying" about a "painful argument" she had with her husband. *Id.* She advised the responding officers that "if it was not for her kids, she would end her life." *Id.* at 264. At the direction of their supervisor, and over the wife's protestations, the officers detained her and transported her to a hospital for a

19

mental evaluation.  Initially, mental health professionals concluded that the wife was clinically depressed and suicidal.  However, a psychiatrist subsequently conducted a complete psychiatric examination and concluded that the initial impression of the mental health professional was incorrect.  *Id.* at 264–65.  The wife was released and subsequently filed a civil rights suit against the Takoma Park police officers.

The Fourth Circuit, in finding the officers' conduct to be objectively reasonable, emphasized that "[t]he police officers did not decide to detain [the wife] in haste.  Rather, they had ample opportunity to observe and interview [the wife] before making a deliberate decision [to detain her] . . . Reasonable officers, relying upon our decision in *Gooden* and the other circuit court decisions addressing similar situations, would have concluded that involuntarily detaining [the wife] was not only reasonable, but prudent." *Id.* at 267.

More recently, in the case of *Cloaninger v. McDevitt*, the Fourth Circuit again upheld a grant of qualified immunity for a police officer's observations and independent knowledge confirming the potentially dangerous nature of the situation at hand.  In *Cloaninger*, officers responded to reports of an individual threatening suicide.  555 F.3d 324, 328 (4th Cir. 2009).  One of the officers had previously encountered Cloaninger and was aware of prior threats of suicide.  Other officers of their department responding to threats of suicide on another occasion had found firearms in his residence.  Cloaninger was uncooperative and demanded that the officers leave his property.  *Id.*

When the responding officers were unsuccessful in communicating with Cloaninger, they summoned their supervisor.  The supervisor attempted to communicate

20

with Cloaninger both through the doorway and by telephone. Cloaninger demanded to be taken to the VA hospital. When the officers declined, he ordered them off his property, threatening to "kill them all and then kill himself." *Id.* When the officers contacted the VA hospital for guidance, a nurse advised them that she was familiar with Cloaninger and that he had a history of calling the hospital and threatening suicide. *Id.* When the officers suggested the necessity for an emergency commitment order, the nurse concurred. Cloaninger was then taken into custody and transported to the magistrate's office, where an emergency commitment order was issued. *Id.* at 328–29. Cloaninger subsequently filed a complaint under 42 U.S.C. § 1983 claiming that the officers had violated his Fourth and Fourteenth Amendment rights. The Fourth Circuit concluded that "the circumstances facing the defendants were exigent and we hold that the undisputed facts in this case establish that the officers' conduct was objectively reasonable." *Id.* at 334.

On the other hand, in *Bailey v. Kennedy*, the Fourth Circuit rejected a qualified immunity claim where officers acted solely on a neighbor's report that plaintiff was drunk and possibly suicidal. 349 F.3d 731, 742 (4th Cir. 2003). When an officer responded to Bailey's home, he found him to be intoxicated, but otherwise cooperative and nonviolent. *Id.* at 740. After conferring with other officers who arrived at the scene, Bailey was detained for a mental health evaluation. The Fourth Circuit concluded, "accepting the facts as the district court viewed them, the 911 report, viewed together with the events after the police officers arrived, was insufficient to establish probable cause to detain [Bailey] for an emergency mental evaluation." *Id.* at 741. Pivotal to the

21

Fourth Circuit's holding was the absence of any observations by the officers indicating any danger to Bailey or anyone else. The lack of any articulable manifestations of danger, in that court's view, precluded a finding that the officers' actions were objectively reasonable. *Id.* at 740–41. That is not the case here.

Campbell was able to particularize the factual basis for his conclusions, including specific comments by Raub, supporting his findings. Under these circumstances, his conclusions and actions were objectively reasonable. To fully assess Campbell's evaluation of Raub, it is important to be mindful of the necessity for an immediate decision. In addition to the e-mails and his personal observations, Campbell relied on impressions of seasoned police officers, FBI agents, and former Marines who had served with Raub. Raub's Marine colleagues had an experiential basis for their observations.

The other facet of Raub's constitutional claim alleges a deprivation of right to freedom of speech under the First Amendment. Specifically, he contends that "[t]he actions of Campbell . . . were an effort to discredit, silence and punish Raub for the content and viewpoint of his political speech using the pretextual and false allegation that Raub was suffering from a mental illness and was subject to involuntary commitment under Virginia law." (Second Am. Compl. ¶ 48.) "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

Raub's First Amendment claim is founded on his belief that Campbell based his finding of dangerousness and sought a temporary detention order solely because of Raub's somewhat unorthodox political beliefs. During their initial conversation,

Detective Paris advised Campbell that Raub "believed that the United States government had perpetrated the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, and that he believed that the government was committing atrocities on American citizens by dropping a radioactive substance called [t]horium on them from airplanes." (Campbell Ans. to Interrogs. at 2.) Raub also informed Campbell that "a revolution was about to begin and that he was going to lead it." (Campbell Ans. to Interrogs. at 5.) In Campbell's view, such beliefs were suggestive of delusional thinking and paranoia. (Campbell Dep. at 54:1, 11–17; 55:7–13.)

These comments, however, were not the specific basis for Campbell's conclusion that Raub's comments and behavior were sufficiently threatening to warrant application for a temporary detention order. Before he made that decision, Campbell insisted on reviewing the actual e-mails from Raub's fellow Marines received by the FBI. (Campbell Ans. to Interrogs. at 5–6.) "After I read this email, I was convinced that Mr. Raub met the standards under Va. Code § 37.2-809 for the issuance of a temporary detention order . . . ." (*Id.* at 6; Campbell Dep. at 49:3–50:13.)

Although Campbell found Raub's political musings to be detached from reality and indicative of delusional thinking, it was the threatening tenor of his e-mails that formed an independent factual basis for Campbell's finding of probable cause. Even though Dr. Martin would have reached a different conclusion, the factual basis for Campbell's actions are unrebutted in the record evidence. Unlike Dr. Martin, an improvident decision by Campbell could have had tragic consequences.

Given the collective information presented to Campbell, and the results of his interview with Raub, Campbell's decision as a mental health evaluator to seek a temporary detention order was objectively reasonable, irrespective of Raub's political beliefs. Raub's assertion that Campbell, in league with the Chesterfield County Police Department and the FBI, was involved in a conspiracy to suppress dissident speech is unsupported by the evidence—and frankly, far-fetched.[14]

Aside from Raub's failure to advance any factual basis to support an actionable First Amendment claim on the record at hand, he has failed to demonstrate a violation of a clearly established right. *Saucier*, 533 U.S. at 200. As the Fourth Circuit noted in *Tobey v. Jones*, "[i]n *Reichel*, an appeal from summary judgment, the Supreme Court found that it was not clearly established that a plaintiff could make out a cognizable First Amendment claim for an arrest that was supported by probable cause." 706 F.3d 379, 392 (4th Cir. 2013) (citing *Reichel v. Howards*, ___ U.S. ___, 132 S. Ct. 2088, 2097 (2012)) (emphasis omitted). During the brief period following the court's decision in *Reichel*, and prior to the detention of Raub, neither the Supreme Court nor the Fourth Circuit provided further clarification on this point. Decisions in other circuits hew closely to the holding in *Reichel*. *See Patrizi v. Huff*, 690 F.3d 459, 467 n.7 (6th Cir.

---

[14] In the first iteration of his complaint, Raub maintained that the Chesterfield County Police and the federal agents conspired to detain him as part of a program sponsored by the Department of Homeland Security, dubbed "Operation Vigilant Eagle." (Compl. ¶¶ 49–56, ECF No. 1.) He appears to have abandoned this contention in the amended versions of his complaint.

2012); *Thayer v. Chiczewski*, 705 F.3d 237, 253 (7th Cir. 2012).  Consequently, Raub's First Amendment claim cannot survive summary judgment challenge.[15]

In his Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment, based on qualified immunity, Raub asserts that a finding of qualified immunity would not foreclose his entitlement to injunctive relief.  (Pl.'s Supplemental Mem. at 3.)  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Raub suggests that his "claim for injunctive relief [could be rendered moot by Campbell] by entering into an enforceable agreement not to participate in any future mental health evaluation or commitment proceeding involving Raub."  (*Id.* at fn.2.)  While Raub may be correct that the theoretical underpinnings of qualified immunity and injunctive relief turn on separate axis, the public policy implications of his request preclude injunctive relief in this case.

Federal courts historically have been reluctant to enjoin state officials from executing their statutory duties absent compelling proof of imminent constitutional injury.  As the Supreme Court noted in *Los Angeles v. Lyons*, "the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the States' criminal laws in the absence of irreparable injury which is both great and immediate."  461 U.S. 95, 112 (1983) (citing *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)).  Notwithstanding the prescience of Raub's expert psychotherapist, there is no way for law enforcement

---

[15] Although the Court need not directly address the issue, the threatening language in Raub's e-mails undoubtedly exceeds the boundaries of First Amendment protected speech. *See United States v. Hassan*, 2014 U.S. App. LEXIS 2104 (4th Cir. Feb. 4, 2014) (citing *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012).

officials or mental health evaluators to foretell the mindset or behavior of Raub in future years. To assess the danger inherent in restraining future official action in Raub's case, one need only review the e-mails he conveyed to his fellow Marines, which this Court finds to be both threatening and actionable. Therefore, the public interest would be disserved by the permanent injunction sought in this case. *See Monsanto Co. v. Geertson Seed Farms*, ___ U.S. ___, 130 S. Ct. 2743, 2748 (2010).

Raub has also failed to demonstrate constitutional injury in the first instance, much less an immediate threat of future injury. Even if Raub had shown that his rights were violated on one occasion, it does not establish any likelihood of a reoccurrence. *See Lyons*, 461 U.S. at 113. As the court concluded in *Lyons*, "[a]bsent a sufficient likelihood that [Lyons would] again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of [public officials] are unconstitutional." *Id.* at 111. Raub has failed to show a real or immediate threat of future detention for a mental examination without probable cause. He therefore lacks standing to petition for injunctive relief. *Id.* at 111–12.

Moreover, in the event of a reoccurrence, if Raub is able to prove that his detention for a subsequent mental evaluation is without probable cause or in violation of Virginia law, he has an adequate remedy at law in the form of compensatory and/or punitive damages.

Raub clearly fails to satisfy the well-established standard for the granting of injunctive relief articulated in *Monsanto Co.* The law is well settled that federal

26

injunctive relief is an extreme remedy granted in only the most compelling circumstances. *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995). This is not such a case.[16]

In the final analysis, Raub places far too much weight on the studied opinion of his expert psychologist. The fact that his expert drew different conclusions than Campbell adds little impetus to his argument. Qualified immunity turns on the perspective of the public official whose actions are under review. In both *Gooden* and *City of Takoma Park*, a subsequent diagnosis of no mental illness by a psychiatrist did not preclude a finding that detention for a mental evaluation was objectively reasonable.

Here, context is important. In stressful situations where lives are potentially at risk, public safety officials are frequently called upon to make tough decisions. Some involve close calls based on scant information hastily gathered. But duty still demands decisive action—citizens expect no less. That's why the law affords such officials reasonable room to exercise guided discretion and a safe harbor from litigation waged by persons who, in retrospect, may have acted differently.

Campbell's Motion for Summary Judgment will therefore be granted and both remaining claims in Raub's Second Amended Complaint will be dismissed.

---

[16] The facts and circumstances of Raub's detention have been extensively mined and thoroughly briefed by the parties. Consequently, this Court finds no need to conduct an evidentiary hearing before denying a permanent injunction in this case. Considering the comprehensive scope of the record evidence, a hearing would not have altered the Court's decision. *Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 938 (4th Cir. 1995); *see also Eisenberg ex rel. Eisenberg v. Montgomery Cnty. Pub. Schs.*, 197 F.3d 123, 134 (4th Cir. 1999).

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Dated: Feb 28, 2014
Richmond, VA